15
5/31/01

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY DREW SUDERS | : | |
| **Plaintiff** | : | |
| | : | No. 1:CV-00-1655 |
| **v.** | : | |
| | : | (Judge Rambo) |
| ERIC D. EASTON, et al., | : | |
| **Defendants** | : | |

FILED
HARRISBURG
MAY 3 1 2001
MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
### AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Defendants, through their counsel and pursuant to Local Rule 56.1, hereby submit that the following facts are material to this action and are not genuinely in dispute:

1.      Eric D. Easton was employed by the Pennsylvania State Police (PSP) as a sergeant and station commander in McConnellsburg from 1996 until 1998. Easton deposition at p. 8-9.

2.      Eric Prendergast is employed by the PSP and during the time of the complaint was a corporal at the McConnellsburg barracks. Prendergast deposition at p. 6.

3.      William Baker is employed as a patrol corporal by the PSP in the McConnellsburg barracks.  Baker deposition at p. 6-7, 12.

4.      Virginia Smith is retired from the PSP but during the time of the complaint, she was the equal employment opportunity officer for the PSP.  Smith deposition at p. 6-7.

5.      Nancy Suders began employment as a police communications operator (PCO) on probationary status with the PSP on March 23, 1998.  Suders deposition at p. 25-27.

6.      Jody Lancaster was a PCO who had been working at the McConnellsburg barracks and on plaintiff's first day, Lancaster explained the working of the communications office to plaintiff, and the other two PCO trainees, Bob Strait and Stacy Gelvin.  Suders

deposition at p. 40.

7.    On Suder's first day of work, Jody Lancaster gave Suders a tour of the barracks. When Lancaster showed them the women's locker room, she pointed out two dressers, pointed out which drawers were her own (Lancaster) and assigned drawers to Suders and Gelvin. Lancaster Declaration ¶8; Gelvin Declaration ¶7; Davis deposition at p. 49-50.

8.    In June, 1998, Suders attended a two week long PCO training at the police academy. Suders deposition at pp. 40-41.

9.    When Suders began work as a PCO, she had several weeks of training with another PCO present. Suders deposition at pp. 42.

10.    Suders states that the harassment started when she was assigned as PCO by herself and employees told her she was doing things incorrectly, such as speaking too quietly on the radio or not answering the telephone properly. Suders deposition at pp. 42-43.

11.    Suders was "humiliated" because her birthday was not on a birthday list that had other employees on it. Suders deposition at p. 43-44.

12.    Suders believed she was being discriminated against when Easton made a comment "It's awful getting old, isn't it?" Suders deposition at p. 143.

13.    Suders never informed Easton that such comments bothered her. Suders deposition at p. 45.

14.    Easton talked to Mikael Fix, a Republican Party Chairman and one of the individuals who helped Suders get the PCO position, and told him that Suders was having difficulty with the PCO position and that she does have the ability to learn, maybe not as fast as a 25 or 26 year old fresh out of college. Fix deposition at pp. 6, 9, 14, 27-28; Easton deposition at pp. 61-63. This statement was made as a comparison to Stacy Gelvin who was doing well in the

PCO position and right out of college and had computer skills. Easton also compared Suders to

Bob Strait who was doing well in the PCO position and had prior experience. Easton deposition

at p. 61-63.

15.     Suders believed she was being discriminated against based on her age when Baker

allegedly called her "momma." Suders deposition at p 45.

16.     Suders alleges that Easton talked about sex with animals, would wear spandex

shorts that allowed her to see his crotch, talked to Prendergast about teaching daughters to give

blowjobs and made a comment to PCO Gelvin about a brand of nylons and that these actions and

comments by Easton bothered and scared plaintiff. Suders deposition at p. 46-52.

17.     Suders did not tell Easton that these things bothered her. Suders deposition at p.

47.

18.     Easton never made sexual advances toward Suders. Suders deposition at p. 51.

19.     Suders alleges that Baker harassed her by repeatedly doing a wrestling move

which she considered vulgar. Suders deposition at p. 53.

