*See Attachment* (23)
8/16/01
✓SM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NANCY DREW SUDERS,  :  **CIVIL NO. 1:CV-00-1655**

    **Plaintiff**  :

v.  :

ERIC D. EASTON;  :
WILLIAM D. BAKER;  :  **FILED**
ERIC B. PRENDERGAST;  :  **HARRISBURG, PA**
VIRGINIA SMITH ELLIOTT;  :
and THE PENNSYLVANIA  :  AUG 1 6 2001
STATE POLICE,  :
    MARY E. D'ANDREA, CLERK
    **Defendants**  :  PER_____
    DEPUTY CLERK

## MEMORANDUM

    Before the court is Defendants' motion for summary judgment. The parties have briefed the issues, and the motion is ripe for disposition.

## I.    Background

    The following facts are undisputed except where noted:[1] Plaintiff, Nancy Suders, became employed by Defendant the Pennsylvania State Police ("PSP") on March 23, 1998 as a police communications operator ("PCO"). During all times relevant to the instant litigation, the following Defendants were employed by the PSP at the McConnellsburg, Pennsylvania barracks of the PSP: (1) Defendant Eric Easton was employed as a sergeant and station commander; (2)

---

[1]Plaintiff's brief in opposition to Defendants' motion for summary judgment contains various facts which are not included in Plaintiff's Counterstatement of Disputed Material Facts. Furthermore, the additional facts included in Plaintiff's opposition brief do not contain any citations to the record. Accordingly, the court will not take such facts into consideration, and will only rely upon facts for which Plaintiff or Defendants' have provided "references to the parts of the record that support the statement," as required by Local Rule 56.1. Certified from the record

Date_____8/16/01
Mary E. D'Andrea, Clerk
Per_____
    Deputy Clerk

Defendant Eric Prendergrast was employed as a corporal; (3) Defendant William Baker was employed as a patrol corporal; and (4) Defendant Virginia Smith-Elliot was employed as the equal opportunity officer for the PSP.[2]

On Plaintiff's first day of work another PCO, Jody Lancaster, explained to Plaintiff and two other new trainees the workings of the communications office. Defendants contend that Lancaster showed Plaintiff the women's locker room and pointed out two dressers, explaining that two of the drawers were Lancaster's and assigning separate drawers to Plaintiff and one of the other trainees. (Def. Stat. Mat. Facts, "Def. Facts" at ¶ 7.)  However, Plaintiff avers that no one ever pointed out what drawers in the dressing room belonged to each individual employee. (Pl. Responsive Facts at ¶ 7.)  When Plaintiff first began working, she had another PCO working with her. (Def. Ex. G, "Pl. Dep." at 42.)  Then, in June 1998, Plaintiff attended training for her position at the police academy for two weeks.  Plaintiff testified, however, that when she had questions at work, other employees would not help her "any more than they had to." (*Id.* at 69.)

Plaintiff testified that she began to experience "harassment" one to two weeks after she began her job. (*Id.* at 42.)  With regard to Defendant Easton, Plaintiff alleges before Plaintiff began her job, Easton told Plaintiff that he had some concerns about her and that anything Plaintiff would say about Easton would be her word against his. (*Id.* at 48.)  Comments that Plaintiff found offensive included Easton saying "it is awful getting old, isn't it, Nancy" and similar statements that were "constant." (*Id.* at 43.)  Plaintiff was also offended by a

---

[2]Hereinafter, where possible Defendants Easton, Baker, Prendergrast, and Smith-Elliot will be referred to collectively as the "individual Defendants."

2

comment from Easton that "a 25-year-old could catch on faster than [Plaintiff] could." (*Id.* at 44.) Easton contends that this statement was made in Plaintiff's defense to explain why she was having trouble catching on to the job.[3]

Plaintiff further avers that every time she would go into Easton's office "he would bring up this business about people having sex with animals. He would say, you know people have sex with animals. . . that's all the man wanted to talk about." (*Id.* at 46, 50.) Plaintiff was offended when Defendant Easton, wearing spandex shorts, "would sit down in the chair [near Plaintiff's work space], put his hands behind his head and spread his legs apart." (*Id.* at 46-47.) Plaintiff also testified that Easton told Defendant Prendergrast that people should teach their daughters how to "do a good blow job." (*Id.* at 49.) Easton would leer at Plaintiff when she went into his office, and she was afraid of him. (*Id.* at 50.) Plaintiff alleges that Easton told her that he would do anything for PCO Lancaster, including take a person out back and shoot them in the head. (*Id.* at 51-52.) Plaintiff testified that Easton never made any sexual advances, but that she "didn't know what he was going to do" so she stayed away from him. (*Id.* at 51.) Plaintiff also testified that on one occasion, Easton told Plaintiff that he had dealt with his wife's paranoia for 20 years and didn't want to deal with Plaintiff's, and he told Plaintiff that his wife had small breasts. (*Id.* at 123.)

