# REPORT OF
# THE INDEPENDENT MONITOR
# OF THE
# PENNSYLVANIA STATE POLICE



## THIRD QUARTERLY REPORT
## FOR THE PERIOD ENDING
## JULY 31, 2004

## ISSUED SEPTEMBER 27, 2004



Office of the Independent Monitor
of the Pennsylvania State Police



Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004

## EXECUTIVE SUMMARY

This Third Quarterly Report of the Independent Monitor of the Pennsylvania State Police (PSP) covers the period beginning on May 1, 2004 and ending on July 31, 2004. This Report concerns the compliance by the PSP with the recommendations of the Office of Inspector General (OIG) in its Investigative Report on Sexual Harassment and Sexual Misconduct at the Pennsylvania State Police (OIG Report). As this Report demonstrates, the PSP has complied with a broad variety of the recommendations in the OIG Report; on other issues, the PSP's work is still in progress; and, on another issue – the discipline guidelines issue – it is unclear whether there has been any progress at all.

The most significant event of the quarter came on July 29, 2004, when the Pennsylvania State Troopers Association (PSTA) announced its withdrawal from the Collective Bargaining Agreement (CBA) negotiations concerning the discipline issue. As discussed in this Report (pp. 26-27), the PSP had presented to the PSTA a proposed Memorandum of Understanding (MOU) setting out Discipline Standards for what the PSP viewed as the most significant disciplinary violations. Since discipline is the responsibility of the PSP, the PSP took the lead in making the proposals, and in seeking the concurrence of the PSTA.

By cover letter dated June 10, 2004, from Commissioner Jeffrey B. Miller to Sgt. Bruce Edwards, President of the PSTA (attached at the end of this Report as Exhibit 1), the PSP forwarded its initial proposed MOU to the PSTA. By letter dated June 22, 2004, from Corporal Dennis Rodriguez, Chairman of the Discipline Committee, to Commissioner Miller (Exhibit 2), the PSTA stated that the PSP's proposed MOU, in its then current form, was unacceptable. The PSTA, however, expressed its commitment to formulating a fair discipline system and its willingness to continue to meet with the PSP to reach common ground. After a series of meetings with the PSTA, the PSP submitted several revisions of the initial MOU. In each of the revisions, the PSP narrowed the scope of the infractions defined, presumably in response to comments made by the PSTA's representatives at or after the meetings. The last MOU was presented by the PSP on July 28, 2004. This proposal set out 11 infractions for which the sanction would be automatic dismissal. Of those 11 infractions, one applied to conduct involving sexual harassment and sexual misconduct. Because the PSTA then withdrew from the CBA negotiations, there was no agreement as to any of the PSP's proposals. As of the date of the issuance of this Report, the Monitor has been advised that discipline is a subject of the Act 111 interest arbitration proceedings between the PSP and the PSTA, presently underway in Harrisburg.

i

**Kroll**

Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004

As reported by the Monitor in the Second Quarter, the OIG had made discipline a central focus, if not the central focus, of the OIG Report.[1]  The OIG had recommended that the PSP establish uniform consistent disciplinary guidelines, with serious consequences, for members engaging in sexual harassment and/or sexual misconduct.  The OIG Report went further to explain that there were disparities in the discipline imposed on PSP members who engaged in similar types of sexual misconduct while on duty.  The OIG Report also stated (p. 39):

> Furthermore, to add uniformity and consistency to disciplinary decisions, the State Police should attempt to set definitive guidelines stating the appropriate discipline for specific kinds of misconduct.  For example, the guidelines could provide that a Member found to have engaged in sex on duty will be subject to dismissal.  In some instances, a maximum and minimum sanction might be appropriate.  Such guidelines will establish consistency as well as notify Members and the public of the State Police's expectations and standards.

The PSP agreed with these recommendations and, as of the second quarter, had developed a proposed Discipline Matrix in consultation with the PSTA.[2]

The Monitor's Second Quarterly Report (pp. 16-17) described the procedure by which, once the PSP initially imposes a disciplinary penalty, the member may take what is essentially an administrative appeal by filing a grievance, pursuant to the CBA.

In the context of the inconsistent discipline imposed, concluding with the grievance process, the OIG Report (p. 42)

> makes the following recommendations to enhance the State Police's ability to more effectively uphold its disciplinary decisions for sexual harassment and sexual misconduct before arbitrators.  The State Police should establish a practice of imposing higher levels of discipline for sexual misconduct by consistently imposing heavier, more appropriate discipline.  A routine practice of imposing more serious sanctions for sexual harassment

---

[1] The OIG Report began its discussion of Discipline (which the Monitor analyzes in Section II, pp. 15-23, of its Second Report) with the following statement (p. 31):

> In 1986, the Pennsylvania House of Representatives established a "Special Committee to Investigate the Pennsylvania State Police" to review allegations of misconduct.  The Committee issued the Deal Commission Report in which it reached conclusions regarding the imposition of discipline by the State Police, particularly the lack of consistency.  The Deal Commission Report recommended the establishment of a codified system of disciplinary guidelines.  To date, no such codified guidelines exist.

While the OIG did not make this a formal recommendation, the Monitor expects that the PSP will be mindful of the 1986 Deal Commission Report in whatever proposal it makes to revise the current version of the Matrix,

[2] The PSP and the PSTA had formed a Discipline Committee and began meetings in 1996 for the purpose of resolving inconsistencies and injustices in the PSP's discipline procedures and penalties.  As part of its attempt to remedy the widespread problems in the discipline system, the Discipline Committee developed a "Discipline Matrix."  The proposed Discipline Matrix reviewed by the Monitor in the second quarter was the product of years of collaboration between the PSP and the PSTA, acting through the Discipline Committee.



and sexual misconduct will support the State Police's position when those disciplinary actions are grieved in the future.

The proposed Discipline Matrix, discussed at length in the Monitor's Second Report (pp. 17-19), was a central part of the PSP's approach to address the issues identified in the OIG Report. The purpose of the Matrix was to achieve consistency in the application of discipline for all the infractions in the Field Regulations, not just those dealing with sexual harassment and/or sexual misconduct. During the second quarter the PSP submitted the proposed Matrix to the Monitor for evaluation. Since the PSP, in consultation with the PSTA, proposed an across-the-board Discipline Matrix, the Monitor believed that the Discipline Matrix had to be considered as a whole.

In the Second Report, the Monitor stated that it believed - as did both the PSP and the PSTA - that the proposed Discipline Matrix had serious deficiencies, and needed to be revised. Despite the many years of work and thought which was put into the Matrix by both the PSP and the PSTA, the Monitor found that the proposed Matrix, as it then existed, was fundamentally unworkable.

As the Monitor stated in its Second Report (p. 19):

> If the parties are serious about achieving both consistency and fairness, they are going to have to be prepared to explore approaches substantially different from the PSP's and the PSTA's jointly proposed Matrix. One possible approach would be for the parties to focus revisions on a core group of the most serious infractions, including sexual harassment and sexual misconduct, and to later revise the remainder of the Matrix, to meet the recommendations of the Deal Commission, as suggested by the OIG.

Although the Monitor found that the prior negotiations for the proposed Matrix had been in good faith, the Monitor urged the parties to continue to negotiate to meet the recommendations in this section of the OIG Report.

After the PSP and the PSTA, as noted above, stopped negotiating the proposed Discipline Matrix, and the PSTA stopped negotiating the proposed MOU, the parties were left with no recourse but to submit the outstanding discipline issues to the Act 111 interest arbitration proceedings. While the Monitor cannot, of course, become a participant in the CBA negotiations, we can and do express our deep disappointment that the parties did not make some specific agreements to reform at least some aspects of what both parties agree is a mostly ineffective and inconsistent system of discipline.

Since the PSTA willingly agreed to participate in the CBA negotiating sessions, and since the PSP produced several revised MOUs, in response to comments by the PSTA, the withdrawal by the PSTA is puzzling. While it is true that the PSTA was not required to negotiate a new CBA – the PSTA could opt to defer to the Act 111 interest arbitration proceedings – the PSTA's current

**Kroll**

Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004

stance seems at odds with its prior statements that it wanted to develop a fair system of discipline.

In a letter to Governor Edward G. Rendell dated October 1, 2003 (Exhibit 3), Sgt. Edwards pledged the PSTA's full cooperation to work with the PSP to insure that individuals who engage in "such egregious offenses as sexual harassment and sexual misconduct," and who, accordingly, violate the public trust, should "not be among" the PSP's ranks. Sgt. Edwards, on behalf of the PSTA, continued,

> To that end, we embrace the Office of the Inspector General's recommendation that PSP develop guidelines for appropriate levels of discipline for various offenses. Further, we look forward to work[ing] with the Department in developing these guidelines and are prepared to do so immediately. Upon the successful development and implementation of these guidelines, the PSTA is willing to commit that the guidelines will be utilized as the **new baseline for all future grievance and arbitration proceedings!** (emphasis in original).

In light of this assurance, the Monitor is at a loss to understand the PSTA's decision to withdraw from the CBA negotiations on discipline. Because the PSP had already offered several proposed MOUs which had narrowed the initial MOU, it appears that the negotiations were making progress, and that there was no obvious reason why the PSTA could not have continued the negotiations. Despite Sgt. Edwards's pledge of full cooperation in his letter to Governor Rendell, the PSTA withdrew from the negotiations after only seven weeks. The Monitor understands that the PSTA had not made any written objections to the last MOU proposed by the PSP, and that the PSTA had not offered a counter-proposal.

In a letter from the PSP to the PSTA dated July 16, 2004 (Exhibit 4), the PSP stated that it was committed to meeting with the PSTA's representatives to negotiate the disciplinary issues throughout the Act 111 process. The PSP further stated that, if the parties were unable to reach a mutually acceptable resolution on these issues by the end of the Act 111 interest arbitration process – which the Monitor understands could take at least two months, and perhaps several months - the panel of arbitrators would have all the information necessary to decide the discipline issues. In what might best be described as a negotiating tactic, the PSTA responded by setting a deadline of July 29, 2004 for the completion of the CBA negotiations on discipline. This deadline might be considered sound strategy, from the PSTA's point of view, or arbitrary, from the PSP's point of view. The PSTA set the July 29, 2004 deadline because, as they stated in a letter dated July 16, 2004 (Exhibit 5), it would be on that date that the Act 111 interest arbitration proceedings were scheduled to start. (The PSTA also stated in the July 16, 2004 letter that they would consider postponing the July 29, 2004 deadline for negotiations if the parties also agreed to postpone the arbitration proceedings.) From the PSP's point of view, there was no apparent reason to set a deadline of July 29, 2004 on the CBA negotiations, and no apparent reason to postpone the arbitration proceedings.



However, regardless of the merits of the July 29, 2004 deadline – whether this deadline is viewed as sound strategy or as arbitrary – it is nonetheless at odds with the spirit, if not the letter, of Sgt. Edwards's October 1, 2003 correspondence to Governor Rendell. In his letter to the Governor, Sgt. Edwards speaks of wanting to work with the PSP to develop discipline guidelines "to help restore the public confidence that they do indeed have one of the finest law enforcement organizations in the country." Similarly, the PSTA's recent stance is also at odds with Sgt. Edwards's letter to the editor published in *The Philadelphia Inquirer* (Exhibit 6), titled "**Pa. state troopers favor tough discipline code,**" where he publicly stated that the PSTA "will continue to work with State Police Commissioner Jeffrey Miller on . . . a disciplinary code that is tough, fair to all, and shows no favoritism toward rank." Although the PSTA certainly has the right to change its strategy, the Monitor believes that the PSTA should recognize that the July 29, 2004 deadline represents a change from Sgt. Edwards's letter to the Governor, and his letter to the *Inquirer,* where there were no stated time limits. The Monitor reads these letters to mean that the PSTA was pledging their "full cooperation" in developing the discipline guidelines until the guidelines were completed and until the goal of helping to restore public confidence in the PSP was achieved. Since the negotiation of the guidelines has not been concluded and no agreement has been reached, and since the goal of restoring the public's confidence in the PSP has likewise not been achieved, the Monitor would assume that the PSTA would want to keep negotiating with the PSP so that the public's confidence could be restored as soon as possible. The PSTA was a full participant in the negotiations with the PSP of the proposed Discipline Matrix, a process that lasted approximately five years; it is not unreasonable to think that the effort to negotiate discipline guidelines based on the several proposed MOUs would take more than the seven weeks allotted by the PSTA.

Although the PSP has made progress, on a broad variety of issues, that will help deter any recurrences of the type of conduct engaged in by former Trooper Michael K. Evans and other former and current PSP Troopers, as the Monitor has detailed in its three Reports, these reforms, no matter how laudable, will fall well short of the mark set by the OIG unless the PSP can also achieve the fundamental reforms advocated in the Discipline section of the OIG Report. Ultimately, the issue is not whether the PSTA could or should have been more agreeable in its negotiations with the PSP; rather, the issue is how and when the PSP can achieve the reforms recommended in the OIG Report.

*    *    *    *

During the third quarter, the Monitor continued to receive information and advice from the many sources enumerated in the Second Report. As the Monitor stated in its Second Report and, which equally holds true during this quarter, there have been a variety of accomplishments by the PSP during this quarter and, as well, a number of areas where more needs to be done. The PSP has shown progress in many of the areas where the Monitor previously had urged the PSP to do more.

As the Monitor noted in its Second Report, there appeared to be "certain budgetary constraints on the PSP's time and resources, as well as restrictions due to the CBA" (p. iii). As was also

**Kroll**
Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004

stated by the Monitor in its Second Report, "According to the PSP, some of the needed reforms cannot be finally resolved without the cooperation of the PSTA in the Act 111 arbitration proceedings, set to begin in July 2004" (p. iii).[3] These constraints, especially the PSTA's lack of full cooperation on the discipline guidelines, continue to impede the PSP's efforts to comply with certain of the OIG's recommendations.

The Monitor recognizes the progress made by the PSP in the following areas:[4]

- **Direct Reporting (Section I.A.).** The PSP has followed the recommendations of the Monitor that time limits should be set for making referrals of complaints of sexual harassment and/or sexual misconduct, from Troopers and/or Troop Commanders to the Bureau of Integrity and Professional Standards (BIPS)[5], and from the EEOO to the BIPS, as is more fully set out in Section I.A. of this Report. The PSP has also established time limits for notifications from the BIPS to the EEOO, when a complaint goes to the BIPS before it goes to the EEOO. The Monitor recommends, in this Report, that the Office of the Governor and/or the PSP consider methods to emphasize to the various District Attorneys the importance of treating referrals of cases involving criminal misconduct by Troopers as priority cases, including complaints of sexual misconduct.

- **Outreach Program (Section I.F.).** The PSP has achieved considerable success with its 24-hour toll-free telephone hotline and its Internet website, both of which are part of the PSP's outreach program to facilitate the ability of citizens to provide compliments and complaints on the performance of PSP personnel directly to the BIPS. There was considerable activity on the telephone "hotline" and on the PSP's Internet website.

- **Informational Materials (Section I.G.).** The PSP developed fact sheets, in both English and Spanish, which informed those coming into contact with members of

---

[3] As the Monitor has said on a number of occasions throughout these three Reports, the Monitor has always found that the PSTA has demonstrated good faith in all of their contacts with the Monitor. The PSTA has furnished the Monitor with both information and insights which have been helpful to the Monitor's understanding of the often complex issues discussed in the OIG Report. The Monitor would note, however, its disappointment that the PSTA has not yet furnished the Monitor with its comments on the issues raised in the OIG Report, as indicated. The Monitor hopes that it will receive the PSTA's comments during the fourth quarter. The Monitor would especially welcome the PSTA's comments on the discipline guidelines issues; the Monitor recalls the many comments by individual PSTA members, during informal meetings with the Monitor, which were very supportive of the advantages, for all concerned, of a consistent and fair system of discipline guidelines.

[4] The items of progress listed here, as well as the items where more needs to be done listed below, are not meant to include everything in this Report which could have been placed in these two categories. Rather, the items listed are those that the Monitor considers to be the most significant in each category.

[5] The Monitor notes that, due to a reorganization, the functions of the Bureau of Professional Responsibility (BPR) have been assumed by the BIPS as of March 13, 2004. For the purposes of this Report the BPR/BIPS will be referred to as the BIPS.



the PSP that they provide compliments or complaints to the PSP regarding the performance of the PSP. Specifically, these forms advise the public of their right to file complaints regarding any allegations of sexual harassment and/or sexual misconduct.

- **Assignment of Cases (Section I.J.).** To insure that there are no investigative delays due to the varying caseloads of BIPS investigators, the PSP established an Intake Unit for the BIPS, which conducts reviews, every 30 days, of the caseloads of all BIPS investigators.

- **Treat Sexual Harassment Seriously (Section II.B.).** The PSP added "sexual orientation" to the list of classes that are protected against harassment and/or discrimination of any kind, including sexual harassment and/or sexual misconduct.

- **Centralized Discipline (Section II.E.).** The PSP issued Department Special Order 2004-51, which provides for a systematic means of review of any inconsistencies or disputes with respect to the Troop Commanders' findings regarding whether a complainant's allegations are supported by the BIPS's investigation.

- **Consistent Policies (Section IV.B.).** To insure that the PSP's regulations were consistent with, among other things, state-wide rules regarding equal employment opportunity, the PSP amended its practices to insure that even anonymous complaints of criminal conduct of sexual harassment and/or sexual misconduct will be investigated.

- **EEOO Involvement (Section IV.I.).** The PSP is working to increase the EEOO's involvement in all sexual harassment and/or sexual misconduct issues with the following: (1) the EEOO will have an increased dialogue with the BIPS regarding investigations as a result of the direction provided by the Deputy Commissioner of Professional Responsibility; (2) the EEOO is developing an incident tracking system, which the BIPS will be able to access; (3) the PSP is developing a webpage to provide additional information about the EEOO, including a list of EEOO liaisons and information as to how to file complaints; and (4) the EEOO Director has been requested to participate in all training covering sexual harassment and sexual misconduct issues.

Areas where there has been progress, but additional reforms need to be made, include:

- **Outreach Meetings (Section I.H.).** While the PSP began its periodic outreach meetings, by holding four meetings in different parts of the Commonwealth, the PSP must expand the numbers of these meetings so that they can be held throughout the remainder of the state.



- **Protection From Abuse (PFA) Orders (Section I.L.).** While the PSP is working to draft a new regulation, as recommended by the OIG, to follow the model policy issued by the International Association of Chiefs of Police (IACP), concerning PFA Orders, this new regulation, in the Monitor's view, should include two specific provisions: any member of the PSP who is the subject of a PFA Order should, upon notification to the PSP of the existence of the Order, immediately (1) surrender his or her duty weapon; and (2) be assigned to restricted duty. Since the President of the PSTA has stated that the PSTA is in favor of a "zero tolerance" policy concerning sexual harassment and/or sexual misconduct, the Monitor assumes that the PSTA will work with the PSP to insure that the IACP model policy on PFA Orders is followed on these two important issues. While the Monitor is not now familiar with any objection(s) the PSTA may have to the IACP model policy, the Monitor hopes that any such objection(s) would be to details, rather than to the essence of the policy itself.

- **Background Investigations (Section III.A.).** While the Monitor recognizes that the PSP has drafted a training manual for investigators doing background checks on applicants for positions as Troopers, the Monitor recommends in this Report that the PSP consider amending Section I of the manual to require background investigators and reviewing officers to express their subjective opinions as to the suitability or unsuitability of the applicants.

- **Training (Sections IV.C. to IV.G.).** The PSP improved training in a number of respects, including: (1) increasing the number of hours of sexual harassment and sexual misconduct training; (2) increasing the number of members taking the training; (3) coordinating the training with the state EEOO; and (4) introducing video vignettes which are specific to law enforcement situations. However, the PSP has still not developed a computer-based training module, as recommended by the OIG. The PSP has advised that the Office of Administration, Bureau of Equal Employment Opportunity, is developing web-based training that will become mandatory for all employees. Moreover, the Monitor is recommending, in this Report, that the PSP develop comprehension testing to determine whether participants have retained the information provided in the training.

As discussed above, the Monitor identifies the following area of concern where it is unclear whether any progress has been made:

- **Discipline Guidelines (Section II.C.).** As noted above, the PSP has made, despite its considerable efforts, no concrete progress in the area of discipline guidelines. While the PSTA – despite the years of work it put, in good faith, into drafting the proposed Discipline Matrix – has to bear at least some of the responsibility for the absence of any progress on this issue, the PSP must continue to vigorously pursue, either through the Act 111 interest arbitration



proceedings, negotiations, or otherwise, improvements in the discipline system which will make discipline more consistent, less time-consuming, more predictable and more just. The current system, for the reasons set out in Section II.C. of this Report, results in a disservice to the PSP's management, to the PSP's members and to the residents of the Commonwealth.

The Monitor will continue monitoring the PSP's implementation of the recommendations in the OIG Report. The Monitor will issue its Fourth Quarterly Report in or about December of this year.



Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004

## REPORT CONTENTS:

**SECTION ONE:  INTRODUCTION**......................................................................1

    A. APPOINTMENT OF THE MONITOR.......................................................1

    B. THE MONITORING TEAM...................................................................1

**SECTION TWO:  BRIEF HISTORY** .................................................................2

**SECTION THREE:  THE OIG'S RECOMMENDATIONS, THE PSP'S RESPONSES AND THE MONITOR'S ASSESSMENT OF COMPLIANCE AND RECOMMENDATIONS**...................................................................................4

**I.**      **COMPLAINT PROCESSING AND INVESTIGATIONS** ......................................4

    A. DIRECT REPORTING TO BIPS ...........................................................4

    B. BIPS'S ROLE .................................................................................10

    C. CONFIDENTIALITY..........................................................................11

    D. COMPLAINT VERIFICATION .............................................................12

    E. FACE-TO-FACE INTERVIEWS ............................................................13

    F. OUTREACH PROGRAM .....................................................................14

    G. INFORMATIONAL MATERIAL.............................................................15

    H. OUTREACH MEETINGS.....................................................................16

    I. ASSIGNMENT OF CASES ...................................................................17

    J. COMMIT ADDITIONAL INVESTIGATORS................................................18

    K. DOCUMENTATION OF WITNESS INTERVIEWS.........................................20

    L. PROTECTION FROM ABUSE ORDERS ..................................................20

    M. FULL INVESTIGATIONS ...................................................................22

    N. SUMMARY OF THE MONITOR'S RECOMMENDATIONS .............................22

**II.**      **DISCIPLINE** ....................................................................................23

    A. MEMBER TRANSFERS......................................................................23

    B. TREAT SEXUAL HARASSMENT AND SEXUAL MISCONDUCT AS SERIOUS OFFENSES .......................................................................24

    C. ESTABLISH DEFINITIVE GUIDELINES .................................................24



D. CENTRALIZE DISCIPLINE IN THE DDO ........................................................30

E. REMOVE DISCIPLINE FROM TROOP COMMANDERS ..............................30

F. PROVIDE ADDITIONAL STAFFING AT DDO ...............................................33

G. SUPPORT S.B. NO. 877 .................................................................................33

H. SUMMARY OF THE MONITOR'S RECOMMENDATIONS ..........................34

**III. PRE-EMPLOYMENT BACKGROUND INVESTIGATIONS AND
PROBATIONARY EMPLOYMENT ........................................................................34**

A. INCONSISTENCIES IN BACKGROUND INVESTIGATIONS ......................34

B. STANDARDS AND TRAINING OF THE APPEAL PANEL ...........................37

C. COORDINATE PROBATIONARY REVIEW WITH BIPS AND EEOO .........37

D. COORDINATE WITH OTHER OFFICES ......................................................38

E. COMPLAINTS AGAINST PROBATIONARY MEMBERS ...........................39

F. CAUTIONARY APPROACH .........................................................................40

G. SUMMARY OF THE MONITOR'S RECOMMENDATIONS ..........................41

1. Inconsistencies In Background Investigations (Section III.A.). ..........................41

**IV.    SEXUAL HARASSMENT TRAINING ..............................................................41**

A. ADMINISTRATIVE REGULATION .............................................................41

B. ADOPT CONSISTENT POLICIES ...............................................................42

C. TRAINING OF BIPS INVESTIGATORS AND EEOO LIAISONS ..................43

D. CADET TRAINING .....................................................................................44

E. SUPERVISOR TRAINING ...........................................................................44

F. ANNUAL IN-SERVICE TRAINING .............................................................45

G. COMPUTER-BASED TRAINING MODULE ................................................47

H. INCREASE EEOO STAFFING .....................................................................48

I. EEOO INVOLVEMENT ...............................................................................49

J. SUMMARY OF THE MONITOR'S RECOMMENDATIONS ..........................50

**V.    ATTITUDES INVOLVING SEXUAL HARASSMENT AND SEXUAL
MISCONDUCT ..................................................................................................50**



A.  METHOD TO MEASURE AND MONITOR COMPLAINTS ............................50

B.  PERIODIC REPORTS ...............................................................................51

C.  DIRECT REPORTING BY BIPS TO THE COMMISSIONER ..........................51

**SECTION FOUR:  ADDITIONAL ACTIONS TAKEN BY THE MONITOR ................53**

**I.      NEW INVESTIGATIONS ........................................................................53**

**II.     EARLY INTERVENTION PROGRAM ....................................................54**

**III.    AN INCIDENT OF INSENSITIVITY ......................................................55**



Office of the Independent Monitor
of the Pennsylvania State Police

# SECTION ONE: INTRODUCTION

## A. APPOINTMENT OF THE MONITOR

Kroll Associates, Inc. (Kroll) has been appointed by the Governor to serve as the Independent Monitor of the PSP. Accordingly, Kroll is acting on behalf of the Governor, working through his General Counsel, to monitor the implementation of recommendations contained in the OIG Report. In addition, the Governor has requested Kroll to perform other services, including providing technical assistance and assisting with the implementation of the best practices. Kroll is serving as the Independent Monitor of the PSP for a period of one year, covering the period from November 1, 2003 to October 31, 2004. The Report for the fourth quarter will be issued in December 2004.

As the Independent Monitor of the PSP, Kroll has two major responsibilities: (1) to monitor and assess implementation by the State Police of measures to improve State Police processing and investigation, disciplinary procedures, pre-employment background investigations and probationary employment, and training with respect to all matters of sexual harassment and sexual misconduct issues; and (2) to monitor and assess the State Police's implementation of recommendations for improving its processes for the prevention, investigation and proper disposition of complaints of sexual harassment and sexual misconduct.

This Report is for the third quarter. The Report for the first quarter was issued on March 1, 2004, and the Report for the second quarter was issued on June 25, 2004. The current Report continues the Monitor's assessment of all the areas outlined in the preceding paragraph. As before, this Report finds that the PSP has made progress in certain areas and needs to do more in a number of other areas.

## B. THE MONITORING TEAM

The Monitoring team includes William C. Nugent, Sheryl L. Robinson and Michael A. Pavlick in leadership roles.

Mr. Nugent serves as a Senior Managing Director and Regional Counsel and is head of Kroll's Pennsylvania office. In addition to his accomplishments as a prosecutor where, among other matters he investigated and prosecuted cases involving organized crime, political corruption, and federal civil rights, he has conducted numerous internal investigations and reviews at Kroll, including internal investigations involving alleged sexual harassment and sexual misconduct.

Ms. Robinson serves as Vice President and Managing Director of Kroll Government Services, Inc. and leads Kroll's practice in Washington, D.C. She offers unique expertise in police integrity practices in both the litigation and policy development areas. During her time in the Civil Rights Division of the U.S. Department of Justice (DOJ), Ms. Robinson evaluated, investigated and/or prosecuted hundreds of allegations of excessive use of force and sexual abuse matters in police



Office of the Independent Monitor
of the Pennsylvania State Police

agencies across the country. Furthermore, in the policy area, she actively participated in DOJ's efforts to identify promising police practices for state and local police agencies. Ms. Robinson served as the Department's primary contact for state and local law enforcement agencies and associations on police integrity and civil rights policy matters. Ms. Robinson was recently appointed by the Honorable Julian A. Cook, Jr., United States District Court Judge for the Eastern District of Michigan, to serve as the Independent Monitor for the Detroit Police Department.

Mr. Pavlick provides extensive law enforcement experience including an outstanding career at the Drug Enforcement Administration and work as a consultant with the United States State Department and the Executive Branch of the United States Government. Mr. Pavlick has conducted numerous investigations in Internal Affairs of corrupt DEA agents and police officers, and handled many allegations of sexual harassment while at the DEA.

Walter S. Batty, Jr., formerly the Chief of Appeals at the United States Attorney's Office for the Eastern District of Pennsylvania, also contributed to this Report.

The Monitoring team has, where appropriate and advantageous to the Commonwealth of Pennsylvania, the public, and the State Police, utilized designated subject matter experts on specific issues including internal investigations, policing, training, and report writing. In addition to acting as the Independent Monitor of the PSP in this matter, Kroll is currently acting as the Court-Appointed Independent Monitor of both the Los Angeles Police Department and the Detroit Police Department. Both of these monitorships are five-year appointments. The Kroll team monitoring the PSP is able to draw upon the insights and experience of the Kroll teams working in Los Angeles and Detroit.

The Monitor takes this appointment by the Governor very seriously. Sexual harassment and sexual misconduct by police officers is especially intolerable. This is a trying time for the vast majority of State Troopers, honorable men and women who risk their lives to protect the public, and who have not been accused of wrongdoing; these good men and women cannot help but feel ashamed by the improper and immoral acts of some fellow officers. However, it is also a time of opportunity. The Monitor is confident that, with the promised support of all the parties, significant improvements will occur in this important area of police conduct.

## SECTION TWO: BRIEF HISTORY

The relevant history leading up to the Governor's hiring of Kroll as the Independent Monitor of the PSP is set forth in the First Quarterly Report for the period ending January 31, 2004. This brief history outlines significant events such as: the guilty plea and sentence of former Pennsylvania State Trooper Michael K. Evans on various crimes of sexual misconduct; the federal civil rights lawsuits filed against the PSP arising from the criminal conduct of former Trooper Evans; the extensive local and national media coverage; the aggressive actions to



Office of the Independent Monitor
of the Pennsylvania State Police

accelerate change taken by the Governor, the Commissioner, the Office of General Counsel and the OIG; and legislative efforts to reform discipline within the PSP.[6]

After the third quarter ended, the four outstanding civil suits against former Trooper Evans and a number of former and current PSP officials were settled. On September 2, 2004, attorneys for the plaintiffs, together with PSP Commissioner Miller, issued a joint press release in which it was stated that the Commonwealth, on behalf of the individual defendants, agreed to pay the plaintiffs a total of $5 million in a global settlement. In the joint press release, the parties stated, in part, as follows:

> Although Evans' crimes occurred under a prior administration, the current administration recognizes that the victims were seriously wronged by Evans and the settlement is designed to provide them with just compensation. . . .

> The Department and counsel for the plaintiffs maintain that under the direction of Gov. Edward G. Rendell and State Police Commissioner Jeffrey B. Miller, the State Police have taken aggressive steps to implement reforms designed to make sure that this type of incident never happens again.

> These actions have included a review of State Police procedures by the Office of Inspector General, which developed recommendations for State Police policy and procedure changes; the appointment of Kroll Associates to serve as an independent monitor to evaluate [the] State Police['s] response to the recommendations[;] and creation of a new State Police position of Deputy Commissioner of Professional Responsibility to focus on issues related to the investigation and prevention of police misconduct.

> Steps taken by [the] State Police also have included enforcement of a "zero tolerance" policy against sexual harassment and misconduct; creation of an early intervention program; tightening of pre-employment screening practices[;] and the implementation of additional training focused on preventing sexual harassment and misconduct.

> Although the Department maintains that the Evans case was unique and that the vast majority of State Police troopers conduct themselves professionally at all times, Gov. Rendell and the current State Police administration acknowledge the harm caused by

---

[6] Kroll's First and Second Quarterly Reports, as well as the Third Quarterly Report, are available for review on the Internet on the PSP's site at http://www.psp.state.pa.us/. The reports can be accessed by first selecting the link for "Department Information," then clicking the link for "PSP Information and Online Services," and finally selecting "Kroll First Quarterly Report," "Kroll Second Quarterly Report," etc. The reports can be downloaded and/or viewed online using Adobe Acrobat Reader, which is available for free on the PSP's Internet site. The First and Second Quarterly Reports, as well as the Third Quarterly Report, are also available for review on the Internet on Kroll's site at http://www.krollworldwide.com/psp.



former Tpr. Evans and recognized the need to address the situation and prevent a reoccurrence.

The Monitor commends the current administration for recognizing that the plaintiffs were seriously wronged by Evans and joins the PSP and counsel for the plaintiffs in their appreciation of the changes made to rectify this situation.

# SECTION THREE: THE OIG'S RECOMMENDATIONS, THE PSP'S RESPONSES AND THE MONITOR'S ASSESSMENT OF COMPLIANCE AND RECOMMENDATIONS

This section contains the Monitor's compliance assessments for the third quarter ending July 31, 2004 for: (1) Complaint Processing and Investigations; (2) Discipline; (3) Pre-Employment Background Investigations and Probationary Employment; (4) Sexual Harassment Training; and (5) Attitudes Regarding Sexual Harassment and Sexual Misconduct.

# I. COMPLAINT PROCESSING AND INVESTIGATIONS

## A. DIRECT REPORTING TO BIPS

The OIG Report (p. 16) recommended that all members of the PSP be required to report in writing, directly to the BPR,[7] any knowledge they have or complaints they have heard of sexual harassment or sexual misconduct. The Report also recommended that members who did not report such conduct be disciplined, and that the PSP provide revised, comprehensive definitions of sexual harassment and sexual misconduct. The Monitor stated in its First Quarterly Report that all members are required to report misconduct by the existing Field Regulations (FR), including FR 1.17b. In September 2003, the Director of the BIPS, in consultation with the Director of the IAD, began personally reviewing all complaints filed with the PSP and directed that all investigations of sexual harassment and sexual misconduct be investigated by the BIPS. This process was not formalized initially by issuance of a written directive. In addition, the PSP did not have comprehensive definitions of sexual harassment or sexual misconduct. Accordingly, in its First Report, the Monitor stated that the PSP did not satisfy the OIG's recommendations in this area.

In the second quarter, the PSP issued a Bureau Special Order and revised an Administrative Regulation to address two of the OIG's recommendations in this area. On March 10, 2004, the PSP issued Bureau Special Order 2004-01, which required that investigations of sexual harassment and sexual misconduct be assigned to a BIPS investigator.[8] This Bureau Special

---

[7] As noted in footnote 5, the BIPS has assumed the functions of the Bureau formerly known as the BPR.

[8] The specific language of Bureau Special Order 2004-01 on this point is as follows:



Office of the Independent Monitor
of the Pennsylvania State Police

Order, among other things, created an exception to the usual procedure, where the Troop Commander would be the one initially responsible for all matters of Troop discipline. On April 30, 2004, the PSP issued a draft of revised Administrative Regulation (AR) 4-26, Sexual Harassment Policy,[9] which provided comprehensive definitions of sexual harassment and sexual misconduct. By issuing and revising these directives, the PSP complied during the second quarter with the policy requirements of the OIG Report's recommendations in this section. In its Second Quarterly Report, the Monitor reported that the PSP was complying with the existing regulations regarding the duty of each member to report violations by any other members. The Second Report also stated that BIPS personnel were scrutinizing complaint files "to determine if Members present at the scene of a violation are forthcoming in providing information." During its compliance reviews, the Monitor had not obtained any information suggesting that a member had violated this regulation; also, the Monitor was informed that officials at the BIPS were not aware of any such failures to report, on the appropriate forms, during the first or second quarters.

For reasons which are fully set out in its Second Report, the Monitor recommended that the PSP establish time limits for referrals if a complaint alleging sexual harassment and/or sexual misconduct is first made to either personnel at a Troop or to the EEOO. Similarly, the Monitor also expressed concern as to the timing of referrals to the EEOO when complaints are filed initially with the BIPS. The Monitor recommended that the PSP remedy these omissions by adding suitable provisions to a revised Bureau Special Order 2004-01 (or to another Special Order) and later, to a revised AR 4-25, Internal Investigations, and/or AR 4-26. These provisions would establish time limits for the referrals from the Troop Commanders and from the EEOO to the BIPS, and from the BIPS to the EEOO.

---

All Internal Affairs Investigations alleging sexual misconduct or sexual harassment shall be assigned to an investigator within the Bureau of Professional Responsibility, Internal Affairs Division.

[9] AR 4-26 provides the following definitions of sexual misconduct and sexual harassment:

    I.    Sexual Misconduct: Sexual Misconduct includes any uninvited or unwelcome sexual touching or sexual contact. Sexual touching or sexual contact includes intentional touching or other physical contact of a sexual nature, done either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. Sexual misconduct also includes those types of conduct (whether or not criminally charged) which are described in the sexual offenses subchapter of the Crimes Code, as defined in 18 PA CS 3121 through 3129, 5901, and 6301 (but only as it relates to acts of a sexual nature), and equivalent offenses committed (whether or not criminally charged) in other jurisdictions.

    II.    Sexual Harassment: Sexual Harassment is defined to include: unwelcome sexual advances, requests for sexual favors, and/or other verbal, visual, or physical conduct of a sexual nature (whether or not criminally charged) where:

        a.   submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or

        b.   submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individuals; or

        c.   such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Case 1:00-cv-01655-SHR    Document 52-4    Filed 02/10/2005    Page 19 of 87



Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004
Page 6 of 56

In its Second Report, the Monitor expressed concern not only about the lack of time limits when complaints are first filed, but also about the time within which complaints are adjudicated. In that Report, the Monitor discussed a matter first reviewed by the Monitor during the second quarter.[10] Our preliminary examination of this matter showed that there was a complaint filed approximately 18 months ago (at the time of the Second Report), in which a noncommissioned officer (NCO) alleged that her immediate superior had groped her and otherwise engaged in unwanted sexual touching. According to the Monitor's initial review, the subject of the investigation accrued enough hours so that he could retire, in April 2004, at 50% of his then salary, without any discipline having been imposed. While we did not express any view as to the accuracy of the statements made to us by the complainant, the Monitor offered this as an illustration of what could go wrong as a result of the above-described omissions from Bureau Special Order 2004-01, AR 4-25, and/or AR 4-26. The Monitor found from its review of cases during the second quarter that the PSP had complied with the time limits imposed by the CBA; however, the Monitor recognized that the possibility for delay in the adjudicative process can occur, over which the PSP has no control, when a matter is referred to a county, state, or federal prosecutor.

For the reasons set out in its Second Report, the Monitor determined that, once the PSP adopts and implements strict timing requirements, it would have met the intent of the OIG Report's recommendations on this point. Based on this analysis, the Monitor found that the PSP had complied with the recommendations in this section of the OIG Report, with the exception of the recommendation that all complaints are to be initially filed with the BIPS, which the Monitor determined was not necessarily practical or advantageous.

**Current Assessment of Compliance**

During the third quarter, the Monitor's compliance reviews showed that, in matters of sexual harassment and/or sexual misconduct, there were no instances where a Trooper failed to report what he or she had seen or heard regarding such matters. The PSP advised that, while it might take some time for such information to surface, it had not received any information suggesting that Troopers had failed to follow the PSP's directive concerning the need to report any known violations. The Monitor's compliance reviews also showed that Troopers reported two cases directly to the BIPS during the third quarter.

The PSP, in response to the Monitor's recommendations in its Second Report, implemented time limits for reporting to the BIPS allegations of sexual harassment and/or sexual misconduct. Under the current draft of the revision to AR 4-26, if the allegation were initially reported by a Trooper to the Troop Commander and/or Area Commander, the Trooper is now required to make

---

[10] As of the filing of that Report, the Monitor had not had sufficient time to investigate all the facts concerning this matter; accordingly, the Monitor could not make any judgment as to whether, in fact, there had been any deficiencies. Instead, the Monitor considered the scenario related in the text on a merely hypothetical basis. In the third quarter, the complainant in this matter, who had referred it to the Monitor, filed suit in federal court. Because this litigation is now pending, the Monitor will still consider this case only on a hypothetical basis.



his or her report of such an allegation "forthwith" (within 24 hours) from the alleged incident and "forthwith" (within 24 hours) of his or her first learning of the alleged incident.  In turn, the Troop Commander and/or Area Commander each must report to the BIPS "forthwith" (within 24 hours) from the time he or she receives a report of such an incident from a Trooper.  Also, under the draft of the revised AR 4-26, if the report of the alleged incident were first made to the EEOO, that office now has a limit of 10 working days in which to report the matter to the BIPS.

Regarding the Monitor's recommendation that the PSP also establish time limits for reporting by the BIPS to the EEOO, as part of the BIPS's duty to coordinate with the EEOO, the PSP has, in draft AR 4-26, established a 10 day time limit for notifications from the BIPS to the EEOO, when a complaint goes to the BIPS before it goes to the EEOO.

As to the Monitor's view, expressed in the Second Report, concerning the time within which matters were adjudicated, the Monitor has been able to further examine the PSP's file concerning the above-mentioned complaint of sexual misconduct - groping and unwanted sexual touching - made by the NCO against her immediate supervisor.  The Monitor has determined that the timeline of significant events in this matter is as follows:

> •    October 9, 2002 – The Commander of the Bureau of Criminal Investigation (BCI) was informed by the Troop Commander of the allegations made by the NCO.  On October 10, 2002, a Complaint Worksheet was completed by the BCI Commander and the NCO.  On October 15, 2002, the BCI Commander notified the EEOO of the allegations.

> •    October 15, 2002 – The subject of the complaint was notified that he was being reassigned to another Troop pending the outcome of the BIPS[11] investigation.

> •    October 17, 2002 – The Director of the EEOO notified the appropriate official at the BIPS that she had received certain corroborating information against the subject of the investigation.

> •    October 23, 2002 – The complainant was interviewed by the assigned BIPS investigator.

> •    November 2002 to January 2003 – The assigned BIPS investigator conducted interviews of five members of the PSP concerning their observations of the interactions between the subject and the complainant.

---

[11] As previously noted, the BIPS assumed the functions of the BPR on March 13, 2004.



Office of the Independent Monitor
of the Pennsylvania State Police

• May 28, 2003 – Another PSP employee was interviewed by the assigned BIPS investigator concerning her allegations against the subject, which were similar to the allegations by the complainant.

• June 17, 2003 – The assigned BIPS investigator contacted the subject, and asked him if he would agree to an interview where he would receive his "<u>Miranda</u> warnings."[12]  The subject responded he would not agree to such an interview.

• July 8, 2003 – The assigned BIPS investigator wrote the District Attorney for the appropriate county requesting a prosecutorial decision concerning the allegations made by the complainant. The assigned BIPS investigator wrote follow-up letters, approximately every 30 days, seeking a prosecutorial decision.

• December 4 and December 17, 2003 – Two letters were received, by the assigned BIPS investigator, from the appropriate District Attorney, declining criminal prosecution of the subject.

• January 24, 2004 – The assigned BIPS investigator gave the subject an "administrative interview" regarding the allegations of sexual harassment and sexual misconduct.[13]

• February 25, 2004 – A Disciplinary Action Report (DAR) was issued to the subject by the Troop Commander. On March 1, 2004, the DAR was received by the subject.  On March 8, 2004, the DAR was received by the DDO from the Troop Commander.

• April 4 and April 9, 2004 – The DDO set the penalty (dismissal) and forwarded the appropriate papers to the subject, requesting him to choose between proceeding by court martial or by arbitration.

• April 28, 2004 – The subject retired from the PSP, before there could be either a court martial hearing or an arbitration proceeding.

From this timeline, certain tentative conclusions can be drawn:

---

[12] "<u>Miranda</u> warnings" concern the subject's right to maintain his silence, pursuant to the Fifth Amendment, in a criminal matter.  If the subject had agreed to a waiver of his <u>Miranda</u> rights, the subject's statements could have been submitted to the appropriate District Attorney's office for possible use against him in a criminal case.  It should also be noted that, on occasion, a subject's statements could inure to his/her benefit.

[13] An "administrative interview" is one where the subject is informed that his or her answers will not be used in any criminal proceeding against the subject, but may be used against the subject in the administrative disciplinary process.  The subject is also advised that he or she must answer the questions, or be dismissed by the employer. That procedure was followed in the January 24, 2004 interview of the subject.


