# OFFICE OF INSPECTOR GENERAL



# INVESTIGATIVE REPORT
# ON SEXUAL HARASSMENT AND SEXUAL MISCONDUCT AT THE PENNSYLVANIA STATE POLICE

### INSPECTOR GENERAL DONALD L. PATTERSON

OIG-03-378-SP

*September 8, 2003*

Exh.1.#'A'

## Table of Contents

Executive Summary.................................................................................................i

I. Introduction .................................................................................................... 1

  A. Background ................................................................................................ 1

  B. Scope.......................................................................................................... 5

  C. Methodology ............................................................................................. 6

  D. Acknowledgment....................................................................................... 8

II. Complaint Processing And Investigations ................................................. 9

  A. Complaint Processing And Investigative Procedures............................. 9

  B. Complaint Processing Issues And Recommendations........................... 11

    1. The State Police Do Not Document All Misconduct ......................... 11

    2. Investigations Of Subordinate Misconduct ...................................... 16

    3. State Police Members Receiving Complaints About
       Co-Workers Have Improperly Contacted Subjects ........................... 18

    4. The State Police Do Not Always Follow Up On
       Complaints Of Misconduct When Complainants Fail
       To Submit A Complaint Verification ................................................. 19

  C. Complaint Investigation Issues And Recommendations ....................... 22

    1. Some Investigations Are Conducted At The Troop
       Level Rather Than By Bureau Of Professional
       Responsibility Staff ........................................................................... 22

    2. Witness Interviews Have Not Been Consistently
       Documented In Sexual Harassment And Sexual
       Misconduct Investigations ................................................................ 25

    3. Some Cases Involving Domestic Violence
       Allegations Were Withdrawn When The
       Complainants Failed To Cooperate ................................................... 26

4.  In Some Cases Investigators Focus On Peripheral
    Matters And Miss Sexual Harassment Or Sexual
    Misconduct Issues ................................................................... 28

**III.  Discipline** ................................................................................ 31

A.  Disciplinary Procedure ............................................................ 31

B.  Issues And Recommendations .................................................. 34

1.  Supervisors Are Sometimes Unaware Of Their
    Subordinates' Full Record Of Conduct ............................... 34

2.  Discipline Is Often Minimal, Disparate, And
    Diminished During The Grievance Process .......................... 35

**IV.  Pre-Employment Background Investigations And
    Probationary Employment** ........................................................ 44

A.  Former Pre-Employment Procedures ......................................... 44

B.  Present Pre-Employment Procedures ......................................... 46

C.  Evans' Pre-Employment Background Investigation ...................... 48

D.  Pre-Employment Issues And Recommendations .......................... 51

1.  Inconsistencies In Pre-Employment Background
    Investigations ..................................................................... 51

2.  Standards And Training Of The Appeal Panel ...................... 52

E.  Probation ............................................................................... 57

F.  Probationary Issues And Recommendations ............................... 57

1.  Probationary Standards ...................................................... 57

**V.  Sexual Harassment** .................................................................... 60

A. The Commonwealth Strictly Prohibits Sexual
   Harassment In Work Settings .................................................. 60

B. State Police Administrative Regulations Establish Policy, Guidelines, and Procedures Regarding Sexual Harassment .................................................................................. 60

   1. Supervisory Inquiry ........................................................... 61

   2. Investigation ..................................................................... 62

C. Issues And Recommendations ............................................. 63

   1. State Police Administrative Regulations Are Not Consistent With Commonwealth Management Directives Relating To Sexual Harassment ....................... 63

   2. Employees Responsible For Investigating Sexual Harassment Allegations Lack Formalized Sexual Harassment Training.................................................................. 66

   3. Sexual Harassment Education And Training Is Not "An Ongoing Effort" ............................................................ 66

   4. The Equal Employment Opportunity Officer's Involvement In Sexual Harassment Issues Is Limited Because Of Current Staff Size......................................... 68

   5. Notification And Involvement Of The Equal Employment Opportunity Officer In Sexual Harassment Investigations ............................................... 69

VI. **Attitudes Regarding Sexual Harassment And Sexual Misconduct**.................................................................... 72

A. Issues And Recommendations............................................... 72

   1. Failure To Respect The Prohibition Against Sexual Harassment And Sexual Misconduct By High Ranking Officials In The State Police .......................... 72

   2. Failure To Recognize The Problem Of Sexual Harassment And Sexual Misconduct At The Pennsylvania State Troopers Association......................... 75

   3. The State Police Diminish The Importance Of Sexual Harassment And Sexual Misconduct...................... 75

**VII. Summary Of Recommendations**................................................................... 79

**Appendices**

## EXECUTIVE SUMMARY

### A.   INTRODUCTION

On June 30, 2003, after the disclosure of detailed allegations of sexual harassment and sexual misconduct by Pennsylvania State Police Members, the Office of Inspector General (OIG) initiated an investigation. The purpose of the OIG's investigation is to establish the groundwork for changes and improvements and to deter and prevent sexual harassment and sexual misconduct. The OIG examined State Police policies, procedures, and practices. The OIG focused on the following State Police processes: complaint procedures; disciplinary procedures; pre-employment background investigations and probation; and sexual harassment policies and procedures. The OIG also considered the organizational culture and attitudes that may impact the way the State Police handles complaints of sexual harassment and sexual misconduct.

Throughout this Report, the OIG refers to the conduct of former State Police Member Michael K. Evans and the course of conduct that led to his arrest and incarceration. The OIG also refers to other State Police investigations of alleged acts of sexual harassment and sexual misconduct. The purpose of this Report is not to investigate specific acts of alleged sexual harassment or sexual misconduct, or to establish individual culpability. The OIG reviewed and reports on the Evans case and the other investigations in order to provide a context for its recommendations.

In conducting its investigation, the OIG requested that the State Police Bureau of Professional Responsibility provide its records of all sexual harassment and sexual

misconduct complaints and investigations from 1995 to the present and the corresponding disciplinary records. The OIG examined applicable Commonwealth and State Police policies, regulations, and procedures. The OIG interviewed the Commissioner, the former Commissioner, current State Police officials responsible for administering the relevant processes, and the current president of the Pennsylvania State Troopers Association. The OIG also solicited comments and recommendations from the attorney representing some of the plaintiffs in the Evans federal court litigation, but received no input from him.

Throughout its investigation the OIG has received the full cooperation of the State Police.

## B.    COMPLAINT PROCESSING AND INVESTIGATIONS

### 1.    Complaint Processing

State Police regulations require the recording of all misconduct complaints, whether made by State Police Members or the public, on a Use of Force or Complaint Reception and Processing Worksheet. Use of Force or Complaint Reception and Processing Worksheets are forwarded to the Bureau of Professional Responsibility for investigation. According to State Police procedures, a complainant must return a Complaint Verification within 20 days of making a complaint, unless the complaint involves allegations of criminal conduct, in order for the Bureau of Professional Responsibility to begin an investigation.

The OIG identified several issues concerning State Police complaint processing. First, the State Police do not always report and document Member misconduct. Evans' course of conduct illustrates the impact of failing to document all misconduct complaints. The OIG recommends that the State Police enforce, through discipline, the requirement that Members who have personal knowledge, or receive complaints of sexual harassment and sexual misconduct, immediately report and document it.

The OIG also notes incidents where Troop Commanders investigated complaints of misconduct, on their own, rather than report the incidents to the Bureau of Professional Responsibility. The OIG recommends that the State Police prohibit the practice. Furthermore, the State Police should reiterate that complaints of misconduct are confidential and should not be disclosed to the subject or anyone else.

With respect to the requirement that complainants return Complaint Verifications, the OIG notes that in most, but not all cases, the Bureau of Professional Responsibility followed up and contacted the complainant even if the form was not returned. The OIG recommends that the State Police establish a policy of interviewing all complainants even when a complainant does not return a Complaint Verification.

The OIG also recommends that the State Police develop and implement an outreach program to facilitate the ability of citizens to complain directly to the Bureau of Professional Responsibility in person, by mail, by telephone, via the Internet, by e-mail, or by facsimile. The OIG further recommends that the State Police provide informational material about the complaint handling process and establish and publicize a 24-hour toll

free telephone number for citizens to make complaints, or otherwise provide feedback to the Bureau of Professional Responsibility.

### 2. Investigations

Although the Bureau of Professional Responsibility has its own staff and oversees all investigations of misconduct, criminal investigators at the Troop level sometimes perform misconduct investigations. The OIG finds this practice, particularly as it applies to sexual harassment and sexual misconduct, troubling for several reasons: Troop level investigators lack the same level of training and experience as Bureau of Professional Responsibility investigators; a Troop level investigator's relationship with the subject may impact the credibility of the investigation; and the Bureau of Professional Responsibility is not able to assert sufficient control over the quality of the investigation.

The OIG recommends that the State Police assign all allegations of sexual harassment and sexual misconduct to investigators permanently assigned to the Bureau of Professional Responsibility. To effectively implement the recommendation, the State Police should increase Bureau of Professional Responsibility staff.

The OIG reviewed many investigations that included allegations of domestic violence and Protection From Abuse Orders. The State Police has a policy outlining the measures to be taken in the event of a Protection From Abuse Order, including when Members are required to surrender their weapons. Because of the unique circumstances surrounding domestic violence and law enforcement officers, the OIG recommends that the State Police follow the International Association of Chiefs of Police model policy on

Police Officer Domestic Violence. The State Police should adopt the model policy of proceeding with investigations even when a complaining witness recants or withdraws a Protection From Abuse Order.

During its investigation the OIG reviewed some cases in which investigators focused on peripheral issues rather than alleged sexual harassment and sexual misconduct. The OIG recommends that the State Police take steps to emphasize the importance of focusing on and investigating the issues involved in sexual harassment and sexual misconduct allegations.

## C.    DISCIPLINE

Under the current State Police disciplinary procedure, if the Bureau of Professional Responsibility sustains an allegation of sexual harassment or sexual misconduct, an investigative report is forwarded to the Deputy Commissioner of Administration and then to the subject's Troop Commander. The Troop Commander can initiate discipline through the preparation of a Disciplinary Action Report, which is then provided to the Member. The Disciplinary Action Report is then forwarded to the Department Disciplinary Officer. The Troop Commander is not required to prepare a Disciplinary Action Report and may address the infraction with the Member without any involvement by the Department Disciplinary Officer.

The Department Disciplinary Officer determines the appropriate discipline for the infractions listed on the Disciplinary Action Report. After the discipline determination, the Member is notified of the discipline and the appeal rights. If the Member appeals, the

grievance procedure between the State Police and the Pennsylvania State Troopers Association provides for the presentation of the grievance to a grievance committee and, if unresolved, to an arbitrator.

The OIG's review of the disciplinary actions taken by the State Police in sustained sexual harassment and sexual misconduct cases from 1995 to the present disclosed that the discipline, if any, was often minimal, disparate, or diminished during the grievance process.

In this Report the OIG provides examples of disciplinary actions that were minimal. For example, the State Police imposed a one-day suspension without pay for engaging in sex while on duty and for accessing pornography via the Internet.

Two factors have contributed to the imposition of minimal discipline. First, the State Police previously considered anticipated arbitration results when determining discipline. The Commissioner has already announced that the State Police will no longer consider anticipated arbitration results. Second, the State Police previously agreed to the substitution of annual leave for days in which a Member was suspended without pay. The practice diminishes the effect of discipline and the Commissioner has announced that the State Police will no longer agree to such substitutions. The OIG supports the Commissioner's announced policies.

The OIG recommends that the State Police further address the issue of minimal discipline. The State Police must establish a policy of treating sexual harassment and sexual misconduct as serious infractions that merit significant discipline, up to and

including dismissal. The State Police should implement the zero tolerance policy that the Commissioner recently announced in deciding discipline for sustained allegations of sexual misconduct. To enact the zero tolerance policy, the OIG recommends that the State Police set specific disciplinary guidelines for sexual misconduct that recognize the seriousness of the offense.

The OIG investigation also disclosed instances of disparate discipline. The OIG recommends that the State Police centralize its disciplinary procedure to allow the Department Disciplinary Officer to make all disciplinary determinations. Allowing individual Troop Commanders to decide whether a Disciplinary Action Report should be issued leads to the imposition of disparate as well as minimal discipline. The OIG investigation disclosed instances where allegations of sexual harassment and sexual misconduct were sustained, but the Troop Commander exercised his authority to take no disciplinary action and merely counseled the subject.

To effectively implement the recommendation and improve the disciplinary process, the State Police should increase the Department Disciplinary Officer's staff. Additionally, the OIG's previous recommendation to develop specific guidelines for appropriate levels of discipline for specific offenses will minimize disparities in discipline.

A major concern to the State Police is the arbitrators' modification of disciplinary decisions. The OIG has reviewed the arbitration decisions in sexual misconduct cases since 1995. On some occasions, the arbitrators modified or reversed the discipline

imposed by the State Police because the arbitrator found the discipline incompatible with discipline imposed in similar cases. By following the OIG's recommendation of establishing a policy and practice of consistently imposing serious discipline for sexual harassment and sexual misconduct, the State Police will be more likely to sustain its actions.

In some instances, arbitrators have refused to sustain the dismissal of a Member convicted of criminal conduct. The OIG notes that while there is a statute addressing the dismissal of municipal police officers convicted of crimes, no such statute applies to State Police Members. The OIG recommends that the State Police consider supporting legislation that would require the dismissal of State Police Members convicted of felonies and at least some misdemeanors.

Act 111, the statute governing collective bargaining rights for police and fire personnel in Pennsylvania, governs arbitration decisions involving the State Police. In a series of decisions, the Pennsylvania Supreme Court has ruled that, based on the legislative intent manifested in Act 111, arbitration decisions are subject to a very narrow scope of review. The Supreme Court decisions give arbitrators significant control over disciplinary decisions. While the OIG has identified this issue, it is beyond the scope of this Report and the OIG has made no recommendation on it.

## D.    BACKGROUND INVESTIGATIONS AND PROBATIONARY EMPLOYMENT

The State Police conducts pre-employment background investigations on applicants who are successful on written and oral examinations. State Police criminal

investigators perform the investigations. A Background Investigation Screening Board renders a decision on whether the applicant is qualified. Applicants may appeal determinations that they are not qualified to the Background Investigation Appeal Panel.

