Westlaw.

116 F.Supp.2d 571  
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717  
**(Cite as: 116 F.Supp.2d 571)**

Page 1

C

United States District Court,  
M.D. Pennsylvania.  
Kathy C. LIDWELL, Plaintiff,  
v.  
UNIVERSITY PARK NURSING CARE CENTER,  
a/k/a SC Investors, Inc., Defendant.  
No. 4:CV-98-1778.

Oct. 19, 2000.

Female employee of temporary work agency brought action against **employer** under **Title VII** and Pennsylvania Human Relations Act for hostile work environment and retaliation. On employer's motion for summary judgment, the District Court, McClure, J., held that: (1) male co-employee's conduct towards plaintiff was **sufficiently** severe and pervasive to constitute hostile work environment; (2) **employer** was not liable for co-employee's action prior to plaintiff's informal **complaint** to supervisor; and (3) fact issues remained as to whether **employer** retaliated against plaintiff.

Motion granted in part, and denied in part.

West Headnotes

**[1] Civil Rights** ☞1147  
78k1147 Most Cited Cases  
(Formerly 78k145)  
Whether work environment is hostile or abusive in violation of Title VII is determined based on totality of circumstances, including frequency and severity of discriminatory conduct, its nature as physically threatening or humiliating as opposed to mere offensive utterance, and whether it interferes with employee's work performance. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

**[2] Civil Rights** ☞1185  
78k1185 Most Cited Cases  
(Formerly 78k145, 78k167)

**[2] Civil Rights** ☞1187  
78k1187 Most Cited Cases  
(Formerly 78k167)  
Title VII does not prohibit genuine but innocuous differences in ways men and women routinely interact with members of their own or opposite sex, and thus simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in terms and conditions of employment. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

**[3] Civil Rights** ☞1185  
78k1185 Most Cited Cases  
(Formerly 78k167)  
To succeed on claim of sexually hostile work environment, Title VII plaintiff must prove that: (1) she suffered intentional discrimination because of her sex; (2) discrimination was pervasive and regular; (3) discrimination detrimentally affected her; (4) discrimination would detrimentally affect reasonable person of same sex in that position; and (5) existence of respondeat superior liability. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1)

**[4] Civil Rights** ☞1146  
78k1146 Most Cited Cases  
(Formerly 78k145)

**[4] Civil Rights** ☞1147  
78k1147 Most Cited Cases  
(Formerly 78k145)  
Employer's potential liability under Title VII is not affected by characterization of claim as either quid pro quo or hostile environment. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

**[5] Civil Rights** ☞1528  
78k1528 Most Cited Cases  
(Formerly 78k371)  
When alleged harasser is within that class of employer organization's officials who may be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.


EXHIBIT E

116 F.Supp.2d 571  
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717  
**(Cite as: 116 F.Supp.2d 571)**

Page 2

treated as organization's proxy, employer may be liable under Title VII. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1)

**[6] Civil Rights ☞1528**  
78k1528 Most Cited Cases  
(Formerly 78k371)  
When there is discriminatory employment action with tangible results, employer will be liable under Title VII once discrimination is proven. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

**[7] Civil Rights ☞1528**  
78k1528 Most Cited Cases  
(Formerly 78k371)  
When employer or high-echelon official of employer has actual knowledge of actionable harassment by subordinates, employer may be liable under Title VII. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1)

**[8] Civil Rights ☞1528**  
78k1528 Most Cited Cases  
(Formerly 78k371)  
Principles of agency law are applied in determining employer's liability under Title VII for harassment by co-worker who is not of class of persons **sufficiently** high in employer's hierarchy to be considered proxy for **employer**, using general common law of agency rather than law of any particular state. Civil Rights Act of 1964, § 701(b), as amended, 42 U.S.C.A. § 2000e(b).

**[9] Civil Rights ☞1189**  
78k1189 Most Cited Cases  
(Formerly 78k167)  
Employer is liable under Title VII for actionable discrimination by supervisory employee, unless (1) employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by employer or to avoid harm otherwise. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1)

**[10] Civil Rights ☞1149**  
78k1149 Most Cited Cases  
(Formerly 78k145)  
When harasser is coworker, negligence standard applies, and employer will be liable under Title VII if it knows or should have known of conduct, unless it can show that it took immediate and appropriate corrective action. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1)

**[11] Civil Rights ☞1185**  
78k1185 Most Cited Cases  
(Formerly 78k167)  
Male co-employee's conduct towards female employee, including sexual comments, was sufficiently severe and pervasive to constitute hostile work environment under Title VII, where co-employee allegedly had reputation for chasing women and cheating on his wife. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

**[12] Civil Rights ☞1189**  
78k1189 Most Cited Cases  
(Formerly 78k167)

**[12] Civil Rights ☞1528**  
78k1528 Most Cited Cases  
(Formerly 78k371)  
Employer was not liable under Title VII for male employee's sexual harassment of female employee prior to time when female employee informally complained of co-worker's conduct to supervisor, absent evidence that employer knew or should have known of co-worker's conduct. Civil Rights Act of 1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

**[13] Civil Rights ☞1185**  
78k1185 Most Cited Cases  
(Formerly 78k167)

**[13] Civil Rights ☞1187**  
78k1187 Most Cited Cases  
(Formerly 78k167)  
Conduct of male employee and his wife towards female employee after she complained of male employee's sexual harassment did not create hostile work environment in violation of Title VII, where there was no overtly sexual conduct nor any statement of sexual nature. Civil Rights Act of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571  
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717  
**(Cite as: 116 F.Supp.2d 571)**

Page 3

1964, § 703(a)(1), as amended, 42 U.S.C.A. § 2000e-2(a)(1).