20.     Suders allegedly told Baker that she does not think Baker should be doing his

move. Suders deposition at p. 53-54.

21.     Suders alleges that there was a picture of a wrestler making his motion near

Baker's desk and that this picture bothered her. Suders deposition at p. 58.

22.     Suders never told anyone that she was bothered or offended by the alleged picture.

Suders deposition at p. 59.

23.     Suders was offended when Baker complained about his back hurting

and PCO Bob Strait rubbed Baker's back and legs. Suders interpreted this to mean that the two

men were "sweet on each other." Suders deposition at p. 61-62.

24.     Suders alleges that Baker said he was going to get his penis pierced and his wife was going to get her nipple pierced.  Suders deposition at p. 63.

25.     Suders did not inform Baker that she was offended by his comment. Suders deposition at p. 64.

26.     Suders also did not tell anyone else in the PSP about these comments. Suders deposition at p. 65.

27.     Suders stated that other than the above mentioned comments, there were no other sexual comments made by any employees. Suders deposition at p. 66.

28.     Suders believed she was harassed by Prendergast because Prendergast would "watch" her, tell her when she was doing something wrong, and would not "let me alone." Suders deposition at pp. 67-71.

29.     Suders felt intimidated when Prendergast wore black gloves and would clap his hands.  Suders deposition at p. 72.

30.     Suders did not tell Prendergast, Easton or anyone else within the PSP that any of Prendergast's actions bothered her.  Suders deposition at p. 74.

31.     Instead, Suders went to Senator Robert Jubilier, through Mikael Fix, to complain to the Senator about her employment. Suders deposition at pp. 131-132; Fix deposition at pp. 19-21, 30-31; Davis deposition at p. 51.

32.     On August 18, 1998, Suders contacted the affirmative action officer to tell her that she believed she was being discriminated against.  Suders deposition at p. 74-75, 93; complaint at ¶ 28; Smith deposition at p. 13.

33.     During that conversation, Smith recalls Suders complaining about political affiliation discrimination and age discrimination, but does not recall that Suders mentioned

discrimination because she was a woman. Smith deposition at pp. 13-16.

34.     Smith told Suders that she needed to file a complaint form so that an investigation could be conducted. Suders deposition at p. 95; Smith deposition at pp. 16-17.

35.     Smith did not tell Suders that she would not send her a form, but advised her that there was a form in the AR (administrative regulation) Manuals. Suders deposition at p. 96; Smith deposition at pp. 18-19, 29.

36.     Plaintiff voluntarily resigned two days later and did not fill out a complaint form before she quit. Suders deposition at p. 97.

37.     When an accident file was missing and employees asked Suders about it, Suders believed she was being accused of taking the file. Suders deposition at p. 76-77.

38.     Suders believed Easton had a reputation for liking young girls because when PCO Gelvin was cold, Easton loaned her his jacket to wear. Suders deposition at p. 79.

39.     Suders was aware of the PSP's sexual harassment policy, received it when she went to training, and "hunted it up" out of the AR Manual. Suders deposition at p. 82.

40.     No employees at the PSP asked Suders for sex, no one physically touched Suders, and no one told sexual jokes. Suders deposition at pp. 87-88.

41.     Suders referred to an area in McConnellsburg as the "black community" over the police radio. Suders was offended when she was told by several officers that she should not refer to the area as the "black community" because it could be considered a racial remark. Suders deposition at pp. 88-89.

42.     One month after starting her position, Suders received a performance evaluation in which most of the categories were marked "satisfactory." Suders deposition at p. 125.

43.     At the end of her probationary period, Suders received another performance

evaluation in which most of the categories were marked "needs improvement." Suders deposition at pp. 125-126.

44.     Suders did her PCO job, and helped people when they called and no one suffered. Suders deposition at p. 138.

45.     Suders received a supervisor's notation on July 22, 1998 because she failed to complete an assignment that was given to her on May 12, 1998. Suders deposition at pp. 140-141; Prendergast deposition at p. 21.