Plaintiff also had the impression that Defendant Easton "had a reputation for liking young girls." (*Id.* at 79.) Plaintiff based this on her observations of him sharing his jacket with a young female PCO, seeing him in a

---

[3]Specifically, one of Plaintiff's co-workers had prior experience in the field, and the other had just graduated from college and was very familiar with computers.

back hallway "pushed up against [the same individual]. His face was only inches maybe from hers." (*Id.* at 79-80.) She also observed him putting his arms around a woman in her twenties, pulling her tightly to him, and "wiggling around" with her in that position. (*Id.* at 81.)

Turning to Defendant Baker, Plaintiff testified that soon after she started sitting at the communications desk by herself, Defendant Baker would do a wrestling move "where he would cross his hands, grab hold of his private parts and yell suck it. The man did this, and he would beat on it. He would beat his hands on his crotch and yell suck it. He would ask me to do this garbage." (*Id.* at 53.) According to Plaintiff, Baker would do this five to ten times per night when she was working. Plaintiff also states that one night, when Plaintiff told Baker that she did not think he should be doing the move, Baker climbed on a chair approximately five feet from the communications desk and simulated the move again. (*Id.* at 53-54.) Plaintiff testified that "all [Baker] wanted to do was play with his crotch." (*Id.* at 57.) Plaintiff also claims that Baker "would rub his rear end and say, I have a nice ass, don't I?" (*Id.* at 59.) Plaintiff also found offensive a picture near Baker's desk of a wrestler making the same move.

Another incident involving Baker occurred when he came to work one day claiming that his back hurt, and a fellow male employee said things to him in front of Plaintiff such as "can I rub the hair on your legs?" and "can I rub your back?" (*Id.* at 61.) Then Baker went and rubbed the other employee's back and said "amorous things." (*Id.*) Baker then said to Plaintiff "what's the matter, don't you like gays?" (*Id.*) Baker also commented to Plaintiff that he was going to get

4

his penis pierced and that his wife was going to get her nipple pierced. (*Id.* at 63.) Finally, Baker would refer to Plaintiff as "momma."

Plaintiff did tell Baker that she was offended by the wrestling move and the back rubs, but when asked why she did not tell anyone else about the events she responded that "there was no one on that station that I could go to. I had a sergeant there who was talking about abusing children and bestiality. There was no way I was going to be able to tell him. There was nobody." (*Id.* at 65.)

Regarding Defendant Pendergrast, Plaintiff contends that he would verbally "pound" her day after day, referring to Plaintiff as a liar and telling her that the village idiot could do her job. (*I d.* at 67.) Plaintiff also testified that Pendergrast would wear black gloves and hit the side of the communication desk across from Plaintiff, and that this was intimidating. (*Id.* at 73.) Plaintiff contends that Pendergrast was proud to be compared to a "storm trooper" or a "Nazi." (*Id.*)

At some point during Plaintiff's employment, an accident file turned up missing. Defendant Baker asked Plaintiff if she had the file and she responded negatively. Plaintiff testifies that Defendant Pendergrast accused her of taking the file home. (*Id.* at 76.)

Plaintiff complained about the incidents at work to Mikael Fix, a Republican Party Chairman who helped Plaintiff obtain her position. When Plaintiff was in training in June 1998, Virginia Smith-Elliot taught a class on sexual harassment. Plaintiff approached Smith-Elliot and told her that she might need some help, and Smith-Elliot gave Plaintiff her phone number. (*Id.* at 93.) Plaintiff did not contact Smith-Elliot until August 18, 1998, two days before she resigned from her position. Plaintiff contacted Smith-Elliot by phone and told her that she

5

was afraid and that she was being harassed. (*Id.* at 94.) Plaintiff says that Smith-Elliot told her to fill out a form that Plaintiff was unsure how to obtain, to which Smith-Elliot responded "I'll see what I can do." (*Id.* at 95.) Plaintiff states that she looked through manuals to see what she could do about the harassment, but never found a form to fill out, and that she felt as though Defendant Pendergrast was watching her all the time. Plaintiff says that Smith-Elliot did not agree to send her the form or even ask her for her address. When asked about her contact with Plaintiff, Smith-Elliot recalls complaints of age and political affiliation discrimination, but not complaints of sex discrimination. Plaintiff states that she had seen the PSP's sexual harassment policy, and Smith-Elliot testified that she believes it was posted at the McConnellsburg barracks and that it went out per capita to each employee. (Smith-Elliot Dep. at 42.)