(1) There was little investigative activity during the delay of approximately eight months between the October 23, 2002 interview of the complainant and the June 17, 2003 contact of the subject by a BIPS investigator. While there were five interviews of potential third-party witnesses during the months of November 2002 to January 2003, none of these interviews was unusually complicated for this type of investigation.  While the pace of this phase of the investigation was less than optimal, the Monitor is aware that the assigned BIPS investigator was handling numerous other investigations.  Moreover, during the months February 2003 to May 2003, there was no investigative work on this case by the assigned BIPS investigator because he had been assigned to two other, high-priority cases.  In light of the priority that should have been given to a serious sexual misconduct investigation of a PSP supervisor, this investigation should have been reassigned to an investigator who could have completed the investigation in a more timely manner. Subsequent reforms by the PSP, as described below in Section I.J., mean that it is unlikely that such investigative lapses will recur in the future.  The effectiveness of these reforms will be evaluated during the fourth quarter.

The Monitor would also note, from its examination of this file, that the PSP failed to communicate with the complainant on a regular basis to update her on investigation developments or to monitor her feelings, needs, and sentiments. Because of this failure to communicate, the complainant could only assume that the PSP was actively investigating when, in fact, there had been substantial delays in completing the investigation and issuing the DAR. The PSP has advised that changes in staffing at the EEOO and the BIPS, along with the reorganization of the case Intake Unit at the BIPS and increased coordination between the BIPS and the EEOO, should result in better communication with the victims of all acts of misconduct, especially sexual harassment and sexual misconduct.

(2) The delay of approximately five months between the initial contact with the District Attorney for the appropriate county and the issuance of a declination letter by that District Attorney was too long.  While it is certainly understandable that the District Attorney had other priority matters – the Monitor has been advised that all prosecutorial decisions in that county are made by the District Attorney personally and that the District Attorney handled five homicide trials during that time period – it is also true that an allegation of sexual misconduct by a member of the PSP is an important matter.

On the issue regarding possible delays in the handling of sexual harassment and/or sexual misconduct matters, the PSP has advised the Monitor that, where the PSP has referred a matter to a District Attorney's office for a prosecutorial decision, investigators for the BIPS have been required, since 1999, to send a letter to the appropriate District Attorney's office, inquiring as to the status of the case, every 30 days. This requirement was initially set out in Division Directive 99-5, and finalized effective in 1999.  That Directive was followed by the assigned BIPS investigator here.



Although delays by the District Attorney's offices in the handling of referrals by the PSP are rare – and are almost always due to the offices' demanding case loads – the Monitor is recommending, by a copy of this Report, that the Office of the Governor and/or the PSP consider methods to emphasize to the various District Attorneys the importance of treating referrals of cases involving criminal misconduct by Troopers as priority cases, including complaints of sexual misconduct. For example, the Office of the Governor and/or the PSP may consider working with the Pennsylvania District Attorneys Association (PDAA) to distribute newsletters, articles and other outreach materials in an effort to promote more uniformity and efficiency in the handling of such cases by the 67 District Attorneys across the Commonwealth.[14]

Based on the foregoing, the PSP has complied with the policy requirements of the OIG's recommendations to require members to report in writing knowledge or complaints of sexual harassment or sexual misconduct, and to issue revised, comprehensive definitions of sexual harassment and sexual misconduct. The PSP has also complied with the Monitor's recommendation to implement time limits for reporting allegations to the BIPS, and drafted a policy setting time limits for notifications by the BIPS to the EEOO.

## B. BIPS'S ROLE

The OIG Report (pp. 17-18) recommended that the PSP issue an FR prohibiting supervisors from independently investigating allegations of sexual harassment and/or sexual misconduct on the part of a direct subordinate. In addition, the OIG Report recommended that supervisors who violate such an FR should be disciplined. As of the First Quarterly Report, the BIPS had initiated a new policy of taking investigative jurisdiction of all complaints of sexual harassment and/or sexual misconduct. See discussion under Direct Reporting to BIPS, at Section I.A., of the Second Quarterly Report. Under this new practice, the BIPS is using its own personnel to investigate all such complaints.[15]

As noted in Section I.A. of its Second Report, the Monitor found that the PSP's new policy was reflected in Bureau Special Order 2004-01, which was issued by the PSP on March 10, 2004. The Monitor also found that, based on our compliance reviews during the first and second quarters, there were no instances where any Troop supervisor investigated a sexual harassment or sexual misconduct matter in violation of the new policy. The PSP advised that it had developed a draft FR which would meet, in the third quarter, the recommendation for the issuance of an FR. Accordingly, the Monitor found that, during the second quarter, the PSP had complied with the implementation aspect of this OIG recommendation, but had not yet complied with the policy

---

[14] The Monitor notes that, in July 2001, the PSP made a presentation to the PDAA requesting that the District Attorneys provide the PSP with prosecutorial decisions in writing, in a timely manner.

[15] As noted above, the BIPS can also refer the case to the County District Attorney's office; such referrals certainly do not run afoul of the OIG's recommendations.


recommendation to issue an FR prohibiting supervisors from independently investigating allegations of sexual harassment and/or sexual misconduct on the part of a direct subordinate.

**Current Assessment of Compliance**

During the third quarter, the Monitor's compliance reviews found that there were no investigations of sexual harassment and/or sexual misconduct matters which were performed by personnel at the Troops in violation of the requirement that all such investigations be performed by investigators for the BIPS. Moreover, the PSP also advised that a written directive on this point would be incorporated into the revised AR 4-25. The PSP has submitted draft FR 1.18, Interference with Investigations, to the Bureau of Research and Development. This draft FR does not explicitly prohibit supervisors at the Troop level from investigating allegations of sexual harassment/sexual misconduct on the part of direct subordinates; however, when interpreted alongside other regulations, it will, in the Monitor's opinion, meet the OIG's recommendation. The PSP expects the finalized version of FR 1.18 to be issued during the fourth quarter.

Based on the foregoing, the PSP has partially complied with the OIG's recommendations on this point.

## C.   CONFIDENTIALITY

The OIG Report (pp.18-19) recommended that the PSP reiterate that its members, other than the assigned investigator, are not permitted to disclose or otherwise discuss a pending investigation with the subject of the investigation. The OIG further recommended that the PSP enforce violations of this policy with discipline. The situations noted in the OIG Report concerned unauthorized "leaks" by members of the PSP in which the subjects were improperly advised that they were under investigation. While the Monitor noted that the PSP agrees with the OIG's recommendation on this issue, the Monitor stated that the regulations contained in AR 4-25 and in the OIG Report were not sufficiently explicit to cure the problem cited in the OIG Report. Accordingly, the Monitor recommended in its Second Quarterly Report that the PSP consider whether Bureau Special Order 2004-01 should be revised promptly (or a separate Special Order issued) and whether, subsequently, AR 4-25 should be amended to make more explicit the requirement that only the assigned investigator(s) from the BIPS discuss any internal investigation (including any investigation concerning sexual harassment and/or sexual misconduct) with the subject of the investigation, until after the investigation is complete.

In the second quarter the Monitor, in its compliance reviews, found no evidence of any violations of the OIG Report's recommendations on this point. The Monitor interviewed officials at the BIPS who were aware of all 18 investigations involving sexual harassment and/or sexual misconduct which had been opened during the first two quarters and who stated that they knew of no situations where the subject of the investigation had been improperly "tipped-off" to the existence of the investigation prior to being contacted by the BIPS case investigator(s).



**Current Assessment of Compliance**

In its compliance reviews for the third quarter, the Monitor found no evidence of any violations of the OIG's recommendation against a member's "tipping off" the subject of a sexual harassment and/or sexual misconduct investigation that he or she was the subject of such an investigation. As to the Monitor's recommendation that the PSP issue a regulation which more explicitly prohibits such "tip offs," the current drafts of the revised AR 4-25, the revised FR 1-2, and the revised FR 1.18, include language which appears to satisfy the Monitor's recommendation. However, this language is not expected to become finalized until the fourth quarter. The Monitor will wait until then to include the final language in the next Report.

Based on the foregoing, once the draft revisions of AR 4-25, FR 1-2, and FR 1.18 become finalized and issued, the Monitor expects that the PSP will have complied with the recommendations of the OIG and of the Monitor on this point. At this time, the PSP has not complied with these recommendations.

## D.   COMPLAINT VERIFICATION

The OIG Report (p. 20) recommended that the PSP should follow-up on all complaints of sexual harassment and/or sexual misconduct, even if the complainant had not submitted a written Complaint Verification Form. The OIG also recommended that the letter accompanying the Complaint Verification should include a statement that assures complainants that the PSP is interested in aggressively pursuing any misconduct by PSP personnel. In its Second Quarterly Report, the Monitor observed that, before the OIG submitted its Report, it had been the policy of the PSP not to follow-up on complaints without a Complaint Verification Form since the PSP would treat such a complaint as having been withdrawn. The PSP, however, would follow-up, even without a Complaint Verification Form, in cases of criminal activity, but not in cases of non-criminal activity.   On September 26, 2003, the PSP issued an oral directive consistent with the OIG's recommendation.

Based on its review of Bureau Special Order 2004-01, issued on March 10, 2004, the Monitor found that the PSP had formalized the oral directive cited above (using the same language).[16] The Monitor had reviewed the 18 files containing complaints of sexual harassment and/or sexual misconduct which were open during the first and second quarters and found no instances where either of the new PSP policies concerning Complaint Verification and face-to-face interviews (as described in the next section) had been violated.[17]

---

[16] Bureau Special Order 2004-01 states, in part:

> No complaint alleging sexual misconduct or sexual harassment shall be deemed withdrawn on the basis of a complainant failing to return a Complaint Verification Form. In such cases, personal contact with the complainant shall be pursued by the IAD.

[17] The Monitor's review of the BIPS files included: (1) an examination of all the contents of each file, including reports of witness interviews; (2) interviewing selected witnesses in several of the files; and (3) listening to selected audiotapes of witness interviews in several of the files.



**Current Assessment of Compliance**

The Monitor determined that, during the third quarter, there were no instances where the new policy regarding Complaint Verifications had been violated. In its compliance reviews for the third quarter, the Monitor examined the nine open files and the 13 files that were closed during the third quarter.[18]

Based on the foregoing, the PSP has complied with the OIG's recommendations on this point.

## E.    FACE-TO-FACE INTERVIEWS

The OIG Report (p. 20) recommended that the PSP establish a policy to pursue face-to-face interviews with complainants in all cases, even if the complainant fails to submit and sign a Complaint Verification Form. The PSP's initial response to the OIG's recommendation was that a face-to-face meeting would be pursued, where the complainant had not filed a Complaint Verification Form, but only in cases involving criminal allegations. This was the same procedure previously followed in determining whether or not a complaint would be considered withdrawn, as discussed at Section I.D. After issuing an oral directive, on September 26, 2003, consistent with the OIG's recommendations, the PSP formalized this new policy in Bureau Special Order 2004-01, which went into effect on March 10, 2004.[19] Based on our compliance reviews during the first and second quarters, as described in the Second Quarterly Report, the Monitor found that, in those instances where there was no Complaint Verification, this new policy and this Order were adhered to by the PSP.

**Current Assessment of Compliance**

During its compliance reviews for the third quarter, the Monitor determined that the requirement of a face-to-face interview of all complainants, whether or not a Complaint Verification had been filed, was being followed by the PSP. Moreover, the Monitor determined that all such interviews were being recorded, both in the form of the investigator's written summary of the interview and by means of an audiotape recording.

Based on the foregoing, the PSP has complied with the OIG's recommendations on this point.

---

[18] During the third quarter, 13 files were closed on the merits - because the PSP's investigation was completed and adjudicated, and it was determined that the allegations were "sustained," "not-sustained," "unfounded," or "withdrawn." Also during the third quarter, ten files were reclassified because they involved the misuse of the PSP's Intranet system, referred to as the Enterprise Network, either for sexually explicit images or sexually explicit stories/jokes, where there were no intended victims.

[19] See footnote 16.

**Kroll**

Office of the Independent Monitor
of the Pennsylvania State Police

## F.  OUTREACH PROGRAM

The OIG Report (p. 21) recommended that the PSP develop an effective outreach program to facilitate the ability of citizens to complain or otherwise provide feedback on the performance of PSP personnel directly to the BIPS.  The OIG recommended that the PSP's outreach program permit a complaint to be made in person, by mail, by telephone, via the Internet, by e-mail, by facsimile transmission, or by a 24-hour toll-free telephone hotline.  The OIG also recommended that the PSP should document all calls to the hotline, and should refer to the hotline all citizens who call a PSP barracks to make a complaint.  Finally, the OIG also recommended that the PSP publicize the complaint process and the 24-hour telephone hotline number on the PSP's website. The PSP initially agreed that it would follow most of the OIG's recommendations, with the exception of the 24-hour toll-free telephone hotline, due to the expense.  As we noted in our First Quarterly Report, the PSP placed on the Internet in September 2003 complete instructions as to how an individual can file a compliment and/or complaint regarding a member of the PSP.  The PSP's website also provides a form that can be used to file such a compliment and/or complaint on the Internet.

In its Second Report, the Monitor stated that the PSP had set up, as of April 8, 2004, a toll-free telephone hotline.  That Report described the telephone hotline and the Internet website in detail. As stated in its First Report, the Monitor has verified that the online Compliment/Complaint form is accessible and can be easily downloaded from the PSP's Internet site.  The Monitor has also verified that the toll-free telephone hotline is operating.  The Monitor determined that the PSP had complied with the OIG's recommendation to permit complaints to be made in person, by mail, by telephone, via the Internet, by e-mail, by facsimile transmission or by a toll-free telephone hotline.

**Current Assessment of Compliance**

The Monitor has determined that from April 11, 2004 until July 6, 2004 there were 114 "hotline" calls made to the PSP.  One call was in the category of sexual misconduct; 62 of these calls requested that Complaint Verification forms be sent out; and the remaining calls consisted of compliments and information requests.

The Monitor determined that, as to the PSP's website, there was the following activity during the third quarter: In May 2004, 212 Complaint Verification forms were downloaded; in June 2004, 308 Complaint Verification forms were downloaded; in July 2004, 320 Complaint Verification forms were downloaded.[20]  Based on information received from the PSP, and the Monitor's own testing, it appears that both the hotline and the website are functioning smoothly.

Based on the foregoing, the PSP has complied with the OIG's recommendations on this point.

---

[20] In June 2004 there were 1,410 hits on the PSP's website for Kroll's Second Report, and in July 2004, there were 1,074 hits on the PSP's website for the Kroll Report.



Office of the Independent Monitor
of the Pennsylvania State Police

## G. INFORMATIONAL MATERIAL

The OIG Report (p. 21) recommended that the PSP develop informational material describing the complaint and feedback process for distribution at PSP headquarters, PSP stations, state-operated rest stops, and other locations throughout the Commonwealth. The OIG also recommended that the PSP consider making the informational material available in English, Spanish, and other languages.

The PSP's response to this recommendation was that it would be implemented by the EEOO. However, the PSP did not comply with this recommendation during the first or second quarters.

**Current Assessment of Compliance**

In response to this OIG recommendation, and as part of its outreach program, the PSP developed Form 3-228 and 3-228S, in English and Spanish respectively. This form serves as an informational fact sheet entitled "Pennsylvania State Police Compliment/Complaint Procedures" that generally describes the PSP's compliment and complaint procedures. The form is designed to promote feedback from citizens concerning how well the PSP is doing in fulfilling its "core purpose."[21] The form provides that compliments and/or complaints concerning PSP service or personnel may be filed at any PSP station, 24 hours a day, seven days a week, either in person, by telephone, or in writing. The form also provides that complaints may be filed directly with the BIPS, through the PSP's toll-free hotline number, and that additional information about the compliment/complaint procedures can be found online at the PSP's website.

The PSP has stated that this form and other reference materials, including Special Order 2003-18 (Problem Specific Policing), AR 1-1 (Organization), and Operation Manual (OM) 7-6 (Community Services), will be distributed to Area, Troop and Station Commanders, and Bureau and Office Directors, during the fourth quarter. Department Special Order 2004-81 instructed any member or employee making a Department presentation to adult community groups to include a brief overview of the PSP and to provide the forms as handouts. Department Special Order 2004-81 further stated that the intent of the Department overview and distribution of the forms is to:

a. Ensure the community is satisfied with the performance of the PSP.
b. Provide an opportunity to identify factors that may be negatively affecting the community.
c. Inform the community as to the procedure for lodging a compliment or complaint concerning Department operations or personnel.

The form will also be available at all Communications-Desk Units and in public areas at all Department facilities.

---

[21] The PSP has defined its core purpose on the fact sheets "To seek justice, preserve peace, and improve the quality of life for all."



The Monitor has evaluated the form and determined that it sufficiently offers citizens an opportunity to file compliments or complaints and provides information about the PSP's "core purpose" and information about the agency in general. The form also provides the toll-free number for filing complaints. While Form 3-228 and 3-228S adequately describes the complaint process, the PSP has not yet distributed the informational materials and complaint forms to its many locations throughout the Commonwealth.

Based on the foregoing, the PSP has not fully complied with this OIG recommendation.

## H.   OUTREACH MEETINGS

The OIG Report (p. 22) recommended that the PSP host quarterly or other periodic informational meetings designed to inform communities on proper PSP functions and procedures. The OIG Report also recommended that, at these meetings, the PSP advise those in attendance how to report compliments and complaints regarding members of the PSP. The PSP did not comply with this recommendation for outreach meetings during the first or second quarters. As the Monitor stated in its First Quarterly Report, the PSP planned to implement this recommendation through the Problem Specific Policing Initiative, which requires monthly community outreach meetings for each Troop. This Initiative is described in our summary of the Outreach Program, at Section I.F., of the Second Report.

As noted in our Second Report, the PSP drafted a proposal during the second quarter identifying and facilitating an effective outreach program as part of its Problem Specific Policing Initiative. According to the PSP, this portion of the Problem Specific Policing Initiative, which requires all Troop and Bureau Directors to facilitate a Community Outreach Program, would be implemented during the third quarter. Although the PSP was then attending township meetings and conducting Citizen Police Academies throughout the Commonwealth, the PSP did not comply with this OIG recommendation during the second quarter.

**Current Assessment of Compliance**

During the third quarter, the PSP implemented the Community Outreach Program, as an addition to the Problem Specific Policing Initiative.[22] As part of this program, the PSP has started to hold meetings at community facilities, such as high schools, in the vicinity of each Troop's barracks, at which members of the public are encouraged to give such compliments, or make such complaints, as they wish. The PSP has informed the Monitor that there were four Community Outreach meetings throughout the Commonwealth during the third quarter. For each of the four Community Outreach meetings, the PSP placed ads in newspapers serving the communities

---

[22] This Initiative was implemented pursuant to Operation Manual (OM) 7-6. OM 7-6 is currently being revised; the PSP expects the revision to be issued during the fourth quarter. The changes to OM 7-6 are intended to bring this provision into conformity with the recommendations of the OIG and of the Monitor.

Case 1:00-cv-01655-SHR    Document 52-4    Filed 02/10/2005    Page 30 of 87



Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004
Page 17 of 56

where the barracks were located, inviting the community and any interested observers to attend the meetings.[23]

As part of these meetings, the PSP invited members of the community to participate in the Citizens Police Academy (CPA) training sessions. The CPA training includes approximately 20 hours of instruction presented in two-hour segments. These training sessions are designed to cover, in a summary fashion, the range of training topics used to train Troopers. The CPAs have been in existence for a number of years; during the third quarter, the CPA training was expanded to include awareness of the complaint procedures in sexual harassment and/or sexual misconduct matters.

Also, as part of these meetings, the PSP has invited members of the community to enroll children in the Camp Cadet program, in which the children attend week-long sessions in which they are taught about various aspects of PSP work, including physical fitness, surveillance techniques, firearms, fingerprinting, and investigations. The purpose of the Camp Cadet program is to encourage youngsters to think about careers in law enforcement, especially with the PSP. As a part of the Camp Cadet sessions, youngsters are informed of the training that Troopers receive concerning sexual harassment and sexual misconduct.

The Monitor has not yet attended any of the Community Outreach meetings, but expects to do so during the fourth quarter. When fully implemented, the community outreach component of the PSP's Problem Specific Policing Initiative[24] is expected to satisfy the OIG's recommendations on this point. The Monitor has determined that the PSP has attempted to achieve and maintain positive and productive police-community relations.

Based on the foregoing, it appears that the PSP has complied with the OIG's recommendations on this point; however, until the Monitor has attended the outreach meetings, it cannot yet say that it has confirmed that the PSP has complied here.

## I.   ASSIGNMENT OF CASES

The OIG Report (pp. 24-25) recommended that the PSP should assign all allegations of sexual harassment or sexual misconduct directly to the BIPS. This recommendation is related to the OIG Report's other recommendations discussed in Sections I.A. and I.B. in the Second Quarterly Report.

As of the second quarter, the PSP had advised the Monitor that, as of September 26, 2003, all allegations involving sexual harassment and/or sexual misconduct have been investigated by the

---

[23] The Monitor notes that no citizens from the community attended the first of the two advertised scheduled outreach meetings in southern Chester County. The PSP has stated that, while community participation has been less than expected at the initial outreach meetings, citizens contact local barracks on an almost daily basis to, among other things, ask questions, obtain information, and voice complaints and concerns.

[24] The PSP's Problem Specific Policing Initiative went into effect on May 1, 2003.



BIPS, either at its headquarters or at one of its three off-site field units. The PSP had further advised that no investigations involving sexual harassment and/or sexual misconduct are being referred out to the Troops. Bureau Special Order 2004-01, issued on March 10, 2004, quoted above in relevant part at footnote 14, provides that all such investigations shall be assigned to the BIPS. In performing its compliance reviews for the first and second quarters, the Monitor found that all of these investigations came from complaints either initially filed with the BIPS, or from complaints referred to the BIPS from the Troops or the EEOO. The Monitor found that the PSP had complied with this recommendation during the first and second quarters, for the reasons stated in Section I.A. of the Second Report.

**Current Assessment of Compliance**

During its compliance reviews during the third quarter, the Monitor found that the PSP had followed the directives set out above on this issue.