The OIG reviewed the State Police background investigation procedures in place at the time of Evans' hire as well as the current procedures. Since Evans' hire, the background investigation process has changed. The present background investigation process addresses some of the problems that occurred in the Evans case. For example, background investigators receive more training and are specifically allowed to include opinions as to whether the candidate is suitable. The background investigation now includes the use of a polygraph examination and a psychological evaluation, processes precluded under the provisions of a consent decree that impacted the State Police hiring processes from 1974 to 1998.

Troop level investigators throughout the Commonwealth conduct background investigations. Investigators from the Troop in the geographic area where the applicant resides conduct the background investigation. While the OIG recognizes that assigning investigators to solely conduct background investigations may be impractical, the OIG recommends that a limited number of investigators conduct investigations so that they gain experience and training and, in turn, increase the uniformity and consistency of background reports.

As part of its investigation, the OIG identified 20 Members of the State Police who were the subject of more than one complaint of sexual misconduct. The OIG

reviewed the pre-employment background investigation of each of the individuals. The review disclosed that the Background Investigation Screening Board originally disqualified 20% of the Members. The Members were admitted to the State Police after successfully appealing to the Background Investigation Appeal Panel, or in one case reapplying at a later date. The fact that the Members who were originally disqualified ultimately became the subjects of multiple complaints calls into question the performance of the Appeal Panel. The OIG recommends that the State Police take steps to guide the Appeal Panel and assist it in making more considered decisions with training and articulation of more specific standards.

Every State Police Member is required to complete an 18-month probationary period. Before the probationary period ends, the State Police conducts a general investigation of the Trooper's performance. In Evans' case, the State Police conducted his probationary review while he was under investigation by the Bureau of Professional Responsibility for improper conduct with a 16 year-old. Despite this, Evans passed his probationary period.

The OIG recommends that the State Police take steps to coordinate the probationary review with the Bureau of Professional Responsibility and the Equal Employment Opportunity Officer before a Member passes his or her probationary period. If there is an open investigation, the State Police should take steps to extend the probationary period until it is resolved.

### E.     SEXUAL HARASSMENT

The State Police has instituted policies and procedures governing the prevention of sexual harassment in the workplace and has an Office of Equal Employment Opportunity to address complaints of sexual harassment along with the Bureau of Professional Responsibility.  In its review of the State Police sexual harassment policies, the OIG discovered that its policies are not always consistent with the Commonwealth's policies and procedures.   While the Commonwealth policies require investigation of all complaints of sexual harassment regardless of whether they are written, the State Police policies do not provide the same guarantee.  The OIG recommends that the State Police amend its policies to conform to the Commonwealth policies.

The OIG review of the sexual harassment training at the State Police shows that the Equal Employment Opportunity Officer provides training to cadets at the State Police Academy and to newly promoted supervisors.  Although the State Police conducts annual mandatory in-service training, sexual harassment training has not been included since 1999.  The OIG recommends that the State Police consider making sexual harassment part of its annual in-service training.  The OIG also encourages the State Police to support the Equal Employment Opportunity Officer in her efforts to develop a computer based training module.

The Equal Employment Opportunity Officer's participation in training and investigations is limited because of the lack of staffing.  In an organization of over 5,000 employees, the office that has responsibility for not only monitoring sexual harassment

but also all other claims of discrimination has only the Equal Employment Opportunity Officer and one clerical employee. The OIG recommends that the State Police devote greater resources to the Equal Employment Opportunity Office including additional staff to promote greater visibility and to provide a greater role in training and the conduct of investigations.

### F.    ATTITUDES INVOLVING SEXUAL HARASSMENT AND SEXUAL MISCONDUCT

In its review of files and during interviews, the OIG observed several factors exhibiting organizational culture and attitudes that do not regard sexual harassment and sexual misconduct as serious issues.

Among the cases reviewed by the OIG, three sustained cases involved allegations against State Police Majors, the rank just below Deputy Commissioner. One Major was charged with indecent assault and allowed to retire. Three women who worked for him complained that he touched and grabbed them, and in one instance he went to his Administrative Assistant's home and assaulted her. Another Major had a relationship with one of his subordinates and after it ended stalked and harassed her. The State Police allowed the Major to retire prior to being dismissed. In the third instance, a Major repeatedly touched the back, thigh and buttocks of an executive secretary until she finally filed a complaint against him. The allegation was sustained and he received a "constructive counseling" session.

The repeated occurrence of sexual harassment and sexual misconduct at such a high level shows a failure to appreciate a serious issue within the agency. A similar

attitude was evident when the OIG interviewed the President of the Pennsylvania State Troopers Association. The President told the OIG that the introduction of women in policing -- the fact that they ride in patrol cars with men all night, essentially "spending the night together" -- has put an "extra burden on policing" and has caused problems of sexual harassment and sexual misconduct.

The procedural problems this Report describes are not unrelated to the organizational culture and attitudes that the OIG observed: the minimal discipline for engaging in sexual harassment and sexual misconduct; the diminished importance of the Office of Equal Employment Opportunity; and the tendency in some investigations of sexual misconduct to focus on peripheral issues. The procedural problems are symptomatic of an attitude that fails to respect and recognize the importance of sexual harassment and sexual misconduct issues.

In order to address the organizational culture and attitudes, the OIG recommends additional training throughout this Report. The OIG also recommends that the Bureau of Professional Responsibility and the Equal Employment Opportunity Officer maintain statistics of sexual harassment and sexual misconduct complaints to monitor for trends and comparisons to other relevant agencies. In order to emphasize the importance of the Bureau of Professional Responsibility, and its role in maintaining the integrity of the State Police, the OIG recommends that the Bureau report directly to the Commissioner.

Finally, the OIG recommends that the Governor appoint a Commission, to exist for a minimum of three years, to monitor the State Police progress in handling complaints

of sexual harassment and sexual misconduct. The Commission should receive periodic reports from the State Police on any proposed policy changes and statistical data regarding complaints of sexual harassment and sexual misconduct. The Commission should have access to State Police personnel, personnel files, and Bureau of Professional Responsibility files and report directly to the Governor.

The OIG encourages the State Police to review and implement the recommendations provided in this Report.

# I.     INTRODUCTION

Pursuant to Executive Order 1987-7, the Office of Inspector General (OIG) independently investigates fraud, waste, misconduct, and abuse in executive agencies in the Commonwealth of Pennsylvania and recommends policies to deter, detect, prevent and eradicate fraud, waste, misconduct, and abuse. The OIG submits this Report for appropriate action.

## A.     Background

The Pennsylvania State Police employs over 5,000 civilians and uniformed Members. According to its organizational chart (a copy is attached as Appendix A), the Commissioner and three Deputy Commissioners administer the State Police. The ranks in descending order are Colonel, Lieutenant Colonel, Major, Captain, Lieutenant, Sergeant, Corporal, and Trooper. All Members except the Commissioner, the Deputy Commissioners, and cadets are part of the collective bargaining unit represented by the Pennsylvania State Troopers Association.

The Bureau of Professional Responsibility through its Internal Affairs Division is authorized (1) to recommend to the Commissioner policies and procedures to initiate, conduct, and control all necessary investigations and (2) to process all complaints or allegations of personnel misconduct.

The State Police classifies the results of the Bureau of Professional Responsibility's investigations in five ways

- "Sustained" -- investigation indicates misconduct actually occurred;

- "Not Sustained" -- indicates a failure to conclusively prove or disprove the allegation;

- "Unfounded" -- indicates that the incident did not or could not have occurred as alleged;

- "Policy Void" -- indicates that the action in question was consistent with State Police policy but the complainant still suffered harm; and

- "Withdrawn" -- indicates that the complainant refused to sign a Complaint Verification and the investigation was terminated or an investigation was otherwise concluded on advice of the Director of the Bureau of Professional Responsibility.

Pursuant to Executive Order 2002-4, sexual harassment includes unwelcome sexual advances, requests for sexual favors, or other verbal, visual, or physical conduct of a sexual nature that unreasonably interferes with an individual's work place or creates an intimidating, hostile, or offensive work environment.

Neither the Commonwealth nor the State Police precisely defines sexual misconduct. For this Report, the OIG reviewed allegations of behavior, whether criminal or not, of any Member's on-duty conduct with a sexual connotation (for example, engaging in sex while on duty). The OIG also reviewed allegations of off-duty conduct involving gender motivated use of force or assault, gender based harassment, unwanted sexual attention, sexual coercion, domestic violence, and any other conduct with a sexual connotation that might bring disrepute to the State Police.

As background for this Report, a brief explanation of how the events involving former State Police Trooper Michael K. Evans brought the issue of sexual misconduct at the State Police to the attention of the OIG is necessary. Evans entered the State Police Academy as a cadet on April 22, 1996. After graduating from the Academy in October 1996, the State Police assigned Evans to Troop K, Limerick Station, later known as Skippack Station. In July 1997, during his 18-month probationary period, he became the subject of a misconduct complaint and a Bureau of Professional Responsibility investigation.

The parents of a 16 year-old girl alleged that while investigating a burglary at their home Evans made several comments of a sexual nature to their daughter, rubbed his genital area, and asked her to open her shirt. Evans completed his probationary period in October 1997 even though the investigation was still in progress. When the State Police completed the investigation in February 1998, it determined that the allegations regarding the 16 year-old were unfounded. In his determination, Evans' Commanding Officer wrote, "A large part of my determination was based upon your [Evans] integrity, character and professional demeanor."

In September 1998, Evans' supervisors seized photographs of a nude prostitute posing against a State Police vehicle from Evans' locker. The Bureau of Professional Responsibility was notified of the photographs in November 1998 and initiated an investigation, which ultimately sustained the allegation against Evans. In May 1999, Evans served a three-day suspension without pay for the nude photograph incident.

-3-

In September 1999, Evans transported a 15 year-old runaway from Berks County to Skippack Station. While alone with the 15 year-old at the Skippack Station, Evans made sexually suggestive comments, fondled her, exposed himself, and masturbated in front of her. The 15 year-old reported the incident to a school counselor who then reported the incident to the Bureau of Professional Responsibility. The Bureau of Professional Responsibility initiated a criminal investigation. The State Police suspended Evans without pay, but he returned in October 1999 on restricted duty. In November 1999, the Bureau of Professional Responsibility submitted its file to the Montgomery County District Attorney's Office for investigation.

The Montgomery County investigation revealed a pattern of criminal behavior and sexual misconduct that began while Evans was still in the Academy. Evans brought a woman to class and had her sit provocatively, showing she was not wearing underwear. Other acts of Evans' criminal behavior and misconduct that occurred between April 1996 to September 1999 include the following: fondling and exposing himself to women he met while on duty; sexually assaulting women, some of whom he met while on duty; entering into sexual relationships with women he met on duty and in at least one instance telling her to lie if asked about the relationship; in the course of a car stop, asking the woman in the car if he could obtain a video of her and her partner having sex; while transporting another runaway teenage girl making sexually suggestive comments, touching her breast, and rubbing his genital area; having sex with a woman at a State Police training facility along with another Member; and masturbating and fondling the

-4-

breasts of a woman in the hospital after meeting the woman during the investigation of her attempted suicide.

Evans was arrested for assaulting three adult women and three juveniles -- the assault of the 16 year-old in the burglary investigation and the two runaways. He pleaded guilty on October 3, 2000, to Solicitation of Prostitution, Indecent Exposure, three counts of Indecent Assault, three counts of Corruption of Minors, and three counts of Official Oppression. Evans was sentenced to five to 10 years in state prison followed by 10 years of probation. On the day of his sentencing, Evans submitted his resignation to the State Police.

In May 2003, Ashley Haber filed a complaint in federal court against several current and former State Police officials. The complaint alleged Evans sexually assaulted Haber and violated her civil rights. The complaint also alleged, in detail, a pattern of sexual misconduct by certain Members. As a result of the Haber complaint, the OIG initiated an investigation to review State Police procedures relating to sexual harassment and sexual misconduct.

**B.    Scope**

The scope of the OIG investigation included the examination of past and present State Police policies, procedures, and practices. The intent of the OIG's investigation is to establish the groundwork for necessary changes and improvements. Although the OIG reviewed documents and policies applicable to State Police, civilian and uniformed employees, the investigation focused on uniformed Members.

The OIG did not initiate the investigation to identify specific acts of sexual misconduct or establish individual culpability. The OIG did not investigate Evans' individual acts, or the way the State Police responded to the complaints it received, to determine individual responsibility. Nevertheless, the OIG refers to Evans' case when evaluating the State Police policies, practices, and procedures to improve the process and prevent a similar situation from occurring again.

This Report focuses on four processes impacting the State Police's ability to deter and prevent sexual harassment and sexual misconduct: complaint procedures; disciplinary procedures; background investigations for hiring State Troopers and their probationary period; and sexual harassment procedures.

### C.    Methodology

The OIG reviewed Commonwealth Executive Orders and Management Directives and pertinent State Police policies and procedures including Field Regulations, Administrative Regulations and the applicable Collective Bargaining Agreements between the Commonwealth and the Pennsylvania State Troopers Association, specifically Articles 26 and 28. The OIG requested that the Bureau of Professional Responsibility provide records of all sexual harassment and sexual misconduct complaints and investigations from 1995 to the present. In addition to the Bureau of Professional Responsibility files, the OIG requested the discipline records, if any, in cases where the allegations were sustained. Much of this Report is based on the OIG's review of the documents provided by the Bureau of Professional Responsibility.

The OIG also reviewed the pleadings and discovery produced in the civil litigation in federal district court surrounding Evans including *Weller v. Evanko, et al.*, CA No. 00-5660 (E.D. Pa.); *Mary Doe, Etc. v. Evanko, et al.*, CA No. 01-1538 (E.D. Pa.); *Nancy Doe v. Evans, et al.*, CA No. 01-2166 (E.D. Pa.); *Maslow v. Evans, et al.*, CA No. 01-3636 (E.D. Pa.); *L.H., Etc. v. Evanko, et al.*, CA No. 00-5805 (E.D. Pa.); and *Haber v. Evans, et al.*, CA No. 03-3376 (E.D. Pa.).