**[14] Civil Rights ☞1243**
78k1243 Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)
To recover for retaliation under Title VII, plaintiff must show that: (1) she engaged in protected activity; (2) employer took adverse employment action after or contemporaneous with plaintiff's protected activity; and (3) causal link exists between plaintiff's protected activity and employer's adverse action. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[15] Civil Rights ☞1541**
78k1541 Most Cited Cases
(Formerly 255k40(1) Master and Servant)
Temporal proximity between employee's protected activity and alleged retaliatory act may be sufficient to support inference of causation for retaliation claim under Title VII. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[16] Civil Rights ☞1541**
78k1541 Most Cited Cases
(Formerly 255k40(1) Master and Servant)
When temporal proximity is not sufficiently close to support inference of causation in retaliation claim under Title VII, timing and other evidence, such as evidence of intervening antagonism, may support inference. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[17] Civil Rights ☞1244**
78k1244 Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)
Female employee's informal complaint to supervisor of male co-worker's sexual harassment was "protected activity" for purposes of Title VII retaliation claim. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[18] Civil Rights ☞1541**
78k1541 Most Cited Cases
(Formerly 255k40(1) Master and Servant)
Reduction of female employee's work hours five months after she reported male co-worker's sexual harassment was not sufficiently close in time to support, by itself, inference of causation in female employee's Title VII action. Civil Rights Act of

1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[19] Civil Rights ☞1541**
78k1541 Most Cited Cases
(Formerly 255k40(1) Master and Servant)
Plaintiff alleging retaliation in violation of Title VII has burden both to show that employer's proffered reasons are false and that retaliation is real reason for adverse action; merely demonstrating falsity of proffered reason is insufficient, although falsity of proffered reason may be considered in determining whether there has been retaliation. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[20] Civil Rights ☞1245**
78k1245 Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)
Employer's reduction of employee's hours or shifts based on unavailability would be legitimate, non-retaliatory reason. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[21] Civil Rights ☞1245**
78k1245 Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)
Employer's reduction in employee's hours and termination of employee's employment would be "tangible employment actions" sufficient to support claim of retaliation under Title VII. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[22] Evidence ☞317(2)**
157k317(2) Most Cited Cases
Purported statement in telephone call from **employer** to temporary employment agency that **employer** was cancelling all of employee's shifts was inadmissible hearsay in employee's **Title VII** retaliation action against **employer**, absent evidence identifying caller or person who received message. Fed.Rules Evid.Rules 801(d)(2), 803(6), 28 U.S.C.A

**[23] Federal Civil Procedure ☞2497.1**
170Ak2497.1 Most Cited Cases
Genuine issue of material fact as to whether employer's reduction of temporary employee's shifts and hours was in retaliation for her reporting of sexual harassment by co-worker precluded

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
(Cite as: 116 F.Supp.2d 571)

Page 4

summary judgment in employee's Title VII action against employer. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

*573 Richard S. McEwen, Lemont, PA, for Kathy C. Lidwell.

Timothy G. Hewitt, Latrobe, PA, for University Park Nursing Care Center

Robert A. Seiferth, Marshall Dennehey Warner, Williamsport, PA, for Carol Emanuelson.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On October 30, 1998, plaintiff Kathy C. Lidwell commenced this action with the filing of a complaint pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e et seq. (Count I), and the Pennsylvania Human Relations Act (PHRA), 43 Pa.Cons.Stat.Ann. §§ 951 et seq. (Count II). Lidwell also asserts supplemental claims under Pennsylvania law for intentional infliction of emotional distress (Count III) and negligence (Count IV). Lidwell alleges a sexually hostile work environment at her former place of employment, University Park Nursing Care Center (UPNC), operated by defendants *574 SC Investors, Inc. The hostile atmosphere is alleged to have been created by defendant Carl Emanuelson, with later retaliation by defendant Carol Emanuelson.

One named defendant, Anne Ferguson, has been dismissed as a party by stipulation of all parties.

Default entered against Carol and Carl Emanuelson was set aside. By Memorandum and Order dated January 19, 2000, summary judgment in favor of the Emanuelsons was granted, with the entry of final judgment deferred pending resolution of the remaining claims. The claim asserted against the Emanuelsons (Count III) is no longer a part of the case, at least for present purposes, and Count IV, which was asserted against both UPNC and Ferguson, remains only as to UPNC. Counterclaims asserted by the Emanuelsons were withdrawn after summary judgment was granted in their favor with respect to Lidwell's claims.

In the same memorandum and order, we addressed a motion for summary judgment by UPNC which was limited to the issue of whether it took effective steps to end the harassment once it learned of Carl Emanuelson's conduct. Because there appeared to be evidence of other violations of Title VII after the report, we denied the motion for summary judgment. However, during the final pre-trial conference on January 28, 2000, counsel for UPNC indicated that renewal of the motion for summary judgment might be appropriate, and counsel for Lidwell later concurred. We therefore issued an order permitting the renewal of the motion. After a minor dispute between the parties as to the form of the motion, a renewed motion for summary judgment was filed by UPNC on May 23, 2000, and now is ripe for disposition.

### DISCUSSION:

#### I. STANDARD

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed.R.Civ.P. 56(c) (emphasis added).

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571  
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717  
**(Cite as: 116 F.Supp.2d 571)**

Page 5

those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex* at 323, 106 S.Ct. 2548. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex* at 325, 106 S.Ct. 2548.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 693-694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Material facts are those which will affect the outcome of the trial under governing law. *Anderson* at 248, 106 S.Ct. 2505. The court may not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny,* 139 F.3d 386, 393 (3d Cir.1998). In determining whether an issue of material fact exists, the court must *575 consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Boyle* at 393; *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir.1988).

If the moving party satisfies its burden of establishing a prima facie case for summary judgment, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. *Boyle* at 393 (quoting, *inter alia, Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## II. STATEMENT OF FACTS

We note initially that the factual development for the renewed motion for summary judgment is considerably more extensive that the initial motion. *See* Statement of Facts (appended to Motion for Summary Judgment), filed November 15, 1999 (consisting of 5 numbered paragraphs on one page); Statement of Material Facts filed May 23, 2000 (consisting of 26 numbered paragraphs on 9 pages). Based on this development, the court's analysis is more extensive. Our prior memorandum, then, is of no assistance at this time, and our review of both the facts and the applicable law is *de novo*.