46.     On July 26, 1998, Suders was counseled because she put a CLEAN message about a prison escapee in the crime corporal's bin and did not disseminate the information to patrols. Suders deposition at pp. 142-144; Prendergast deposition at p. 21.

47.     Suders took the CLEAN test three times because she repeatedly failed it. Suders deposition at p. 149.

48.     Jody Lancaster kept answers to the CLEAN test and copies of some tests in her personal drawer in the ladies' locker room because she believed it was a safe location to place these items where no one could find them. Lancaster declaration at ¶10; Easton deposition at p. 26.

49.     Suders went through Jody's drawer, found what she believed to be her own test, and some other papers which she thought were examples of her mistakes, and she took those papers from Jody's drawer. Suders deposition at pp. 98-102, 155-158, 171-172.

50.     When papers were missing, a file was dusted with theft detection powder and placed back in Jody Lancaster's drawer. Baker deposition at p. 36; Easton deposition at pp. 66-67.

51.     On August 20, 1998, plaintiff's last day of work, she went into the women's

locker room, went into the same drawer where she had taken papers a few days before, went through more papers and when she returned to the communications room, she had blue all over her hands. Suders deposition at pp. 98-102.

52.     On August 20, 1998, when it was discovered that Suders' hands were blue from theft detection powder, Suders was questioned, accused of theft of files, read her Miranda warnings because she was suspected of stealing Jody Lancaster's papers, and pictures were taken of her hands. Suders deposition at pp. 105-111; Baker deposition at pp. 27-30; 45-46; Easton deposition at pp. 68-69.

53.     After being questioned about the blue on her hands, Easton told Suders to take the rest of the evening off. Easton deposition at p. 69.

54.     Instead, on August 20, 1998, Suders voluntarily resigned her position at the PSP by handing in a pre-typed letter of resignation in which she wrote in the date. Suders deposition at pp. 104-107.

55.     Suders frequently was late for work. Gelvin and Lancaster declaration at ¶6; Baker deposition at pp. 26-27.

56.     Suders' work performance needed improvement as she was disorganized, became easily overwhelmed by the PCO job responsibilities and did not handle constructive criticism well. Prendergast deposition at p. 10; Easton deposition at pp. 39, 45-46, 66.

57.     The PSP's sexual harassment policy was located in the barracks in the AR manuals, it went out per capita to each employee and it was posted on bulletin boards in the barracks. Smith deposition at p. 42.

58.     Suders was aware of the sexual harassment policy, probably received it when she went to the PCO training and then found the policy in the AR Manual. Suders deposition at p. 82.

59.    Suders filed a complaint with the Pennsylvania Human Relations Commission in

September, 1998. Suders deposition at p. 186.


                               Respectfully submitted,

                               D. MICHAEL FISHER
                               Attorney General


              BY:    _Sarah C. Yerger_____
                               SARAH C. YERGER
                               Deputy Attorney General

                               SUSAN J. FORNEY
                               Chief Deputy Attorney General
                               Litigation Section


Office of Attorney General
15th Fl., Strawberry Square
Harrisburg, PA 17120
(717) 705-2503

DATE: May 31, 2001

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NANCY DREW SUDERS** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:CV-00-1655** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **ERIC D. EASTON, et al.,** | : | |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

I, **SARAH C. YERGER**, Deputy Attorney General for the Commonwealth of

Pennsylvania, Office of Attorney General, hereby certify that on **May 31, 2001**, I caused to be

served a true and correct copy of the foregoing document entitled **DEFENDANTS'**

**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE**

**ISSUE TO BE TRIED** by depositing same in the United States Mail, first-class postage prepaid

to the following:

Don Bailey, Esq.
4311 North 6th Street
Harrisburg, PA 17110

**SARAH C. YERGER**
Deputy Attorney General