Plaintiff received a supervisor's notation on July 22, 1998 because she failed to complete an assignment that had been given to her on May 12, 1998. On July 26, 1998, Plaintiff was counseled because she put a message about a criminal escapee from Ohio in the crime corporal's bin, but did not disseminate the information to patrols. Plaintiff states that someone in the office told her not to worry about the message because the escapee was from Ohio. (*Id.* at 143.) Defendants Prendergrast and Easton testified that Plaintiff was disorganized, that she became overwhelmed by her job responsibilities easily, and she did not handle constructive criticism well. (Prendergrast Dep. at 10; Easton Dep. at 39, 45-46, 66.)

There was an employment related exam that Plaintiff had to take three times. Defendants contend that Plaintiff failed the exam, but Plaintiff believed that her test results were hidden from her and that she was lied to about them. (Pl. Dep.

6

at 155-60.) The test results were kept in a file drawer in the dresser kept by Defendant Lancaster in the ladies locker room. Plaintiff had gotten into the drawer on two occasions prior to the night that she resigned. When papers were missing from the drawer, a file was dusted with theft detection powder and placed back into the drawer. On August 20, 1998, Plaintiff again went through papers in the drawer, and when she returned to the communications area, she had blue on her hands. Plaintiff contends that she had a right to be in the drawer because "[s]he had found some of her personal papers in there, and the drawer was not assigned to any one person." (Pl. Counter Stat. Facts at ¶ 51.)

Defendant Easton says that Plaintiff was told to take the rest of the evening off after questioning her about the blue on her hands. (Easton Dep. at 69.) Plaintiff contends that she was "abused, threatened and held against her will." (Pl. Counter Stat. Facts at ¶ 53.) Specifically, Plaintiff testified as follows to the events of that evening:

> Baker was there. He said–he said, that's bad getting into somebody's stuff. . . . I said, I didn't get into anything in here. . . . I told Baker–I said, well, I'm resigning. I couldn't–you know, I think at that point I said–and he said–I said, I'm resigning. . . . And he said, well, you can't leave. And I said, well, I'm going to leave. I said, I'm resigning, I'm leaving. I couldn't stand–take it anymore. And he said to me–he said, well, you're not leaving. He said, you're a suspect.

(Pl. Dep. at 102.) Plaintiff turned in a resignation letter that she had been carrying with her.

Plaintiff filed the instant action on September 18, 2000. Plaintiff seeks redress for discrimination based on age, political affiliation and sex. Specifically, Plaintiff contends that she was "forced to endure an insulting, humiliating work

7

environment, and . . . forced to suffer a termination of employment because she would not yield to sexual suggestions, innuendoes, and solicitous behavior." (Compl. at ¶ 1.) Plaintiff states her claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951 *et seq.*

## II.        Legal Standard: Motion for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in her complaint; instead, she must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that

8

there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

(1986) (internal quotations omitted). Summary judgment should be granted where a

party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case and on which that party will bear the burden at trial."

*Id.*

### III.     Discussion

#### A. Individual Liability under Title VII and the ADEA[4]

The individual Defendants move for summary judgment on all of

Plaintiff's Title VII claims arguing that individuals cannot be held liable under Title

VII. The individual Defendants also note that ADEA claims are also barred against

individual defendants.

Title VII provides that it is unlawful for an employer to discriminate

against an individual on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). The Third

Circuit has specifically held that "Congress did not intend to hold individual

employees liable under Title VII." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d

173, 184 (3d Cir. 1997) (citing *Sheridan v. E.I. DuPont de Nemours & Co.*, 100

F.3d 1061, 1077 (3d Cir. 1996); *Dici v. Commonwealth of Pennsylvania*, 91 F.3d

542, 552 (3d Cir. 1996)).