In addition, the Monitor determined that the BIPS has developed a technique which permits streamlined email communications. There is now email access, for authorized users only, which permits users (only from the BIPS) to obtain current information from the BIPS's investigative files and records, including records of all discipline and adjudications.

Based on the foregoing, the PSP has complied with the OIG's recommendations on this point.

## J.    COMMIT ADDITIONAL INVESTIGATORS

The OIG Report (p. 25) recommended that additional investigators be assigned to the BIPS sufficient to permit the BIPS to conduct all investigations of sexual harassment and sexual misconduct by permanently assigned personnel. In its First Quarterly Report, the Monitor noted that two BIPS investigators have been added to BIPS off-site units in Pennsylvania. In that Report, the Monitor recommended that one additional investigator be added to the Philadelphia Office of the BIPS to meet the demanding workload being generated in the Philadelphia area. The Monitor also recommended adding one officer and one non-commissioned officer to BIPS headquarters, as well as one civilian intake employee.

During the second quarter, the PSP had supplemented its organizational structure in this area by creating the position of Deputy Commissioner for Professional Responsibility. The Deputy Commissioner of Professional Responsibility has jurisdiction over the BIPS, [25] the EIPO, the EEOO, and the DDO. While the OIG did not recommend this change in the PSP's organizational structure, the Monitor recognized that there may well be advantages to this change. The Monitor also recognized that the creation of this new Deputy Commissioner position appeared to be an important step in centralizing control and oversight of implementation of the OIG's recommendations, and focusing the PSP's efforts to address issues related to

---

[25] Two other divisions come under the BIPS – The Internal Affairs Division (IAD) and the Systems Process and Review Division (SPR).



misconduct, including sexual harassment and sexual misconduct. In addition to committing two investigators to BIPS off-site units, the PSP stated that it planned to further reorganize the BIPS by moving a Lieutenant from a Department headquarter's Bureau to be permanently assigned to the BIPS to handle case intake. The PSP also advised that it would be conducting an audit in the third quarter to further evaluate staffing needs, reassignment of personnel and budgetary constraints. The Monitor recommended that the PSP make a determination as to whether the BIPS needs additional staffing and resources at its headquarters and/or its off-site units. The Second Report also stated that this determination should be based on the audit and evaluation of the BIPS to determine specific staffing levels and resources needed in light of the issues identified by the OIG.

**Current Assessment of Compliance**

During the third quarter, the PSP added significant numbers of BIPS personnel throughout the Commonwealth. Between the beginning of the first quarter and the end of the third quarter, the PSP realigned two additional investigators to the BIPS complement. To streamline the intake process, the PSP added a lieutenant and transferred a sergeant, and a corporal from another unit. In addition, one investigator has been added to the Western sector of the BIPS and one has been added to the Central sector.

The reorganization of the BIPS, including the new Intake Unit, now permits a review every 30 days of the sexual harassment and sexual misconduct cases, so as to avoid in the future any of the problems noted by the Monitor in Section I.A. above, concerning the "timeline" of an investigation during the 18 months from the filing of the initial complaint to the issuance of discipline. In addition, this reorganization allows the BIPS to more easily insure that all sexual harassment and sexual misconduct cases are being handled by the BIPS, rather than elsewhere in the PSP, and to better coordinate the sexual harassment cases with the EEOO.

The Monitor has determined that the BIPS now has a complement of investigators that can adequately handle the caseload of approximately 500 investigations each year. (The vast majority of these approximately 500 investigations do not involve allegations of sexual harassment and/or sexual misconduct.)

The file room for the BIPS has been reorganized so as to permit investigators for the BIPS to easily follow each event in a Trooper's career with the PSP, including prior discipline.

Based on the foregoing, the PSP has complied with the OIG's recommendations on this point. The Monitor recommends that the PSP continue to evaluate staffing needs at the BIPS, in light of caseloads and available resources.



## K. DOCUMENTATION OF WITNESS INTERVIEWS

The OIG Report (p. 26) recognized that the PSP has a policy that all BIPS investigations should include documentation for each witness interview. The OIG recommended that, if the PSP did not follow the OIG's prior recommendation that all sexual harassment/sexual misconduct investigations be conducted by BIPS personnel, then the PSP should establish a written policy requiring all PSP members to document all witness interviews. In our First Quarterly Report, the Monitor stated that the BIPS had established a policy, promulgated on September 26, 2003, requiring that only BIPS personnel conduct sexual harassment and sexual misconduct investigations and requiring documentation in all BIPS investigations. As of the issuance of the September 26, 2003 oral directive, the PSP had complied with the literal requirements of the OIG's recommendations.

The PSP issued Bureau Special Order 2004-01 on March 10, 2004, which mandates that all witness interviews during a sexual harassment or sexual misconduct investigation must be documented in writing, or by an audiotape recording. By issuing this written directive, the PSP went beyond the literal requirements of the OIG's recommendations. Furthermore, requiring written and/or audiotaped witness statements is consistent with the best policing practices. This directive in the Bureau Special Order will become part of the revised AR 4-25, Internal Investigations. Based on its compliance reviews during the first and second quarters of the 18 open files, the Monitor determined that the PSP complied with the OIG's recommendations on this point.

**Current Assessment of Compliance**

The Monitor determined that, of the total of 22 files which had been open at some time during the third quarter, all 22 files included the appropriate documentation of witness interviews.

Based on the foregoing, the PSP has complied with the recommendations contained in the OIG's Report.

## L. PROTECTION FROM ABUSE ORDERS

The OIG Report (pp. 27-28) recommended that the PSP implement additional measures in addressing Protection From Abuse (PFA) Orders involving members of the PSP. The OIG Report encouraged the PSP to consult and consider the model policy adopted by the International Association of Chiefs of Police (IACP) on Police Officer Domestic Violence in amending its regulations. In addition, the OIG Report recommended that the PSP adopt a policy requiring the BIPS to continue a domestic violence investigation even if the complaining victim recants or withdraws a PFA Order. The relevant Field Regulation, FR 7-6, which was in effect at the time


of the OIG Report, was issued on April 27, 2000.[26] The Monitor reported in its First Quarterly Report that the BIPS was in the process of drafting a policy, consistent with the OIG's recommendation, based on the model policy of the IACP.

During the second quarter, the Monitor was advised that the PSP was planning to issue a revised FR 7-6. The PSP examined the IACP model, but found the model to be inadequate for the PSP's specific needs. The PSP stated that it was continuing to develop its policy on this issue. The Monitor determined that the PSP had not yet complied with the recommendations in the OIG Report.

**Current Assessment of Compliance**

The PSP has drafted a regulation on PFA Orders involving PSP personnel. The PSP presented the draft regulation to the Monitor for technical assistance and best practices recommendations. The Monitor, at the end of the third quarter, has not yet responded to the PSP's request for technical assistance and best practices recommendations regarding the proposed revision of FR 7-6.

As of the end of the third quarter, there were three open cases against PSP personnel involving physical abuse, stalking, or harassing behavior against spouses, ex-spouses, or intimate partners, all of which include PFA Orders. (There are 15 domestic violence cases, currently under review by the BIPS, which do not involve PFA Orders.)

The Monitor recommends that, when FR 7-6 is revised, it should contain language, similar to that contained in the IACP model policy, which mandates that Troopers who have PFA Orders lodged against them must surrender their weapons. The Monitor also recommends that the proposed revision of FR 7-6 include language placing a Trooper who is the subject of a PFA Order on restricted duty.

Based on the foregoing, the PSP has not yet complied with the OIG's recommendations.

---

[26] The prior version of FR 7-6, issued on April 27, 2000, provided, in part: "Domestic violence incidents and violations of PFA Orders shall not, under any circumstances, be cancelled by the complainant or by any other person(s). All incidents shall require personal contact with the victim and the complainant."



## M.  FULL INVESTIGATIONS

The OIG Report (p. 30) recommended that the PSP emphasize the importance of completing a full investigation into allegations of sexual harassment and sexual misconduct, through training and supervisory reviews.  While the Monitor previously reported that the PSP already required full investigations of such allegations, it was necessary for the PSP to provide comprehensive definitions of sexual harassment and sexual misconduct so that there would be written policies as to what kind of matters would be fully investigated.

In its Second Quarterly Report, the Monitor noted that comprehensive definitions of sexual harassment and sexual misconduct were set out in AR 4-26, issued on April 30, 2004.  As of the date of the issuance of the Second Report, there had not yet been any training programs where members of the BIPS had been instructed as to the necessity of full investigations in such cases.  The Monitor observed that the PSP does require full investigations into all cases; however, the PSP had not conducted any specific training programs where members of the BIPS had been instructed as to the nuances and subtleties of handling sexual harassment and sexual misconduct investigations.  The Monitor found that the PSP did not comply with this OIG recommendation during the second quarter.

### Current Assessment of Compliance

The Monitor's compliance reviews of the 22 files which had been open at some time during the third quarter showed that there had been full investigations in all 22 of these files.  As set forth below in Section IV.A., Sexual Harassment Training, the PSP held training for nine of the 16 BIPS IAD investigators on conducting investigations of sexual harassment complaints.  The only investigators conducting sexual harassment and/or sexual misconduct investigations will be those BIPS investigators who have been trained.  The Monitor has not yet evaluated this training provided to the BIPS investigators.

Based on the foregoing, the PSP has partially complied with these OIG recommendations.

## N.  SUMMARY OF THE MONITOR'S RECOMMENDATIONS

1.    **Commit Additional Investigators (Section I.J.).** As set out more fully in Section I.J., the Monitor recommends that the PSP continue to evaluate staffing needs at the BIPS in light of case loads and available resources.

2.    **Protection From Abuse Orders (Section I.L.).** As set out more fully in Section I.L., the proposed revision of FR 7-6 should contain language which requires that a Trooper who has a Protection From Abuse (PFA) Order lodged against him or her must (1) surrender his or her weapon, and (2) be placed on restricted duty.



Office of the Independent Monitor
of the Pennsylvania State Police

## II. DISCIPLINE

### A.  MEMBER TRANSFERS

The OIG Report (p. 34) recommended that, when a member of the PSP is transferred, information about all "sustained," "not-sustained," "unfounded," and "withdrawn" cases should be provided to the current supervisor and new supervisors.  The Monitor reported in its First Quarterly Report that the PSP stated that it would implement this policy, beginning in 2004.  The Monitor also observed that certain items of information, which the PSP had recently included in its transmittals of information to the current and new supervisors, were obtained pursuant to the Early Intervention Program (EIP) discussed at pages 27-28 of our First Quarterly Report.[27]

In its Second Report, the Monitor observed progress during that quarter on the PSP's transmittal of information, specifically records of complaints and dispositions, from the BIPS to current and new supervisors when members were transferred under their command.   The OIG's recommendation was implemented as of February 27, 2004, with the first transmittal of information to new supervisors when members were transferred under their command.  The Monitor noted that the PSP was then using documentation to furnish the information described above to the new supervisors.  The Monitor also reported that the PSP was continuing to try to find appropriate software to improve the reliability of the methods of communication of this information.  The PSP advised that it would make policy changes to AR 4-25 to reflect this change during the upcoming quarters.  The Monitor found that the PSP had complied with the implementation of this OIG recommendation.   The PSP had not complied with the implementation portion of this recommendation to state this new policy in writing.

**Current Assessment of Compliance**

During the third quarter, the PSP made improvements in tracking member transfers.  The new Intake Unit at the BIPS, as more fully described in Section I.J., is now required to do a search of the BIPS database, to determine if there are any records of any discipline matters, within two weeks of the BIPS's receiving notice of a member's transfer or promotion.  If the BIPS finds any discipline matters, that information will be transmitted to the appropriate Commander.

An Internal Affairs Division Order has been issued mandating the Intake Unit to provide detailed BIPS histories to the Commanding Officers of newly transferred members.  The PSP intends to incorporate this Order into the revised AR 4-25.

Based on the foregoing, the PSP has complied with the OIG's recommendation on this point.

---

[27] In its First Report, Kroll also noted that, on December 31, 2003, the PSTA filed, with the Pennsylvania Labor Relations Board, a charge of an unfair labor practice against the PSP for implementation of the EIP.  This matter is still pending.









## B. TREAT SEXUAL HARASSMENT AND SEXUAL MISCONDUCT AS SERIOUS OFFENSES

The OIG Report (p. 37) recommended that, consistent with the PSP's zero tolerance policy on sexual harassment and sexual misconduct, the PSP should establish and embrace a policy treating sexual harassment and sexual misconduct as serious offenses, and discouraging them institutionally. As the Monitor stated in its First Quarterly Report, this recommendation has been accomplished through Bureau Special Order 2003-39, setting out the PSP's zero tolerance policy. As stated in its Second Report, the Monitor found that the PSP complied with this recommendation. The PSP actively investigated 18 complaints in the first and second quarters, consistent with enforcing its rules and regulations regarding sexual harassment and sexual misconduct and discouraging these offenses institutionally.

**Current Assessment of Compliance**

During the third quarter, the PSP adopted a revised version of AR 4-6. This regulation, titled Rules of Conduct for Employees, now includes a provision prohibiting discrimination or harassment based on an individual's sexual orientation. Section 6.03, A.6., provides, in part, as follows:

> Discrimination or Harassment: Employees shall not discriminate or harass, for or against, any other employee, member or the public, on the basis of race, color, sex, religion, national origin, age, disability, or sexual orientation....

Also during the third quarter, the Monitor, in its compliance reviews of the 22 files which were open for at least a part of the quarter, determined that these matters were being handled by the PSP in accordance with its zero tolerance policy, as well as with the rules and regulations regarding sexual harassment and sexual misconduct.

Based on the foregoing, the PSP has complied with the OIG's recommendations on this point.

## C. ESTABLISH DEFINITIVE GUIDELINES

The OIG Report (pp. 37-39) recommended that the PSP establish uniform and consistent disciplinary guidelines, with serious consequences, for members engaging in sexual harassment and/or sexual misconduct. The OIG Report found that there were "disparities in the discipline imposed . . . on different individuals engaging in similar sexual activity while on duty" (p. 38). The Report also stated (p. 39):

> Furthermore, to add uniformity and consistency to disciplinary decisions, the State Police should attempt to set definitive guidelines stating the appropriate discipline for specific kinds of misconduct. For example, the guidelines could provide that a Member found to have engaged in sex on duty will be subject to dismissal. In some instances, a maximum and minimum sanction might be appropriate. Such guidelines will establish consistency as well as notify Members and the public of the State Police's expectations and standards.

Office of the Independent Monitor
of the Pennsylvania State Police

In the Monitor's Second Report, the Monitor stated that it believed - as did both the PSP and the PSTA - that the proposed Discipline Matrix had serious deficiencies, and needed to be revised. Despite the many years of work and thought which was put into the Matrix by both the PSP and the PSTA, the Monitor found that the proposed Matrix was fundamentally unworkable.

As the Monitor stated in its Second Report (p. 19):

> Based on the informal discussions that the Monitor has had with members of the PSP and of the PSTA, there appears to be broad consensus that the proposed Discipline Matrix produces penalties that are not consistent, promotes unnecessary litigation, wastes the time and money of both the PSP and the PSTA, and results in lengthy delays. If the parties are serious about achieving both consistency and fairness, they are going to have to be prepared to explore approaches substantially different from the PSP's and the PSTA's jointly proposed Matrix. One possible approach would be for the parties to focus revisions on a core group of the most serious infractions, including sexual harassment and sexual misconduct, and to later revise the remainder of the Matrix, to meet the recommendations of the Deal Commission, as suggested by the OIG.

After noting that the prior negotiations for the proposed Matrix had been in good faith, the Monitor urged the parties to continue to negotiate to meet the recommendations in this section of the OIG Report.

The Monitor stated in its Second Report that it applauded the parties for having successfully resolved 31 outstanding disciplinary actions involving inappropriate use of the PSP's Intranet system, referred to as the Enterprise Network.[29] The Monitor also recommended that the parties agree on a method of resolving any outstanding disciplinary actions involving inappropriate use of the Enterprise Network. As to the unresolved cases, the parties would need to agree upon the penalties to be imposed for each type of case. Kroll also stated that it would then also expect that the parties would agree that, going forward, the newly revised Matrix or other guideline system would be applied after a specific date and that, once the new Matrix went into effect, the former practice of looking to prior results in other cases would be eliminated.

---

[29] During the third quarter, the PSP acquired software which acts, among other things, as a filter to screen out inappropriate uses of the Enterprise Network. Specifically, this software, known as Websense, is being used by the PSP to screen and block out such inappropriate uses as pornographic and/or sexually explicit images, jokes and stories. This use of the Websense software will help deter future misuse of the Enterprise Network by members of the PSP. In addition, for those PSP members who ignore the rules against inappropriate use of the Enterprise Network, the software will also permit the systematic detection of such misuse and comprehensive enforcement, through discipline, of any violations. Websense is also being employed by the PSP as a management tool to prevent the wasteful and unproductive use of employees' time, such as games, gambling, streaming video, etc.



As stated in its Second Report, the Monitor determined that the PSP had not complied with the OIG's recommendations to establish uniform and consistent disciplinary guidelines, with serious consequences, for members engaging in sexual harassment and/or sexual misconduct.

**Current Assessment of Compliance**

During the third quarter, the PSP presented to the PSTA a proposed Memorandum of Understanding (MOU) setting out Discipline Standards for what the PSP viewed as the most significant disciplinary violations. By cover letter dated June 10, 2004, from Commissioner Jeffrey B. Miller to Sgt. Bruce Edwards, President of the PSTA (Exhibit 1), the PSP forwarded its initial proposed MOU to the PSTA. By letter dated June 22, 2004, from Cpl. Dennis Rodriguez, Chairman of the PSTA's Discipline Committee, to Commissioner Miller (Exhibit 2), the PSTA stated that the PSP's proposed MOU in its then current form was unacceptable. The PSTA, however, expressed its commitment to formulating a fair discipline system and its willingness to continue to meet with the PSP to reach common ground. After a series of meetings with the PSTA, the PSP submitted several revisions of the initial MOU. The last MOU was presented by the PSP on July 28, 2004. This proposal, which was made during CBA negotiations with the PSTA, set out 11 infractions for which the sanction would be automatic dismissal. Of those 11 infractions, one applied to sexual harassment and sexual misconduct. As phrased in the July 28, 2004 proposal, this infraction was described as follows:

> [7] Engaging in sexual misconduct; or serious sexual harassment as defined in Administrative Regulation 4-26, including use of position, to obtain or attempt to obtain sexual favors; or engaging in further sexually harassing conduct despite prior disciplinary action.

Despite the approximately seven weeks of hard work and diligent effort put forth by both parties, on July 29, 2004, the PSTA told the PSP that the negotiations were "at an impasse," and announced their withdrawal from the CBA negotiations on the discipline issue. Because the PSTA withdrew from the CBA negotiations on this issue, and decided to proceed with its case on discipline in the Act 111 interest arbitration proceedings, there was no agreement as to any of the PSP's proposals. As of the date of the issuance of this Report, the Monitor has been advised that discipline is a subject of the Act 111 interest arbitration proceedings, presently underway in Harrisburg. The PSTA presented its case on discipline at the end of the third quarter; the PSP will present its case on discipline during the fourth quarter.

While the Monitor believes that the proposals made by the PSP were a reasonable first step toward compliance with the OIG's recommendations on this point, the PSP has not, as of the end of the third quarter, complied with the OIG's recommendations. The Monitor recognizes that the PSP cannot compel the PSTA to enter into agreements concerning such CBA issues as discipline; moreover, the Monitor recognizes that the PSTA has legal rights which it can seek to protect in the CBA negotiations. But the Monitor can express its deep disappointment that the parties have not reached an agreement to reform at least some aspects of what both parties agree is a mostly ineffective and inconsistent system of discipline.



Since the PSTA willingly agreed to participate in the CBA negotiating sessions, and since the PSP produced several revised MOUs, apparently in response to comments by the PSTA, the withdrawal by the PSTA is puzzling. While it is true that the PSTA was not required to negotiate a new CBA – the PSTA could opt to defer to the Act 111 interest arbitration proceedings – the PSTA's current stance seems at odds with its prior statements that it wanted to work out a fair system of discipline.

In a letter to Governor Edward G. Rendell dated October 1, 2003 (Exhibit 3), Sgt. Edwards pledged the PSTA's full cooperation to work with the PSP to insure that individuals who engage in "such egregious offenses as sexual harassment and sexual misconduct," and who, accordingly, violate the public trust, should "not be among" the PSP's ranks. Sgt. Edwards, on behalf of the PSTA, continued,

> To that end, we embrace the Office of the Inspector General's recommendation that PSP develop guidelines for appropriate levels of discipline for various offenses. Further, we look forward to work[ing] with the Department in developing these guidelines and are prepared to do so immediately. Upon the successful development and implementation of these guidelines, the PSTA is willing to commit that the guidelines will be utilized as the **new baseline for all future grievance and arbitration proceedings!** (emphasis in original).

In light of this assurance, the Monitor is at a loss to understand the PSTA's decision to withdraw from the CBA negotiations on discipline. Because the PSP had already offered several proposed MOUs which had narrowed the initial MOU, it appears that the negotiations were making progress, and that there was no obvious reason why the PSTA could not have continued the negotiations. Despite Sgt. Edwards's pledge of full cooperation in his letter to Governor Rendell, the PSTA withdrew from the negotiations after only seven weeks. The Monitor understands that the PSTA had not made any written objections to the last MOU proposed by the PSP, and that the PSTA had not offered a counter-proposal.

In a letter from the PSP to the PSTA dated July 16, 2004 (Exhibit 4), the PSP stated that it was committed to meeting with the PSTA's representatives to negotiate the disciplinary issues throughout the Act 111 process. The PSP further stated that, if the parties were unable to reach a mutually acceptable resolution on these issues by the end of the Act 111 interest arbitration process – which the Monitor understands could take at least two months, and perhaps several months - the panel of arbitrators would have all the information necessary to decide the discipline issues. In what might best be described as a negotiating tactic, the PSTA responded by setting a deadline of July 29, 2004 for the completion of the CBA negotiations on discipline. This deadline might be considered sound strategy, from the PSTA's point of view, or arbitrary, from the PSP's point of view. The PSTA set the July 29, 2004 deadline because, as they stated in a letter dated July 16, 2004 (Exhibit 5), it would be on that date that the Act 111 interest arbitration proceedings were scheduled to start. (The PSTA also stated in the July 16, 2004 letter that they would consider postponing the July 29, 2004 deadline for negotiations if the parties also agreed to postpone the arbitration proceedings.) From the PSP's point of view, there was no


apparent reason to set a deadline of July 29, 2004 on the CBA negotiations, and no apparent reason to postpone the arbitration proceedings.