During its investigation, the OIG interviewed State Police personnel including the Commissioner, the former Commissioner, the Director of the Bureau of Professional Responsibility, the Director of Systems and Process Review Division (Bureau of Professional Responsibility), the Personnel Director, the Director of Training, the Equal Employment Opportunity Officer, and the Department Disciplinary Officer. In addition, the OIG interviewed a representative from the Governor's Office of Administration who participates in the disciplinary grievance process for the State Police. The OIG also interviewed subjects, complainants, and witnesses in sexual harassment and sexual misconduct allegations that were investigated and withdrawn, unfounded, not sustained, or sustained. The OIG also interviewed the current president of the Pennsylvania State Troopers Association. Finally, the OIG solicited comments and recommendations from the attorney representing some of the plaintiffs in the Evans civil litigation, but received no input from the attorney.

In preparing this Report, the OIG referred to the following sources: STANDARDS FOR LAW ENFORCEMENT AGENCIES, 4TH ED., THE STANDARDS MANUAL OF THE LAW

ENFORCEMENT AGENCY ACCREDITATION PROGRAM (2001), Commission on Accreditation for Law Enforcement Agencies, Inc.; THE KNAPP COMMISSION REPORT ON POLICE CORRUPTION (1972); THE REPORT OF THE WORKING GROUP CONCERNING THE DETERRENCE OF AND RESPONSE TO INCIDENTS OF SEXUAL ASSAULT AT THE U.S. AIR FORCE ACADEMY, (2003); and THE PENNSYLVANIA STATE POLICE: FINDINGS AND RECOMMENDATIONS, REPORT OF THE SPECIAL COMMITTEE TO INVESTIGATE THE PENNSYLVANIA STATE POLICE, PENNSYLVANIA HOUSE OF REPRESENTATIVES ("Deal Commission Report") (1986).

## D.  Acknowledgment

Although the OIG reviewed voluminous records of unsavory behavior by some Members, the OIG recognizes that the vast majority of men and women who work for the State Police have never engaged in such misconduct.  This Report is not intended to suggest otherwise.  Throughout the investigation, the OIG has requested information from the State Police, particularly the Bureau of Professional Responsibility.  The State Police has cooperated fully in providing timely responses to all the OIG's requests.  The OIG appreciates the cooperation and efforts by the State Police.

## II.    COMPLAINT PROCESSING AND INVESTIGATIONS

### A.    Complaint Processing And Investigative Procedures

State Police regulations require the recording of every complaint of misconduct, whether anonymous, verbal, or written, on a form titled "Use of Force or Complaint Reception and Processing Worksheet," Form SP 1-101 (a copy is attached as Appendix B). The person receiving the complaint is responsible for forwarding it through appropriate channels to the Troop Commander. The Troop Commander is responsible for contacting the Bureau of Professional Responsibility to obtain a control number for the complaint. The Troop Commander, with the Bureau of Professional Responsibility, determines whether a limited or full investigation is warranted. An investigator from the Troop level or the Internal Affairs Division of the Bureau of Professional Responsibility conducts the investigation.

According to State Police regulations, citizens must submit a Complaint Verification, Form SP 1-108, that provides specific information or other written verification. The complainant has 20 days to return the Complaint Verification.[1] If the complainant does not return the Complaint Verification within 20 days, the State Police will only conduct a limited investigation for documentary purposes except in cases where

---

[1] The amount of time was reduced from 30 days to 20 days in an effort to comply with the time limits imposed on investigations by the Collective Bargaining Agreement. The Collective Bargaining Agreement requires that in cases involving alleged criminal conduct, cases which could reasonably be construed to give rise to court martial proceedings, alleged violations of the Governor's Code of Conduct, or cases in which a prosecutorial determination is sought, the State Police shall complete its investigation and advise the Member of the administrative findings within 120 days.

criminal conduct is alleged or in cases that the Department Disciplinary Officer could reasonably construe to give rise to court martial proceedings.

A limited investigation must clearly establish that the alleged misconduct failed to constitute a violation of State Police rules and regulations; the complainant was mistaken and the misconduct alleged was not attributable to State Police personnel; or the complaint is a result of official police action which was adverse to the complainant and alleges only a *de minimis* violation. In accordance with the Collective Bargaining Agreement, the State Police do not investigate anonymous complaints unless the substantiation of the complaint could give rise to criminal charges.

In a full investigation, an assigned investigator conducts an investigation and prepares a General Investigation Report, which is forwarded to the Director of the Bureau of Professional Responsibility. The Director returns the General Investigation Report for further investigation or forwards it to the Deputy Commissioner of Administration. The Deputy Commissioner of Administration sends the General Investigation Report to the Area Commander who then sends it to the subject's Troop Commander.

The Troop Commander decides whether the allegation is sustained, not sustained, or unfounded. After making a decision, the Troop Commander notifies the subject. If an allegation is sustained, the Area Commander and Troop Commander determine whether a Disciplinary Action Report is warranted. A Troop Commander may decide that a Disciplinary Action Report is not warranted even if an allegation is sustained. The Troop Commander must return the General Investigation Report along with his administrative

-10-

decision to the Area Commander and Deputy Commissioner of Administration. If the Troop Commander issues a Disciplinary Action Report, the Disciplinary Action Report is provided to the subject and the Department Disciplinary Officer.

**B.     Complaint Processing Issues And Recommendations**

The OIG has identified issues and makes recommendations as a result of its review of the State Police complaint processing policy and procedures.

**1.     The State Police Do Not Document All Misconduct**

Administrative Regulation 4-25 specifically states that State Police personnel initiating or receiving a complaint are responsible for completing a Use of Force or Complaint Reception and Processing Worksheet. Despite the clear mandate requiring the documentation of every complaint whether anonymous, verbal, or written, the OIG identified occasions when Members failed to complete the Use of Force or Complaint Reception and Processing Worksheet. The failure to document and forward complaints to the Bureau of Professional Responsibility has profound ramifications. Not only does the failure prevent the investigation from commencing, it deprives the State Police of the opportunity to monitor the activities of its Members. The Evans case manifests the consequences of such a failure.

While Evans was a cadet, through his probationary period, and during the remainder of his active duty, he committed numerous crimes and acts of sexual misconduct. Yet, several instances of misconduct were not properly documented and forwarded to the Bureau of Professional Responsibility for investigation.

For example, as a cadet at the Academy, Evans brought a female companion to class. Evans had her sit in front of the other cadets in a provocative manner, wearing no underwear. Nobody at the Academy documented the incident, which came to light in the later criminal investigation. Accordingly, the State Police took no action while Evans was a cadet.

According to Evans' supervisor, on July 10, 1997, Evans told her that a complaint was going to be filed against him for allegedly making inappropriate comments about a girl's underwear and boyfriend; for rubbing his genital area; and asking the girl to open her shirt while he was investigating a burglary. Rather than immediately documenting the incident on a Use of Force or Complaint Reception and Processing Worksheet, Evans' supervisor contacted the mother of the girl and tried to resolve the matter. Eventually, the supervisor completed the Use of Force or Complaint Reception and Processing Worksheet on July 14, 1997, after which an investigation was initiated. On February 9, 1998, after the completion of the investigation, Evans' Troop Commander determined that the complaint was unfounded.[2]

In April or May 1998, the mother of Plaintiff Ashley Haber told a Sergeant in Evans' Troop that she believed something happened between Evans and her daughter, a runaway who was returned home by Evans. The Sergeant failed to complete a Use of

---

[2] In October 2000, Evans eventually pleaded guilty to this crime, among others. The actions of the investigators and Troop personnel involved in the investigation are not the focus of the OIG investigation; however, the OIG strongly recommends that the State Police review the actions of all personnel involved.

Force or Complaint Reception and Processing Worksheet and did not document the conversation.

In August 1998, Evans was assigned to assist in a criminal investigation of a rape that occurred in Montgomery County. A Sergeant from Norristown asked a State Police supervisor to remove Evans because he was "getting too friendly" with a woman at the scene. The incident was never documented in a Use of Force or Complaint Reception and Processing Worksheet.

The State Police also had notice of an allegation that Evans photographed a prostitute posing nude with a State Police vehicle. In September 1998, the State Police became aware of the photographs and seized them during a search of Evans' locker. On November 10, 1998, a Lieutenant submitted a Use of Force or Complaint Reception and Processing Worksheet documenting the nude photographs and an investigation was initiated. During the investigation, witnesses described other instances of Evans' misconduct, including an allegation that he was seen masturbating in the Trappe Tavern parking lot. In January 1999, as a result of the nude photograph investigation, Evans served a three-day suspension without pay. After the investigation, Evans' Commanding Officer requested re-adjudication of the July 10, 1997 investigation, but the request was denied.

Also in September 1998, a Sergeant received an allegation from an Assistant District Attorney in Montgomery County that Evans acted inappropriately during a traffic stop. The complaint alleged that Evans asked a woman if she and her partner videotaped

themselves having sex and if he could purchase the tape. The Sergeant did not document the complaint in a Use of Force or Complaint Reception and Processing Worksheet. The attorney for the woman subsequently sent a letter asking that any implication of Evans' improper conduct be stricken.

When the woman was finally interviewed in 2000 as part of the Montgomery County criminal investigation, she was asked if she knew of any other people who had problems with Evans. Presumably, the Bureau of Professional Responsibility would have asked a similar question had it initiated an investigation in September 1998. The woman stated that the Habers' daughter had a problem with Evans when she was 14 or 15 years old.

The failure to complete a Use of Force or Complaint Reception and Processing Worksheet in each of these instances prevented the State Police from recognizing and investigating Evans' consistent and progressive sexual misconduct. The attached timeline shows the impact of the failure to properly document complaints about Evans' conduct (a copy is attached as Appendix C). Above the line in red are the incidents that were documented, in blue are those that were known to State Police personnel but were not documented. Below the line are all the sexual crimes and sexual misconduct that were discovered during the criminal investigation.

The failure to promptly document a complaint of misconduct is not confined to the Evans case. In BPR #2000-0595,[3] a Trooper told his supervising Corporal that a woman with whom he had just had sexual relations was going to accuse him of rape. Rather than submit a Use of Force or Complaint Reception and Processing Worksheet, the Corporal called the local hospital's emergency room to find out if the hospital was treating any rape victims. The Corporal also contacted the local police department to see if it had received a rape report. Neither the hospital nor the local police department had received a report of a rape in the recent past. The Corporal told the Trooper that he did not think there was anything to worry about and to wait and see if the woman reported the alleged rape. The Trooper who told the Corporal about the accusation filed a Use of Force or Complaint Reception and Processing Worksheet alleging the Corporal engaged in improper conduct by failing to take appropriate action. After an investigation by the Bureau of Professional Responsibility, the Trooper's allegation about the Corporal was determined to be unfounded. No further action was taken.

Although the Administrative Regulation clearly requires the documentation of all complaints on a Use of Force or Complaint Reception and Processing Worksheet, State Police personnel have different interpretations of the guidelines and policies. For example, during a deposition in the Evans' litigation, a Lieutenant stated that Administrative Regulation 4-25 only applies to complaints received from the public. A

---

[3] In this Report, the OIG identifies the records it received from the State Police by the Bureau of Professional Responsibility control number. During the period covered by the OIG's Report, the Bureau of Professional Responsibility altered its numbering system. Accordingly, the numbers used throughout this Report vary in appearance.

Sergeant testified that a station commander or someone else could say "we're not going to do it this way, or there's no complaint or let's wait and - wait and see until we get this information in so we can accurately document it."

## RECOMMENDATION:

The OIG recommends that the State Police require all Members to report, based on personal knowledge or the receipt of a complaint from the public, any misconduct or sexual harassment by other Members. Such reports should be made directly to the Bureau of Professional Responsibility. A Member who has personal knowledge of sexual harassment or sexual misconduct or who receives a complaint of sexual harassment or sexual misconduct and fails to report it should be subject to discipline.

The OIG notes that the Sergeant who failed to file a report about the information he received from Ashley Haber's mother and other information he had about Evans' misconduct was the subject of a Bureau of Professional Responsibility investigation. In August 2003, the allegation against the Sergeant was sustained and a Disciplinary Action Report was issued. The State Police response to the allegation against the Sergeant is different from and an improvement over the response in BPR #2000-0595. This is a positive step and the Bureau of Professional Responsibility should continue enforcement of the reporting requirement through discipline.

### 2.    Investigations Of Subordinate Misconduct

During its investigation, the OIG found instances where Troop Commanders and other supervisors investigated subordinate misconduct. As previously noted, Evans'

-16-

supervisor in July 1997 initially tried to investigate and resolve a complaint that was purportedly going to be filed against Evans for inappropriate behavior with a teenage girl. In another instance, a Captain did not complete a Use of Force or Complaint Reception and Processing Worksheet and investigated an allegation that Evans masturbated in the parking lot of the Trappe Tavern.

Similarly, in BPR #2000-0595, a Member alleged that a Corporal who received notice of a potential rape charge initiated an investigation rather than immediately preparing a formal complaint.

When supervisors conduct investigations of alleged misconduct committed by their direct subordinates, their proximity to the subject compromises their ability to impartially investigate. Furthermore, supervisors lack the resources to investigate such allegations and may divert limited resources from other essential investigations. A Troop Commander's failure to report an allegation of misconduct impedes the Bureau of Professional Responsibility's ability to conduct a thorough investigation and conceals issues of misconduct.

**RECOMMENDATION:**

The OIG recommends that the State Police reiterate the policy requiring the notification of the Bureau of Professional Responsibility of all allegations of sexual harassment and sexual misconduct. Moreover, the State Police should specifically prohibit its supervisors from investigating allegations of subordinate misconduct. The State Police must emphasize the prohibition by issuing a new Field Regulation and

-17-

including the new Field Regulation in its annual in-service training. Additionally, the OIG recommends that the State Police enforce the prohibition with discipline. The State Police should discipline any supervisor who, independent of the Bureau of Professional Responsibility, investigates allegations of subordinate sexual harassment and sexual misconduct.

### 3. State Police Members Receiving Complaints About Co-Workers Have Improperly Contacted Subjects

During its review of State Police files, the OIG found that, on occasion, Members receiving complaints informed the subjects of the allegations.

In BPR #2002-0162, a Corporal received a complaint from a woman alleging that she was in a relationship with a Member of a different station. The woman alleged she was afraid of the Member after an argument that had just occurred. She later stated that she and the Member had engaged in sex while he was on duty. The Corporal called the subject's Sergeant who subsequently called the subject at home to ask him about the allegations. Ultimately, the investigation sustained the allegations.

In BPR #2003-0273, a Corporal received a Complaint alleging that the subject had inappropriately touched a male complainant. The Corporal spoke to the subject shortly after the complaint was filed to obtain the subject's side of the story. The investigation is ongoing.