We note as well that this task was made the more difficult by UPNC's failure to provide facts in a succinct form, *see* Local Rule for the Middle District of Pennsylvania LR 56.1, and in chronological order. We have attempted to restate the facts in a fashion more easily read. Some of the facts have been restated or clarified using the source documents cited by UPNC. For example, UPNC recites that it had a posted sexual harassment policy and that employees were provided with a copy of the policy with their paychecks, citing Lidwell's deposition testimony. Review of that testimony shows that Lidwell herself did not receive the policy, which went only to UPNC employees and not agency employees. Lidwell was shown a copy of the policy by an employee of UPNC who received it with a paycheck.

After completing her nursing classes at the end of May, 1995, Lidwell began work for Kimberly Quality Care, an agency which provided nurses to health care facilities when the facilities were short on staff. One of the places where she worked was UPNC. She began as an aide and later became a floor nurse or a charge nurse. She reported to a shift supervisor, who reported to the Director of Nursing. The Director of Nursing in turn reported to the Nursing Home Administrator. The shift supervisors to whom Lidwell reported varied throughout the time that she worked at UPNC.

Ferguson became the Administrator during the time that Lidwell was assigned to UPNC. Carl Emanuelson was one of the shift supervisors and, like the other shift supervisors, he was responsible for signing time slips when Lidwell worked his assigned shift.

In July, 1995, Lidwell was in a room with two patients when Carl Emanuelson entered. Carl Emanuelson asked Lidwell's age and Lidwell responded that it was none of his business. Carl Emanuelson laughed and stated that the two had a lot in common. Nothing about this conversation was offensive to Lidwell, and she did not report it or complain to anyone.

At an unidentified time, Lidwell handed her time slip to Carl Emanuelson, who was sitting at his desk. He asked what she had done to deserve the money (or pay) and threw the time slip back onto the desk. Lidwell found the behavior inappropriate but did not complain to anyone about the incident,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571  
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717  
(Cite as: 116 F.Supp.2d 571)

Page 6

nor did she report it because she was afraid that Carl Emanuelson would call the agency and cancel her shifts.

In the beginning of August, 1995, Lidwell was feeding a patient while Carl Emanuelson was working in the dining room passing trays. At the next table, an aide told a patient, "You need to set up there and eat that." Carl Emanuelson whispered to Lidwell, "I tell you that all the time but you don't listen."

*576 In early to mid-August, 1995, while Lidwell was serving a patient a tray, Carl Emanuelson told the patient to "bite [her] ass," adding that "she would probably like that, huh?" When the patient laughed, Carl Emanuelson asked, "Pretty nice, Tony, is that what you're laughing about?" Carl Emanuelson made the comments from about ten feet away, but Lidwell was not looking at him at the time. Lidwell did not report the incident to anyone on that date.

In the middle of August, 1995, Lidwell was having a general conversation about nursing issues with Beth Isett when Lidwell mentioned to Isett that she was looking for another job because Carl Emanuelson made her uncomfortable. Lidwell also told Isett that her feelings were due to the comments made both to Lidwell and to other people.

Lidwell was afraid to go to the administration with her complaint. Because she worked weekends, she never really saw administration personnel or the Director of Nursing because neither the Administrator nor the Director of Nursing worked on weekends.

On another occasion, Lidwell suggested to Carl Emanuelson that he looked as though he had worked a double shift because of his unshaven appearance. Carl Emanuelson rubbed his face and said words to the effect, "This is to scratch your inner thighs with," or "I left this grow to scratch your inner thighs with." Lidwell did not complain about this incident at the time.

During a chance encounter with Isett, Lidwell told Isett that if Isett saw Ferguson, Isett should report these incidents. Lidwell also discussed the incident regarding Carl Emanuelson's beard with Glen Hotaling, a union representative.

Another incident Lidwell found offensive was on an occasion when Lidwell volunteered to help Carl Emanuelson set up an IV for a patient. When Carl Emanuelson asked if she was ready, Lidwell asked, "Ready for what? Are you ready for the IV site?" Carl Emanuelson responded, "You know what I want." Because Carl Emanuelson said this with "an undertone and the sneer and the laugh," Lidwell understood the statement to mean something sexual.

The last incident Lidwell found offensive took place near the time clock, when Carl Emanuelson said something to which Lidwell did not respond. Carl Emanuelson told Lidwell that she had an attitude. He added that he was going to call the agency and tell them that he did not want Lidwell there any more. This incident occurred sometime before September 28, 1995. Lidwell was told by someone at the agency in February, 1996, that they had received a telephone call from UPNC canceling Lidwell's shifts. The agency also was told that Lidwell was no longer allowed at the facility. Lidwell did not work at UPNC after being told about the call. Her last shift at UPNC was February 14, 1996, from 6:30 a.m. to 3:30 p.m.

On September 28, 1995, Lidwell received a call at home from Ferguson. Ferguson asked Lidwell exactly what was happening with Carl Emanuelson. It was Ferguson who initiated an investigation, as Lidwell had not complained to Ferguson. Ferguson told Lidwell to write everything down and give the report to her (Ferguson). Lidwell never prepared the report, nor did she ever speak, or request to speak, to Ferguson again about the matter. Lidwell never provided to Ferguson any specific complaints about Carl Emanuelson. Ferguson advised Lidwell that she could work different shifts or hours apart from Carl Emanuelson, but that she must provide that complaint to her employer because of her unwillingness to talk to Ferguson.

The investigation was sparked by a complaint from Carl Emanuelson that employees were circulating false rumors of a relationship between himself and Tammy Conway. A union representative also looked into the allegations of sexual harassment but found insufficient evidence to warrant filing a grievance about Carl Emanuelson's conduct. A

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
(Cite as: 116 F.Supp.2d 571)

Page 7

local union representative *577 was involved in the meeting investigating the conduct of Carl Emanuelson. Lidwell spoke to him and told him that she did not like Carl Emanuelson and that Carl Emanuelson had made some inappropriate comments, but that she was not interested in pursuing the matter through the union.