In response, Plaintiff contends that the definition of "employer"

contained in Title VII includes "any agent" of the employer, 42 U.S.C. § 2000e-(b),

and suggests that this language allows for suits against the individual Defendants.

---

[4]The court here notes that Title VII does not prohibit discrimination based on political
affiliation. Therefore, the court will not address the merits of Plaintiff's political affiliation
discrimination claims.

The court is not persuaded by Plaintiff's argument. Prior to the Third Circuit's decisions in *Sheridan*, *Kachmar*, and *Dici*, at least one district court in this circuit was presented with an argument that individuals could be held liable under Title VII based on the inclusion of the term "any agent" in the definition of employer. *See Caplan v. Fellheimer Eichman Braverman & Kaskey*, 882 F. Supp. 1529, 1523 (E.D. Pa. 1995). At that time the circuits were split on whether an individual could be held liable under Title VII as were the district courts in this circuit. *Id.* at 1531.

Relying on Fifth and Ninth Circuit precedent, the court in *Caplan* held that "the references to 'agents' in the definition of employer [in Title VII] is simply to incorporate respondeat superior liability into Title VII." *Id.* at 1532 (citing *Grant v. Lone Star Co.*, 21 F.3d 649, 651 (5th Cir. 1994); *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir. 1993) ("There is no reason to stretch the liability of individual employees beyond the respondeat superior principle intended by Congress.")). In deciding *Sheridan*, the Third Circuit aligned itself with the circuits that held against individual liability under Title VII, and did not find that the reference to "agents" in Title VII allowed for individual liability. Thus, the court will grant summary judgment in favor of the individual Defendants on Plaintiff's Title VII claims.

The ADEA prohibits discrimination against employees based on their age, and it allows for suits against employers for such discrimination. 29 U.S.C. § 623(a). Moreover, as in Title VII cases, federal courts have refused to allow individual liability under the ADEA. *See, e.g., Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 685 (5th Cir. 2001) ("the ADEA 'provides no basis for individual liability for supervisory employees.' " (citing *Stults v. Conoco, Inc.*, 76 F.3d 651,

10

655 (5th Cir. 1996)); *Hiler v. Brown*, 177 F.3d 542, 546 (6th Cir. 1999)
("[N]umerous courts . . . have held that supervisors, sued in their individual
capacities, are not included within the statutory definition of 'employer' under Title
VII and its sister civil rights statutes, and accordingly cannot be held personally
liable for discrimination."); *Miller v. Maxwell Int'l, Inc.*, 991 F.2d 583, 587-88 (9th
Cir. 1993) (holding that individuals not liable under Title VII of the ADEA).
Therefore, the court will also grant summary judgment in the individual
Defendants' favor on Plaintiff's ADEA claims.

## B. Eleventh Amendment Immunity

The court will grant summary judgment in favor of the PSP on
Plaintiff's ADEA and PHRA claims because Pennsylvania enjoys Eleventh
Amendment immunity. The Eleventh Amendment of the United States Constitution
bars suits against a state or state agency in federal court by citizens of any state.
*See, e.g., Atascadaro State Hospital v. Scanlon*, 473 U.S. 234, 238 (1985);
*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98 (1984).

Exceptions to Eleventh Amendment immunity exist only where a
Plaintiff alleges an on-going violation of federal rights and seeks prospective relief,
or where the state consents to suit in federal court. *See Ex Parte Young*, 209 U.S.
123, 159 (1908); *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981). Here
Plaintiff seeks redress for alleged wrongs that occurred in the past, thus the first
exception to Eleventh Amendment immunity does not apply. Moreover,
Pennsylvania has not waived Eleventh Amendment immunity. *See Laskaris*, 661
F.2d at 25 (recognizing that Pennsylvania has "specifically withheld consent" to suit
in federal court under 42 Pa. Cons. Stat. Ann. § 8521(b)).

Plaintiff argues that the ADEA defines employer as "a state or political subdivision of a State and any agency or instrument of either." 290 U.S.C. 690(b). However, the Supreme Court specifically held in *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000) that "in the ADEA, Congress did not validly abrogate the States' sovereign immunity to suits by private individuals." *Id.* at 91. Thus, Plaintiff cannot assert an ADEA claim against a state agency, and the court will grant summary judgment in favor of the PSP on Plaintiff's ADEA claim. Furthermore, Eleventh Amendment immunity extends to claims premised on state law causes of action. *See Pennhurst*, 405 U.S. at 105. Therefore, the court will also dismiss Plaintiff's PHRA claims against the PSP.