However, regardless of the merits of the July 29, 2004 deadline – whether this deadline is viewed as sound strategy or as arbitrary - it is nonetheless at odds with the spirit, if not the letter, of Sgt. Edwards's October 1, 2003 letter to Governor Rendell. In his letter to the Governor, Sgt. Edwards speaks of wanting to work with the PSP to develop discipline guidelines "to help restore the public confidence that they do indeed have one of the finest law enforcement organizations in the country." Similarly, the PSTA's recent stance is also at odds with Sgt. Edwards's letter to the editor published in *The Philadelphia Inquirer* (Exhibit 6), titled **"Pa. state troopers favor tough discipline code,"** where he publicly stated that the PSTA "will continue to work with State Police Commissioner Jeffrey Miller on . . . a disciplinary code that is tough, fair to all, and shows no favoritism toward rank." Although the PSTA certainly has the right to change its strategy, the Monitor believes that the PSTA should recognize that the July 29, 2004 deadline represents a change from Sgt. Edwards's letter to the Governor and his letter to the *Inquirer*, where there were no stated time limits. The Monitor reads these letters to mean that the PSTA was pledging its "full cooperation" in developing the discipline guidelines until the guidelines were completed and until the goal of helping to restore public confidence in the PSP was achieved. Since the negotiation of the guidelines has not been concluded, and since the goal of restoring the public's confidence in the PSP has likewise not been achieved, the Monitor would assume that the PSTA would want to keep negotiating with the PSP so that the public's confidence could be restored as soon as possible. The PSTA was a full participant in the negotiations with the PSP of the proposed Discipline Matrix, a process that lasted approximately five years; it is not unreasonable to think that the effort to negotiate discipline guidelines based on the several proposed MOUs would take more than the seven weeks allotted by the PSTA.

Although the PSP has made progress, on a broad variety of issues, that will help deter any recurrences of the type of conduct engaged in by former Trooper Michael K. Evans and other former and current PSP Troopers, as the Monitor has detailed in its three Reports, these reforms, no matter how laudable, will fall well short of the mark set by the OIG unless the PSP can also achieve the fundamental reforms advocated in the Discipline section of the OIG Report. Ultimately, the issue is not whether the PSTA could or should have been more agreeable in its negotiations with the PSP; rather, the issue is how and when the PSP can achieve the reforms recommended in the OIG Report.

The Monitor hopes that the Act 111 interest arbitration proceedings will resolve, as much as possible, the need to meet the OIG's recommendation of serious, consistent guidelines for penalties for sexual harassment and sexual misconduct. But even if the arbitration proceedings do define the particular types of sexual harassment and sexual misconduct that would automatically result in dismissal, the PSP would still need to provide appropriate guidelines for infractions that do not result in dismissal. Specifically, there are certain types of sexual harassment which, if presented as a first infraction, would not be expected to result in dismissal, and for which there should be penalties narrowly targeted for specific types of infractions. For example, for a first and less serious infraction such as leering at a woman, or telling sexual



Office of the Independent Monitor
of the Pennsylvania State Police

jokes/stories, where, in the words of AR 4-26, "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment," the PSP might set a penalty such as a disciplinary transfer and/or suspension without pay, for a pre-set range of days.

Although the Monitor recognizes that its jurisdiction is limited to sexual harassment and sexual misconduct, the Monitor has joined the OIG in suggesting that the PSP give favorable consideration to the recommendations made in 1986 by the Deal Commission. Accordingly, the Monitor believes that the PSP should continue its efforts to establish a codified system of disciplinary guidelines with a comprehensive set of penalties covering all the infractions in the Field Regulations. The Monitor urges the parties to resume negotiations on the discipline issues to meet the recommendations in the OIG Report.

Based on the foregoing, the PSP has not complied with the OIG's recommendations to establish uniform and consistent disciplinary guidelines, with serious consequences, for members engaging in sexual harassment and/or sexual misconduct.

## D.   CENTRALIZE DISCIPLINE IN THE DDO

See discussion in the section below.

## E.   REMOVE DISCIPLINE FROM TROOP COMMANDERS

The OIG Report (pp. 38-39) recommended that the PSP centralize its disciplinary procedures in the Department Discipline Officer (DDO) to make all disciplinary determinations. The OIG Report (pp. 38-39) also recommended that the PSP remove the Troop Commanders from involvement in certain disciplinary decisions. The Monitor has grouped these two recommendations together because they are so closely related. The OIG Report provided two reasons for its recommendations.

After setting out, in the Second Quarterly Report (p. 20), the reasons for these two recommendations in the OIG Report, the Monitor then considered the OIG's reasoning. The Monitor concluded (pp. 21-22) that the OIG's analysis was not well-supported but, in any event, even if the Troop Commanders had been responsible, as suggested by the OIG, for "disparate discipline," the Monitor believed "that there are less drastic means to achieve consistency than taking the Troop Commanders entirely out of the discipline process."

Instead, the Monitor recommended that the PSP train the Troop Commanders in how the various possible scenarios of sexual harassment and sexual misconduct complaints can and should be charged. The Monitor also recommended that the PSP should also produce a training manual concerning sexual harassment/sexual misconduct, so that the Troop Commanders would always have reference materials to consult. This manual should emphasize that all colorable charges should be included in the Disciplinary Action Report (DAR). The training should also include all the Area Commanders, who must review the DARs issued by the Troop Commanders.



Moreover, because there was no stated analysis to support the implicit assertion in the OIG Report that the Troop Commanders should be removed from their role as the adjudicators, the Monitor saw no reason to substitute DDO personnel as the adjudicators.

For these reasons, the Monitor stated in its Second Report that it believed that the Troop Commanders should retain their functions as making charging decisions in the DARs and as the initial adjudicators, subject to review by the Area Commanders.

The Monitor noted that, during the second quarter, the PSP conducted a two-day session on adjudication training. Based on its receipt and review of the curriculum, attendance at this training, and discussions with instructors and attendees, the Monitor believed that this training met its intended goal of providing adjudicators with the tools needed to render fair and informed adjudications. In its Second Report, the Monitor stated that, the PSP had partially complied with the recommendations in the OIG's Report.

**Current Assessment of Compliance**

During the third quarter, the Monitor reviewed various aspects of the interrelationship between the Troop Commanders, the BIPS and the DDO. The Monitor was advised by the DDO, and its compliance review confirmed, that there were no significant omissions from the DARs. Although the OIG had found that the DARs sometimes "included" inconsistent infractions, the Monitor determined that, during the first, second and third quarters, the DARs conformed to the findings of the BIPS's investigations. [30]  Finally, the PSP has advised, and the Monitor confirmed, that the Troop Commanders and Area Commanders received "adjudication" training during the second and third quarters; during this training, these Commanders were advised that they should include all pertinent types of misconduct in the DARs. As of the third quarter, all the Commanders had received adjudication training, at which they were given lesson plans, which included references to the processing of the DARs. Accordingly, the compliance investigation done by the Monitor confirmed its assessment in its Second Report (p. 21) that any

---

[30] The PSP's regulation concerning Discipline, FR 3-3, makes clear that the DDO has the sole and exclusive responsibility of adding the Field Regulations citations to the DARs initially prepared by the Troop Commanders.

> The description of the behavior [by the Troop Commanders in the DARs] shall be brief but sufficiently detailed to support the violation. The description should be specific in terms of identifying the member's conduct, attitude or performance. The specific Field Regulation (example: FR 1-1.02) shall not be listed [by the Troop Commanders]. Applicable Field Regulations sections violated shall be determined by the Discipline Officer.

FR 3-3, Appendage A, C. 6. b.



Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004
Page 34 of 56

**Current Assessment of Compliance**

Based on the foregoing, the Monitor has already determined that the PSP has complied with the OIG's recommendation on this point.

## H. SUMMARY OF THE MONITOR'S RECOMMENDATIONS

1.    **Establish Definitive Guidelines (Section II.C.).**  As is more fully set out in Section II.C., the Monitor recommends that, even if the Act 111 interest arbitration proceedings do define the particular types of sexual harassment and sexual misconduct that would automatically result in dismissal, the PSP should provide appropriate guidelines for infractions that do not result in dismissal.  In addition, the Monitor recommends that the PSP and the PSTA resume negotiations, as soon as possible, on all discipline issues, regardless of the status of the Act 111 interest arbitration proceedings.

## III. PRE-EMPLOYMENT BACKGROUND INVESTIGATIONS AND PROBATIONARY EMPLOYMENT

### A. INCONSISTENCIES IN BACKGROUND INVESTIGATIONS

The OIG Report (p. 51) recommended that the PSP limit the number of investigators performing pre-employment background investigations to be able to increase the consistency with which the investigations are conducted, thereby better screening the applicants for positions as Troopers with the PSP.  The OIG also recommended that the PSP should continue to encourage its investigators to offer their views as to the qualifications of the applicants.  In its First Quarterly Report, the Monitor stated that the PSP had taken limited steps to address deficiencies in its pre-employment screening and probationary employment practices. While the PSP stated that its investigators are encouraged to express opinions as to the suitability of the applicants, the Monitor did not verify this statement in its First Report.

During the second quarter, the Monitor assessed the PSP's current pre-employment background investigation process.  The Monitor found that the PSP was continuing to use Troopers to conduct pre-employment background investigations.[32]  One issue that was identified by the Monitor is that Troopers have busy caseloads which impact on the amount of time available to conduct these investigations.  Although the PSP directed that all background investigations shall be completed by Troopers, the PSP did not limit the number of investigators who are performing background investigations. The PSP stated that limiting the number of investigators would limit its flexibility in conducting background investigations.  The PSP encouraged investigators to express their opinions; however, the investigator's opinion alone will not disqualify an applicant. Opinions that are supported by facts are given more weight than unsupported opinions.

---

[32] The CBA prohibits the PSP from using any outside party, including retirees, from conducting pre-employment background investigations.



Office of the Independent Monitor
of the Pennsylvania State Police

By articulating a comprehensive process by which an adjudication is to be reviewed, the PSP has acted to insure that adjudications are consistent. The PSP intends to place the language from this Order into the next revision of AR 4-25.

Based on the foregoing, the PSP has partially complied with the OIG's recommendations.

## F.   PROVIDE ADDITIONAL STAFFING AT DDO

The OIG Report (p. 39) recommended that the PSP provide additional staffing to the DDO to handle the increased responsibility of issuing all the penalties to the members of the PSP on complaints of sexual harassment and/or sexual misconduct. In the Monitor's First Quarterly Report, Kroll stated that it would provide further evaluations of the PSP's efforts on this matter.

In its Second Report, the Monitor stated that, once the parties have implemented the proposed revised Discipline Matrix, the PSP will then be in a position to evaluate the need for additional staffing at the DDO. The Monitor withheld a determination of compliance with this recommendation.

### Current Assessment of Compliance

Because the PSP has been engaged in CBA negotiations with the PSTA concerning discipline issues, and because these discipline issues are a part of the Act 111 interest arbitration proceedings, the PSP has not yet been able to do an assessment of future personnel needs at the DDO. This is because, depending on the results of the CBA negotiations and of the arbitration proceedings, the possible need for additional DDO staffing cannot yet be determined. Once the CBA negotiations and the arbitration proceedings are concluded, presumably during the fourth quarter, the PSP will then be in a position to do an audit of the DDO to determine what, if any, additional staffing is necessary.

Based on the foregoing, the Monitor will defer its determination of whether or not the PSP has complied with the OIG's recommendations on this point.

## G.   SUPPORT S.B. NO. 877

The OIG Report (p. 43) recommended that the PSP support S.B. No. 877, or similar legislation, requiring the dismissal of members convicted of felonies and some misdemeanors. As stated in its Second Quarterly Report, the PSP supported this legislation. Also as previously reported, Governor Edward G. Rendell signed into law the Confidence in Law Enforcement (CLE) Act on January 29, 2004, which mandated that the PSP suspend, without pay, any members charged with serious offenses, and that the PSP terminate from employment any members convicted of such offenses.

Since the PSP supported the CLE, and the law has been enacted and became effective on July 1, 2004, the PSP has complied with this recommendation.



inconsistencies in the drafting of the DARs did not require the drastic step of attempting to reconfigure the adjudication process, so as to assign the function of drafting DARs to the DDO.[31]

Moreover, the Monitor's compliance reviews showed that there were no instances where the Troop Commanders failed to sustain the initial allegations, as long as the BIPS's investigation supported the charges. Accordingly, there was no evidence during the first three quarters of the Monitor's review to support the implicit assertion in the OIG's Report (pp. 38-39) that the Troop Commanders should be removed from their role as adjudicators. The Commissioner has made clear that his zero-tolerance policy in sexual harassment and/or sexual misconduct matters must be taken seriously by all members of the PSP. If there were any situations where a Troop or Bureau Commander did not sustain an allegation supported by the BIPS's investigation, that failure would be reviewed by his or her supervisor, an Area Commander or a Lieutenant Colonel. With the Commissioner's newly stated policy, and with the element of review by one of the five Area Commanders or four Lieutenant Colonels, the Monitor can see no reason to restructure the PSP, especially in light of its record of there being no failures to sustain supported charges in the first three quarters of the Monitor's review.

Finally, Department Special Order 2004-51, Administrative Investigation Adjudication Review Process, issued on June 4, 2004, provides, in part, as follows:

> If, after consultation, the reviewing officer and the adjudication officer cannot reach consensus as to the adjudication of an administrative investigation, the appropriate Deputy Commissioner shall be contacted for further guidance/consultation. This Deputy Commissioner may mediate the matter; remand the matter for adjudication by the Troop Commander or Office/Division Director; reassign the adjudication to the appropriate Area Commander/Bureau Director; or request that the Deputy Commissioner of Professional Responsibility reassign the adjudication.

---

[31] Other reasons support the Monitor's determination in its Second Report that the adjudication function, which includes drafting the DARs, should remain with the Commanders. One of the reasons supporting this view is that there is now an intended separation of functions in the discipline process, much as there is in state and federal criminal prosecutions. Here, it is the function of the Commanders: (1) to make the initial referral of sexual harassment and/or sexual misconduct matters to the BIPS; (2) to issue the DARs and make appropriate findings (both part of the adjudication process) once the Commanders have received investigative reports from the BIPS, and to then refer the case to the DDO for the imposition of penalties; and, finally, (3) to give the DARs to the subject Troopers, including the penalty set by the DDO. It is the function of the BIPS to investigate all matters appropriately referred to them. Lastly, it is the function of the DDO: (1) to identify the specific Field Regulations violated in each case, based on the description of the subject's conduct in the DARs issued by the Commanders, and to enter the name and section number of the infractions on the DARs; and (2) to set the penalties. Any alterations of this three-part system would require major restructuring, and could, if the OIG's recommendations were followed, result in an inappropriate delegation of multiple duties to a unit not now equipped to handle those duties. As noted above, in the state and federal criminal justice systems, there are a number of separate functions – investigative agents, prosecutors, probation officers and judges all have separate functions. While, theoretically, these systems could be reconfigured, in the Monitor's opinion there is no more reason to restructure the PSP than there is to restructure the criminal justice system.



inconsistencies in the drafting of the DARs did not require the drastic step of attempting to reconfigure the adjudication process, so as to assign the function of drafting DARs to the DDO.[31]

Moreover, the Monitor's compliance reviews showed that there were no instances where the Troop Commanders failed to sustain the initial allegations, as long as the BIPS's investigation supported the charges. Accordingly, there was no evidence during the first three quarters of the Monitor's review to support the implicit assertion in the OIG's Report (pp. 38-39) that the Troop Commanders should be removed from their role as adjudicators. The Commissioner has made clear that his zero-tolerance policy in sexual harassment and/or sexual misconduct matters must be taken seriously by all members of the PSP. If there were any situations where a Troop or Bureau Commander did not sustain an allegation supported by the BIPS's investigation, that failure would be reviewed by his or her supervisor, an Area Commander or a Lieutenant Colonel. With the Commissioner's newly stated policy, and with the element of review by one of the five Area Commanders or four Lieutenant Colonels, the Monitor can see no reason to restructure the PSP, especially in light of its record of there being no failures to sustain supported charges in the first three quarters of the Monitor's review.

Finally, Department Special Order 2004-51, Administrative Investigation Adjudication Review Process, issued on June 4, 2004, provides, in part, as follows:

> If, after consultation, the reviewing officer and the adjudication officer cannot reach consensus as to the adjudication of an administrative investigation, the appropriate Deputy Commissioner shall be contacted for further guidance/consultation. This Deputy Commissioner may mediate the matter; remand the matter for adjudication by the Troop Commander or Office/Division Director; reassign the adjudication to the appropriate Area Commander/Bureau Director; or request that the Deputy Commissioner of Professional Responsibility reassign the adjudication.

---

[31] Other reasons support the Monitor's determination in its Second Report that the adjudication function, which includes drafting the DARs, should remain with the Commanders. One of the reasons supporting this view is that there is now an intended separation of functions in the discipline process, much as there is in state and federal criminal prosecutions. Here, it is the function of the Commanders: (1) to make the initial referral of sexual harassment and/or sexual misconduct matters to the BIPS; (2) to issue the DARs and make appropriate findings (both part of the adjudication process) once the Commanders have received investigative reports from the BIPS, and to then refer the case to the DDO for the imposition of penalties; and, finally, (3) to give the DARs to the subject Troopers, including the penalty set by the DDO. It is the function of the BIPS to investigate all matters appropriately referred to them. Lastly, it is the function of the DDO: (1) to identify the specific Field Regulations violated in each case, based on the description of the subject's conduct in the DARs issued by the Commanders, and to enter the name and section number of the infractions on the DARs; and (2) to set the penalties. Any alterations of this three-part system would require major restructuring, and could, if the OIG's recommendations were followed, result in an inappropriate delegation of multiple duties to a unit not now equipped to handle those duties. As noted above, in the state and federal criminal justice systems, there are a number of separate functions – investigative agents, prosecutors, probation officers and judges all have separate functions. While, theoretically, these systems could be reconfigured, in the Monitor's opinion there is no more reason to restructure the PSP than there is to restructure the criminal justice system.



By articulating a comprehensive process by which an adjudication is to be reviewed, the PSP has acted to insure that adjudications are consistent. The PSP intends to place the language from this Order into the next revision of AR 4-25.

Based on the foregoing, the PSP has partially complied with the OIG's recommendations.

## F.   PROVIDE ADDITIONAL STAFFING AT DDO

The OIG Report (p. 39) recommended that the PSP provide additional staffing to the DDO to handle the increased responsibility of issuing all the penalties to the members of the PSP on complaints of sexual harassment and/or sexual misconduct. In the Monitor's First Quarterly Report, Kroll stated that it would provide further evaluations of the PSP's efforts on this matter.

In its Second Report, the Monitor stated that, once the parties have implemented the proposed revised Discipline Matrix, the PSP will then be in a position to evaluate the need for additional staffing at the DDO. The Monitor withheld a determination of compliance with this recommendation.

### Current Assessment of Compliance

Because the PSP has been engaged in CBA negotiations with the PSTA concerning discipline issues, and because these discipline issues are a part of the Act 111 interest arbitration proceedings, the PSP has not yet been able to do an assessment of future personnel needs at the DDO. This is because, depending on the results of the CBA negotiations and of the arbitration proceedings, the possible need for additional DDO staffing cannot yet be determined. Once the CBA negotiations and the arbitration proceedings are concluded, presumably during the fourth quarter, the PSP will then be in a position to do an audit of the DDO to determine what, if any, additional staffing is necessary.

Based on the foregoing, the Monitor will defer its determination of whether or not the PSP has complied with the OIG's recommendations on this point.

## G.   SUPPORT S.B. NO. 877

The OIG Report (p. 43) recommended that the PSP support S.B. No. 877, or similar legislation, requiring the dismissal of members convicted of felonies and some misdemeanors. As stated in its Second Quarterly Report, the PSP supported this legislation. Also as previously reported, Governor Edward G. Rendell signed into law the Confidence in Law Enforcement (CLE) Act on January 29, 2004, which mandated that the PSP suspend, without pay, any members charged with serious offenses, and that the PSP terminate from employment any members convicted of such offenses.

Since the PSP supported the CLE, and the law has been enacted and became effective on July 1, 2004, the PSP has complied with this recommendation.



**Current Assessment of Compliance**

Based on the foregoing, the Monitor has already determined that the PSP has complied with the OIG's recommendation on this point.

## H. SUMMARY OF THE MONITOR'S RECOMMENDATIONS

1. **Establish Definitive Guidelines (Section II.C.).** As is more fully set out in Section II.C., the Monitor recommends that, even if the Act 111 interest arbitration proceedings do define the particular types of sexual harassment and sexual misconduct that would automatically result in dismissal, the PSP should provide appropriate guidelines for infractions that do not result in dismissal. In addition, the Monitor recommends that the PSP and the PSTA resume negotiations, as soon as possible, on all discipline issues, regardless of the status of the Act 111 interest arbitration proceedings.

## III. PRE-EMPLOYMENT BACKGROUND INVESTIGATIONS AND PROBATIONARY EMPLOYMENT

### A. INCONSISTENCIES IN BACKGROUND INVESTIGATIONS

The OIG Report (p. 51) recommended that the PSP limit the number of investigators performing pre-employment background investigations to be able to increase the consistency with which the investigations are conducted, thereby better screening the applicants for positions as Troopers with the PSP. The OIG also recommended that the PSP should continue to encourage its investigators to offer their views as to the qualifications of the applicants. In its First Quarterly Report, the Monitor stated that the PSP had taken limited steps to address deficiencies in its pre-employment screening and probationary employment practices. While the PSP stated that its investigators are encouraged to express opinions as to the suitability of the applicants, the Monitor did not verify this statement in its First Report.