**RECOMMENDATION:**

A State Police regulation specifically requires that personnel receiving complaints "ensure the confidentiality of all complaints." The importance of maintaining

confidentiality and not notifying the subject of the allegation until the assigned investigator determines that it is appropriate is obvious. The OIG recommends that the State Police reiterate that any Member receiving or having knowledge of a complaint is prohibited from discussing it with the subject. The State Police must enforce the policy through discipline.

### 4. The State Police Do Not Always Follow Up On Complaints Of Misconduct When Complainants Fail To Submit a Complaint Verification

During the investigation, the State Police provided records of every complaint of sexual misconduct or sexual harassment deemed withdrawn. These were complaints in which a Use of Force or Complaint Reception and Processing Worksheet was submitted, but the complainant failed to return the signed Complaint Verification as required.

When the Bureau of Professional Responsibility receives a complaint, it forwards a Complaint Verification to the complainant with instructions to return it within 20 days. If the complainant fails to return the Complaint Verification, an investigation is required only if the alleged misconduct is criminal in nature or could be construed to give rise to court martial proceedings (offenses meriting dismissal, a suspension without pay of 30 days or more, transfer, or demotion in rank).

The OIG interviewed individuals who failed to return a Complaint Verification after a Use of Force or Complaint Reception and Processing Worksheet had been completed and no investigation took place. In some instances, the complainants were not

interested in pursuing the complaint and had deliberately failed to return the Complaint Verification.

The OIG reviewed all sustained allegations of sexual misconduct since 1995. Although the complainant had not returned the Complaint Verification in at least 33 sustained cases, the State Police still conducted an investigation. If the State Police had adhered to the policy of not investigating non-criminal cases without a Complaint Verification, it would not have investigated at least some of the sustained cases where it found misconduct had occurred.

## RECOMMENDATION:

As a matter of policy, the State Police should follow up on *every* complaint received regardless of whether the complainant returns the Complaint Verification. The State Police should adopt a policy prohibiting the closure of an internal investigation by deeming it withdrawn on the basis that a Complaint Verification is not returned. If the complainant fails to return the Complaint Verification, the Bureau of Professional Responsibility should still attempt to arrange a face-to-face meeting with the complainant in all cases. Pursuing a face-to-face meeting would ensure that internal investigations are thorough and complete. Of most significance, following up on every complaint, even if no Complaint Verification is returned, would promote the Bureau of Professional Responsibility's ability to protect the integrity of the State Police.

The OIG also recommends that the letter accompanying the Complaint Verification include language assuring complainants that the State Police is interested in aggressively pursuing misconduct.

* * * * *

The State Police should develop and implement an effective outreach program to facilitate the ability of citizens to complain directly to the Bureau of Professional Responsibility; in person, by mail, by telephone, via the Internet, by e-mail, or by facsimile transmission. The program should include a 24-hour toll-free telephone hotline for citizens to make complaints or otherwise provide feedback on State Police conduct directly to the Bureau of Professional Responsibility. The State Police should document the call and connect or refer to the hotline all citizens who call a State Police station to make a complaint.

The outreach program should also include the development of informational materials (like fact sheets and informational posters) describing the complaint process and the distribution of complaint forms. The State Police should consider making the informational materials and complaint forms available in English, Spanish, and other languages.

The State Police should make the informational materials and complaint forms available at State Police headquarters, State Police stations, and other locations throughout the Commonwealth, like state-operated rest stops. The State Police should publicize the complaint process and the 24-hour toll-free telephone number on its Internet

site. The State Police should also consider publicizing the complaint process by having the Bureau of Professional Responsibility host, on a quarterly or other periodic basis, informational meetings for communities designed to inform the public on proper State Police functions and procedures and the methods of reporting civilian complaints or compliments regarding Members.

### C.    Complaint Investigation Issues And Recommendations

Based on the OIG's review of files, Bureau of Professional Responsibility investigators generally perform thorough investigations of allegations coming to their attention through the Use of Force or Complaint Reception and Processing Worksheet. However, the OIG has identified issues that undermine the reliability of some sexual harassment and sexual misconduct investigations and makes the following recommendations.

### 1.    Some Investigations Are Conducted At The Troop Level Rather Than By Bureau Of Professional Responsibility Staff

Each investigation assigned to the Bureau of Professional Responsibility is performed under the direction of its Director. As a matter of practice, some investigations are performed by investigators assigned to the various Troops rather than by Bureau of Professional Responsibility investigators. According to a Bureau of Professional Responsibility official, investigations involving smaller infractions, such as Trooper accidents, are assigned to the Troop level. Significantly, the OIG identified sexual harassment and sexual misconduct cases investigated by Members at the Troop level.

Although there is no formalized training program, Bureau of Professional Responsibility investigators are experienced investigators periodically sent to training courses outside the State Police. Such training and experience is vital to investigating matters impacting the integrity of the State Police. Limiting sexual harassment and sexual misconduct investigations to the Bureau of Professional Responsibility would help ensure that they are treated with the appropriate professional objectivity.

Allowing Troop Members to investigate sexual harassment and sexual misconduct allegations is inherently troublesome because of the increased likelihood that the investigator works with and knows the subject. In fact, the OIG identified examples of unfounded and not sustained cases where an investigator's relationship or proximity to the subject may have compromised the investigation.

For example, in BPR #10023, the complainant, who worked at a massage parlor, alleged that a Trooper paid her to masturbate him. A Corporal who had previously worked with the subject handled the investigation. When the Corporal interviewed the complainant, he told her "that if her memory was incorrect, that she had not remembered something correctly, or that she was giving false information about this incident, that she could be held criminally responsible for her misstatements." After receiving the intimidating and less than accurate description of the law, the witness declined to provide a written statement. The allegation was determined to be unfounded.

In BPR #10294, the complainant alleged that a Member followed her in his personal vehicle, flashed his headlights, and pulled her over as she was driving away

from her job as a bartender. She alleged that the Member got into the passenger seat of her car and tried to kiss her. While the subject of the complaint was in the complainant's car, a marked State Police vehicle occupied by two Troopers pulled up behind them. One of the Troopers approached the car and spoke to the Member. The Troopers in the marked car then left.

A Member of the same Troop as the subject conducted the investigation. During the investigation, the subject admitted that he had pulled the complainant over and entered her car but denied using his authority as a State Police Member. The subject originally denied ever appearing in uniform at the bar and claimed that the complainant had no reason to know he worked for the State Police. However, the subject later admitted that he had interviewed a suspect in an unrelated matter at the bar. The subject was never asked why he pulled the complainant over or why he entered her car. The commanding officer deemed the case not sustained.

In each of these examples, the result of the investigation would appear more credible if the investigator had no relationship or proximity to the subject.

**RECOMMENDATION:**

The OIG recommends that the State Police stop referring allegations of sexual harassment or sexual misconduct to the Troop level for investigation. The Commission on Accreditation for Law Enforcement Agencies, Inc., has published STANDARDS FOR LAW ENFORCEMENT AGENCIES. In the Internal Affairs chapter, it sets standards for specialized internal investigation components in large law enforcement agencies. For

departments that have specialized units, like the Bureau of Professional Responsibility, the Commission recommends that in cases involving the integrity of the agency the "specialized unit . . . conduct the investigation and carry out all assignments related to resolving the issue." Allegations of sexual harassment and sexual misconduct affect the integrity of the State Police. Accordingly, only the Bureau of Professional Responsibility should carry out such investigations.

The OIG's investigation suggests that the Bureau of Professional Responsibility does not have sufficient personnel to properly investigate complaints in a timely manner. Currently, 13 full-time investigators are assigned to the Bureau of Professional Responsibility. Within the past 17 years, only two additional investigators have been added to its complement. The OIG recommends that the State Police commit to the assignment of additional investigators to allow the Bureau of Professional Responsibility to conduct all investigations of sexual harassment and sexual misconduct by permanently assigned personnel.

     **2.**     **Witness Interviews Have Not Been Consistently Documented In Sexual Harassment And Sexual Misconduct Investigations**

In reviewing the Bureau of Professional Responsibility's files, the OIG notes that in some cases the General Investigative Report contained statements attributed to certain witnesses but the file did not contain documentation of interviews with those witnesses. The Director of the Bureau of Professional Responsibility told the OIG that until October 1999, the Bureau of Professional Responsibility did not require documentation of every interview.

Since October 1999, the Bureau of Professional Responsibility requires documentation of all interviews, either in writing or on audiotape. The Bureau of Professional Responsibility also encourages investigators at the Troop level in the field to do the same.

**RECOMMENDATION:**

While Bureau of Professional Responsibility investigators now document and prepare written summaries of all interviews, all internal investigations would be authenticated and more reliable if the State Police required similar documentation for investigations performed at the Troop level. If the State Police does not require the Bureau of Professional Responsibility to conduct all internal investigations as the OIG previously recommended in this Report, the Bureau of Professional Responsibility should establish a firm, written policy for all investigations requiring documentation of each witness interview.

### 3.    Some Cases Involving Domestic Violence Allegations Were Withdrawn When The Complainants Failed To Cooperate

The OIG's review showed that a number of sexual misconduct investigations involved allegations of domestic violence. At least 17 complaints alleged physical abuse, stalking, or harassing behavior by spouses, ex-spouses, or paramours, some of which included Protection From Abuse Orders. In some of these cases, the investigation was deemed withdrawn due to the victim's failure to cooperate or return the Complaint Verification.

The State Police has recognized the unique problems that arise when a Member is involved with a Protection From Abuse Order. Field Regulation 5-4 (rev. 3/11/98) provides that an individual named as a plaintiff in a Protection From Abuse Order is encouraged to provide a copy of the Order to a supervisor. An individual named as a defendant in a Protection From Abuse Order is required to provide a copy of both the Protection From Abuse Order and the Petition for the Protection From Abuse Order to a supervisor on the next scheduled work day. The regulation also addresses the issue of Protection From Abuse Orders that require a defendant to relinquish all weapons to the sheriff. The Member may request permission to relinquish the weapon to the nearest State Police station, but if that is not granted, he or she must relinquish the weapon to the sheriff and notify his or her supervisor.

Members surrendering their weapon are placed on restricted duty until the Department Disciplinary Officer takes further action or the Protection From Abuse Order is dismissed or withdrawn. The individual's supervisor is required to prepare and process a Use of Force or Complaint Reception and Processing Worksheet, with a copy of the Protection From Abuse Order.

**RECOMMENDATION:**

Although the State Police has taken steps in addressing Protection From Abuse Orders, it should implement additional measures. The International Association of Chiefs of Police has generated a model policy on Police Officer Domestic Violence,

dated April 1, 1999, which the OIG encourages the State Police to consult and consider in amending its regulations.

The purpose of the model policy is to establish procedures for handling matters of domestic violence and abuse involving police officers. It addresses early warnings of potential domestic abuse in the hiring process. The model policy recommends that as part of the pre-hiring screening, the background investigation should determine whether elder abuse, child abuse, or domestic violence issues exist. Any candidate with a history of perpetrating any of these abuses should be screened out. The model policy also recommends that the psychological examination for potential candidates focus on indicators of violent or abusive tendencies.

The model policy further recommends that police departments completely investigate charges of domestic violence and where warranted seek prosecution even if the victim recants the charges. In the interest of protecting the public from the possibility of abusive Members, the OIG recommends that the State Police adopt the policy of proceeding with a Bureau of Professional Responsibility investigation even if the complaining witness recants or withdraws the Protection From Abuse Order.

### 4. In Some Cases Investigators Focus On Peripheral Matters And Miss Sexual Harassment Or Sexual Misconduct Issues

The OIG has found examples of cases where, rather than directing their attention toward the relevant sexual harassment or sexual misconduct issues, investigators focused on peripheral issues. In some cases, the investigators failed to completely investigate the underlying allegation.

-28-

In BPR #10352, the subject Member was arrested for breaking into his former girlfriend's home and raping her. The criminal charges were eventually dismissed. In its investigation, the Bureau of Professional Responsibility investigated all the details of the relationship between the subject and his former girlfriend. However, the investigators never fully addressed the alleged rape. There was no examination of the physical evidence. When the investigators interviewed the woman who had provided the subject's alibi for the time of the alleged rape, they questioned her about incidents that occurred with the subject's former girlfriend and issues related to her employment. They never questioned her about the subject's alibi for the time of the rape. In this instance, the Commanding Officer noted the failures in the investigation. Nevertheless, he found that, under the circumstances, the allegations were not sustained.

In another example, in BPR #9321, a topless dancer alleged that a Member offered to have a speeding ticket that she had received "taken care of" by ensuring that the arresting officer would not appear at her hearing. In return, the Member asked her and some of her friends to dance nude at his brother's bachelor party. The complainant alleged that she and her friends performed as requested, but the arresting officer appeared at the hearing and the speeding ticket was upheld. The Corporal who investigated the complaint belonged to the same Troop as the subject. The Corporal interviewed several witnesses including the subject's brother who confirmed that the party with the dancers occurred. The only other dancer who the investigator located corroborated the allegation. However, the Corporal contacted several witnesses who had information about the

hearing regarding the speeding ticket, but had no information about the misconduct allegation. The Troop Commander determined that the allegation was not sustained.

**RECOMMENDATION:**

The OIG recommends that the Bureau of Professional Responsibility emphasize the importance of investigating alleged sexual harassment and sexual misconduct. Through training and supervisory reviews of investigations, it should reinforce the importance of completing a full investigation into such allegations. The Bureau of Professional Responsibility must emphasize that allegations of such conduct reflect poorly on the dignity and integrity of the State Police and require vigorous investigation.

## III.    DISCIPLINE

In 1986, the Pennsylvania House of Representatives established a "Special Committee to Investigate the Pennsylvania State Police" to review allegations of misconduct.  The Committee issued the Deal Commission Report in which it reached conclusions regarding the imposition of discipline by the State Police, particularly the lack of consistency.  The Deal Commission Report recommended the establishment of a codified system of disciplinary guidelines.  To date, no such codified guidelines exist.

### A.    Disciplinary Procedure

The procedure the State Police follow in imposing discipline on Members is based on the provisions of Field Regulations and the Collective Bargaining Agreement.  All disciplinary actions against Members are initiated through the preparation and submission of a Disciplinary Action Report.  A Disciplinary Action Report is prepared after an alleged violation has been sustained.  The disciplinary process allows the Troop Commander to decline to issue a Disciplinary Action Report and address the matter independently.