At some point shortly thereafter, Ferguson spoke to Carl Emanuelson about what she had heard concerning his behavior. She told him that such conduct was unacceptable if it was happening and that his behavior would be monitored. According to Ferguson, no further misconduct was reported or observed. Also, within one or two weeks of Lidwell's discussion with Ferguson, UPNC employees were provided with a revised sexual harassment policy, which Lidwell saw. However, Carl Emanuelson adopted a demeaning attitude toward Lidwell, comprised of looking at her with a sneer and laughing when she passed him at work. According to Lidwell, this occurred every time she saw Carl Emanuelson after speaking to Ferguson. Still, no further statements with a sexual content occurred.

However, after speaking with Ferguson about Carl Emanuelson's conduct, Lidwell found that her shifts at UPNC were cut. [FN1] Ferguson did not order a cut in Lidwell's hours. Rather, it was the policy of UPNC to allow its employees to work before any agency employees even if that meant that UPNC employees were working overtime. Supervisors were directed to cancel any shifts scheduled for agency use whenever possible. Employees of Lidwell's agency were the first to be cut, but RN Supervisors did not determine who was assigned to work because they did not determine which agency employees worked any particular shifts. The use of agency employees decreased dramatically in 1996 (3,726.72) compared to levels existing in 1995 (12,168.91).

> FN1. UPNC refers to a statement by someone at Lidwell's agency referring to her concerns about shift cuts as ridiculous. We fail to see how the agency's opinion of Lidwell's concerns is material for present purposes.

During the fall of 1995, in addition to working at UPNC, Lidwell worked at Nittany Valley Rehabilitation Hospital and "The Meadows," facilities owned by HealthSouth Corporation. Her position was part-time as a "pool employee" from October 23, 1995, until January, 1996, when it became full-time. The full-time position was RN Supervisor at Nittany Valley and required Lidwell to work on weekends.

Generally, Lidwell had worked only weekends at UPNC because her husband was available to stay with their three children. Her agency did not guarantee hours. When Lidwell's shifts were canceled by UPNC, no one was assigned to replace her.

Lidwell was aware that Carl Emanuelson was bitter toward agency personnel because he felt that they were overpaid.

UPNC had a posted sexual harassment policy that also was distributed with employee paychecks, and "in-services" on sexual harassment were provided. The policy provided that, upon receipt of a complaint of sexual harassment, an investigation would follow. Lidwell was not provided with the policy personally, but was aware of the policy after it was shown to her by an employee of UPNC who received it with a paycheck.

### III. TITLE VII
#### (A) Hostile Work Environment

It is an unlawful employment practice under Title VII for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This prohibition is broader than a bar to economic or tangible discrimination, and covers *578 more than terms and conditions in a narrow, contractual sense. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, [78], 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). "[S]exual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
**(Cite as: 116 F.Supp.2d 571)**

Page 8

harassment so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment violates Title VII." *Faragher* at 786, 118 S.Ct. 2275 (quoting *Meritor* at 67, 106 S.Ct. 2399; further citations, internal quotations omitted).

[1][2] The Supreme Court has described hostile environment claims in general terms. Such a claim has two prongs: objective, meaning that a reasonable person would find the environment hostile or abusive; and subjective, meaning that the victim in fact perceived the environment as hostile or abusive. *Faragher* at 787, 118 S.Ct. 2275 (citing *Harris* at 21-22, 114 S.Ct. 367). Whether an environment is hostile or abusive is determined based on the totality of the circumstances, including the frequency and severity of the discriminatory conduct, its nature as physically threatening or humiliating as opposed to a mere offensive utterance, and whether it interferes with an employee's work performance. *Faragher* at 787-788, 118 S.Ct. 2275 (citing *Harris* at 23, 114 S.Ct. 367). Moreover, Title VII does not prohibit genuine but innocuous differences in the ways men and women routinely interact with members of their own or the opposite sex. That is, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher* at 788, 118 S.Ct. 2275 (citing *Oncale* at [81], 118 S.Ct. at 1003).

[3] More specifically delineating the elements of such a claim, the Third Circuit has held that, to succeed on a claim of a sexually hostile work environment, a plaintiff must prove that: (1) the plaintiff suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Kunin v. Sears Roebuck and Co.*, 175 F.3d 289, 293 (3d Cir.1999), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999). [FN2]

> FN2. In *Kunin*, the Third Circuit noted that the term respondeat superior may not be appropriate because liability under Title VII is direct, not vicarious. *Id.* at 293 n. 5 (citing *Williamson v. City of Houston*, 148 F.3d 462, 465 (5th Cir.1998)). The Supreme Court's opinions in *Faragher* and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), also support the idea that Title VII embodies a special form of liability for which the term is inappropriate, at least as relates to its traditional meaning. The Eleventh has termed the fifth element above, "(5) a basis for holding the employer liable," *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (en banc; citation omitted), *cert. denied*, 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000), although it terms the liability "vicarious," *id.* at 1245 n. 4. The appropriate term would depend on whose behavior is at issue, that of the supervisor or the employer itself. Of course, regardless of how liability is characterized or what term is used as an element of liability, the Supreme Court's opinions in *Faragher* and *Ellerth* govern disposition of the instant motion. *But see Allen v. Nat'l R.R. Passenger Corp.*, 90 F.Supp.2d 603, 608-609 (E.D.Pa.2000) (distinguishing between employer liability for supervisor conduct and coworker conduct but using standards derived from RESTATEMENT which would apply in cases of supervisor harassment). It should be noted, however, that the Supreme Court used the term "vicarious liability." *Faragher* at 780, 118 S.Ct. 2275; *Ellerth* at 754, 118 S.Ct. 2257.