Finally, with regard to Plaintiff's PHRA claims, Defendants contend that the Eleventh Amendment bars the claims against both the PSP and the individual Defendants because it bars claims against state officials who are sued for actions taken within the course of their employment. Plaintiff has failed to respond to Defendants' arguments regarding the application of the Eleventh Amendment to Plaintiff's PHRA claims.[5] Thus, the court will grant Defendants' motion for summary judgment on Plaintiff's PHRA claims against the individual Defendants. *See Mueller v. CBS*, No. 99-CV-1310, 2001 WL 528988, at *4 (W.D. Pa. Jan. 31, 2001) (holding that the court will not do the lawyers' work for them and a lawyer who fails to press a point forfeits the point).

---

[5]Plaintiff does caption a section of her opposition brief "The PHRA and the 11th Amendment." (Pl. Br. in Opp. Mot. for Summ. Jud. at 7.) However, the substance of this subsection is two sentences asserting supplemental jurisdiction pursuant to 28 U.S.C. § 1367. These two sentences do not deserve to even be considered as responsive to Defendant's substantive arguments.

12

## C.    Title VII Claims against the Pennsylvania State Police

### 1.    Hostile Work Environment

In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, "a plaintiff must establish 'by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee.' " *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir. 1989)). Specifically, a plaintiff must show: (1) that she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position; and (5) the existence of respondeat superior liability. *Kunin v. Sears Robuck and Co.*, 175 F.3d 289, 293 (3d. Cir. 1999) (describing the requirements for sexual harassment).

The PSP argues that the first prong, discrimination based on sex, is not met here because "the comments and actions allegedly done in plaintiff's presence . . . were generally not directed toward her." (Defs. Br. in Supp. Mot. Summ. Jud. at 6.) However, the Third Circuit has held that a hostile work environment can arise from the frequent use of insulting and derogatory language relating to women. *See Andrews*, 895 F.2d at 1485-86 (quoting *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir. 1988)). Conduct that may be relevant to the inquiry includes name calling, pornography, and displaying sexual objects on desks. *See, e.g., Andrews*, 895 F.2d at 1486. Thus, the court cannot say as a matter of law that

the comments and actions must be directed at Plaintiff in order to be discrimination based on sex.

The second, third, and fourth elements of a hostile environment claim, pervasiveness, subjective offensiveness, and objective offensiveness, are interrelated. It is well-settled that "isolated or single incidents of harassment are insufficient to constitute a hostile environment." *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 482 (3d Cir. 1997). Instead, a defendant's conduct must be objectively offensive to the extent that it alters the conditions of employment for the victim in order to be actionable under Title VII. *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 79 (1998); *Farragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). In determining whether a work environment is objectively hostile, courts are not to examine the scenario on an incident-by-incident basis, but instead must consider the totality of the circumstances. *Andrews*, 895 F.2d at 1485; *Stair v. Lehigh Valley Carpenters Local Union No. 600*, 813 F. Supp. 1116, 1119 (E.D. Pa. 1993). Relevant factors may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance; nonetheless, no single factor is either required or determinative. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Viewing the evidence in the light most favorable to Plaintiff, the court finds that there was enough conduct in the instant action to raise an issue of fact that the atmosphere was sufficiently hostile to offend a reasonable person in Plaintiff's position. Most persuasive is Plaintiff's testimony regarding the "wrestling move" that Defendant Baker allegedly repeated five to ten times during each shift that he

14

worked with Plaintiff. Plaintiff testified that Baker "would cross his hands, grab hold of his private parts and yell suck it. The man did this, and he would beat on it. He would beat his hands on his crotch and yell suck it. He would ask me to do this garbage." (Pl. Dep. at 53.) The fact that one evening when Plaintiff complained about the move, Baker climbed on a chair approximately five feet from her and simulated the move again indicates that he was relentless even knowing that it was offensive to Plaintiff. (*Id.* at 53-54.) Plaintiff also testified that Baker "would rub his rear end and say, I have a nice ass, don't I?" (*Id.* at 59.) Adding to Plaintiff's claims are comments by Defendant Easton that if he had a daughter he would teach her to give "blow jobs"; repeated discussions about sex with animals; and statements about his wife's breast size. (*Id.* at 46-52, 123.) While these events standing alone might not lead to an objectively hostile work environment, viewed in their totality, a reasonable person in Plaintiff's position could find that there existed a hostile work environment.