During the second quarter, the Monitor assessed the PSP's current pre-employment background investigation process. The Monitor found that the PSP was continuing to use Troopers to conduct pre-employment background investigations.[32] One issue that was identified by the Monitor is that Troopers have busy caseloads which impact on the amount of time available to conduct these investigations. Although the PSP directed that all background investigations shall be completed by Troopers, the PSP did not limit the number of investigators who are performing background investigations. The PSP stated that limiting the number of investigators would limit its flexibility in conducting background investigations. The PSP encouraged investigators to express their opinions; however, the investigator's opinion alone will not disqualify an applicant. Opinions that are supported by facts are given more weight than unsupported opinions.

---

[32] The CBA prohibits the PSP from using any outside party, including retirees, from conducting pre-employment background investigations.

Case 1:00-cv-01655-SHR    Document 52-4    Filed 02/10/2005    Page 51 of 87

**Kroll**

Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004
Page 35 of 56

The Monitor also found that the PSP had implemented additional standards for investigators by directing any investigator who discovers an automatic disqualification factor during the course of the investigation to contact the Bureau of Human Resources (BHR) immediately.

The Monitor determined that the Deputy Commissioner of Administration, through the BHR, had directed that all Cadet applicants must complete a pre-employment polygraph examination. The Polygraph Review Committee makes pass/fail decisions. An issue that has been identified by the Monitor is whether polygraph examiners should be permitted to conduct post-test interrogations of applicants. A second issue that has arisen is whether to place a polygraph examiner on the Polygraph Review Committee. On another issue, the PSP has prohibited polygraph examiners and background investigators from conducting an examination or background investigation on an applicant they know either personally or professionally.

**Current Assessment of Compliance**

During the third quarter, the PSP drafted a proposal to use PSP retirees to assist in the completion of background investigations. The use of an established pool of retirees would, in the PSP's opinion, limit to some extent the number of investigators performing pre-employment background investigations and promote more consistency in the manner in which the investigations are conducted. The PSP has advised that the use of retirees to assist in background investigations is a subject of the Act 111 interest arbitration proceedings.

The PSP, also in an effort to promote greater consistency in all background investigations, drafted a training manual for investigators doing background checks on applicants for positions as Troopers. This manual, expected to receive final approval during the fourth quarter, is designed not only for use in training the investigators, but also to assist the investigators when they are conducting background investigations. Among other things, this manual will permit investigators and their supervisors to include their subjective opinions as to the suitability or unsuitability of applicants for positions as Troopers. However, although the manual requires investigators to make derogatory comments when appropriate, it does not explicitly require investigators and/or reviewing officers to express their opinions specifically regarding the suitability or unsuitability of an applicant for a position as a Trooper.[33] The Monitor recommends that the PSP consider amending the manual to require background investigators and reviewing officers to express such opinions directly.

At the end of the third quarter the Monitor became aware of a matter involving an applicant who, during the PSP background investigation, admitted to having a sexual relationship many years earlier, when he was 19, with a 15- or 16-year old girl. The applicant passed the initial

---

[33] The manual requires that all derogatory information, regardless of the source, shall be included in the background investigation. It further provides, at Section 1., Investigator's/Reviewing Officers' Comments, that "[i]investigators may also make any comments that they would like to include in the investigation . . . . Investigators shall make comments regarding the applicant's demeanor, timeliness in attending the interview or submitting documents, etc., when the comments may be derogatory in nature."



Office of the Independent Monitor
at the Pennsylvania State Police

background check and was admitted to the State Police Academy. While he was at the academy, the PSP apparently received additional information and the applicant was thereafter denied a position as a Trooper. Although the Monitor has not had sufficient time to review the facts of this matter, it may be instructive to review the facts on a hypothetical basis during the fourth quarter to assess the PSP's compliance with the OIG's recommendations concerning background investigations and probationary employment.

The PSP, through the BHR, has scheduled background investigation training for criminal investigators and supervisors to be held at headquarters and at the four regional training sites during the fourth quarter.

Also during the third quarter, the PSP maintained its prior practice of having investigations of applicants performed by personnel of the Troop in the area where the applicant resides. The PSP initiated a new policy that even if the investigator conducting the background check believes that information has been uncovered which should disqualify the applicant, the investigator is not permitted to offer the applicant a voluntary withdrawal form. Moreover, if an applicant wishes to withdraw, he or she must now obtain the appropriate form from the BHR, rather than from the background investigator. If the investigator determines that there has been evidence of an automatic disqualification factor, the investigator should immediately contact the BHR. An investigation can be terminated only at the direction of the BHR.

In addition, during the third quarter the PSP adopted a new policy of not permitting a polygraph examiner to offer a voluntary withdrawal form to an applicant who the examiner feels has lied during the polygraph interview. The PSP has determined that a polygraph examiner may conduct a second, follow-up polygraph if the polygraph examiner believes that such a follow-up polygraph is warranted; however, if the examiner makes his or her determination that a follow-up is appropriate during normal business hours, he or she must contact the BHR so that the BHR can be consulted on this matter.

The PSP has prepared a draft memo which, when finalized, will be forwarded to all of the PSP's polygraph examiners. This memo will cover the various situations that may arise during the course of the examiner's interactions with the applicants. Moreover, the PSP has established a new policy by which polygraph examiners are prohibited from advising the applicant whether he or she has passed or failed the polygraph examination; rather, the applicant will only be so informed by the BHR, and then only after the Polygraph Review Panel has analyzed the information received from the polygraph examiner. If the applicant disputes the accuracy of this determination, then he or she can appeal to the Polygraph Review Panel.

Based on the foregoing, the PSP has partially complied with the OIG's recommendations on this point.



## B.  STANDARDS AND TRAINING OF THE APPEAL PANEL

The OIG Report (p. 57) recommended that the PSP take steps to guide the Background Investigation Appeal Panel and to assist the Panel in making more considered decisions. Specifically, the Report recommended that the PSP provide the Appeal Panel with additional training, especially by articulating more specific standards for evaluating appeals by applicants who have initially been rejected as unsuitable.  The OIG also recommended that the "Panel should exercise great caution in reversing a disqualification of a candidate" by the PSP following its investigation.  In its First Quarterly Report, the Monitor found that the PSP had not yet complied with the OIG Report's recommendations.  As of the Second Quarterly Report, standards had not yet been developed for the Appeal Panel, nor had training been provided.[34]

**Current Assessment of Compliance**

During the third quarter, the PSP did not provide training to the Appeal Panel, nor had specific standards been articulated or burdens of proof established for the Appeal Panel to consider prior to rendering a decision on an applicant. The PSP stated that, during the fourth quarter, it will provide training to members of the Polygraph Review Panel, the Background Investigation Screening Panel, and the Background Investigation Appeal Panel.

Based on the foregoing, the PSP has not complied with the OIG's recommendations to address deficiencies in the appeal process.

## C.  COORDINATE PROBATIONARY REVIEW WITH BIPS AND EEOO

The OIG Report (p. 58) recommended that the PSP take steps to coordinate the probationary review of Troopers with the BIPS and the EEOO before the Troopers complete their 18 month probationary periods.  If, during the probationary period, there is an open investigation of a Cadet/Trooper for alleged misconduct, of any kind, the OIG Report recommended that the PSP should take steps to extend the probationary period until the matter under investigation is resolved.  In its First Quarterly Report, the Monitor reported that the PSP was following the recommendations to extend probationary periods, but that the PSP stated that a formal change extending probationary periods would require the cooperation of the PSTA and a change in the CBA.

During the second quarter, the Monitor assessed whether the PSP was taking steps to coordinate the probationary review with the BIPS and the EEOO before a member passed his or her probationary period, and whether the PSP was extending the probationary period whenever a BIPS investigation was pending.  According to the PSP, the PSTA, when requested, allowed the probationary periods to be extended under these circumstances.

---

[34]The Monitor stated in the Second Quarterly Report that the Appeal Panel is comprised of three Majors and one person from the Office of Administration.  During the preparation of this (Third) Report, the Monitor was advised that its Second Report was in error on this point; the Background Investigation Appeal Panel is instead composed of two Majors and one civilian from the Office of Administration.



In its Second Report, the Monitor stated that the PSP had taken steps to coordinate the probationary review of Troopers with the BIPS/IAD and the BHR before the Troopers completed their 18 month probationary period. The Monitor recommended that the PSP take additional steps to establish a written policy to include the EEOO in the coordination of the background investigations, as recommended by the OIG. The PSP had stated that revised AR 4-25 and draft AR 4-26 would direct the BIPS to notify the EEOO of all sexual harassment and sexual misconduct complaints before Troopers complete their 18 month probationary period.

During the first and second quarters (November 1, 2003 through April 30, 2004), there had been one Trooper who had his/her probationary period extended as a result of a pending BIPS investigation. This Trooper was the only one who had a pending BIPS investigation during his/her probationary period during these quarters.

**Current Assessment of Compliance**

During the third quarter, there had been one Trooper who had his/her probationary period extended as a result of a pending BIPS investigation. This Trooper was the only one who had a pending BIPS investigation during his/her probationary period during the third quarter. This pending BIPS investigation did not involve sexual harassment or sexual misconduct.

The PSP has drafted a revision to AR 5-2, section 2.09, requiring the probationary period of Troopers to be extended pending the completion of an investigation by the BIPS. The PSP expects to issue the revised AR 5-2 during the fourth quarter.

Based on the foregoing, the PSP has partially complied with the OIG's recommendations by implementing extensions of the probationary periods. The PSP has not complied with the written policy and procedure recommendations. The Monitor repeats its recommendation that coordination of the probationary review between the BIPS and the EEOO and the need for extensions of the probationary period, where appropriate, should be reflected in written policy.

## D.   COORDINATE WITH OTHER OFFICES

The OIG Report (p. 58) recommended that the BIPS, the EEOO, and the member assigned to conduct the general background investigation of the Trooper coordinate their activities before the end of the Trooper's probationary period. In its First Quarterly Report, the Monitor stated that this recommendation required better coordination and had raised the awareness of the PSP. The Monitor also stated that this recommendation appeared to have created a climate for more information sharing.

In its Second Report, the Monitor stated that the required coordination with the BIPS, the EEOO, and the assigned member, before the end of the probationary period, was not taking place. The Monitor recommended that the PSP consider developing standards to require coordination among relevant Bureaus, Offices, and personnel. The Monitor stated that the PSP had not complied with this OIG recommendation.



Office of the Independent Monitor
of the Pennsylvania State Police

**Current Assessment of Compliance**

During the third quarter, the PSP has not fully coordinated with the BIPS, the EEOO, and the assigned member, before the end of the probationary period. The BHR does, as part of the review process, provide a list of names of probationary Troopers to the BIPS and requests all disciplinary records from the BIPS; if any records exist, they are included in the probationary Trooper's file for review. The PSP has drafted a revision to AR 5-2, Section 2.09, to require the BHR, the BIPS, and the EEOO to determine if a probationary Trooper is the subject of any completed, open, or pending investigation or inquiry. The draft policy also includes consideration of a probationary Trooper's Cadet background investigation and disciplinary history while at the police academy.

Based on the foregoing, the PSP has partially complied with this OIG recommendation.

## E.  COMPLAINTS AGAINST PROBATIONARY MEMBERS

The OIG Report (p. 59) recommended that the PSP re-examine the pre-employment background investigation when a complaint is made against a probationary member. In its First Quarterly Report, the Monitor stated that the PSP had said that it was re-examining its investigation practices when a complaint is made against a probationary member. The PSP also said that the CBA would have to be renegotiated on this point before the PSP could implement such a practice.

In its Second Report, the Monitor assessed whether the PSP was re-examining pre-employment background investigations when a complaint was made against a probationary member. According to the PSP, the Department was committed to carrying out this recommendation. However, relevant personnel were unaware of an order or other instruction that had been issued directing that a re-examination of the background investigation take place when a complaint was filed against a probationary member.

**Current Assessment of Compliance**

During the third quarter, the PSP and the PSTA made (as yet unsuccessful) efforts to resolve the issue of how to treat a probationary Trooper if there has been a "break" in his or her probationary term due to an injury, an illness, military service or a discipline matter. However, because the PSP and the PSTA are currently engaged in the Act 111 interest arbitration proceedings, resolution of this issue is pending the completion of the arbitration proceedings.

Case 1:00-cv-01655-SHR    Document 52-4    Filed 02/10/2005    Page 56 of 87


Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004
Page 40 of 56

Based on the foregoing, the Monitor has not fully evaluated the implementation aspect of the OIG's recommendation. The PSP has not complied with the policy requirements of this OIG recommendation.[35]

## F.  CAUTIONARY APPROACH

The OIG Report (p. 59) recommended that the PSP exercise greater caution in preparing and reviewing the general investigation of every probationary member. In the Report for the first quarter, the Monitor stated that the PSP agreed to emphasize greater caution as recommended in the OIG Report.

During the second quarter, the Monitor assessed whether the PSP was exercising a greater degree of caution in preparing and reviewing the general investigation of each probationary member. The general investigation is conducted at the end of the probationary period. The Troop is responsible for this investigation. Among other things, interviews are conducted with the probationary member's supervisors, citizens with whom the member interacted, judges, prosecutors, etc. According to the PSP, the review panels were using greater caution, although the PSP had not issued any instructions to the personnel who conduct the investigations or the panels that review them. The Monitor stated that it was evaluating the OIG's recommendation and assessing whether it would make sense for the PSP to issue a Department Special Order directing that greater caution be taken in preparing and reviewing the general investigation of every probationary member. The Monitor recommended that the PSP should identify a mechanism for insuring that such an order would be implemented. For these reasons, in its Second Quarterly Report, the Monitor withheld a determination of compliance.

**Current Assessment of Compliance**

During the third quarter, the PSP planned training on the necessity for the use of greater caution by supervisors, by reviewers, and by members of the Probationary Trooper Review Panel (PTRP) when filing periodic reports concerning the acceptability of retention of probationary Troopers. The PSP stated that it will provide such training during the fourth quarter, including additional training to members of the PTRP so that there will be more consistency in the treatment of probationary Troopers. The PSP stated that it also plans, during the fourth quarter, to issue a revised version of AR 5-2, covering all aspects of the probationary Trooper program.

Based on the foregoing, the PSP has partially complied with the OIG's recommendations.

---

[35] Although the OIG did not make a specific recommendation that the PSP develop a policy and/or procedure requiring re-examination of pre-employment background investigations where a complaint is made against a probationary member, such a policy and/or procedure is necessary to effectively implement the OIG's recommendations.




## G. SUMMARY OF THE MONITOR'S RECOMMENDATIONS

1. **Inconsistencies In Background Investigations (Section III.A.).** The Monitor recommends that the PSP consider amending the Manual to require background investigators and reviewing officers to express opinions regarding the suitability or unsuitability of applicants for positions as Troopers directly.

# IV. SEXUAL HARASSMENT TRAINING

## A. ADMINISTRATIVE REGULATION

The OIG Report (p. 64) recommended that the PSP amend Administrative Regulation 4-26, Sexual Harassment Policy, to reflect that the BIPS will investigate all allegations of sexual harassment. The OIG Report specifically suggested that the PSP should not require that the complaint be in writing or that it be supported by a Complaint Verification.

Shortly after the OIG Report was issued, the PSP advised that it would not implement this recommendation, stating that amending its Administrative Regulations to reflect this fact would adversely impact the duties and responsibilities of the EEOO and would directly conflict with Management Directive 410.10. The PSP later reversed its position and issued Bureau Special Order 2004-01, which requires that investigations of sexual harassment and sexual misconduct be assigned to a BIPS investigator. The PSP stated that this Special Order will be incorporated into the revisions of AR 4-25, Internal Investigations.[36] In the Second Quarterly Report, the Monitor recommended that the PSP also incorporate the language of Bureau Special Order 2004-01 into AR 4-26, Sexual Harassment Policy, to incorporate the important policy requirement that BIPS investigators handle sexual harassment and sexual misconduct cases.

The Monitor tracked all new sexual harassment and sexual misconduct complaints during the second quarter and confirmed that the BIPS had been assigned to investigate all allegations of sexual harassment, as recommended by the OIG. The Second Report stated that the PSP had complied with the implementation portion of the OIG's recommendations, but that the Monitor would defer evaluating the policy portion of the recommendations until the proposed changes in the regulation had become finalized.

### Current Assessment of Compliance

During the third quarter, Bureau Special Order 2004-01 was incorporated into the revisions that have been made to AR 4-25, Internal Investigations. In addition, the PSP issued a draft revision to AR 4-26, Sexual Harassment Policy. The Monitor reviewed the draft revisions to AR 4-26

[36] The OIG recommended that the PSP amend its Sexual Harassment Policy, AR 4-26. The PSP responded by amending its Internal Investigations Policy, AR 4-25 (initially through issuance of Bureau Special Order 2004-01).

and confirmed that the language of Bureau Special Order 2004-01 has been included. According to the PSP, the revised AR 4-26 will be issued in the fourth quarter. The Monitor also continued to track all new sexual harassment and sexual misconduct complaints and confirmed that the BIPS is in fact assigned to investigate all allegations of sexual harassment and sexual misconduct, as recommended by the OIG Report.

Based on the foregoing, the PSP has complied with the implementation requirements of the OIG's recommendation. The policy requirements will be assessed when the draft regulations are issued.

## B.  ADOPT CONSISTENT POLICIES

The OIG Report (p. 64) recommended that the PSP adopt policies consistent with applicable Commonwealth Executive Orders and Management Directives on Sexual Harassment. Specifically, the Report recommended that AR 4-26 be amended to permit the EEOO "to have more responsibility in the investigation and resolution of sexual harassment complaints." The PSP responded that AR 4-26 was written to comply with the applicable Commonwealth Executive Orders and Management Directives. The PSP also replied that the CBA imposes certain constraints on the PSP's policies in this area.

During the second quarter, the Monitor evaluated AR 4-25 and AR 4-26. According to the PSP, AR 4-26 was written to be consistent with the applicable Commonwealth Executive Orders and Management Directives. However, according to the PSP, the current CBA imposes certain constraints. For example, anonymous complaints are not investigated unless the allegations could result in criminal charges. Executive Orders and Management Directives require that all sexual harassment complaints be investigated. The PSP reported to the Monitor that it was negotiating this and other related issues for the next CBA. The Second Quarterly Report stated that the PSP had not yet complied with the OIG's recommendation because of constraints imposed by the CBA.

### Current Assessment of Compliance

During the third quarter, the Monitor continued to evaluate the PSP's draft changes to AR 4-25 and AR 4-26. The PSP contends that these regulations are written to comply with applicable Commonwealth Executive Orders and Management Directives. The PSP previously represented that the CBA imposed certain restraints on the PSP, such as only allowing anonymous complaints to be investigated if the allegations could result in criminal charges. The PSP now contends that it has used language in the regulations indicating that "all complaints" will be investigated, which includes anonymous complaints. One anonymous complaint alleging criminal sexual misconduct was received in the third quarter; this complaint is being investigated by the BIPS.

Furthermore, the EEOO has been given more significant responsibility with regard to sexual harassment complaints (see Section IV. I., EEOO Involvement).


Based on the foregoing, the PSP has complied with the implementation requirements of the OIG's recommendation. The policy requirements will be assessed when the draft regulations are issued.

## C.  TRAINING OF BIPS INVESTIGATORS AND EEOO LIAISONS

The OIG Report (p. 66) recommended that the PSP consider providing specific training on sexual harassment and sexual misconduct investigations to BIPS investigators and to EEOO liaisons.

The PSP responded that specific training in this area was to begin for all enlisted personnel in November 2003. In its First Quarterly Report, the Monitor stated that the PSP had made efforts to increase the amount of training on these issues. Moreover, the BIPS had advised that it was developing a training course specifically designed to meet the needs of the BIPS's IAD investigators.

In the second quarter, after attending sexual harassment training courses, the Monitor recommended that the PSP consider retaining an outside consultant with extensive experience in developing sexual harassment and sexual misconduct training for law enforcement and investigators to work with the PSP and the EEOO to develop this training. The Monitor requested that, in any event, the PSP provide the Monitor with the full lesson plan prior to delivering this training to the BIPS investigators. The Monitor found that the PSP had partially complied with the OIG's recommendation to provide specific training on sexual harassment and sexual misconduct investigations to the BIPS investigators.

**Current Assessment of Compliance**

During the third quarter, the PSP held training for BIPS investigators on conducting investigations of sexual harassment complaints. On July 22, 2004, the Monitor was informed that nine of the 16 IAD investigators had completed the training. According to the PSP, the remaining investigators will receive the training as their schedules permit.[37] In the interim, all sexual harassment and sexual misconduct complaints will be assigned to investigators who have already received the training.

Although the Monitor had requested, in its Second Report, that the PSP provide the Monitor with a full lesson plan prior to delivering the training to the BIPS investigators, the PSP did not comply with this request. Therefore, the Monitor has not evaluated the lesson plan or the training course.

Based on the foregoing, the PSP has partially complied with the OIG's recommendation to provide training to the BIPS investigators. The Monitor has not yet evaluated the training

---

[37] On July 22, 2004, the Monitor requested advance notice of the training that will be provided to the remaining investigators.

Case 1:00-cv-01655-SHR    Document 52-4    Filed 02/10/2005    Page 60 of 87


Office of the Independent Monitor
of the Pennsylvania State Police

REPORT OF THE INDEPENDENT MONITOR
FOR THE QUARTER ENDING JULY 31, 2004
ISSUED SEPTEMBER 27, 2004
Page 44 of 56

provided to the BIPS investigators. The PSP has not complied with the OIG's recommendation to provide investigative training to the EEOO liaisons.[38]

## D.  CADET TRAINING

The OIG Report (p. 68) recommended that the PSP consider making instruction on sexual harassment and sexual misconduct a more significant part of Cadet training. The PSP responded that the 115th Cadet class received training from the EEOO on sexual harassment in November 2003. In the First Quarterly Report, the Monitor stated that it had determined that this is an ongoing priority within the Bureau of Training and Education (BTE).

In its Second Report, the Monitor confirmed that Cadets receive "Core Values and Core Purpose" training, which covers sexual harassment and sexual misconduct. The Monitor's assessment also revealed that, prior to the OIG's Report, Cadets were given two hours of training on sexual harassment. As of the second quarter, Cadets are being given two hours of training on sexual misconduct. The Monitor attended the sexual harassment portion of the Cadet training and determined that the subject matter was adequately covered. The training had been changed to use the lesson plan of the Office of Administration (OA) (described below in Sections E and F). However, the OA training did not include specific law enforcement examples. The Cadet training was consistent with the training the rest of the department will be receiving. Further recommendations with regard to this training were outlined in the Monitor's Second Report. In its Second Report, the Monitor withheld a determination of compliance concerning the OIG's recommendation to make sexual harassment and sexual misconduct a more significant part of Cadet training.