The Disciplinary Action Report form consists of four sections.  The first section identifies general information about the Member.  The second section covers "Infractions."  The initiating officer, generally the Troop Commander, completes the section.  The initiating officer determines what violation, if any, has occurred and lists each violation separately.  The initiating officer then provides a copy of the Disciplinary Action Report to the Member.  The third part is the "Member's Notice" section.  This

-31-

section requires the Member's signature, acknowledging receipt of the Disciplinary Action Report, and notice of his or her rights. The Disciplinary Action Report, with a copy of the investigative report and any other supporting documents, is forwarded to the Department Disciplinary Officer. The fourth part is the "Action" section, which indicates the final action taken by the State Police.

A Member has 10 days in which to respond to a Disciplinary Action Report. The Member's response is forwarded to the Department Disciplinary Officer through the initiating officer. In determining the appropriate discipline, the Department Disciplinary Officer considers the Disciplinary Action Report and investigative reports. The Department Disciplinary Officer compares the alleged misconduct to instances of similar misconduct. The Department Disciplinary Officer reviews disciplinary records, official personnel files, and any information provided by the Member in response to the Disciplinary Action Report.

The Department Disciplinary Officer can request further investigation or impose sanctions ranging from a written reprimand to a 30-day suspension without pay. The Department Disciplinary Officer may also impose suspension in excess of 30 days without pay, intertroop transfers, demotions in rank, or dismissal with the concurrence of the Deputy Commissioner of Administration and the approval of the Commissioner. After a decision is made regarding discipline, the Department Disciplinary Officer sends a written notice, indicating violations, penalties, and appeal rights to the Member.

In cases where a Disciplinary Action Report is issued and discipline, ranging from a written reprimand to a 30-day suspension without pay is imposed, the discipline is subject to the grievance procedure. If the Member does not file a grievance, discipline is imposed and the Department Disciplinary Officer completes the Disciplinary Action Report.

If the discipline is suspension without pay in excess of 30 days, intertroop transfer, demotion in rank, or dismissal, Members can choose a court martial and challenge the discipline through the grievance procedure. The option of using the grievance procedure to challenge discipline, which would otherwise be subject to court martial, became effective with the binding Interest Arbitration Award issued February 17, 1988. In virtually all such cases Members choose the grievance procedure.

Whenever a Member files a grievance, the State Police, in accordance with the Collective Bargaining Agreement, waits until the full grievance process is completed before imposing discipline.

A Member may appeal a disciplinary decision by filing a notice with the Governor's Office of Administration within 15 days of receiving notice of the discipline. The appeal is presented to a 10-person grievance committee, consisting of Members from the State Police, personnel from the Governor's Office of Administration, and the Pennsylvania State Troopers Association. The grievance committee may resolve the grievance by reaching a settlement agreeable to both the State Police and the Pennsylvania State Troopers Association. According to the Collective Bargaining

-33-

Agreement, any decision reached at the grievance committee cannot be used as precedent in a subsequent case. If the grievance committee does not satisfactorily resolve the grievance, the grievant may proceed to arbitration.

The Commonwealth and the Pennsylvania State Troopers Association jointly select a panel of five neutral arbitrators for State Police discipline cases. Only one of the arbitrators from the panel is chosen to hear each case. The arbitrator may conduct hearings and receive briefs from both parties. The decision of the arbitrator assigned to the case is final and binding.

**B.    Issues And Recommendations**

The OIG has identified issues and makes recommendations as a result of its review of State Police disciplinary policies, procedures, and sexual harassment and sexual misconduct records of the discipline imposed on Members from 1995 to the present.

**1.    Supervisors Are Sometimes Unaware Of Their Subordinates'
Full Record Of Conduct**

Sustained Disciplinary Action Reports are maintained in a Member's official personnel file; however, complaints that are not sustained, unfounded, or withdrawn are not available to Supervisors. Therefore, supervisors in the State Police are not fully aware of their subordinates' conduct.

**RECOMMENDATION:**

The OIG recommends that information about all sustained, not sustained, unfounded, and withdrawn cases be provided to the current supervisor and new

supervisors when a Member transfers. The OIG notes that the State Police is in the process of implementing an Early Intervention Program to identify Members who exhibit a pattern of conduct of concern. The purpose of the program is to identify such Members and take efforts to correct their conduct before it requires enforcement and discipline. Other departments have instituted such programs, and the OIG encourages the State Police to proceed with its program.

### 2. Discipline Is Often Minimal, Disparate, And Diminished During The Grievance Process

The OIG reviewed the records of the discipline imposed on Members in cases from 1995 to the present in which allegations of sexual harassment and sexual misconduct were sustained. The discipline, if any, for such infractions has frequently been minimal, disparate, and diminished during the grievance process. The failure to impose consistent and meaningful discipline for these infractions undermines any efforts by the State Police to prevent and eliminate sexual harassment and sexual misconduct by its Members.

#### a. Minimal Discipline

Through document reviews and an interview with the Department Disciplinary Officer, the OIG notes that State Police often impose minimal discipline for sexual harassment and sexual misconduct.

In determining discipline, the State Police, prior to making its determination, has considered the anticipated result of the grievance process rather than focusing exclusively on what is in the best interest of the State Police and the public. In doing so, the State

-35-

Police has lowered the discipline it imposed because it assumed the grievance and arbitration process would impose less severe discipline. The Commissioner has stated that the practice will not continue.

Another factor diminishing the effectiveness of discipline is the practice of allowing disciplined Members to use annual leave as a substitute for suspension without pay. The Commissioner has stated that the State Police will not agree to such substitution in the future.

The current disciplinary process allows Troop Commanders to decline to issue Disciplinary Action Reports and to address infractions on their own. In three of the cases listed below, the records that the OIG reviewed did not indicate the issuance of a Disciplinary Action Report. Counseling, rather than discipline, was imposed.

The following examples show imposition of minimal discipline.

| CASE NUMBER | ALLEGATION | DISCIPLINE (If Any) |
|---|---|---|
| 9535 | harassment by repeated touching | constructive counseling[4] |
| 2000-0185 | sexually abused confidential informant | five day suspension without pay; [grievance reduced to three day suspension without pay, two days annual leave] |
| 8837 | harassment | counseling |
| 2000-739 | accessing pornography via Internet | one day suspension without pay |
| 9646 | distributing nude photographs with comments | counseling |

---

[4] State Police defines counseling as a non-disciplinary action.

-36-

| CASE NUMBER | ALLEGATION | DISCIPLINE (If Any) |
|---|---|---|
| 11268 | sex on duty | seven day suspension without pay; [grievance reduced to two day suspension without pay, five days annual leave] |
| 1999-0712 | sex on duty | one day suspension without pay |

## RECOMMENDATION:

The OIG recognizes that on June 23, 2003, the Commissioner issued Special Order 2003-39, Policy Statement - Sexual Misconduct, stating that the State Police will enforce a zero-tolerance policy toward sexual misconduct. The Policy Statement also provides that Commanders and Directors shall ensure all allegations of sexual misconduct are critically reviewed. The Policy Statement warns that any Member who engages in conduct of a sexual nature which brings discredit to the force or victimizes another person will face appropriate administrative action, up to and including dismissal and referral for criminal prosecution.

Consistent with the Commissioner's mandate, the State Police must establish and embrace a policy treating sexual harassment and sexual misconduct as serious offenses and take greater efforts to discourage it institutionally. In addition to the recommendations the OIG makes in other parts of this Report regarding sexual harassment policies, and the need to more effectively enforce those policies, the State Police can further enforce the prohibitions against all sexual misconduct by establishing a policy of serious disciplinary consequences for Members engaging in sexual misconduct.

The OIG recommends that the State Police set disciplinary guidelines for sexual misconduct that recognize the seriousness of such misconduct.

Centralizing the disciplinary procedure in the office of the Department Disciplinary Officer would curtail the use of minimal sanctions where the Troop Commander declines to issue a Disciplinary Action Report in a sustained case. The OIG recommends that the State Police remove disciplinary decisions from Troop Commanders. The removal would address the problem of minimal discipline as well as the issue of disparate discipline.

### b. Discipline Is Disparate

The current process, in which the Troop Commander prepares the Disciplinary Action Report, leaves most of the discretion for determining what, if any, infraction occurred at the local level. The conduct that one Troop Commander may consider not meriting the issuance of a Disciplinary Action Report another Troop Commander may consider more egregious and issue a Disciplinary Action Report with several infractions. For example, in instances of sustained allegations of having sex on duty, Troop Commanders who issued Discipline Action Reports included the infraction of "Unbecoming Conduct"; however, some Troop Commanders also included "Performance on Duty," "Use of Property and Equipment," "Reporting of Information," "Interference with Discipline," "Restriction," and "Competency."

The OIG found disparities in the discipline imposed prior to the grievance process on different individuals engaging in similar sexual activity while on duty.

**RECOMMENDATION:**

The OIG recommends a centralized decision making process where the Department Disciplinary Officer determines the appropriate infractions and discipline. A centralized decision making process can effectively eliminate discrepancies. Although immediate supervisors may have more knowledge and information about a Member's daily performance, personnel files and evaluations are available to the Department Disciplinary Officer and should contain an accurate description of the Member's performance. The Department Disciplinary Officer is in a position to consider all relevant information about performance issues.

The OIG recommends additional staffing in order to enhance the office of the Department Disciplinary Officer and ensure more consistent disciplinary determinations in the future.

Furthermore, to add uniformity and consistency to disciplinary decisions, the State Police should attempt to set definitive guidelines stating the appropriate discipline for specific kinds of misconduct. For example, the guidelines could provide that a Member found to have engaged in sex on duty will be subject to dismissal. In some instances, a maximum and minimum sanction might be appropriate. Such guidelines will establish consistency as well as notify Members and the public of the State Police's expectations and standards.

*c.*    *Discipline Is Diminished During The Grievance Process*

The State Police expressed concern that arbitration decisions have modified the discipline it imposes on Members. The OIG reviewed arbitration decisions that modified the discipline of Members for sexual misconduct from 1995 to the present. The OIG confirmed that in some decisions the arbitrator did not uphold the level of discipline imposed by the State Police. The OIG notes that in making decisions the arbitrators rely on earlier examples of lesser discipline for the same or similar offense even when a Member has been convicted of a crime.

The most shocking instance of an arbitrator not sustaining State Police discipline was upheld by the Pennsylvania Supreme Court. *Pennsylvania State Police v. Pennsylvania State Troopers Association (Trooper Rodney Smith)*, 559 Pa. 586, 741 A.2d 1248 (1999). The State Police dismissed Smith who, after an argument with his ex-girlfriend, put his loaded, state-issued weapon into her mouth and threatened to kill her. Smith pleaded guilty to Driving Under the Influence, Simple Assault and Making Terroristic Threats. The arbitrator ordered reinstatement despite the guilty plea because he found Smith's actions were less egregious than actions committed by Members who had merely been suspended.

In another case implicating sexual misconduct, the Pennsylvania Supreme Court upheld the arbitrator's award in favor of the grievant. *Pennsylvania State Police v. Pennsylvania State Troopers' Association (Betancourt)*, 540 Pa. 66, 656 A.2d 83 (1995). The Member was charged with "Unbecoming Conduct" when he exposed himself while

on duty at Troop headquarters during a conversation with other Members. The Member was placed on restricted duty and after a court martial received a 30-day suspension without pay. The arbitrator ruled that the conduct did not squarely fit the definition of "Unbecoming Conduct" and that the State Police adequately punished the Member by having him perform janitorial work during the two months he was on restricted duty. The arbitrator awarded lost wages and ordered the expungement of the Member's record.

Collective bargaining rights for police and fire personnel in Pennsylvania are governed by the provisions of 43 P.S. § 217.1-217.10 (Act 111). Act 111 denies police and fire personnel the right to strike; however, their rights are safeguarded through collective bargaining and arbitration provisions. When the Pennsylvania Supreme Court upheld the arbitrators' decisions in the *Smith* and *Betancourt* cases, it did so based on its determination that the legislature intended that arbitrators' rulings under Act 111 be subject to a very limited scope of review. Under what the Pennsylvania Supreme Court defined as the narrow certiorari scope of review, courts are limited to inquiring into only four areas when reviewing an Act 111 arbitrator's award: (1) the jurisdiction of the arbitrator; (2) the regularity of the proceedings; (3) an excess of the arbitrator's powers; or (4) deprivation of constitutional rights. The Court reasoned that the legislature dictated these severe limits as part of a carefully crafted plan to equitably define rights between management and labor and ensure swift resolution of disputes. In light of such limits, the Pennsylvania Supreme Court affirmed the arbitrators' decisions in both cases.

The following chart shows additional examples of diminished discipline during the grievance process, either at the grievance committee or at arbitration.

| CASE NUMBER | ALLEGATION | DISCIPLINE |
|---|---|---|
| 8448 | sex on duty | twenty-five day suspension without pay; [grievance committee reduced to ten day suspension without pay, five days annual leave] |
| 2001-0405 | sex on duty with individual under 18 years old | dismissal; [arbitrator reinstated] |
| 9026 | indecent assault | dismissal; [arbitrator reinstated] |
| 1999-597 | indecent assault | dismissal; [arbitrator reinstated] |
| 2001-0247 | improper conduct | three day suspension without pay; [arbitrator reduced to written reprimand] |

**RECOMMENDATION:**

The OIG makes the following recommendations to enhance the State Police's ability to more effectively uphold its disciplinary decisions for sexual harassment and sexual misconduct before arbitrators. The State Police should establish a practice of imposing higher levels of discipline for sexual misconduct by consistently imposing heavier, more appropriate discipline. A routine practice of imposing more serious sanctions for sexual harassment and sexual misconduct will support the State Police's position when those disciplinary actions are grieved in the future.

An additional factor affecting the State Police's ability to sustain its disciplinary actions in the grievance process is the absence of legislation requiring the dismissal of

Members who are convicted of felonies or misdemeanors.[5]  This factor is beyond the control of the State Police.

The OIG recommends that the State Police explore the possibility of supporting legislation that would impose statutory sanctions and require dismissal of Members who are convicted of felonies or misdemeanors.[6]  The Pennsylvania Legislature has already addressed the suspension, removal, or reduction in rank of municipal police officers who violate "any law of this Commonwealth which provides that such violation constitutes a misdemeanor or felony." 53 P.S. § 53270.  There is no basis for holding municipal police officers to a higher standard than the State Police.