**(B) Employer Liability**

The primary argument put forth in support of UPNC's renewed motion for summary judgment is that UPNC is not liable under *Faragher* and *Ellerth*. In those *579 opinions, the Supreme Court established the law of employer liability under Title VII.

[4] As a preliminary matter, it should be noted that the distinction between quid pro quo claims and hostile environment claims under Title VII is not significant in the context of determining whether the employer may be held liable. Rather, that distinction is significant in the context of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571  
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717  
(Cite as: 116 F.Supp.2d 571)

Page 9

threshold question of whether the plaintiff can prove discrimination: when there is a tangible employment action, the employment decision itself constitutes an actionable change in the terms and conditions of employment; for harassment which precedes any tangible employment action, the conduct must be severe or pervasive. The employer's potential liability, however, is not affected by the characterization of the claim as either quid pro quo or hostile environment. *Ellerth* at 753-754, 118 S.Ct. 2257.

[5][6] There are several categories of cases in which an employer's liability is rather straightforward. When the alleged harasser is "within that class of an employer organization's officials who may be treated as the organization's proxy," the employer may be liable. *Faragher* at 789, 118 S.Ct. 2275. Also, when there is a discriminatory employment action with tangible results, the employer will be liable once the discrimination is proven. *Id.* at 790, 118 S.Ct. 2275. The rationale for the latter rule may be that the decision maker "merges" with the employer or becomes the proxy for the employer in making such a decision. Alternatively, the decision maker may be seen as acting within the scope of his or her authority in making the decision. Finally, it may be said that the decision maker is aided by the agency relation in taking a discriminatory action. *Id.* at 790-791, 118 S.Ct. 2275 (collecting cases). Regardless, *Meritor* confirmed the "soundness of the results in these cases (and their continuing vitality), in light of basic agency principles ..." *Faragher* at 791, 118 S.Ct. 2275.

[7] When the employer or high-echelon official of an employer has actual knowledge of actionable harassment by subordinates, the employer may be liable. This liability is premised on a theory of demonstrable negligence or as the employer's adoption of the conduct and results as if they had been authorized as the employer's policy. *Id.* at 789, 118 S.Ct. 2275. *See also Kunin* at 293-294 (employer liable if it knew or should have known of harassment and failed to take prompt remedial action). The Third Circuit utilizes a theory of negligence. *Kunin* at 294 (no liability when employer's response stops the harassment; citing *Bouton v. BMW of N. America, Inc.*, 29 F.3d 103, 110 (3d Cir.1994), which held that there is no negligence if grievance procedure is effective).

[8] More difficult are those instances in which there is no tangible, adverse job action, and the harasser is not of that class of persons sufficiently high in the defendant's hierarchy to be considered a proxy for the **employer**. Because **Title VII** defines "**employer**" to include "agents," 42 U.S.C. § 2000e(b), principles of agency law are applied, using the general common law of agency rather than the law of any particular state so that there will be uniformity and predictability in the law under Title VII. *Ellerth* at 754-755, 118 S.Ct. 2257.

The beginning point is the RESTATEMENT (SECOND) OF AGENCY (1957) *Ellerth* at 755, 118 S.Ct. 2257. *See also Faragher* at 793, 118 S.Ct. 2275. The first relevant provision reads, "A master is subject to liability for the torts of his servants committed while acting within the scope of their employment." RESTATEMENT, § 219(1). Conduct is within the scope of employment when actuated, at least in part, by a purpose to serve the master. RESTATEMENT, § 228(1)(c). [FN3] *See also *580Ellerth* at 756, 118 S.Ct. 2257; *Faragher* at 793, 118 S.Ct. 2275. While courts generally have found that conduct creating a hostile environment falls outside the scope of employment because it is not motivated by a purpose to serve the master, the Supreme Court pointed out that this will not be true in every case. *Ellerth* at 756-757, 118 S.Ct. 2257; *Faragher* at 793-798, 118 S.Ct. 2275. For example, sexual harassment may be a way of furthering the employer's policy of discouraging women from seeking advancement. *Ellerth* at 757, 118 S.Ct. 2257 (citing *Sims v. Montgomery County Comm'n*, 766 F.Supp. 1052, 1075 (M.D.Ala.1990)). Other examples might be racial discrimination in job assignments to placate prejudice in the workforce, thereby preserving peace, or reprimanding male workers with banter while responding to female employees' shortcomings in harsh or vulgar terms. *Faragher* at 798-799, 118 S.Ct. 2275. [FN4] However, "The general rule is that sexual harassment by a supervisor is not conduct within the scope of employment." *Ellerth* at 757, 118 S.Ct. 2257.

> FN3. In addition, the conduct must be of the kind the servant is employed to perform, occur substantially within

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
(Cite as: 116 F.Supp.2d 571)

Page 10

authorized time and space limitations, and, if force is applied, be expectable by the master. Sec. 228(1). Section 228(2) states the obverse of these principles, i.e. when conduct is not within the scope of employment. Because workplace harassment is the basis for the suit, these elements generally will not be at issue.

FN4. Comparing these examples to the usual case of harassment as an expression of the supervisor's own sexual interests, the Supreme Court found the former to be within the scope of employment while the latter would be traditional "frolic and detour" of a servant outside the scope of employment. *Faragher* at 799, 118 S.Ct. 2275.

Even if an employee is not acting within the scope of employment, there are instances in which the employer may be liable. These instances are those described in the following provision:
  A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
  (a) the master intended the conduct or the consequences, or
  (b) the master was negligent or reckless, or
  (c) the conduct violated a non-delegable duty of the master, or
  (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
RESTATEMENT, § 219(2).

Subsection (a) addresses situations discussed above; that is, when the employer is directly liable because the conduct is its own or because the actor is the proxy or alter ego of the employer. *Ellerth* at 758, 118 S.Ct. 2257. Subsection (b) also addresses direct liability because the employer itself is negligent; it would apply when the employer knew or should have known of the harassment and failed to stop it. *Ellerth* at 758-759, 118 S.Ct. 2257.