Regarding the subjective element of a hostile environment claim, Defendants aver that Plaintiff did not suffer any identifiable ill consequences and that the alleged discriminatory conduct did not result in an inability to do her job. (Def. Br. in Supp. Mot. for Summ. Jud. at 9.) The court finds this unpersuasive as Plaintiff has testified that the conduct was offensive to her, that on at least one occasion she did not go into work because of it, and that she felt compelled to write a letter of resignation. Thus, the court finds that the subjective test is met.

Finally, addressing the issue of vicarious liability, Defendants contend that liability only exists where an employer knew or should have known about the harassment and failed to respond. (*Id.* at 10 (citing *Meritor*, 477 U.S. at 71).)

Defendants argue that there is no way that the PSP had actual notice of the allegedly discriminatory conduct prior to Plaintiff contacting Defendant Smith-Elliot two days before she resigned. Defendants further contend that Plaintiff did not avail herself of the procedures in place to report the alleged harassment, and that Plaintiff cannot maintain constructive knowledge on the part of the PSP.

In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court addressed the scope of employer liability for hostile work environments. The Court in *Faragher* adopted the following rule:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.* at 777-78 (citation omitted).

The court went on to discuss the relevance of employers having antiharassment policies in place:

> While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

16

*Id.* at 778.

In the case *sub judice*, Defendants contend that the PSP's sexual harassment policy was located in the McConnellsburg barracks in the Administrative Regulations manuals, that the policy went out to each employee, and that it was posted on the bulletin boards in the McConnellsburg barracks. Smith-Elliot's testimony was as follows:

> Q: Is the sexual harassment policy posted?
>
> A: It has been.
>
> Q: In the barracks?
>
> A: Yes.
>
> Q: Do employees sign for the sexual harassment policy; basically sign that they read it?
>
> A: If I recall correctly, during the time that I was there there were some changes made to the sexual harassment policy. Like I said I believe that it went out per cpita to each employee, but also that it was supposed to be posted on bulletin boards.
>
> And what they do is they have just a check-off list with everyone's name from the station on that list. Then as you read it, you're supposed to check off that you did read the policy.

(Smith-Elliot Dep. at 42.) Defendants further aver that Plaintiff was aware of the sexual harassment policy, that she probably received it during training, and that she found the policy in the Administrative Regulations manual. (Pl. Dep. at 82.)

The PSP's sexual harassment policy includes in the definition of sexual harassment "Making suggestive or provocative gestures, e.g., leering, staring, inappropriate gestures, comments, jokes or stories of a sexual nature." (Pl. Dep. Ex. 4, "Harassment Policy" at 2 ¶ C.3.) The policy further provides that "[a]ny person

17

who believes they have been sexually harassed shall contact their immediate supervisor or the Affirmative Action Office." (*Id.* at 3 ¶ A.)

In the instant action, it is undisputed that Plaintiff's alleged harassers were supervisors, thus the court cannot hold that Plaintiff acted unreasonably by failing to bring her complaints to these individuals pursuant to the PSP's sexual harassment policy. However, Plaintiff also failed to contact the Affirmative Action Office as required by the sexual harassment policy. Plaintiff did approach Smith-Elliot in June 1998 during training, and Smith-Elliot gave Plaintiff a phone number to call regarding any problems that she was having. (Pl. Dep. at 93.) However, Plaintiff chose not to contact the Affirmative Action office during the interim period when the majority of the allegedly harassing behavior took place. Plaintiff finally did contact Smith-Elliot on August 18, 1998, however, this was only two days before she resigned. Smith-Elliot told Plaintiff to fill out a complaint form, located in the Administrative Regulation manual. However, Plaintiff resigned from her employment two days later, and the PSP was never given the opportunity to respond to any complaints of sexual harassment. The court finds as a matter of law that Plaintiff unreasonably failed to avail herself of the PSP's internal procedures for reporting any harassment. This is especially true as Plaintiff had personal contact with the Affirmative Action officer early in her employment, but failed to pursue this avenue of complaint.

As Plaintiff has failed to meet the fifth element of a claim for hostile work environment, e.g., respondeat superior liability, the court will grant Defendants' motion for summary judgment on this issue.