**Current Assessment of Compliance**

Since the PSP has represented that the lesson plan for Cadets will mirror the OA sexual harassment training for all PSP members, the Monitor's assessment is articulated below in Section F.

## E.  SUPERVISOR TRAINING

The OIG Report (p. 68) recommended that the PSP consider offering specific training in sexual harassment and sexual misconduct to PSP supervisors at all levels.

In its First Quarterly Report, the Monitor stated that in November 2003 the PSP began offering mandatory training entitled "Honor of the Force." The PSP represented that this training was developed to deal with the impact of the sexual misconduct reported in the media and with the subsequent OIG investigation. According to the PSP, input was sought from several community

---

[38] Although EEOO liaisons received "Train the Trainer" training on sexual harassment and subsequently delivered the training to PSP personnel, they have not been given specific investigative training on receiving and conducting investigations of sexual harassment complaints.



organizations, including the Pennsylvania Coalition Against Rape, the Pennsylvania Coalition Against Domestic Violence, and the Victims Advocate. The PSP advised that this training had been provided to all members. The PSP stated that it planned to give Honor of the Force training for civilian employees in March 2004.

Since the PSP was not offering separate sexual harassment and sexual misconduct training for supervisors, but instead offered the same training to all members, the Monitor incorporated its compliance assessment and recommendations in Section IV.F. of the Second Report.

**Current Assessment of Compliance**

During the third quarter, the PSP held the annual training on sexual harassment and sexual misconduct that was developed by the OA and was delivered by the OA and the PSP. This training, entitled "Sexual Harassment Awareness and Prevention Training for Managers," was designed for managers. The OA and the PSP added some examples in their oral presentation to make the training more applicable to law enforcement and to non-managers. Supervisors potentially have an enhanced role since allegations of sexual harassment and/or sexual misconduct may be made to them directly. Supervisors may also witness actions taken to create a hostile work environment or other issues related to sexual harassment/misconduct. Since investigative training has been given to the majority of BIPS investigators and will be provided to EEOO liaisons because of their enhanced roles, it is logical that the OIG included a recommendation that specific sexual harassment/misconduct training be provided to supervisors because of their potential role in accepting complaints and managing PSP personnel.

The PSP provides basic supervision classes for all members who become new supervisors. This training covers sexual harassment. The PSP provides supervision development training for civilians who become new supervisors. As this issue is a potentially recurring one, the Monitor recommends that the PSP also include issues related to sexual harassment and sexual misconduct such as responding to complaints, hostile work environment and other potential issues specifically for supervisors on a scheduled basis (not just for new supervisors).

Also during the third quarter, the PSP issued Department Special Order 2004-49, which provided that all PSP employees, including civilians, should receive sexual harassment awareness and prevention training by no later than July 23, 2004. This training was conducted, and specifically covered sexual harassment and sexual misconduct.

Based on the foregoing, the PSP has complied with the OIG's recommendations.

## F.    ANNUAL IN-SERVICE TRAINING

The OIG Report (p. 68) recommended that the PSP consider making training regarding sexual harassment and sexual misconduct a part of the annual in-service training for all members. The PSP responded that specific training in sexual harassment and sexual misconduct was being provided through the "Honor of the Force" in-service training for all personnel, as described above in Section IV.E.


The Second Quarterly Report stated that, during that quarter, the PSP had made progress in its in-service sexual harassment training. The BTE instituted specific training on sexual harassment in November 2003. Sexual harassment training had been included in the PSP's "Honor of the Force" training, and sexual harassment and sexual misconduct issues are included in the PSP's "Core Values and Core Purpose" training. The Monitor recommended that the PSP continue to develop more comprehensive training to include specific PSP examples.

During the second quarter, the PSP reported that it trained the EEOO liaisons with a Core Training curriculum on Awareness and Prevention of Sexual Harassment that all Commonwealth agencies under the Governor's jurisdiction have been directed to use. The training was developed by the OA, the Bureau of Equal Employment Opportunity and the Office of General Counsel. This training covers the law on sexual harassment. The training curriculum had not been implemented by the PSP prior to the issuance of the OIG Report.

In April 2004, the PSP instituted "Train-the-Trainer" training on "Sexual Harassment: Awareness and Prevention" for EEOO liaisons. Having received the "Train-the-Trainer" training, the liaisons were directed to commence providing mandatory three hour "Sexual Harassment: Awareness and Prevention" training to all personnel within their respective Troops/Bureaus/Offices. The PSP directed that this training for all personnel be completed during the third quarter. The EEOO liaisons were responsible for conducting the training. After attending a portion of the "Train-the-Trainer" training held on April 26, 2004, and reviewing all of the course materials, the Monitor made several recommendations regarding the training in the Second Report.

## Current Assessment of Compliance

During the third quarter, the PSP named a new Director of the EEOO, effective July 17, 2004. According to the PSP, following the appointment of the new director, an audit of the EEOO was conducted. The PSP has represented that, after the audit, a determination was made that the sexual harassment training, which had been given by the EEOO in conjunction with the state's Equal Employment Opportunity Office (state EEOO), should be made a part of the Cadet training. The Monitor attended a training session for Cadets which was taught jointly by the PSP EEOO and the state EEOO and found that the training was consistent with the OA sexual harassment training that is offered to all PSP members.

The EEOO liaisons delivered the OA sexual harassment training to the vast majority of PSP personnel during this quarter. A member of the monitoring team attended two separate two-hour training sessions.

However, the PSP has not incorporated the Monitor's recommendations outlined in the Second Report. The PSP has indicated that it intends to expand the "Train-the-Trainer" training in response to the Monitor's recommendations that the OA PowerPoint presentation and notes for the trainers should include written examples specific to law enforcement and that more time


should be provided for the substantive course portion of the "Train-the-Trainer" training. According to the PSP, the "Train-the-Trainer" training that will take place in 2005 will be provided over three days instead of one. The first part will include an instructor development course, the second part will be the substantive training, and the third part will cover investigations, to include going through specific law enforcement scenarios.[39] The EEOO is also developing information to provide to the liaisons which will include information on how to conduct investigations including the types of questions to ask.

With regard to the Monitor's recommendation that the PSP should develop video vignettes, the PSP advised the Monitor that it is developing video vignettes containing examples specific to law enforcement for use during the next annual in-service training on sexual harassment. Specifically, the PSP has developed 21 sexual harassment training scenarios that cover different types of harassment situations. Three of the scenarios have been chosen for production into video vignettes; two of the scenarios involve Troopers; and one involves civilians. According to the PSP, production of the video scenarios will begin in August 2004. The remaining video scenarios will be used in later years.

The PSP has not reported to the Monitor as to whether they have conducted an evaluation of the effectiveness and overall quality of the training as provided by the EEOO liaisons (along with a state EEOO representative, at times).

The Monitor notes that the PSP provides a pre-training questionnaire to the participants. The Monitor recommends that the PSP engage in comprehension testing of participants at the end of the training course. A comprehension test will allow the PSP to determine whether the participants have comprehended the information in the course and assist in making changes to future lesson plans and instruction techniques. The Monitor has been informed that the PSP will develop a comprehension test, along with computer-based training, which is expected to be implemented within the next 12 months.

The Monitor observes that the PSP has embraced the recommendations and is working toward their implementation.

Based on the foregoing, the PSP has complied with the OIG's recommendation, but has not yet complied with the recommendations in the Monitor's Second Report.

## G.  COMPUTER-BASED TRAINING MODULE

The OIG Report (p. 68) recommended that the PSP support the EEOO's efforts to develop a computer-based training module, as well as other methods designed to reinforce the PSP's strict prohibition of sexual harassment and sexual misconduct.

---

[39] This will be investigative training for EEOO liaisons as recommended by the OIG (Section IV.C.).


In its First Report, the Monitor found that the EEOO was in the process of developing a database that would track notifications to the victims and the BIPS, as well as investigations and training needs.

During the second quarter, the Monitor found that the EEOO was working with the BTE to develop a computer based training module. The Second Report stated that the PSP had not complied with the OIG's recommendation.

**Current Assessment of Compliance**

The PSP is still in the process of developing a computer-based training module. The PSP has advised that the Office of Administration, Bureau of Equal Employment Opportunity, is developing web-based training that will become mandatory for all employees. According to the PSP, this training should be developed in one year.

Based on the foregoing, the PSP has not complied with the OIG's recommendation.

## H.  INCREASE EEOO STAFFING

The OIG Report (p. 69) recommended that the PSP consider increasing the staffing and support levels for the EEOO to promote greater visibility of the EEOO and to make for the EEOO's having a greater role in training and in investigations. The PSP responded that it opposed this request, but would give it further evaluation, in light of budget constraints. In the First Quarterly Report, the Monitor stated that it would continue to evaluate the need for increased staffing and support for the EEOO.

During the second quarter, the Monitor's assessment found that the EEOO had one full-time staff person, the Director. During the OIG's investigation, the EEOO also had one administrative support person. The duties of the EEOO are generally listed in AR 4-26. Additional duties are set out in the OIG's recommendations and the PSP's response. The EEOO Director is currently supported by 39 EEOO liaisons representing all Troops/Bureaus/Offices throughout the Commonwealth. The Monitor recommended that the PSP make a determination as to whether the EEOO needs additional staffing and resources at its headquarters. The PSP should also evaluate the role and effectiveness of the EEOO liaisons in helping the EEOO carry out its duties in light of the issues identified in the OIG Report. This determination should be based on an evaluation of the EEOO to determine specific staffing levels and resources needed based on the PSP's full response to the OIG's recommendations and concerns. The Second Report stated that the Monitor was withholding a determination of compliance with the OIG's recommendation.

**Current Assessment of Compliance**

During the third quarter, as mentioned above, the PSP named a new Director of the EEOO. As discussed in Section IV.F., after naming the new Director, the PSP conducted an audit of the EEOO to be able to evaluate the office's operations in light of the recommendations in the OIG's



Report and in the Monitor's first two reports. The PSP, based on the audit, has made a recommendation for reconfigured staffing of the EEOO.

In June 2004, prior to the appointment of the new EEOO Director and the audit, the PSP issued a position vacancy announcement for an Equal Opportunity Specialist 1. The PSP later issued an application supplement for an Equal Employment Specialist 1, 2 and 3. As of the end of July 2004, the EEOO Director had received a number of applications for the position. According to the PSP, a specialist will be hired during the fourth quarter.

The Monitor observes that the PSP has moved forward on providing improved staffing for the EEOO. The Monitor has not yet had an opportunity to review the audit, and cannot yet evaluate the sufficiency of the audit. The Monitor looks forward to receiving additional information regarding the audit of the EEOO.

Based on the foregoing, the Monitor will defer a determination of compliance with the OIG's recommendations at this point.

## I.    EEOO INVOLVEMENT

The OIG Report (p. 70) recommended that the EEOO become involved in an investigation when the allegation potentially constitutes sexual harassment and/or sexual misconduct, even if the BIPS is already investigating the allegations as more generalized misconduct.

Previously, the Monitor reported that the BIPS and the EEOO have advised that the BIPS notifies the EEOO when an allegation potentially constitutes sexual harassment. During the second quarter, according to the PSP, the BIPS and the EEOO were working closely on sexual harassment investigations. In practice, the BIPS notified the EEOO of any complaints of sexual harassment and sexual misconduct, and vice versa. The dialogue appeared to primarily end there. The Second Quarterly Report stated that the PSP had not yet complied with the OIG's recommendation for more EEOO involvement.

**Current Assessment of Compliance**

During the third quarter, the Monitor assessed whether the EEOO's involvement in investigating allegations of sexual harassment/misconduct had increased. It appears that the EEOO's involvement has improved in several ways, and there are plans in the works to continue to increase the dialogue between the EEOO and the BIPS. First, there is increased dialogue between the EEOO and the BIPS regarding investigations. Second, the EEOO's development of an incident tracking system, which the BIPS will be able to access, will increase the EEOO's involvement. There will be a flag in the system regarding re-contacting complainants during the course of an investigation. Third, the PSP is developing a webpage to provide additional information specifically about the EEO Office, including a mission statement, a list of EEOO liaisons, information on how to file a complaint, and other relevant information. The EEOO expects that the website will be up and running by September 2004. Furthermore, the EEOO



Director has been requested to participate in the development of all training, department-wide, covering sexual harassment and sexual misconduct issues.

Based on the foregoing, the PSP has complied with the OIG's recommendation.

## J.   SUMMARY OF THE MONITOR'S RECOMMENDATIONS

1.    **Training for all Supervisors (Section IV.E.).**  The Monitor recommends that the PSP also include issues related to sexual harassment and sexual misconduct such as responding to complaints, hostile work environment and other potential issues specifically for supervisors on a scheduled basis (not just for new supervisors).

2.    **Comprehension Testing (Section IV.F.).**  The Monitor recommends that the PSP engage in comprehension testing of participants at the end of the training course.

# V.   ATTITUDES INVOLVING SEXUAL HARASSMENT AND SEXUAL MISCONDUCT

## A.   METHOD TO MEASURE AND MONITOR COMPLAINTS

The OIG Report (p. 77) recommended that the PSP establish a method by which the BIPS and the EEOO can measure and monitor sexual harassment and sexual misconduct complaints.

In its First Quarterly Report, the Monitor recommended that the PSP explore developing a risk management function to assist the identification of negative trends.  During the second quarter, although the PSP had stated that it was developing an IAD tracking system, it had not yet established a method by which the BIPS and the EEOO could measure and monitor sexual harassment and sexual misconduct complaints.  The Monitor also recommended that all relevant personnel take part in the development of the tracking system.   During the second quarter, the PSP continued to evaluate methods to measure and monitor complaints.

**Current Assessment of Compliance**

The EEOO's incident tracking system, as discussed in Section IV.I. above, is being developed.  According to the PSP, this system is designed to measure and monitor sexual harassment and sexual misconduct complaints.  The Monitor reviewed printed copies of several of the screens from the system.   The system will contain fields with information about each complaint, including the type of complaint, the complainant's name, where, when and how the complaint was filed, a narrative, the assigned BIPS case number and investigator, EEOO liaison, the disposition, and other relevant information.  The system will allow the user to query any of the fields to run reports.  The EEOO, the DDO and all BIPS investigators will have access to the



Office of the Independent Monitor
of the Pennsylvania State Police

system by name only. If a name is identified, the DDO and/or the BIPS investigator will be required to contact the Director of the EEOO for additional information. The Monitor will continue to evaluate the system once it is up and running. According to the PSP, the system is expected to become operational in September 2004.

Based on the foregoing, the PSP is not in compliance with this OIG recommendation.

## B.   PERIODIC REPORTS

The OIG Report (p. 77) recommended that the Monitor should receive periodic status reports from the PSP on any proposed changes and statistical data regarding complaints of sexual harassment and sexual misconduct. The OIG also recommended that the statistics be evaluated for trends and for comparisons of the PSP to other comparable organizations.

In its first report, the Monitor stated that the PSP had provided all information requested, including status reports on proposed changes to rules, regulations and policies, and statistical data regarding complaints of sexual harassment and sexual misconduct.

During the second quarter, the Monitor continued to receive regular status reports from the PSP; however, the PSP had not provided the Monitor with any statistical data regarding complaints or statistical evaluations for trends and for comparisons to other comparable organizations.

**Current Assessment of Compliance**

Although the PSP continues to provide the Monitor with status reports and documents, the Monitor has not received relevant statistical data or evaluations.

Based on the foregoing, the PSP is in partial compliance with this OIG recommendation.

## C.   DIRECT REPORTING BY BIPS TO THE COMMISSIONER

The OIG Report (p. 78) recommended that the PSP amend its organizational structure to require that the Director of the BIPS report directly to the Commissioner.

During the second quarter, the Monitor's assessment found that the PSP had determined that amending the organizational structure to require the Director of the BIPS to report solely and directly to the Commissioner would pose a legal issue by compromising the Commissioner's ability to serve in an adjudicative function in court martial cases. According to the PSP, Special Order 98-22 gave the Director of the BIPS the authority to report directly to the Commissioner in matters requiring the highest level of executive awareness. Legal issues only arise if the details of the investigation are provided to the Commissioner prior to an adjudication that warrants a court martial. However, according to the PSP, this does not prevent the Director of the BIPS from contacting the Commissioner directly and making recommendations on those matters of policy and procedure to initiate, conduct, or control all necessary investigations and process all



complaints, and allegations of misconduct by personnel. It should be noted that members of the BIPS, when performing IAD duties, can contact the Commissioner directly.

In its Second Quarterly Report, the Monitor stated that, except under the circumstances outlined above, the PSP did not intend to comply with this OIG recommendation. Since the PSP articulated sound reasoning for its failure to comply with the recommendation, the Monitor stated that it would not evaluate this recommendation unless circumstances require.

**Current Assessment of Compliance**

The Monitor has made a determination that the PSP's failure to comply with this OIG recommendation has not had an adverse effect on the agency. The Monitor will continue to evaluate its current determination in the fourth quarter. It should be noted that, with the creation of the Department of Professional Responsibility (which oversees the BIPS), the Deputy Commissioner of Professional Responsibility has the authority to report directly to the Commissioner on matters related to BIPS investigations. This new position will not compromise prior rulings in this area, but will allow the Deputy Commissioner flexibility in discussing matters related to IAD investigations directly with the Commissioner.

Based on the foregoing, the Monitor withholds a determination of the PSP's compliance with the OIG's recommendation.



Office of the Independent Monitor
of the Pennsylvania State Police

# SECTION FOUR:  ADDITIONAL ACTIONS TAKEN BY THE MONITOR

## I.    NEW INVESTIGATIONS

The OIG Report (p. 78) recommended ongoing monitoring of the PSP's progress in handling sexual harassment and sexual misconduct complaints, which the Monitor and the Office of General Counsel have concurred includes a review of all new and pending non-adjudicated investigations.  The Monitor previously reported that the BIPS assumed investigative responsibility for all sexual harassment and sexual misconduct investigations in September 2003, and established a database of all active investigations involving sexual content.  However, the Monitor noted that the BIPS database did not track complaints of sexual harassment and sexual misconduct separately from other types of complaints and recommended that the BIPS define a specific category of offenses as sexual harassment and sexual misconduct to facilitate more efficient tracking of complaints.  The Monitor also recommended that the BIPS and the EEOO coordinate the development of relevant databases to facilitate notifications and other requirements applicable to such investigations.

In the second quarter, the Monitor continued to review all new and pending non-adjudicated investigations involving sexual harassment and sexual misconduct.[40]  The PSP provided the Monitor with complete access to all PSP personnel, personnel files, and BIPS files.  At the end of the second quarter, the Monitor was actively reviewing 31 pending cases involving sexual content (these include both civilian employees and members) which had been opened after November 1, 2003.  The Monitor stated that it would not make a determination of compliance at that time regarding the PSP's handling of these active cases.  The Monitor also stated that it would identify any observed deficiencies in handling these investigations in future Reports.

In its Second Quarterly Report, the Monitor stated that the BIPS had complied with the Monitor's recommendation to modify its database and had defined specific categories of offenses as sexual harassment and sexual misconduct.  The Monitor recommended that the PSP increase the level of coordination among the various bureaus and the EEOO to facilitate notifications and other requirements applicable to sexual harassment investigations.  The PSP has stated that, during the third and fourth quarters, it would continue to evaluate the level of coordination necessary among the various bureaus and the EEOO.

---

[40] The Monitor reviewed all new and pending non-adjudicated investigations involving sexual content, including inappropriate uses of the PSP Enterprise Network (such as sexually explicit emails, etc.).  Because many of these cases did not constitute sexual harassment and/or sexual misconduct, the Monitor determined that these cases are outside its scope of review.  The Monitor will continue to review all cases involving sexual content on the PSP Enterprise Network that otherwise meet the definitions of sexual harassment and/or sexual misconduct.



**Current Assessment of Compliance**

During the third quarter, the Monitor reviewed all new and pending non-adjudicated investigations involving sexual harassment and sexual misconduct. At the end of the third quarter, the Monitor was actively reviewing nine open files. Thirteen files were closed during the third quarter. The Monitor is not aware of any deficiencies in the handling of the nine open files, nor in the handling of any of the 13 files closed during the third quarter.

## II.   EARLY INTERVENTION PROGRAM

The OIG Report (p. 35) noted that the PSP was implementing an Early Intervention Program (EIP) to aid supervisors in identifying members/enforcement officers who may be experiencing stress or exhibiting patterns of questionable conduct and to take corrective action before such conduct requires enforcement and discipline. The OIG encouraged the PSP to proceed with its EIP program. The Monitor stated in its First Report that the EIP was officially established on November 24, 2003 with the issuance of AR 4-36. The PSP appointed a Director of the EIP and had created an electronic database.

In its Second Quarterly Report, the Monitor stated that the PSTA had filed a charge of unfair labor practices (ULP) against the PSP alleging violations of the Pennsylvania Labor Relations Act and Act 111 of 1968. The PSTA alleged, among other things, that the implementation of AR 4-36 revised the reasons a member might be disciplined and the manner in which disciplinary records might be utilized. The PSTA further alleged that the PSP unilaterally modified existing terms of employment without fulfilling its mandatory bargaining obligations. The Monitor had met with the leadership of the PSTA and its counsel regarding the EIP and the filing of the ULP. The PSTA stated that it was not against the concept of the EIP; however, it had concerns with the current implementation and design of the program, including issues of equal treatment and maintenance of strict confidentiality. The Monitor expressed its disappointment that the PSTA had not met with the PSP regarding its concerns about the implementation of AR 4-36 and the EIP. The Monitor believed that the EIP benefits both the PSP and its bargaining members, and encouraged the parties to meet to resolve any outstanding issues.