The issue of the scope of review for grievance arbitration decisions under Act 111 is more complicated and affects more parties than just the State Police.  While the OIG has identified the issue, it is beyond the scope of this Report and the OIG makes no recommendation on it.

* * * * *

As noted earlier in this Report, the Deal Commission Report recommended the establishment of a codified system of disciplinary guidelines for the State Police.  Seventeen years have passed since the Deal Commission Report and no guidelines have been established and the problem persists.

---

[5] The OIG notes that the Governor's Code of Conduct, Executive Order 1980-18 Amended, which applies to all Commonwealth employees, including the State Police, provides that any employee convicted of a felony or misdemeanor related to his or her employment, shall be terminated.

[6] The OIG notes that there is currently pending in the State Legislature, S.B. No. 877, known as the "Confidence in Law Enforcement Act," which would provide for termination for conviction of a felony and certain misdemeanors.

## IV.    PRE-EMPLOYMENT BACKGROUND INVESTIGATIONS AND PROBATIONARY EMPLOYMENT

The State Police recognizes that the pre-employment "background investigation provides the most useful information regarding the qualifications of an applicant."[7] However, a review of the pre-employment background investigations conducted for Evans and others suggests that the State Police has sometimes failed to recognize and eliminate applicants likely to present problems regarding sexual harassment or other misconduct.

While the Commonwealth requires all agencies to conduct identification, employment, education, and three reference verifications before employing an applicant, State Police written procedures require a more thorough background investigation. From 1974 through 1998, a Consent Decree, arising from litigation challenging the limited number of minorities hired, had some impact on State Police pre-employment background investigations. *See William Bolden, III, et al. v. Pennsylvania State Police, et al.*, Civil Docket No. 73-2604 (E.D. Pa. June 20, 1974). In evaluating State Police background investigations, the OIG reviewed former and present pre-employment procedures.

### A.    Former Pre-Employment Procedures

At the time of Evans' appointment in 1996, all applicants had to complete a written examination. According to the Director of the Bureau of Personnel, 6,000 to

---

[7] "Preparation and Completion of the Background Investigation for State Police Cadet Applicants and Liquor Enforcement Officer Trainee Applicants," (Background Manual), Form SP3-326A (June 2001).

10,000 applicants would take the written examination with approximately the top 1,000 scoring applicants proceeding to an oral examination. The State Police would extend approximately 300 conditional offers of employment to the top applicants after the oral examination. The State Police conditioned the offers of employment on the results of a pre-employment background investigation and the successful completion of an agility examination, a urinalysis, and physical examination.

After identifying the top applicants, the Bureau of Personnel forwarded requests for pre-employment background investigations to Troop Commanders for assignment of a criminal investigator. Criminal investigators performed pre-employment background investigations in addition to their other investigative duties. The object of the pre-employment background investigation was to verify information provided by the applicant and to obtain additional information about the applicant.

The investigators conducting the pre-employment backgrounds were prohibited from expressing their personal opinions. However, investigators were supposed to include derogatory remarks made by persons interviewed and to question applicants about any derogatory information revealed by the investigation. Once a criminal investigator completed a pre-employment background investigation report, the criminal investigator's supervisor reviewed the report before forwarding it to the Troop Commander for transmittal to the Bureau of Personnel.

The Bureau of Personnel reviewed the pre-employment background investigation report and then forwarded it to the Background Investigation Screening Board. In

-45-

accordance with the Consent Decree, the Background Investigation Screening Board, at the time of Evans' appointment, consisted of three persons: a member of the State Police; a member of the State Civil Service Commission; and a member of the Governor's Office of Administration. After evaluating the background investigation report, the Background Investigation Screening Board rendered a decision on the applicant's qualification. A consensus of two of the three Board members was sufficient to render a decision.

In the event of an adverse decision, an applicant had 20 days to appeal to the Background Investigation Appeal Board. When Evans joined the State Police, the Appeal Board consisted of a Deputy Commissioner of the State Police, a Deputy Director of the State Civil Service Commission, and a representative from the Governor's Office of Administration. The decision of the Appeal Board was final, but an applicant meeting the general requirements could reapply.

**B.    Present Pre-Employment Procedures**

Present State Police procedures for pre-employment background investigations are based on the former procedures; however, the State Police now conduct a psychological evaluation and polygraph examination. Additionally, investigators completing background reports may express their opinion regarding an applicant's suitability for employment.

-46-

The Director of the Bureau of Personnel identified the polygraph examination as the most significant change since Evans' application. The Director told the OIG that there have been significant admissions by candidates since its inception.

The Director also told the OIG that since 1997 all criminal investigators receive formal training on pre-employment background investigations and a copy of the Background Manual. The Background Manual provides guidance to the investigators conducting pre-employment background investigations. The Background Manual expressly states that investigators and reviewing officers "may make any comments that they would like to include in the investigation." According to the Director, investigators are specifically told not to leave anything out of a background report.

Current procedures still provide for a Background Investigation Screening Panel and Background Investigation Appeal Panel, but alter the panels' composition. The Background Investigation Screening Panel now consists of two Commissioned Officers of the State Police and a representative from the Governor's Office of Administration.

The Director of the Bureau of Personnel stated that the Screening Panel receives training prior to the review process. The training includes reviewing decisions on prior background investigations. The cases are discussed with the Screening Panel to provide guidance.

The Director said that the Screening Panel reviews the pre-employment background investigations to assess the applicants' patterns of behavior. A recent change now requires the Screening Panel to render a unanimous decision.

The Background Investigation Appeal Panel now consists of two individuals from the State Police holding the rank or classification of Major, Bureau Director or higher, and one individual from the Governor's Office of Administration holding a similar classification. The decision of the Appeal Panel is final but an applicant may reapply in the event of an adverse decision.

## C.    Evans' Pre-Employment Background Investigation

The criminal investigator who conducted Evans' pre-employment background investigation found and reported information sufficient to raise questions regarding Evans' suitability as a Member of the State Police. However, the investigator also received derogatory information that was never presented to the Background Investigation Screening Panel. Additionally, the investigator's personal opinion that the State Police should not employ Evans was never conveyed to the Screening Panel. All three members of the Screening Panel found Evans qualified.

The investigator's background report indicated that the Joliet Junior College Campus Police Department, in Illinois, employed Evans until he was dismissed from the Police Training Institute for disciplinary reasons. The Chief of the Campus Police stated that he could not recommend Evans for a job with the State Police. According to the background report, the Chief told the investigator that Evans was overaggressive and a racist. The Chief recalled an incident where he and Evans were outnumbered by a group of minorities, and Evans wanted to make a mass arrest because, as he told the Chief, "I hate those people." The background report noted that the Chief verbally reprimanded

Evans several times about straying from his jurisdiction and leaving portions of the campus unprotected. The background report forwarded to the Screening Panel included a memorandum the Chief wrote regarding his refusal to recommend Evans.

The background report also indicated that Evans' personnel file from the Illinois Department of Corrections revealed that Evans had been involved in several incidents during his employment with the Department. Evans received two counseling sessions for being tardy; an oral reprimand for being tardy; a recommendation for a written reprimand for being tardy on a fourth occasion; and a one-day suspension for failing to appear for work on another occasion.

In addition, the background report noted that Evans had been dismissed from the Police Training Institute at the University of Illinois for three disciplinary infractions. One of the disciplinary infractions occurred when Evans and another male made comments about the legs of a resident advisor. The resident advisor asked them to leave her alone.

In addition to the racial and sexual harassment issues identified in the background report, the investigator uncovered additional issues regarding Evans' suitability. The investigator testified at a deposition in the Evans litigation that an Officer from the Allentown Police Department advised him of reports of Evans' sexual impropriety. The Allentown Police Officer wished to remain confidential and directed the investigator to a woman connected with the Lehigh County Courthouse who purportedly dated Evans. According to the investigator, the woman was very curt and said that she wanted nothing

-49-

to do with the background investigation; she did not want her name used; she did not want to talk about Evans; she was done with Evans; and her relationship with him was over. The investigator testified that the whole encounter with the woman lasted approximately 30 seconds before she walked out.

The investigator also testified that he advised his Station Commander of his concern with the sexual misconduct attributed to Evans. According to the Station Commander, the investigator told her that he did not think the State Police should employ Evans. The Station Commander testified that she contacted the Bureau of Personnel twice with the information. The Station Commander also testified that the Bureau of Personnel advised that the unsubstantiated derogatory information from the Allentown Police Officer could not appear in the background report. Although written procedures prohibited the investigator from expressing an opinion regarding Evans' suitability for employment, written procedures permitted the inclusion of derogatory information such as the remark provided the Allentown Police Officer.

While the investigator was not permitted to include his opinion regarding Evans' suitability for employment, the Background Investigation Screening Panel was able to review and consider favorable opinions and recommendations that Evans solicited on his own behalf. The Screening Panel reviewed the background report that included at least five letters specifically expressing the writers' opinions that Evans was not a racist but not the investigator's opinion that Evans was unsuitable. After the review, the Screening Panel unanimously concluded Evans was qualified to be a Member of the State Police.

### D.    Pre-Employment Issues And Recommendations

The OIG has identified issues and makes recommendations as a result of its review of State Police pre-employment background procedures.

### 1.    Inconsistencies In Pre-Employment Background Investigations

Currently, any criminal investigator may be called upon to conduct a pre-employment background investigation. Investigators stationed in different Troops may treat the same information about separate candidates differently. For example, another investigator may have included the derogatory, but unsubstantiated information, that the Evans' investigator excluded.

### RECOMMENDATION:

While the State Police has corrected some of the problems noted in the Evans background investigation by allowing investigators to express their opinions regarding applicants, adding polygraph examinations and psychological evaluations, and formally training investigators, the OIG recommends additional measures. The State Police may gain greater consistency, uniformity, and accountability if it limits the number of investigators performing pre-employment background investigations.

Although it may be impractical to devote a certain number of investigators to solely conducting background investigations, the State Police may increase the consistency and uniformity of background investigations by identifying a limited number of investigators to conduct pre-employment background investigations. By identifying a

limited number of investigators, the State Police can concentrate more frequent training on fewer investigators.

The State Police should continue to encourage its background investigators to express their opinions regarding the suitability of applicants.

### 2. Standards And Training Of The Appeal Panel

During its review, the OIG identified at least 20 Members who were the subject of more than one sexual harassment or sexual misconduct complaint. The OIG examined the Members' pre-employment background investigations. Based on adverse information included in the pre-employment background investigations, the Screening Board initially disqualified 20 percent, or four, of the Members. In one case, the Screening Board and Appeal Board concluded that the applicant was not qualified; however, within 13 months, the applicant reapplied and became a Member.

The following sections discuss the background investigations of the four applicants who ultimately became Members with multiple complaints of sexual harassment or sexual misconduct against them.

#### a. BPR #96-0455 and #2001-0372

In March 1994, the Background Investigation Screening Board unanimously disqualified a candidate because it questioned his self-restraint and self-discipline.

The pre-employment background investigation included statements from the candidate's estranged wife that the applicant physically, mentally, and emotionally abused her. The candidate's estranged wife claimed that he slapped her on a few

-52-

occasions and would not allow her to freely leave the house. She sought counseling and shelter at an agency providing assistance to domestic violence victims. The agency's Executive Director submitted a letter to the Screening Board expressing concern about how the applicant would view domestic violence and whether he would protect the rights of a victim as an alleged abuser. The Executive Director also expressed concern about the candidate's lack of self-discipline and self-control and whether it would affect his interaction with victims of violence. During his background investigation, the candidate admitted that he slapped his wife once and punched a hole in the wall on another occasion.

After the Screening Board disqualified the candidate, the candidate appealed and received a hearing by the Background Investigation Appeal Board. At the hearing, the investigator who conducted the background testified that a representative from the domestic violence agency observed some signs of physical abuse in the form of bruising on the candidate's estranged wife. At the hearing, the investigator also acknowledged that he knew the candidate because they were from the same hometown. On cross-examination, the investigator testified that based on his personal knowledge of the candidate, "setting aside" his position as an investigator, he was not aware of any information that would lend credence to the abuse allegation. Following the hearing at which the candidate's estranged wife did not testify, the Appeal Board concluded that there was insufficient evidence presented at the hearing to support a disqualification.

In 1996, the Bureau of Professional Responsibility received an allegation that the candidate, now a Member, was sleeping with a complainant's wife and drinking and driving off-duty while carrying his weapon. The complaint was withdrawn.

In 2001, a complaint that the Member harassed two females at a Unimart was sustained and the State Police dismissed the Member. The Member referenced prostitution and then asked if one of the females would take $20. At the time of the incident, the Member was off-duty and traveling in his personal vehicle with another male. The Bureau of Professional Responsibility found that the Member previously sexually harassed a female employee and acted in a rude and offensive manner at the Unimart.

### b. BPR #1999-0923, #1029, and #11241

In September 1993, the Background Investigation Screening Board disqualified a candidate because of his "inability to accept responsibility and answer for one's own obligations as evidenced by his conviction for a series of traffic offenses and failure to pay or resolve his financial obligations." The Screening Board noted that in the four years preceding his application, the candidate received six traffic citations and was placed into the Accelerated Rehabilitative Disposition program for Driving Under the Influence. The Screening Board also recognized that the candidate's credit history noted five outstanding bills between July 1990 and January 1992 that were in the possession of a collection agency. The Appeal Board overturned the candidate's disqualification.

Subsequently, the Member was the subject of two complaints involving sexual misconduct. The Member was also the subject of other disciplinary actions. One complainant alleged that the Member followed her in his personal vehicle from the bar where she worked, flashed his headlights at her, had her pull off of the road, and entered her vehicle. He purportedly kept trying to kiss the complainant and stated, "Don't I get a kiss good-bye?" In the second incident, a complainant alleged that the Member videotaped her while having sex, without her knowledge or permission and showed the videotape to friends and a cousin. The Member denied the allegation, saying the videotape story was a ruse.

Although none of the sexual misconduct complaints were ultimately sustained, the Screening Board's comment that the candidate was "disqualified for his inability to accept responsibility" is prescient given the candidate's subsequent history.