In neither *Faragher* nor *Ellerth* did the Supreme Court discuss the applicability of Subsection (c), violation of a non-delegable duty, as described in RESTATEMENT, § 214. There may be two reasons for this. First, it may be said that an **employer** has a duty to protect employees from violations of **Title VII**. However, subjecting an **employer** to liability for every violation of **Title VII** would be the sort of strict liability which the Court has eschewed. Second, when there is a tangible, adverse action, the conduct of the harasser merges with that of the **employer** and the **employer** would be liable under § 219(1) (*cf. Faragher* at 790, 118 S.Ct. 2275), § 219(2)(a) (*cf. Faragher* at 791, 118 S.Ct. 2275), or § 219(d) (discussed below). Thus, even if there may be a non-delegable duty to refrain from tangible, adverse actions which violate Title VII, the employer is otherwise subject to liability.

It appears, then, that Subsection (c) may represent one of those principles of agency law which are not transferable in all their particulars to Title VII. See *Faragher* at 803 n. 3, 118 S.Ct. 2275.

Subsection (d) provides for employer liability if the agent exercises apparent but not actual authority, and the victim's reliance *581 on the apparent authority is reasonable. *Ellerth* at 759, 118 S.Ct. 2257. This analysis would apply only in rare cases, since most cases involve the misuse of actual authority. *Id.*

Finally, there are those cases in which the employer will be subject to liability because the harasser was aided by the existence of the agency relation. This principle is known as the "aided in the agency relation standard." *Ellerth* at 760, 118 S.Ct. 2257; *Faragher* at 802, 118 S.Ct. 2275. In a sense, the harasser always is aided by the existence of the agency relation because there is proximity and regular contact with a captive pool of potential victims. *Ellerth* at 760, 118 S.Ct. 2257. Because liability under these circumstances would apply not only to all supervisor harassment but to all coworker harassment as well, an unacceptable result (as imposing strict liability), the aided in the agency relation standard requires the existence of something more than the employment relation itself. *Ellerth* at 760, 118 S.Ct. 2257; *Faragher* at 802-83, 118 S.Ct. 2275.

In some cases, the "something more" which subjects the employer to liability will be a tangible employment action by a supervisor, *Ellerth* at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
(Cite as: 116 F.Supp.2d 571)

Page 11

760-761, 118 S.Ct. 2257, which also may be termed an active or affirmative invocation or supervisory authority. *Faragher* at 804, 118 S.Ct. 2275. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth* at 761, 118 S.Ct. 2257. Because of the nature of such actions, that is, authority to take these actions is conferred only by the employer, there can be no question that the harasser is aided by the agency relation in such cases. *Ellerth* at 761-762, 118 S.Ct. 2257; *Faragher* at 803-804, 118 S.Ct. 2275.

[9] When the harasser is a supervisor who takes no tangible employment action, the "something more" consists of subjecting the employee's claim to an affirmative defense. That is, the employer is liable for actionable discrimination by a supervisory employee, but may raise an affirmative defense consisting of two elements: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth* at 764-765, 118 S.Ct. 2257; *Faragher* at 807, 118 S.Ct. 2275.

[10] It should be emphasized that the discussion in both *Ellerth* and *Faragher* relates directly to discrimination by a supervisor. If the harasser is not the supervisor, the principles enunciated in those opinions may not apply. Specifically, when the harasser is a coworker, the negligence standard applies, and the employer will be liable if it "knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." *Faragher* at 799-800, 118 S.Ct. 2275 (quoting 29 C.F.R. § 1604.11(d) (1997); also citing, inter alia, *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir.1990)).

(C) PHRA
Generally, claims under the PHRA are analyzed in accordance with Title VII. *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir.1996). More specifically, retaliation claims under the PHRA are analyzed in the same manner as retaliation claims under Title VII. *Fogleman v. Mercy Hospital, Inc.*, 91 F.Supp.2d 788, 790-791 (M.D.Pa.2000). The discussion herein therefore applies to the PHRA claim as well.

IV. APPLICATION
The question at this stage is whether UPNC may be held liable based on the above-recited principles for the conduct of Carl Emanuelson and/or Carol Emanuelson. *582 Because of its nature, the conduct must be separated into distinct stages.

The conduct of Carl Emanuelson before September 28, 1995, may support a finding of a hostile work environment. While some of the conduct may not seem, in isolation, very serious, it must be placed into context. That is, Lidwell testified that Carl Emanuelson had a reputation for chasing women and cheating on his wife. With that in mind, otherwise innocuous statements may have more meaning. Also, given the overtly sexual nature of some of the comments, a jury might infer that statements which otherwise might not be interpreted as sexual in nature indeed were intended to be such. The comments may not have been great in number, but Lidwell only worked weekends, so that the comments would not have to be as numerous to be a regular occurrence.

[11] Given all of these circumstances, we do not believe that summary judgment is warranted based on UPNC's argument that the conduct was not severe and pervasive.

[12] However, we further conclude that UPNC cannot be held liable for Carl Emanuelson's conduct before September 28, 1995. Carl Emanuelson was a coworker, not a supervisor, since he did not have authority to take a tangible employment action against Lidwell. The only authority Carl Emanuelson appears to have exercised is signing Lidwell's timecard to show that she worked a given shift with him. Carl Emanuelson therefore was not a supervisor for Title VII purposes, and UPNC can be liable only if it knew or should have known of the conduct and did not take remedial action.

Lidwell points to no evidence that UPNC knew or should have known of the conduct, and in fact admits that she did not report his conduct to anyone in authority at UPNC, at her agency, or with her union. When UPNC, in the person of Ferguson,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
(Cite as: 116 F.Supp.2d 571)

Page 12

came to learn of the problems in Carl Emanuelson's conduct, a meeting for the purpose of investigating the complaints was held, and Ferguson spoke to Carl Emanuelson about his behavior. This action was taken despite the fact that Lidwell indicated that she did not wish to pursue her complaints about Carl Emanuelson. After that point, there was no further conduct of an overtly sexual nature directed toward Lidwell.