### D. **Retaliation**

Plaintiff's complaint also states that she was the victim of retaliation. However, Plaintiff has failed to establish any element necessary for a retaliation claim. Title VII prohibits an employer from "discriminat[ing] against an[ ] . . . employee[ ] . . . because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000(e)-3(a). To establish a *prima facie* claim of Title VII retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) that the employer took adverse action against her; and (3) that a causal link exists between the protected activity and the employer's adverse action. *See Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

Plaintiff in the instant action has failed to allege any protected activity that she engaged in. Plaintiff did not file her PHRA claim until after she resigned. Furthermore, there is no adverse employment action indicated in any part of the record. Plaintiff argues that she was retaliated against for reporting the harassing conduct to her state Senator, and that she was "finally forced into a no win resignation." (Pl. Br. in Opp. Mot. Dis. at 5.) Speaking to a state Senator does not fall within the activities protected by Title VII which include testifying, assisting, or participating in an investigation, proceeding, or hearing of a Title VII violation. Finally, even if Plaintiff's complaint to her Senator did fall within the realm of protected activity, Plaintiff cannot show an adverse employment action to satisfy the second element of the *prima facie* retaliation case. Plaintiff acknowledges that she had written her letter of resignation and was carrying it around in her purse when she turned it into her supervisors. There is no evidence of record that she was

19

forced to do this.  In fact, she was told only to take the rest of the evening off on the night that she resigned.  Finally, even if Plaintiff had been forced to resign, she has failed to raise even an issue of fact as to a causal connection between contacting her state Senator and her resignation.  Therefore, the court will also grant summary judgment in favor of Defendants on Plaintiff's retaliation claim.

## IV.        Conclusion

In accordance with the foregoing, the court will grant summary judgment in favor of Defendants on all counts of Plaintiff's complaint.  An appropriate order will issue.

SYLVIA H. RAMBO
United States District Judge

August  16 , 2001

20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**NANCY DREW SUDERS,**

      **Plaintiff**

      **v.**

**ERIC D. EASTON;**
**WILLIAM D. BAKER;**
**ERIC B. PRENDERGAST;**
**VIRGINIA SMITH ELLIOTT;**
**and THE PENNSYLVANIA**
**STATE POLICE,**

      **Defendants**

**CIVIL NO. 1:CV-00-1655**

FILED
HARRISBurg Pa.

AUG 1 6 2001

MARY E. ~~~~~~
PER ~~~~ DEPUTY CLERK

## ORDER

In accordance with the foregoing memorandum of law, **IT IS HEREBY ORDERED THAT:**

    (1) Defendants' motion for summary judgment on all counts of Plaintiff's complaint is **GRANTED;**

    (2) The clerk of court shall enter judgment in favor of Defendants and against Plaintiff and close the case.

_____
SYLVIA H. RAMBO
United States District Judge

August _16_ , 2001

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

\* \* MAILING CERTIFICATE OF CLERK \* \*

August 16, 2001

Re: 1:00-cv-01655   Suders v. Easton


True and correct copies of the attached were mailed by the clerk
to the following:


    Don Bailey, Esq.
    4311 N. 6th St.
    Harrisburg, PA  17110   Fax No.: 717-221-9600


    Sarah C. Yerger, Esq.
    Office of Attorney General
    15th Floor, Strawberry Square
    Harrisburg, PA  17120


cc:
Judge                          ( ✓ )        ( ) Pro Se Law Clerk
Magistrate Judge               ( )          ( ) INS
U.S. Marshal                   ( )          ( ) Jury Clerk
Probation                      ( )
U.S. Attorney                  ( )
Atty. for Deft.                ( )
Defendant                      ( )
Warden                         ( )
Bureau of Prisons              ( )
Ct Reporter                    ( )
Ctroom Deputy                  ( )
Orig-Security                  ( )
Federal Public Defender        ( )
Summons Issued                 ( )  with N/C attached to complt. and served by:
                                    U.S. Marshal ( )   Pltf's Attorney ( )
Standard Order 93-5            ( )
Order to Show Cause            ( )  with Petition attached & mailed certified mail
                                    to:  US Atty Gen   ( )   PA Atty Gen ( )
                                         DA of County  ( )   Respondents ( )
Bankruptcy Court               ( )
Other_____        ( )

                                           MARY E. D'ANDREA, Clerk

DATE: _____ 8/16/01 _____        BY: _____

Deputy Clerk