**Current Assessment of Compliance**

Since the program's inception, through the date of the Third Report, 18 candidates had been identified for potential inclusion in the EIP. These candidates were identified both by review of the EIP database (11 members) and by recommendation from Troop Commanders (seven members). Pursuant to AR 4-36, Troop Commanders have reviewed (or are currently reviewing) these candidates' records of conduct, with the following results: eight members were included in the EIP; two members were not included in the EIP; three members were dismissed from the PSP or suspended with intent to dismiss; and five members were being reviewed. The Director of the EIP concurred with the Troop Commanders' recommendations not to include the two members mentioned above. One of the 18 candidates identified for possible inclusion in the EIP was



Office of the Independent Monitor
of the Pennsylvania State Police

involved in an alleged incident of sexual harassment or sexual misconduct, and the incident is currently under investigation.

The Monitor recommends that the PSP consider revising AR 4-36, at section 36.04, A. 2., to include the following additional information to be contained in the EIP database: cases involving sexual harassment and sexual misconduct, and cases involving domestic violence and protection from abuse orders. Moreover, AR 4-36 does not impose time limitations within which Troop Commanders and Bureau/Office Directors shall make a determination as to whether a member/enforcement officer should be included in the EIP. The Monitor recommends that the PSP consider further revisions to AR 4-36 to impose appropriate time limitations for determinations of EIP inclusion. At the end of the third quarter, the determinations of the Troop Commanders and Bureau/Office Directors as to whether members and/or enforcement officers should be included in the EIP were outstanding between one and 52 days.

The PSP has stated that the PSTA's filing of the ULP has prevented the PSP from making any further changes to the operation of the EIP at this time.

Based on the foregoing, the PSP has complied with the OIG's recommendation/encouragement to proceed with the EIP program.

## III.    AN INCIDENT OF INSENSITIVITY

In the course of monitoring an investigation of a complaint of sexual misconduct, the Monitor learned of events not directly related to the underlying sexual misconduct that deserve mention. This incident concerned an invitation to a retirement party for the subject of the sexual misconduct investigation, who had received a sustained DAR and a penalty of dismissal by the DDO, and showed a lack of sensitivity to the victim by certain members of the PSP. The Monitor will provide here a timeline of the events regarding the invitation to the retirement party.

- Day One - An officer reported that an invitation to a party for the retired member had been displayed on a chalkboard in the patrol room of the retired member's Troop station. The officer reported this matter, and the report ultimately reached the Deputy Commissioner of Professional Responsibility.

- Day Two - The Deputy Commissioner of Professional Responsibility ordered an immediate investigation of the incident. A Captain investigated the incident and erased the invitation from the chalkboard. The Captain determined that, because the member's retirement involved an internal investigation of sexual harassment and/or sexual misconduct, any postings in a PSP facility that could be construed as honoring the member were inappropriate and insensitive to the victim of the harassment and/or



misconduct. The Captain personally met with the Station Commander and, in the Monitor's opinion, handled the matter appropriately. In addition, the Station Commander was advised to check bulletin boards and other postings frequently to ensure that incidents of this nature did not occur in the future.

- Day Five - The Captain spoke with the victim of the sexual harassment and/or sexual misconduct, who had become aware of the invitation on the chalkboard, and conveyed to her the PSP's position that the incident was inappropriate and insensitive to her. The Captain advised the victim that the incident had been addressed, and the victim expressed her appreciation for the PSP's response.

The PSP's response to the above-referenced incident shows that certain procedural changes have been made in the PSP's handling of issues related to sexual harassment and sexual misconduct. It also shows that the Deputy Commissioner of Professional Responsibility made this investigation concerning insensitivity to a victim of sexual harassment and/or sexual misconduct a high priority, as the circumstances demanded.

## CONCLUSION

During the fourth quarter, the Monitor will continue to conduct compliance assessments and offer recommendations and technical assistance. The Monitor is confident that, with the continued cooperation and hard work of the PSP, the PSTA, and all other relevant entities, real and meaningful reforms will continue to occur.

Kroll Associates, Inc.
Independent Monitor

September 27, 2004

Principal Contributors

William C. Nugent
Sheryl L. Robinson
Michael A. Pavlick
Walter S. Batty, Jr.



# EXHIBIT 1



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

COLONEL JEFFREY B. MILLER
COMMISSIONER

June 10, 2004

Sergeant Bruce A. Edwards
Pennsylvania State Troopers Association
3625 Vartan Way
Harrisburg, Pennsylvania  17120

Re:    **Disciplinary Code**

Dear Sergeant Edwards:

Over the course of the last four years, the Pennsylvania State Police (PSP) and the Pennsylvania State Troopers Association (PSTA) have been attempting to reach an agreement on a disciplinary matrix in an effort to address mutual concerns regarding the necessity to protect the integrity of the force and to ensure the consistency of the application of discipline.

The PSP has come to the conclusion that the current draft of the parties' matrix will not allow either party to reach these goals.  We have concluded that the product drafted to date, which is based on Field Regulations, lacks the necessary specificity on critical issues.

In several letters to the editor, the PSTA has expressed the opinion that there should be "zero tolerance" for members who engage in serious misconduct and that the PSTA has no tolerance for anyone who commits such misconduct or threatens the reputation of the PSP.  The PSP has always agreed with this position.

We have reached the point that the disciplinary matrix, in its draft form, cannot serve as the basis for further discussions.  The PSP is still interested in defining those types of misconduct that all reasonable minds can agree undermine the integrity of the force and mandate serious disciplinary action.  Such a result would be in the interests of the members of the PSTA, as well as the PSP as the Commonwealth's highest echelon of law enforcement.  Toward this end, we are proposing that the parties agree upon certain basic precepts that would apply to the disciplinary process.  We are encouraged that PSTA representatives recently have indicated an interest in moving in this direction.

As you know, the Act 111 interest arbitration proceeding is scheduled to begin in late July.  We understand that the PSTA is committed to resuming our discussions on the issue of discipline for serious misconduct and resolving these

Sergeant Bruce A. Edwards
June 10, 2004
Page 2

issues prior to the commencement of the arbitration.  The PSP shares this
interest.  We, therefore, are proposing that a newly constituted discipline
committee commence meeting immediately.  We are appointing the following
individuals to serve on the committee and represent the interests of the PSP: Lt.
Colonel Rick Brown, Captain Barry Titler, and Vicki Beatty, Esquire, outside
counsel who has been engaged to work with the PSP on discipline issues.  We
hope that the PSTA will identify a small number of individuals with the
appropriate level of decision-making authority to serve on this committee.

We propose that the agenda for these meetings will be limited to the
significant issues facing the PSP and the PSTA involving discipline for serious
misconduct, including the issues of sexual misconduct and sexual harassment
addressed in the OIG Report.  To facilitate our discussions, we have enclosed a
draft memorandum of agreement containing the PSP's proposal for addressing
these issues.  We would like to address this proposal at our first meeting.

We are prepared to begin meeting as soon as possible.  We understand
you have offered the date of June 22 for a meeting.  While this date will not work
for our committee, we can offer the following alternative dates:  June 25, 28, 29,
or 30.

The PSP is committed to working in good faith with the PSTA to bring
these issues to a successful resolution.  If, however, we do not reach a mutually
acceptable outcome, the PSP is prepared to proceed to arbitration and address
those issues that are mandatory subjects of bargaining through the legislatively
mandated impasse procedures.

We are committed to the time it takes to reach agreement prior to the Act
111 hearings.  I look forward to your cooperation in concluding these discussions
with a result that is good for both PSP and the members.

Sincerely,

Col. Jeffrey B. Miller

Colonel Jeffrey B. Miller
Commissioner

Enclosure

cc:    Lt. Col. Rick Brown (w/enc.)
       Capt. Barry Titler  (w/enc.)
       Vicki Beatty, Esquire (w/enc.)

bcc:   Adrian King, Esquire (w/enc.)
       Sheryl Saxe-Dowling (w/enc.)
       Donald O. Adams (w/enc.)
       Brian D. Pedrow, Esquire (w/enc.)



Office of the Independent Monitor
of the Pennsylvania State Police

# EXHIBIT 2

P E N N S Y L V A N I A

# STATE ⬤ TROOPERS

ORGANIZED 1962     A S S O C I A T I O N

June 22, 2004

Colonel Jeffrey B. Miller
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA 17110

Dear Colonel Miller:

The Pennsylvania State Troopers Association (PSTA) has always taken a stance of supporting fair and expeditious discipline measures against its offending members. To further this aim, the PSTA entered into an agreement with the Pennsylvania State Police to form a "Discipline Committee" consisting of members chosen by the Commissioner and the PSTA. Since these proceedings began in 1996, the Discipline Committee has attempted to resolve numerous inconsistencies and injustices within the structure of the standing discipline procedures the Command Staff of the Pennsylvania State Police employ against its members. As part of an attempt to remedy the widespread problems within the discipline system, the members of the joint Discipline Committee took steps towards policy changes, which included the construction of a "discipline matrix." While not a completed product, the discipline matrix was to serve as the impetus for evenly distributed discipline at all levels of our Department for numerous infractions of regulations, violations of law, and unbecoming conduct.

The representatives of the Command Staff of our Department stalled in the process of refining the matrix and reaching an eventual resolution to the various disparities within the existing discipline procedures. The PSTA agrees that the discipline matrix was the beginning measure in a complicated procedure towards policy changes. The PSTA has made tremendous strides towards the governing of unconscionable conduct of all members of the Pennsylvania State Police. On January 29, 2004, Governor Ed Rendell signed into law Senate Bill 877, the "Confidence in Law Enforcement Act." Because of the PSTA's support of a law which would prohibit members engaging in conduct encompassed within the body of the bill from being further employed by the Pennsylvania State Police, our desire of fair and just discipline of our members cannot be questioned.

We support the furtherance of negotiations between the PSTA and the Commissioner and Staff. We believe that the negotiating history of the standing Discipline Committee and the inclusion of members from various areas in the state will aid in the proper resolution of an agreeable discipline system. The Discipline Committee members are tasked with negotiating a fair and acceptable discipline system, which would in turn have to be approved by the governing body of our bargaining unit, as discipline is currently a mandatory subject of bargaining and an article in our current Collective Bargaining Agreement with the Commonwealth of Pennsylvania.

The Memorandum of Agreement that you submitted in its current form is unacceptable. We agree that behavior which rises to the level of serious criminal conduct should not be tolerated. However, we cannot unilaterally support the inclusion of conduct that does not rise to

---

**PSTA**   3625 Vartan Way, Harrisburg, PA 17110    (717) 540-5646 • 800-541-9934     Fax (717) 540-5318 • 800-540-5318
e-mail: psta@paonline.com     website: www.psta.org

PENNSYLVANIA
# STATE ✦ TROOPERS
ORGANIZED 1962    ASSOCIATION

the level of a crime to be subjectively selected by the Command Staff as "serious misconduct." The inclusion and definition of such conduct is a matter for negotiation between the members of the Discipline Committee.

We are concerned that the Command Staff appears to have dismissed the conditions as set forth in the language of Senate Bill 877, as evidenced by the wording of item [2] of the proposed memorandum. We supported this language and stand by the level of the discipline that will be taken against a member if convicted. This bill would also govern criminal conduct resulting in incidents of misuse of firearms.

The memorandum also lists under item [3] conditions of untruthfulness that would result in the termination of employment. There have been numerous recent disagreements between the Command Staff and the PSTA as to the Command Staff's subjective view of incidents of members' untruthfulness. Item [4] is merely a reassertion of conduct which would rise to the level of a serious criminal offense. Again, we believe that the level of discipline should be governed by conviction of a member for this offense and not the mere unsupported supposition that the member committed the offense.

The PSTA would require an adequate and objectively fair definition of "sexual misconduct" as enumerated upon in item [5]. We do not support members using drugs illegally, as evidenced by our agreement in the implementation of random drug testing. Unintentional or accidental misplacement of items would not be considered criminal behavior and should not be handled with the same measures as criminal conduct.

The conditions of item [8] should be governed by Chapter 5 of the Crimes Code, which also governs Use of Force as defined in the FR Manual. Items [9] and [10] are too broad in their scope and lead to unilateral subjective enforcement without due process to the member.

In closing, the PSTA is committed to formulating an objective, fair and expeditious discipline system. We urge the Command Staff and its representatives to continue to meet with us on this common ground.

Sincerely,

Dennis Rodrigues, Chairman
Discipline Committee

Cc: PSTA President Bruce Edwards
    Gary Lightman, Esq.
    PSTA Discipline Committee

PSTA  3625 Vartan Way, Harrisburg, PA 17110    (717) 540-5646 • 800-541-9934    Fax (717) 540-5318 • 800-540-5318
e-mail: psta@paonline.com    website: www.psta.org

**Kroll**

Office of the Independent Monitor
of the Pennsylvania State Police

# EXHIBIT 3

PENNSYLVANIA
# STATE TROOPERS
ORGANIZED 1962    ASSOCIATION

October 1, 2003

The Honorable Edward G. Rendell
Governor
225 Main Capitol Building
Harrisburg, PA 17120

Dear Governor Rendell,

As the President of the Pennsylvania State Troopers Association (PSTA), I want to commend you for initiating the Pennsylvania State Police sexual harassment and sexual misconduct investigation. Such egregious offenses as sexual harassment and misconduct should be neither ignored nor tolerated. PSTA's members pledge their lives to protect and serve, and do so with great integrity and honor. We share your desire to insure that individuals who violate the public trust not be among our ranks. As President of the PSTA I pledge our full cooperation in developing fair and effective remedies to address such offenses. To that end I greatly appreciate the recent request from Colonel Miller to meet so that we can work together to achieve our mutual goal of restoring the public's confidence in the Pennsylvania State Police (PSP). It is my sincere hope that we can maintain the active involvement of Senator Conti, Senator Thompson, Senator Logan and their staffs as we work with Colonel Miller and others in your Administration in crafting language agreeable to all parties.

It is our belief that the PSP needs to develop and implement clear procedures in order to prevent such misconduct from recurring. However, the procedures must remedy the findings related to the investigation and not seek to change policies unrelated or outside the scope of the investigation. For example, the report does not call for the dismantling of the grievance and arbitration process, or for wholesale changes to ACT 111 (providing for grievance and arbitration). Rather, it notes that historically, disciplinary measures have been dispensed unevenly.

To that end, we embrace the Office of Inspector General's recommendation that PSP develop guidelines for appropriate levels of discipline for various offenses. Further, we look forward to work with the Department in developing these guidelines and are prepared to do so immediately. Upon the successful development and implementation of these guidelines, the PSTA is willing to commit that the guidelines will be utilized as the new baseline for all future grievance and arbitration proceedings! We believe that when the schedule of discipline is coupled with the automatic termination for convictions of felonies and misdemeanors of the first degree, that a truly fair and effective termination and disciplinary process can be implemented and supported by all parties.

As the Association representing the outstanding men and women who are our frontline of defense for public safety and security, we look forward to working with the Department and the members of the General Assembly to help restore the public confidence that they do indeed have one of the finest law enforcement organizations in the country.

Thank you for your consideration of and hopefully support of our collaborative efforts.

Sincerely yours,

Bruce A. Edwards, President

cc:     Members of the Senate Law and Justice Committee
        Colonel Jeffrey B. Miller
        Captain William McHale
        Steve Crawford – Secretary of Legislative Affairs
        Adrian King – Special Assistant to the Governor
        Colleen Kopp – Deputy Secretary, Legislative Affairs



Kroll
Office of the Independent Monitor
of the Pennsylvania State Police

# EXHIBIT 4



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

OFFICE OF DEPUTY COMMISSIONER

July 16, 2004

Corporal Joseph Sarkis
Vice President
Pennsylvania State Troopers Association
3625 Vartan Way
Harrisburg, Pennsylvania  17120

Re:    **Pennsylvania State Police Disciplinary Standards Bargaining**

Dear Vice President Sarkis:

The Pennsylvania State Troopers Association (PSTA) Discipline Committee and the Pennsylvania State Police representatives have held two meetings in an attempt to reach common ground on disciplinary standards, particularly as to the most serious forms of misconduct. Our last meeting was on July 15, 2004.

At the first meeting, the PSTA expressed reservations concerning several aspects of the Pennsylvania State Police proposal. Some of these were substantive in nature, i.e., only activity rising to the level of a criminal offense should be included as dischargeable misconduct, and others related to the disciplinary process in general. At the conclusion of that meeting, we agreed to meet on July 15, 2004. In the interim, the Pennsylvania State Police representatives were to review the proposed Memorandum of Understanding to determine whether certain concerns of the PSTA could be accommodated while still reaching all serious misconduct. The PSTA Discipline Committee agreed to meet to identify its priorities with regard to the discipline process in order that our next meeting could be a productive discussion of these issues.

At our meeting on July 15th, a revised Memorandum of Understanding was presented to the PSTA Discipline Committee. Unfortunately, very little discussion took place regarding this proposal. Moreover, there was no identification of the specific issues the PSTA sought to address in these discussions. Corporal Rodriguez only indicated that the PSTA may be willing to streamline some of its issues. The PSTA initially took the position that there were two pre-conditions to any further discussions on disciplinary issues. These were the re-instatement of an arbitrator to the arbitration panel and the establishment of a procedure to trade discipline days. Neither of these pre-conditions was acceptable and ultimately was dropped.

Letter to Corporal Joseph Sarkis
July 16, 2004
Page 2

        Yet, we still were not able to move forward. The alternative proposed by the
PSTA was that the parties defer presenting their issues in dispute on Articles 26 and 28
(Discipline and Grievance) for a period of four months to permit the parties to attempt to
negotiate a resolution. The PSTA indicated it was unwilling to continue discussions
unless there was an agreement to this deferral.

        As indicated to you at the meeting, there is no interest on the part of the
Pennsylvania State Police in prolonging the Act 111 process any further, and we have
determined that there does not appear to be any need to do so. Three months remain
before the arbitration panel will receive the entire case for resolution. The Pennsylvania
State Police remains committed to meeting with the PSTA representatives to negotiate
workable disciplinary standards and to address the PSTA's priorities on the discipline
process in the interim. We are willing to continue to meet throughout the Act 111
process without prejudice to either side's ability to make complete presentations on their
issues in dispute. If we are unable to reach a mutually acceptable resolution on these
issues by the end of the Act 111 interest arbitration process, the panel of arbitrators will
have all of the information necessary to decide the case.

        We believe that the PSTA and the Pennsylvania State Police have a mutual
interest in working through these issues, and we believe that we can reach a resolution
that is fair and equitable.    We are not limiting the discussion to only the serious
disciplinary issues. Yet, as we have expressed to the Disciplinary Committee on a
number of occasions, these matters remain a priority for the Pennsylvania State Police
and we still believe that these issues should be a priority for both parties.

        We are willing to continue these discussions as early as next week. Please
advise as to the PSTA's position on these matters at your earliest convenience.

                                        Very truly yours,

                                        Lt. Colonel John R. Brown
                                        Deputy Commissioner of Professional
                                        Responsibility

cc:    Brian Pedrow
       Sheryl Saxe-Dowling
       Vicki Beatty
       Joanna Reynolds
       Captain Robert B. Titler
       Dale Wetzel
       File



# EXHIBIT 5

# PENNSYLVANIA
# STATE TROOPERS
ORGANIZED 1962    A S S O C I A T I O N

July 16, 2004

Lt. Col. John R. Brown
Deputy Commissioner of Professional Responsibility
Pennslyvaina State Police
1800 Elmerton Avenue
Harrisburg, PA 17110

Dear Colonel Brown,

The Pennslyvania State Troopers Association (PSTA) is committed to working with the Pennslyvania State Police (PSP) regarding all areas of mutual interest, including the discipline process. As pointed out in your letter, the PSTA Discipline Committee has met with PSP representatives to discuss several issues of mutual concern regarding the discipline process. While some areas of concern to the PSTA have not been addressed to the satisfaction of our committee, we remain optimistic that a mutually agreed upon discipline process can be achieved.

In an effort to achieve a mutually agreed upon discipline process, the PSTA Discipline Committee is willing to continue negotiations with representatives of the Department. Furthermore, the committee will remain willing to negotiate regarding these issues until presentations and/or arguments regarding our proposals concerning Article 26 and Article 28 of the Collective Bargaining Agreement are made before the panel of arbitrators. As of this date, the PSTA has scheduled July 29, 2004 as the date of our initial presentation regarding these articles.

Furthermore, if mutually agreed upon at that time, the PSTA will postpone presentation of proposals for Article 26 and Article 28, if it is determined that it would be beneficial to the parties to continue negotiations. The PSTA remains optimistic that the parties can mutually resolve these issues and is eagerly awaiting your response.

Very truly yours,

Joseph E. Sarkis
Vice President
Pennslyvania State Troopers Association

PSTA  3625 Vartan Way, Harrisburg, PA 17110    (717) 540-5646 • 800-541-9934    Fax (717) 540-5318 • 800-540-5318
e-mail: psta@paonline.com    website: www.psta.org



Office of the Independent Monitor
of the Pennsylvania State Police

# EXHIBIT 6

**One Reader's View**

# Pa. state troopers favor tough discipline code

The Pennsylvania State Troopers Association (PSTA) represents the uniformed men and women in the oldest state law enforcement organization of its kind in our nation. Since 1905, state troopers have avoided the spotlight, preferring to let our record of distinguished service speak for itself. But because of recent circumstances, PSTA is compelled to speak out because we know the importance of maintaining the public trust.

A recent report by State Inspector General Donald L. Patterson revealed isolated cases of sexual misconduct by troopers of all ranks. As a result, the actions of a very few have created questions in the minds of some Pennsylvanians.

Let the record be clear: The PSTA believes one case is too many. Our troopers have worked too hard to merit the respect of millions of our fellow citizens. Ninety troopers have lost their lives in the line of duty.

In recent years, the PSTA advocated for a tough random drug-testing program for all troopers, a nearly unprecedented move by a union and its membership. It also supports psychological evaluations and lie detector tests now used to help provide a clearer picture of each candidate seeking admission to the State Police Training Academy.

One of our top priorities is the continued improvement of the cadet screening process. We believe that will help avoid problems that could result from allowing a small number of substandard candidates to slip into the system.

We will continue to work with State Police Commissioner Jeffrey Miller on cadet screening and other important issues, including a disciplinary code that is tough, fair to all, and shows no favoritism toward rank.

**Bruce A. Edwards**
Harrisburg

*Edwards is president of the Pennsylvania State Troopers Association.*