      *c.*     *BPR #2003-0189 and #2003-0419*

In 1995, the Screening Board determined that a candidate was disqualified because of his "disregard for the law as evidenced by the number of non-traffic and traffic violations/convictions," which included Theft by Unlawful Taking, Harassment, Criminal Mischief, and Obedience to Traffic Signs. The Screening Board also found that the candidate had omitted the Criminal Mischief arrest from his application for a "dubious" reason. The Background Investigation Appeal Board overturned his disqualification.

The candidate, now a Member, is the subject of two pending Bureau of Professional Responsibility investigations; one involves sending inappropriate electronic mail to the public and the other involves harassing a former girlfriend.

### d. BPR #2001-0850 and #2003-0153

In 1980, the State Police conducted a pre-employment background investigation that revealed a candidate failed to list his September 1979 arrest and guilty plea to Purchasing, Consumption, Possession or Transportation of Intoxicating Beverage. The candidate also pleaded guilty to a traffic violation in March 1979. The Screening Board rejected the candidate's application.

In August 1980, the Background Investigation Appeal Board denied the candidate's appeal with the comment:

> candidate says in his rebuttal that the omission was 'inadvertent'. It is hard to believe that two arrests within nine months of applying to be a cadet would have been forgotten. Furthermore, the candidate does not offer any explanation for the oversight.

Despite the "oversight," the candidate reapplied and was approved by the Background Investigation Screening Board in September 1981.

In 2001, the State Police sought the criminal prosecution of the Member after receiving multiple allegations of sexual misconduct. The State Police dismissed the Member. An arbitrator overturned the dismissal and the District Attorney elected not to pursue a criminal prosecution.

**RECOMMENDATION:**

As the State Police have recognized, pre-employment background investigations provide the most useful information regarding the qualifications of a candidate to become a Member. When a background investigation reveals factors that disqualify a candidate, the Background Investigation Appeal Panel should exercise great caution in reversing a disqualification. Providing greater training and articulating specific standards and burdens of proof for the Appeal Panel to consider may preclude the employment of Members who ultimately become the subject of complaints.

**E.     Probation**

Every Member serves an 18-month probationary period from the date of original enlistment. During the probationary period, a Member may be dismissed at the discretion of the Commissioner for proper cause without a court martial, grievance, or right of appeal to a civil court.

**F.     Probationary Issues And Recommendations**

The OIG has identified issues and makes recommendations as a result of its review of State Police probationary procedures.

**1.     Probationary Standards**

The State Police conducts a general investigation of every Member before his or her probationary period expires. A Commissioned Officer or the Troop Commander for the Member's assigned station conducts the general investigation, which may consist of contacting District Justices, the Member's immediate supervisor, and the general public

-57-

with whom the Member had contact. The Bureau of Human Resources receives and reviews the general investigation report.

Evans entered the State Police Academy on April 22, 1996. Evans' probationary period lasted until October 21, 1997. In July 1997, a parent of a 16 year-old female contacted Evans' supervisor regarding Evans' conduct toward her daughter. Evans' supervisor completed and forwarded a Use of Force or Complaint Reception and Processing Worksheet and forwarded it to the Bureau of Professional Responsibility while Evans was still on probation. When his probation terminated in October 1997, the Bureau of Professional Responsibility had not completed its investigation.

Evans' supervisor completed the general investigation in June 1997. In addition to the complaint that she received in July 1997, Evans' supervisor was aware of issues in Evans' pre-employment background investigation. Although she was aware of the ongoing Bureau of Professional Responsibility investigation and issues with Evans' pre-employment background investigation, the supervisor who conducted the general investigation did not amend her report to include the information.

**RECOMMENDATION:**

The OIG recommends that the State Police take steps to extend the probationary period of any Member whenever there is a pending Bureau of Professional Responsibility investigation at the time a probationary period is scheduled to expire. To ensure there are no pending internal investigations or complaints, the State Police should coordinate with Bureau of Professional Responsibility, the Equal Employment Opportunity Office, and

the person assigned to conduct the general investigation. Also, when a complaint is made against a probationary Member, the Bureau of Professional Responsibility should re-examine the pre-employment background investigation before making a recommendation regarding the retention of the Member. The State Police should exercise great caution in preparing and reviewing the general investigation of every probationary Member.

## V.    SEXUAL HARASSMENT

### A.    The Commonwealth Strictly Prohibits Sexual Harassment In Work Settings

According to Executive Order 2002-4, sexual harassment in Commonwealth work settings is strictly forbidden.  No agency under the Governor's jurisdiction shall tolerate sexual harassment by any Commonwealth employee against any other employee, applicant for employment or client, or other person receiving services from or conducting business with the Commonwealth.

Management Directive 505.30 Amended defines sexual harassment, assigns responsibilities for ensuring compliance with the policy, and establishes general procedures for reporting and investigating sexual harassment.  The Commonwealth guidelines for investigating and resolving internal discrimination complaints, like sexual harassment claims, are in Management Directive 410.10 Amended.  All internal discrimination complaint investigations must follow the "Internal Complaint Investigation Procedures" attached to Management Directive 410.10.

### B.    State Police Administrative Regulations Establish Policy, Guidelines, And Procedures Regarding Sexual Harassment

The State Police has adopted written policies and procedures regarding sexual harassment in Administrative Regulation 4-26.  The current Administrative Regulation assigns responsibility for addressing sexual harassment allegations to the Equal Employment Opportunity Office and the Bureau of Professional Responsibility.  The

-60-

Administrative Regulation notes that even in cases where nobody has filed a complaint a supervisor is still responsible for addressing inappropriate conduct within the work place.

The Administrative Regulation directs any person who has suffered sexual harassment and wants to report the incident to contact his or her immediate supervisor, the Equal Employment Opportunity Liaison, or the Equal Employment Opportunity Officer. Supervisors who receive a report of sexual harassment must contact the Equal Employment Opportunity Officer or Liaison prior to taking action on the complaint and take immediate action to avoid any adverse impact or reprisals against the complainant.

Once an allegation of sexual harassment is received, the Equal Employment Opportunity Officer must determine whether to handle the complaint with a "supervisory inquiry" or an "investigation."

### 1.    Supervisory Inquiry

Based on the records, facts, and circumstances surrounding the complaint, the Equal Employment Opportunity Officer determines whether a supervisory inquiry is the most appropriate method of handling an allegation of sexual harassment. The Commander, Director, or Supervisor of the alleged harasser conducts the supervisory inquiry, which may consist of informing the alleged harasser to immediately cease any actions the complainant perceived as sexual harassment. A supervisory inquiry requires completion of Form STD-501 documenting the circumstances prompting the complaint, the relevant dates and times, the date and time the Equal Employment Opportunity

Officer authorized the inquiry, and the date and time the alleged harasser was counseled and advised that a second complaint would prompt an investigation.

### 2.    Investigation

An investigation of a sexual harassment complaint requires the approval of the Equal Employment Opportunity Officer and the Director of the Bureau of Professional Responsibility or their designee.    The Administrative Regulation mandates an investigation of a sexual harassment incident when

- it involves retaliation against a complainant for filing a sexual harassment complaint;

- it involves inappropriate physical contact or outrageous acts that, if founded, would warrant criminal as well as disciplinary action;

- the nature of the allegation, records, facts, and circumstances of the complaint leads the Equal Employment Opportunity Officer to authorize the investigation; and

- a complaint constitutes a second complaint against the alleged harasser regardless of whether the same victim is involved.

An investigation requires preparation of a Use of Force or Complaint Reception and Processing Worksheet.    After reviewing it, the Equal Employment Opportunity Officer forwards it to the Director of the Bureau of Professional Responsibility for further action.    The Bureau of Professional Responsibility adjudicates sexual harassment

complaints in accordance with Administrative Regulation 4-25 and Administrative Regulation 4-9.

### C.     Issues And Recommendations

The OIG has identified issues and proposes recommendations as a result of its review of State Police policy and practices on sexual harassment.

> **1.     State Police Administrative Regulations Are Not Consistent With Commonwealth Management Directives Relating To Sexual Harassment**
>
> > *a.     The Policy Of Not Investigating Allegations Of Sexual Harassment Without A Written Complaint Is Contrary To Management Directive 505.30*

Management Directive 505.30 declares, "All allegations of sexual harassment will be investigated in a prompt and confidential manner as possible." The Management Directive makes clear that "sexual harassment complaints do not have to be in writing before an investigation is initiated." Similarly, the Commonwealth's Internal Complaint Investigation Procedures require the investigation of "any complaint, whether formal or informal."

In contrast, the State Police Administrative Regulation governing the Bureau of Professional Responsibility requires complainants to place allegations in writing. Administrative Regulation 4-25 requires the verification of complaints through the completion of a Complaint Verification. According to the Administrative Regulation, a refusal to sign the Complaint Verification constitutes a withdrawal of the complaint. Requiring a citizen, or other Member of the State Police, to execute a Complaint

Verification prior to initiating an investigation into allegations of sexual

inconsistent with the Commonwealth's strict prohibition against sexual

contrary to the Management Directives mandating investigation of all

sexual harassment. Additionally, such a requirement discourages the filing of sexual

harassment complaints concerning the State Police, a problem the Commonwealth's

complaint process seeks to avoid.

**RECOMMENDATION:**

The OIG's review of cases indicates that the Bureau of Professional

Responsibility, in fact, investigates many cases in which a complainant has not completed

a Complaint Verification. Nevertheless, until the State Police amend Administrative

Regulation 4-25 to reflect that the Bureau of Professional Responsibility will investigate

*all* allegations of sexual harassment, the State Police's written policy will contravene the

Commonwealth mandate to all agencies. The State Police should adopt policies

consistent with the applicable Commonwealth Executive Order and Management

Directives on sexual harassment. The State Police must investigate all allegations of

sexual harassment regardless of whether they are in writing or supported by a Complaint

Verification.

> b.    *Administrative    Regulation    4-26    Limits    The    Equal*
> *Employment Opportunity Office's Ability To Fulfill Its Duties*

Executive Order 2003-10 assigns an agency's Equal Opportunity Officer with

primary responsibility for developing and implementing the agency's equal employment

opportunity program, which includes the prevention of sexual harassment. Equal

Opportunity Managers and Specialists are required to investigate and assist in the resolution of discrimination complaints, including sexual harassment.

The Administrative Regulation directs the Equal Employment Opportunity Officer to determine whether a supervisor should conduct an inquiry into an allegation of sexual harassment or whether the Bureau of Professional Responsibility should perform an investigation. The Equal Employment Opportunity Officer reviews the results of the supervisory inquiry or investigation. The Administrative Regulation does not authorize the current Equal Employment Opportunity Officer to conduct or directly supervise investigations herself although she told the OIG that on occasion she performs them.

Additionally, Management Directive 505.30 mandates the investigation of "all allegations of sexual harassment" while Administrative Regulation 4-26 provides that the State Police shall investigate only after approval from the Equal Employment Opportunity Officer and authorization of the Director of the Bureau of Professional Responsibility. The Administrative Regulation provision restricts the Equal Employment Opportunity Officer's ability to assist in the resolution of all complaints.

**RECOMMENDATION:**

The OIG recommends that the State Police amend its Administrative Regulations to comply with the Commonwealth mandate to accept complaints of sexual harassment that are not in writing, and to grant the Equal Employment Opportunity Officer more responsibility in the investigation and resolution of sexual harassment complaints.

### 2.   Employees Responsible For Investigating Sexual Harassment Allegations Lack Formalized Sexual Harassment Training

The Equal Employment Opportunity Officer relies on the Bureau of Professional Responsibility to investigate most allegations of sexual harassment. According to the training records that the OIG reviewed, investigators assigned to the Bureau of Professional Responsibility are trained in conducting criminal investigations; however, investigators lack specific training on the investigation of sexual harassment allegations. The Equal Employment Opportunity Officer told the OIG that the Equal Employment Opportunity Liaisons also lack the specific training. Investigations into allegations of sexual harassment may require a different approach and sensitivity than other internal investigations.

**RECOMMENDATION:**

The OIG recommends that the State Police consider specific training on sexual harassment investigations for Bureau of Professional Responsibility investigators and Equal Employment Opportunity Office Liaisons.

### 3.   Sexual Harassment Education And Training Is Not An Ongoing Effort

Executive Order 2002-4 and Management Directive 505.30 mandate the education of employees regarding the Commonwealth's sexual harassment policy. Education may consist of written materials, formal training, educational videos, orientation sessions, workplace discussions, or individual counseling. The Commonwealth policies state that

agency heads should consider education in sexual harassment issues an ongoing effort, with additional approaches used periodically to reinforce earlier education.

The State Police train all new employees, annually distribute the Commonwealth's sexual harassment policy, and obtain the required acknowledgments from its employees; however, the State Police has not made substantive sexual harassment education "an ongoing effort."

The Equal Employment Opportunity Officer provides sexual harassment awareness training to cadets during a two-hour period in their 1,100 hour Cadet Basic Training Course. New civilian employees receive the same two-hour course. The Equal Employment Opportunity Officer told the OIG that she reviews the applicable Executive Order and Management Directive during the training.

In addition to the training provided to cadets and new employees, the Equal Employment Opportunity Officer trains newly promoted civilian supervisors and Corporals on sexual harassment. The training provided to new civilian supervisors and Corporals is the same material presented during Cadet Basic Training, with a concentration on a supervisor's responsibilities and how a supervisor can monitor the work environment to detect sexual harassment. Annually, the State Police conduct mandatory in-service training. The last time the mandatory in-service training addressed sexual harassment was 1999.

The Equal Employment Opportunity Officer told the OIG that she is developing a computer based training module on sexual harassment awareness. The training module

will be a refresher course to the sexual harassment awareness training provided to new employees. According to the Equal Employment Opportunity Officer, the computer-training module is a cost effective method of reaching employees and a relatively easy way of monitoring their participation.

**RECOMMENDATION:**

The OIG recommends that the State Police consider making sexual harassment training a more significant portion of cadet training, offering specific training to supervisors at all levels, and making sexual harassment training an ongoing effort within the annual in-service training. The OIG also recommends that the State Police continue to support the Equal Employment Opportunity Officer's efforts to develop a computer based training module and other methods designed to reinforce the Commonwealth's strict prohibition of sexual harassment.