In short, UPNC cannot be held liable on a theory of negligence for failing to take action because it did so.

[13] The second phase of conduct was that which occurred after September 28, 1995. For present purposes, we consider the conduct of both Carl Emanuelson and Carol Emanuelson because they may be said to have acted in concert. However, even in tandem, the Emanuelsons did not create a hostile work environment for Lidwell. There was no overtly sexual conduct nor any statement of a sexual nature, much less conduct or a statement, or combination of conduct and statements, which was sufficiently offensive to be actionable under Title VII. We therefore conclude that UPNC cannot be liable for any sexually hostile work environment created by Carl Emanuelson and/or Carol Emanuelson.

[14][15][16] Lidwell also alleges, however, that the conduct of the Emanuelsons after September 28, 1995, was retaliatory in nature. To recover for retaliation under Title VII, the plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action after or contemporaneous with the plaintiff's protected activity; and (3) a causal link exists between the plaintiff's protected activity and the employer's adverse action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000). A "temporal proximity" between the protected activity and the alleged retaliatory act may be sufficient to support an inference of causation. *Id.* When temporal proximity is not sufficiently close to support an inference of causation, timing and "other evidence" may support the inference. *Id.* at 280. Evidence of intervening antagonism *583 may constitute "other evidence" for purposes of proving causation but is not the only way of doing so. *Id.* at 280-281. We look to the record as a whole to determine whether causation can be inferred. *Id.* at 281.

[17] In this case, Lidwell's protected activity was relating her problems with Carl Emanuelson to Ferguson on September 28, 1995. While Lidwell may not have made a formal complaint directly to UPNC, or through her union or agency, she provided information to Ferguson, who was looking into allegations of misconduct by Carl Emanuelson. We believe that this activity constitutes assisting in an investigation for purposes of 42 U.S.C. § 2000e-3(a), and therefore is a protected activity.

[18] The precise time at which Lidwell's shifts were canceled is not recited, and we do not think the alleged action taken in February, 1996, is sufficiently close in time to the protected activity in September, 1995, to support an inference of causation standing alone. To be considered as "other evidence" to support causation is the fact that Carl Emanuelson continued to act with antagonism toward Lidwell, in the form of a demeaning attitude, sneering and laughter. Also, Carol Emanuelson, the person who took the allegedly retaliatory action, is married to Carl Emanuelson.

In its brief, UPNC argues that Lidwell's shifts were canceled and her hours reduced because UPNC was attempting to reduce hours worked by agency nurses because agency nurses were paid more than UPNC's own employees. This argument is raised in the context of attempting to demonstrate that Lidwell has not proven that she suffered a tangible employment action. Brief in Support of Motion for Summary Judgment at 4-6. Actually, the argument properly belongs in a discussion of whether the proffered reason for the adverse employment action is a pretext for discrimination.

When a plaintiff produces sufficient evidence to establish a *prima facie* case of retaliation under Title VII, the analysis does not end. Like other forms of discrimination, a complaint of retaliation is subject to the familiar *McDonnell Douglas* burden-shifting analysis, under which the plaintiff first must establish a *prima facie* case. *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 494 (3d Cir.1995) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
(Cite as: 116 F.Supp.2d 571)

Page 13

U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). *See also Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 and 920 n. 2 (3d Cir.), *reh'g en banc denied, cert. denied,* 522 U.S. 914, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997) (applying burden-shifting analysis to retaliation claim); *Clarkson v. Penna. State Police, Bureau of Liquor Control Enforcement,* No. Civ. A. 99- 783, 2000 WL 1513773, at *5 (E.D.Pa. Oct.10, 2000) (same); *James v. Teleflex, Inc.,* No. Civ. A. 97-1206, 1998 WL 966009, at *13 (E.D.Pa. Dec.23, 1998) (same).

If the plaintiff meets the initial burden of production, there is a presumption of unlawful retaliation and the burden then shifts to the defendant/employer to articulate one or more legitimate, non-retaliatory reasons for the employment decision about which the plaintiff complains. *Id.; St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Burdine* at 254, 101 S.Ct. 1089). The burden then returns to the plaintiff to establish that the proffered reasons are pretextual and that retaliation was the reason for the employment decision. *Waldron* at 507-508.

[19] If the plaintiff meets the burden of producing evidence of a *prima facie* case, and the defendant meets the burden of articulating a legitimate, non-retaliatory reason for the adverse employment decision, the *McDonnell-Douglas* framework no longer is relevant and the presumption of unlawful retaliation is eliminated from the case. *St. Mary's* at 507, 510- 511, 113 S.Ct. 2742. The burden on the plaintiff remains, however, both to show that the proffered reason(s) are false and that retaliation *584 is the real reason for the adverse action; merely demonstrating the falsity of the proffered reason is insufficient, although the falsity of the proffered reason may be considered in determining whether there has been retaliation. *St. Mary's* at 511, 113 S.Ct. 2742. *See also Waldron* at 494 (summarizing *St. Mary's* ).

[20] Plainly, reducing Lidwell's hours as part of an effort to save money on agency nurses would be a legitimate, non-retaliatory reason for canceling shifts and not scheduling Lidwell. It also should be pointed out, and indeed is pointed out by UPNC, that Lidwell's full-time employment meant that she was available for less work at UPNC. A reduction in hours or shifts based on unavailability also would be a legitimate, non-retaliatory reason.

[21] It also should be pointed out that a reduction in hours and the termination of Lidwell's employment would be tangible employment actions, subjecting UPNC to liability should the retaliation be proven.

The question becomes whether Lidwell has demonstrated for purposes of summary judgment that the proffered reasons are a pretext for retaliation.