**4.     The Equal Employment Opportunity Officer's Involvement In Sexual Harassment Issues Is Limited Because Of Current Staff Size**

Although the State Police has over 5,000 civilian and enlisted employees, only one full-time Clerk Typist is assigned to the Equal Employment Opportunity Officer. The lack of staff affects the Equal Employment Opportunity Officer's ability to visit field locations, provide in-service training, develop new educational material and courses on sexual harassment, and become more involved in the investigation of sexual harassment allegations. Increasing the visibility of the Equal Employment Opportunity Officer at

field stations would emphasize the importance the State Police places on the Commonwealth's strict prohibition of sexual harassment.

To fulfill her duties, the Equal Employment Opportunity Officer utilizes the Equal Employment Opportunity Liaison stationed in every Troop. According to the Equal Employment Opportunity Officer, the Liaison is usually a commissioned officer or somebody designated by a commissioned officer. Under Administrative Regulation 4-26, Liaisons' primary duties are contacting the Equal Employment Opportunity Officer before any action is taken on a complaint of sexual harassment and ensuring the work place is monitored to keep it free from sexual harassment.

Liaisons have other duties and are not within the Equal Employment Opportunity Officer's chain of command. The Equal Employment Opportunity Officer does not conduct performance evaluations or provide input for such evaluations for Equal Employment Opportunity Liaisons. Consequently, Liaisons may have different priorities than the Equal Employment Opportunity Officer.

**RECOMMENDATION:**

The OIG recommends that the State Police consider increasing the staffing and support for the Equal Employment Opportunity Office.

### 5.    Notification And Involvement Of The Equal Employment Opportunity Officer In Sexual Harassment Investigations

Administrative Regulation 4-26 requires the Equal Employment Opportunity Officer to ensure all allegations of sexual harassment are processed in accordance with the regulation. The Administrative Regulation provides that the Equal Employment

Opportunity Officer shall review all sexual harassment complaints and completed investigations prior to adjudication.

The Equal Employment Opportunity Officer told the OIG that the Bureau of Professional Responsibility handles all claims of sexual harassment made by the general public against Members. According to the Equal Employment Opportunity Officer, she is only involved in the process if it involves sexual harassment within the workplace.

One of the issues in determining if the Bureau of Professional Responsibility should notify the Equal Employment Opportunity Office is the difficulty in defining sexual harassment versus sexual misconduct. In addition to investigating allegations of sexual harassment, the Bureau of Professional Responsibility investigates employee misconduct. In certain instances, conduct that is unbecoming of a Member or sexual misconduct may also constitute sexual harassment, which would warrant the involvement of the Equal Employment Opportunity Office.

**RECOMMENDATION:**

Involving the Equal Employment Opportunity Office when an allegation potentially constitutes sexual harassment, even though the Bureau of Professional Responsibility is already investigating a complaint as more generalized misconduct, would ensure that the State Police is complying with the Commonwealth's strict prohibition against sexual harassment. Involving the Equal Employment Opportunity Office would help ensure a consistent and uniform approach to sexual harassment within

the State Police.  The Bureau of Professional Responsibility should notify and consult with the Equal Employment Opportunity Office.

## VI.    ATTITUDES REGARDING SEXUAL HARASSMENT AND SEXUAL MISCONDUCT

The current State Police Commissioner has imposed a "zero tolerance" policy on sexual misconduct. The OIG commends the Commissioner's action. In this Report, the OIG recommends procedural changes to help the State Police deter and prevent sexual harassment and sexual misconduct in the future. However, the State Police must make the procedural changes in conjunction with changes in the organizational culture and attitudes that contribute to the problem.

### A.    Issues and Recommendations

The OIG has identified issues and makes recommendations as a result of its investigation about the organizational culture and attitudes of the State Police.

### 1.    Failure To Respect The Prohibition Against Sexual Harassment And Sexual Misconduct By High Ranking Officials In The State Police

In the State Police, the rank of Major falls just below Deputy Commissioner. Majors may serve as Bureau Directors and Area Commanders. During its investigation, the OIG found three sustained cases of sexual misconduct in which the subjects were Majors. The following sections detail the facts surrounding these three sustained cases.

### a.    BPR #8714 and #8293

In March and December 1994, an Administrative Assistant, a Clerical Supervisor, and a Clerk Typist complained about a Bureau Director who was a Major. The complaints covered a lengthy period of time. The Administrative Assistant alleged that on several different occasions the Major harassed her by touching and rubbing against

-72-

her, pulling up her skirt and cornering her in the office. In addition, the Administrative Assistant's complaint alleged that the Major went to her home and assaulted her. The Clerical Supervisor asserted that the Major grabbed and pulled females onto his lap in the office. The Clerk Typist accused him of improper touching. The Bureau of Professional Responsibility interviewed several women, at least two of whom stated that they feared reporting the conduct because the Major held a high rank. The Major was charged with indecent assault and was allowed to retire as part of a 1996 settlement agreement.

b.    *BPR #9535*

In April 1996, an Executive Secretary complained about a Major who was a Bureau Director from 1995 to 1996. The Executive Secretary worked near the Major's office and alleged that between 1995 and 1996 he repeatedly touched her on the back, thigh, and buttocks even though she had asked him to stop. Several other co-workers corroborated her description of the Major's behavior. During the investigation, several witnesses stated that they did not report him because they felt too intimidated by the fact that the perpetrator was a Major. Ultimately, the Deputy Commissioner of Staff adjudicated the investigation.

In the adjudication, the Deputy Commissioner made several observations worth noting. The Deputy Commissioner found it revealing that when other women had more forcefully told the Major to stop his behavior, he stopped -- implying that the victim had an obligation to be more assertive. The Deputy Commissioner stated that the Major had not "behaved in a manner purposefully calculated to create an unreasonable interference

with [the complainant's] work performance, nor to create an intimidating, hostile, or offensive working environment for her . . .." The Deputy Commissioner's statements indicate a lack of understanding of the basic concepts of sexual harassment -- the burden is not on the victim to halt the harassment and the perpetrator's behavior does not have to be intentionally calculated to create a hostile environment. The Deputy Commissioner discussed the situation in detail with the Major. The discussion was regarded as a constructive counseling session. No Disciplinary Action Report was prepared for the Major.

### c. BPR #0650

In September 2000, a Clerk Stenographer alleged that she had a personal relationship with the commander of her area, a Major. She alleged that after the relationship had ended the Major followed her and made harassing calls to her home. The Bureau of Professional Responsibility investigated the allegations, which the Deputy Commissioner of Administration sustained. Dismissal was ordered, but prior to acknowledging the notification of his dismissal, the Major retired.

The substantiated allegations against the three Majors show a tolerance for sexual misconduct at the highest levels. If those in charge feel free to behave in an intimidating and harassing manner, they send a message throughout the State Police that such behavior is acceptable.

2. **Failure To Recognize The Problem Of Sexual Harassment And Sexual Misconduct At The Pennsylvania State Troopers Association**

The OIG interviewed the current President of the Pennsylvania State Troopers Association. The OIG, posing many of the same questions posed to others, solicited his opinion on the problem of sexual misconduct. According to the President, the introduction of women in policing has caused the problems of sexual harassment and sexual misconduct in police agencies. Women working with men, riding in patrol cars together all night, essentially "spending the night together" has put an "extra burden on policing."

While the OIG recognizes the comments of the President may not reflect the attitude of the entire Pennsylvania State Troopers Association, the OIG is concerned that the comments reveal an attitudinal problem that the Association and the State Police should address.

3. **The State Police Diminish The Importance Of Sexual Harassment and Sexual Misconduct**

As previously discussed, State Police policies and practices on sexual harassment limit the authority of the Equal Employment Opportunity Office to investigate claims of harassment and to conduct training. In addition, the lack of staff prevents the Equal Employment Opportunity Officer from performing the duties necessary for an effective Equal Employment Opportunity Office. The failure to invest in the Equal Employment Opportunity Office evidences a lack of respect for the mission it serves. It further sends

the message that the State Police is not interested in maintaining an environment free from sexual harassment and sexual misconduct.

Similarly, the minimal discipline imposed for sexual harassment and sexual misconduct evidences a failure to accept the seriousness of these offenses. By failing to stringently discipline those who have participated in sexual harassment and sexual misconduct, the State Police sends a message that it does not take those infractions seriously.

In reviewing the complaint process, the OIG identified instances where the investigation focused on peripheral issues rather than the alleged sexual harassment or sexual misconduct. The focus on peripheral issues has occurred, at least in part, because of the State Police's failure to give proper weight and consideration to allegations of sexual harassment and sexual misconduct.

Finally, many told the OIG that Evans and the sustained incidents of sexual harassment and sexual misconduct are isolated actions by individuals and not evidence of a larger, ongoing problem within the State Police. This is the theory of the "rotten apple" in an otherwise clean barrel. When the Mayor of New York City appointed a Commission in 1972 to investigate police corruption, it addressed a similar attitude. In the Knapp Commission Report, the investigators viewed the "rotten apple" theory as an obstacle to basic reform. The Commission found that a high command unwilling to acknowledge the severity of a problem would be unable to accept the drastic changes necessary to deal with the problem.

The OIG does not suggest that the problem of sexual harassment and sexual misconduct in the State Police is comparable to that of corruption in New York City in 1972. However, the concept that a high command must be willing to acknowledge the existence and extent of a problem within it is valid. Acknowledgement of a problem is a necessary part of remedying it. The State Police must acknowledge the existence and extent of its problem. Sexual harassment and sexual misconduct at the State Police is not just an isolated incident. Changing procedures, attitudes, and culture can go a long way in eliminating the problem.

## RECOMMENDATION:

In addition to the procedural recommendations made in this Report, the OIG recommends additional efforts to publicize the State Police's openness to receiving reports of sexual harassment and sexual misconduct and investigating them. The OIG recommends installation and publication of a toll-free telephone number for complaints of sexual harassment and sexual misconduct. This toll-free telephone number should be available to Members and the public. The toll-free telephone number should be posted visibly in every Troop and Bureau where State Police Members are present and locations where the public may interact with the State Police.

The OIG also recommends that the Bureau of Professional Responsibility and the Equal Employment Opportunity Office establish a method by which they can measure and monitor sexual harassment and sexual misconduct complaints. Statistics of sexual harassment and sexual misconduct complaints should be periodically provided to the

Commissioner. The statistics should be monitored and evaluated for trends and for comparisons of the State Police to other relevant organizations.

Given the importance of the Bureau of Professional Responsibility in maintaining the dignity and integrity of the State Police, the OIG recommends that the Director of the Bureau of Professional Responsibility report solely and directly to the Commissioner.

Finally, the OIG recommends that the Governor appoint a Commission to monitor the State Police's progress in handling complaints of sexual harassment and sexual misconduct in the future. The Commission should receive periodic reports from the State Police, including statistical data on complaints of sexual harassment and sexual misconduct and any policy changes, training, or other actions taken in response to the OIG's recommendations.

The Commission members should have access to the State Police Members, personnel files and records, and Bureau of Professional Responsibility files for purposes of fulfilling their monitoring duties. The OIG recommends that the Commission include persons with expertise in law enforcement and in the area of sexual harassment and sexual misconduct. The Commission should remain in existence for at least three years, subject to extension by the Governor. The Commission should report directly to the Governor.

The OIG is available to work with this Commission in any capacity that the Commission deems appropriate.

## VII.  SUMMARY OF RECOMMENDATIONS

The OIG has made a series of recommendations in this Report.  The OIG's recommendations include the Governor's appointment of a Commission consisting of individuals with expertise in law enforcement and the area of sexual harassment and sexual misconduct.  The Commission should report directly to the Governor and should exist for at least three years, subject to an extension by the Governor.  The Commission should have access to State Police personnel, State Police personnel files and records, Bureau of Professional Responsibility files, statistical data on complaints of sexual harassment and sexual misconduct, reports on proposed policy and training changes and any other information necessary to permit it to monitor the State Police's progress in handling complaints of sexual harassment and sexual misconduct.

The OIG makes additional recommendations to the State Police, some of which are listed briefly below.

- Require all Members to report personal knowledge of sexual harassment or sexual misconduct and complaints of sexual harassment or sexual misconduct committed by other Members directly to the Bureau of Professional Responsibility and discipline Members who fail to report such conduct.

- Issue a Field Regulation prohibiting supervisors from independently investigating allegations of direct subordinate sexual misconduct and discipline supervisors who violate the Field Regulation.

- Discipline any Member violating the confidentiality of a sexual harassment or sexual misconduct complaint by disclosing or otherwise discussing the complaint with the subject.

- Follow up on *every* complaint regardless of whether the complainant submits a Complaint Verification and prohibit the closure of an internal misconduct complaint by deeming it withdrawn on the basis that a Complaint Verification is not returned.

- Pursue a face-to-face meeting with the complainant in all cases even if the complainant fails to submit a Complaint Verification.

- Develop and implement an effective outreach program to facilitate the ability of citizens to complain or otherwise provide feedback on State Police conduct directly to the Bureau of Professional Responsibility in person, by mail, by telephone, via the Internet, by e-mail, by facsimile transmission, and by a 24-hour toll-free telephone hotline.

- Develop informational material describing the complaint and feedback process in English, Spanish, and other languages for distribution at State Police headquarters, State Police stations, state operated rest stops, and other locations throughout the Commonwealth.

- Host quarterly or other periodic informational meetings designed to inform communities on proper State Police functions and procedures and the methods for reporting civilian complaints and compliments regarding Members.

- Stop assigning allegations of sexual harassment or sexual misconduct to investigators at the Troop level.

- Commit to the assignment of additional investigators to the Bureau of Professional Responsibility sufficient to permit it to conduct all investigations of sexual harassment and sexual misconduct by permanently assigned personnel.

- Establish a firm, written policy for all Bureau of Professional Responsibility investigations requiring documentation of each witness interview.

- Implement additional measures in addressing Protection From Abuse proceedings involving Members, including proceeding with Bureau of Professional Responsibility investigations even if the complaining victim recants or withdraws a Protection From Abuse Order.

- Emphasize the importance of completing a full investigation into allegations of sexual harassment and sexual misconduct through training and supervisory reviews.

- Provide information about all sustained, not sustained, unfounded, and withdrawn cases to new supervisors when Members are transferred.

- Consistent with the Commissioner's zero tolerance policy on sexual misconduct, establish and embrace a policy treating sexual harassment and sexual misconduct as serious offenses and discouraging it institutionally.

- Establish a policy of serious disciplinary consequences for Members engaging in sexual harassment and sexual misconduct.

-81-