[22] Lidwell first points to a purported telephone call to her agency in which some unidentified person from UPNC told the agency that UPNC was canceling all of her shifts and that she was not permitted in UPNC any more. Lidwell fails either to identify the person at her agency who received the call or to provide a record of such a call. While a statement by a representative of UPNC might be non-hearsay, Fed.R.Evid. 801(d)(2)(A), (C), (D), the statement as related by an agency employee to Lidwell is hearsay. Also, absent a business record reflecting the statement, Fed.R.Evid. 803(6), no exception to the hearsay rule would allow the statement into evidence. We therefore conclude that the alleged telephone call is not properly considered by the court and does not serve as a basis for a finding of pretext.

Lidwell also points to the evidence of the cancellation of her shifts. UPNC points out that the evidence shows that Lidwell's hours were reduced when she became unavailable and when there was a general reduction in hours worked by agency nurses. The evidence on which the parties rely is not conclusive on the point and, frankly, seems to confuse the point.

According to affidavits submitted by UPNC, Michelle Snyder and Elizabeth Isett were the other RN Supervisors apart from Carl Emanuelson. According to Isett, a scheduling clerk and Carol Emanuelson scheduled agency employees for the 7:00 a.m. to 3:00 p.m. shift. The RN Supervisors did the scheduling for the 3:00 p.m. to 11:00 p.m. and the 11:00 p.m. to 7:00 a.m. shifts. While UPNC could ask for certain agency personnel, the agency made the actual assignment. *See* Exhibit 1

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
(Cite as: 116 F.Supp.2d 571)

Page 14

to Record Document No. 61.

According to Michelle Snyder, Carl Emanuelson worked the day shift as RN Supervisor and Isett worked part-time on the 3:00 to 11:00 p.m. shift. The RN Supervisors all reported to Carol Emanuelson. A scheduling clerk did all of the scheduling of personnel, including agency employees. RN Supervisors could cancel a shift if UPNC employees could work, and shifts worked by nurses from Lidwell's agency were canceled first because they were the most expensive. Also, RN Supervisors could request additional agency nurses if necessary. UPNC did not direct the agency as to what employees to send to work a shift. Exhibit 6 to Record Document No. 61.

Both Isett and Snyder indicate that neither of the Emanuelsons directed them to cancel Lidwell's shifts.

In response, Lidwell points to her deposition testimony to the effect that her shifts were canceled despite the fact that she had more seniority than other agency nurses, and she saw documents with a "yellow sticky" with a notation to cut her (Lidwell) first.

There are a number of questions that this evidence does not answer. Although *585 Lidwell states in her brief that her deposition testimony was to the effect that her shifts were cut "even when she had more seniority than the other agency nurses assigned that day," Brief in Opposition to Motion for Summary Judgment at 5, her testimony falls short of that statement. Her deposition testimony was that her shifts were cut despite the fact that "there was people from the agency that had less experience than me or less time there ..." N.T. 10/27/99 (Lidwell deposition) at 97. This statement does not say necessarily that the nurses with less seniority were assigned to work the same shift or day as Lidwell when her shifts were canceled.

Conversely, although Isett and Snyder may never have canceled one of Lidwell's shifts, and they may never have been told by Carol Emanuelson or Carl Emanuelson to do so, it cannot be said that Carl Emanuelson did not do so, nor that Carol Emanuelson did not do so. In addition, we cannot tell from this record whether Isett or Snyder simply would have been told to cancel a shift for an agency nurse, and Lidwell was the only agency nurse assigned.

To determine that the cancellation of Lidwell's shifts was not retaliatory, at least for purposes of summary judgment, we would need to know the dates or hours of Lidwell's availability, to be compared to the times when agency nurses worked at UPNC. If the two are exclusive, it cannot be said that the cancellations were retaliatory. Alternatively, we would need to know whether the RN Supervisor who canceled a shift knew the identity of the agency nurse working the shift. If not, the cancellation cannot be said to have been retaliatory. Or, if we knew what particular shift was canceled and that Isett or Snyder was the RN Supervisor for that shift, we could draw the inference that the cancellation was not retaliatory.

[23] In other words, we simply do not have sufficient information to determine that the adverse actions taken by UPNC were retaliatory. While Lidwell bears the burden of demonstrating that the proffered reasons were a pretext for retaliation, and we could not conclude definitively that they are a pretext, she has demonstrated sufficiently that the proffered reasons may be disbelieved. That is, her testimony, if accepted, would show that there was a conscious effort to cancel her shifts. This evidence, in combination with the continued demeaning attitude on the part of Carl Emanuelson and questions asked by Carol Emanuelson concerning Lidwell's job status, could support an inference that the effort was by one or both of the Emanuelsons. Moreover, UPNC has failed to eliminate this possibility because it has not shown that neither of the Emanuelsons canceled the shifts. Finally, nothing on the record shows why UPNC stopped scheduling Lidwell but, if a jury determined that the Emanuelsons were responsible for the cancellations, they could infer that the Emanuelsons were responsible for the cessation of the scheduling of Lidwell also.

For these reasons, the claim of retaliation survives the renewed motion for summary judgment.

## V. CONCLUSION

The renewed motion for summary judgment will be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

116 F.Supp.2d 571
116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717
(Cite as: 116 F.Supp.2d 571)

Page 15

granted in part and denied in part. The motion will be granted as it relates to the claim for a hostile working environment, but will be denied as it relates to the claim for retaliation.

An order consistent with this opinion will issue.

### ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. Defendant University Park Nursing Care Center's renewed motion (record document no. 69) for summary judgment is granted in part and denied in part.

2. The motion is granted insofar as it relates to plaintiff Kathy Lidwell's claim of a hostile working environment.

*586 3. The motion is denied insofar as it relates to the claim of retaliation.

4. The entry of final judgment is deferred pending resolution of the remaining claims.

5. A further case management conference will be scheduled upon disposition of the motions for summary judgment in the related *Hill* and *Holler* cases (nos. 98-1298 and 98-1299).

116 F.Supp.2d 571, 84 Fair Empl.Prac.Cas. (BNA) 1717

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.