IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

NANCY DREW SUDERS                    :
                                     :   CASE NO.
              v.                     :   1:00-CV-1655
                                     :
PENNSYLVANIA STATE POLICE            :


TRANSCRIPT OF PROCEEDINGS
PRETRIAL CONFERENCE


BEFORE:  HON. SYLVIA H. RAMBO

DATE  :  February 18, 2005
         9:00 a.m.

PLACE :  Judicial Conference Room, 8th Floor
         Federal Building
         Harrisburg, Pennsylvania

BY    :  Wendy C. Yinger, RPR
         U.S. Official Court Reporter


APPEARANCES:

DONALD BAILEY, ESQUIRE
SAMUEL C. STRETTON, ESQUIRE
SHERI COOVER, ESQUIRE
     For the Plaintiff

SARAH C. YERGER, ESQUIRE
HOWARD HOPKIRK, ESQUIRE
     For the Defendant



COPY

EXHIBIT

1          THE COURT:  Ms. Yerger, who is your

2    associate?

3          MS. YERGER:  Howard Hopkirk.

4          THE COURT:  Hopkirk, H-o-p-k-i-r-k?

5          MR. HOPKIRK:  Yes, Your Honor.

6          MR. BAILEY:  Your Honor, this is Sheri

7    Coover.

8          THE COURT:  I know Sheri.  How are you, Mr.

9    Stretton?

10         MR. STRETTON:  Good.  Thank you, Your Honor.

11   I'm doing okay.  I'm slowly getting over the flu.

12         THE COURT:  Are you going to be able to try

13   this case?

14         MR. STRETTON:  Oh, yes.  I'm having my

15   operation next week for the hernia I got as a result,

16   but I'll be fit as a fiddle on March 15th.

17         THE COURT:  Okay.  Is it possible we could

18   start the afternoon of the 14th, just to pick the jury

19   and -- my concern is, as I understand it, you're going

20   to need a minimum of seven days to try this case.

21         MR. STRETTON:  I doubt it, but I put the

22   outside limit.  But, you know, I like to try a case

23   quick, so I bet that I'll be done in two days.  That's

24   my hope.

25         THE COURT:  My other concern is that, on the

1  16th, I have to be down at the Third Circuit, so I'll be

2  in Philadelphia. I can't avoid it. That's a Wednesday.

3          MR. STRETTON:  I can start in the morning of

4  the 14th.

5          THE COURT:  Let's do it on the afternoon.

6          MR. STRETTON:  That would be at 1:00, Your

7  Honor?

8          THE COURT:  1:30. And we'll pick the jury.

9  Now before we get started on anything, I want to address

10  this Kroll report.

11          MR. BAILEY:  Your Honor, if I may. There

12  are actually two issues there. I think there's an IG

13  report on which the Kroll report is based, and I

14  erroneously -- I believe when I had lodged and went over

15  the issue of the Kroll report with Mr. Xxx knoll, which

16  was prior to the Supreme Court argument, the reference

17  technically in what was lodged on the motion was the IG

18  report. They're essentially the same thing.

19          One is derivative of the other. But the IG

20  report was an investigation done by the state

21  government, so it's actually -- what's at issue in that

22  subject matter is actually both of those.

23          THE COURT:  Now, hold on a minute. There's

24  a reference in the status report that was filed back in

25  September, I believe September 28th, that refers to a

1    BPR report.  Now what is that?

2         MR. BAILEY:  Ma'am, that is an issue of

3    respectful disagreement.  When the litigation began, we,

4    being Nancy and I, had heard rumors of a Bureau of

5    Professional Responsibility investigation into the

6    complaints that Nancy had been making to the governor's

7    office, to Senator Jubelirer, about alleged misconduct

8    by the Defendants.

9         Sarah, who can speak for herself here, of

10   course, told me that there was no BPR report, but then

11   she also said -- I persisted to ask questions about

12   this, and there's some reference to it, I think, in the

13   end of the Easton deposition, but she also said that,

14   even if there were, that it would not be made available

15   because it was attorney work product.

16        You know, we didn't know definitely whether

17   it was there or not, and I had simply felt that it was

18   covered by Rule 26 in any event.  When this issue arose

19   at the -- when we did the LR 16.3, these documents

20   arose.  We have not had an -- we haven't seen them

21   before.  I'm going to be doing -- we did a motion in

22   limine on it, I think, that should be filed by now.  And

23   that was one of the things that was, we thought, should

24   have been in and the reason I put it in the status

25   report, given information that had arisen after the case

1    went to the Supreme Court, including statements

2    police officers.  And we got a couple affidavit

3    communicated those to -- we communicated those to Sarah,

4    and which Adrienne can attest to, but in any event, at

5    the LR 16.3, Sarah informed me that it's attorney work

6    product and we're not allowed to see it.

7            But it comes into the Court, of course, or

8    at least there's an attempt to bring it in, to use it

9    to, we think on largely irrelevant grounds, but

10   regardless, you know, attack Nancy.  That's where that

11   is.

12           THE COURT:  Well, let's get back to the

13   Kroll report, which was the subject of a motion in

14   limine.  When did you ever receive the Kroll report?

15           MS. YERGER:  I did not receive a copy of the

16   Kroll report until Mr. Bailey provided me a copy of the

17   Kroll report.  I'm sorry.  Mr. Bailey provided me a copy

18   of the Kroll report after the attorneys conference.

19           THE COURT:  After?

20           MS. YERGER:  After the attorneys conference.

21   I did receive an Inspector General report -- actually

22   the office did, via a filing with the -- that Mr. Bailey

23   made to the United States Supreme Court.  However, the

24   Inspector General report is a completely and totally

25   different report than the Kroll report.

1          The Inspector General is an agency of the
2    Commonwealth, an independent agency of the Commonwealth.
3    The Kroll report is -- it's referred to as Kroll because
4    that's the name of the business or company, and that
5    report was an independent organization that was asked by
6    the governor to do a report about the Pennsylvania State
7    Police.  So there are two separate documents.  Although
8    I knew what -- I knew I had heard the word Kroll report,
9    I didn't have a copy of it and was certainly not made
10   aware of its relevance to this lawsuit or that it may be
11   used in the lawsuit.
12          MR. BAILEY:  Your Honor, may I respond very
13   briefly?  A Kroll report has been all over the news.
14   It's very difficult for me to believe, with all due
15   respect to Sarah, who I respect very much, that this
16   office, that their office or she was not aware of it.
17   That's not the issue, if I may, if I may.
18          THE COURT:  Well, isn't the issue notice
19   that it was going to be used as an exhibit in trial, I
20   mean, not its existence, but that it was, in fact, going
21   to be an exhibit that you were going to use at trial?
22          MR. BAILEY:  The -- in my view, it was
23   already part of the record.  It had gone to the Supreme
24   Court.  It had been lodged in the Supreme Court.  The
25   issue is, there's a public document out there that has

1    to do with the -- you know, whether it's an exhibit or

2    not, to respond to you, whether it's an exhibit, in my

3    mind, the Kroll report and the IG report were the same

4    thing.  What Kroll did -- and it's -- well, in a

5    nutshell, Judge, these issues -- this was an official

6    report done by an official agency of the government.  I

7    don't see why we can't walk into any courtroom where

8    it's a cogent issue and introduce it and use it.  My

9    understanding was, from your order, that we couldn't use

10   it.

11          THE COURT:  Because it wasn't disclosed as

12   an exhibit pursuant to the rules.

13          MR. BAILEY:  Judge, the -- okay.  Then we

14   can't use it.  I mean, you've ruled.

15          MR. STRETTON:  Stop, stop.

16          MR. BAILEY:  No, no.  You've ruled --

17          MR. STRETTON:  Your Honor --

18          MR. BAILEY:  We won't use it.

19          MR. STRETTON:  Is it possible we can use it

20   in rebuttal depending on what the Commonwealth presents

21   in their defense, even if we can't use it as part of our

22   case?

23          THE COURT:  That report is rather extensive.

24   I mean, what are you going to use?  Have you indicated

25   what portion of the report that you would expect to use?

1      MR. STRETTON:  What I could do is this:  I

2  could submit something later today, what I would intend

3  to use in rebuttal, depending on what the government

4  presents as part of their defense, and then you can make

5  your ruling on that.  I wasn't involved in any of the

6  earlier portions of this, so I can't speak to the issues

7  of what was shown or not shown, but I thought, perhaps,

8  we could use some of it in rebuttal, depending on what

9  they use, even though we didn't apparently disclose it

10  on a timely basis, as indicated.

11      THE COURT:  So it's clear, I'll let you do

12  that.  That doesn't mean -- I'll let you notify her of

13  what you might possibly use.

14      MR. STRETTON:  I'll do that this afternoon.

15      THE COURT:  But that doesn't mean, when the

16  time comes, that I still may not have to make a ruling.

17      MR. STRETTON:  That's clear.

18      MR. BAILEY:  Your Honor, I can tell you what

19  we'll use, what's in there.

20      THE COURT:  Well, let him furnish it in

21  writing with a copy to me.

22      MR. STRETTON:  We'll do that this afternoon

23  before I leave Mr. Bailey's office.

24      THE COURT:  And I'll wait until I hear a

25  response from you.

see q — Tover

1   decision is very quick to indicate that, for instance,

2   if a superior was involved in sexual harassment, that

3   doesn't meet the test.  There has to have been some

4   official act on the part of that superior that was

5   involved in the constructive discharge.  Read that very

6   carefully.  So, I mean, they even set the example.  They

7   use the example that, if a superior is involved in a

8   sexual harassment, that in itself does not make them --

9           MR. BAILEY:  Your Honor, if I may?

10          THE COURT:  Yes, sir.

11          MR. BAILEY:  With all due respect, the issue

12  of an official act is a definition by the Court that, as

13  opposed to a constructive discharge, the official takes

14  some kind of action like, you're fired, you're

15  dismissed, etc.  And what the Supreme Court, I believe,

16  was saying was that, if you come back and can show that

17  there was a constructive discharge, and that's the

18  equivalent of the official act.

19          Now Mr. Thomas, in his dissent, addresses

20  that very issue.  Then the issue became -- and that's

21  what they respectfully disagree with you on, on the

22  issue of -- on the summary judgment which you granted.

23  Now, I believe that the second issue was whether or not,

24  and this is where Judge Fuentes respectfully disagreed

25  with you and was overturned, was the issue surrounding

1    MS. YERGER:  And you'll understand that I'll

2    object for hearsay reasons?

3    THE COURT:  I understand, I understand.

4    MR. BAILEY:  If I may.  What we had wanted

5    to do, we had subpoenaed Mr. Miller.

6    THE COURT:  Oh, the commissioner?

7    MR. BAILEY:  Yes, ma'am.  And the IG report

8    specifically, directly addresses the issue of verbal

9    complaints made to the system and the noncompliance of

10    the Pennsylvania State Police regulation and practices

11    with in-place executive orders of the Pennsylvania State

12    Government that verbal complaints are to be followed up.

13    And that was the precise, exact basis upon which you

14    granted summary judgment on behalf of these Defendants,

15    who should have known at the time of what those

16    practices and conflicts were, where Nancy was found by

17    you to not be in compliance with -- with not making a

18    reasonable effort to comply and report the

19    discrimination.  And you dismissed her out of summary

20    judgment.  And I will pull those portions --

21    THE COURT:  Let's get it straight right now.

22    The issues in this trial are, first of all, whether

23    there was a constructive discharge, whether or not any

24    superiors were involved in the harassment that was

25    alleged to have gone on.  Now, the Supreme Court

1  the affirmative defense.

2         And the affirmative defense, that's where

3  this report comes in, and that's where we believe that

4  the jury should not be allowed to hear what, I think,

5  amounts to a fraudulent claim, that there was a policy

6  or practice in place that Nancy did not take advantage

7  of.

8         THE COURT:  Here is the footnote which I

9  think is instructive.  It's at footnote 4 of the

10  opinion.  When an official act does not underlie the

11  constructive discharge, the Ellerth and Faragher

12  analysis, we here hold, calls for extension of the

13  affirmative defense to the employer.

14         MR. BAILEY:  That's exactly what I just

15  said.  The issue is connected to the availability of the

16  affirmative defense and --

17         THE COURT:  But there has to be something

18  more than participation in the harassment.  There has to

19  be an official act.

20         MR. BAILEY:  All right, Judge.  You know,

21  you're the judge, and we'll litigate it, of course, and

22  according to your instructions.  I would just like to

23  bring to the Court's attention that the issue with the

24  IG's report goes to precisely that alleged affirmative

25  defense, the availability of the affirmative defense.

1    And judicial notice could and should be taken

2    report and its finding that the -- and we will

3    the parts for opposing counsel and bring to your

4    attention, that the Pennsylvania State Police, that

5    their anti-discrimination policy was out of compliance

6    with state law, and it directly affected the facts

7    situation with Nancy Suders.

8              MS. YERGER:  I respectfully, if I may, Your

9    Honor?

10             THE COURT:  Yes.

11             MS. YERGER:  The Inspector General report,

12   which is different than the Kroll report, and the Kroll

13   report are not public records.  They do not fall within

14   the public records exceptions.  They were independent

15   agencies; therefore, it's hearsay.  He would have to

16   bring in every single person that prepared that report

17   to go over and all the people -- not the people that

18   prepared the report, but the people that made

19   allegations in the report in order to establish what

20   he's trying to establish.  The report itself is not

21   enough because it's hearsay.

22             MR. BAILEY:  Our position very simply is,

23   the state police should not be allowed to come in here,

24   present false information, and if they do, we will react

25   accordingly.

1          THE COURT:  Let's go to the Plai

2   pretrial memo.  I note the rather extensive

3   list.  I assume you're just being cautious (

4          MR. BAILEY:  Yes, ma'am.

5          MR. STRETTON:  Your Honor, I started going

6   through with Mr. Bailey yesterday, and I'm willing to

7   spend some time today, and then I'm going to call Sarah

8   and give her who I really intend to call.  But it won't

9   be every witness, I can guarantee you.  There's a couple

10  key people.  One question I had, maybe we can resolve

11  it.  The original named Defendants, the individuals,

12  obviously they're not named Defendants now, but can you

13  have them available or should I do it the old fashioned

14  way, have subpoenas on them?

15         MS. YERGER:  You need to subpoena them.

16         MR. STRETTON:  I may need to get some

17  current addresss from you.  I'm sorry to talk cross

18  purposes, Your Honor.  But any of them who are still in

19  your employ, if you can make them available, that would

20  be great.  If not, we should give subpoenas, I guess,

21  through your office then; right?

22         MS. YERGER:  You don't have to personally

23  serve them, but you need to do it.

24         MR. STRETTON:  Thanks very much.

25         THE COURT:  Who's left in this case, by the

1 way?

2          MS. YERGER:  Pennsylvania State Police is

3 the only Defendant.

4          THE COURT:  PSP, okay.

5          MR. STRETTON:  That's my understanding.  We

6 would be calling all of those individuals, obviously.

7          THE COURT:  Now I have allowed them to

8 produce an economic expert.  You got the report?

9          MS. YERGER:  I just got it this morning.

10         THE COURT:  Are you going to be able to get

11 it to your expert in time?

12         MS. YERGER:  (Witness nodded head

13 affirmatively.)

14         THE COURT:  You have here six to seven days.

15 That's why I was concerned.

16         MR. STRETTON:  When Mr. Bailey and I talked

17 about it, when he was doing the pretrial memorandum, I

18 didn't know enough about the case, so I said, let's list

19 it for approximately six or seven days, but you know my

20 practice is to try to move these cases much quicker, and

21 I'm hoping to be done the Plaintiff's case within two

22 days of selecting a jury.  I think that would be a

23 realistic approach.  Could be maybe two and a half days,

24 but --

25         THE COURT:  Okay.  Now let's get to the

1    exhibit list, Plaintiff's exhibit list.  Objections?

2          MS. YERGER:  My only objections are to P-3

3    and P-35 for the very same reasons that Mr. Bailey said

4    that I haven't shown him documents.  I have never seen

5    those documents before.

6          THE COURT:  The affidavit of Paul Weachter,

7    and 35 is the affidavit of Robert Albright.  Why would

8    affidavits be used unless it's for impeachment or

9    refreshing?

10         MR. STRETTON:  They won't be unless -- these

11   are individuals who heard people make certain

12   admissions.  The only reason the affidavits were marked,

13   if those individuals would get on the stand and deny

14   saying those things, we might want to use those for

15   impeachment and/or substantive evidence issues.  I

16   assume the individuals will not disagree.  For instance,

17   on P-3 --

18         THE COURT:  Have you received that yet?

19         MS. YERGER:  I received it at the attorneys

20   conference for the very first time.

21         MR. STRETTON:  It's in the exhibits.  That

22   was the first time, I believe, she saw it.  Just to give

23   you an example, P-3 is the affidavit of Paul Weachter.

24   And he talks about Bruce Campbell, who's one of our

25   witnesses, and how Mr. Campbell indicated he saw some of

1  the alleged misconduct by some of the officers against

2  Ms. Suders.  If Mr. Campbell, for whatever reason, got

3  on the stand and then denied saying those things, we

4  might want to use Mr. Weachter for impeachment purposes,

5  and the affidavit just sets forth what Mr. Weachter has

6  previously told us.

7            THE COURT:  But you'd call Weachter though?

8            MR. STRETTON:  Yes.  Obviously, I can't put

9  the affidavit in.  I wouldn't even try.  But I may use

10  it to refresh his recollection or something of that

11  nature.  But it would be more for impeachment purposes,

12  maybe substantive evidence under the 803, 804.  But that

13  gets dicey sometimes when you're involved in double

14  hearsay in that particular matter.

15            MS. YERGER:  That's what I was going to say,

16  it's double hearsay.  I'm not sure how he could get it

17  in at all.

18            MR. STRETTON:  I can think of some

19  scenarios, but I would agree, I would be really rowing

20  upstream evidentiary on that issue.  But I just wanted

21  to have them marked in case it came down to an issue

22  where people were changing their stories, and then I

23  would then try -- obviously, I would go to sidebar.  I

24  wouldn't do it in front of a jury.  I'd go to sidebar at

25  that particular point and say, here's how I think I can

1  use this.  And that's why it's there.  But it would not

2  be used directly as substantive evidence.  At least, you

3  know, obviously, I'm not going to put the affidavit in

4  and say, here it is.  You can't cross-examine on an

5  affidavit.

6           THE COURT:  Is that it?  Those are the only

7  two?

8           MS. YERGER:  Yes.

9           THE COURT:  Okay.  Let's go to Defendant's.

10  Again, there's quite a long list of witnesses.  I assume

11  this is just for --

12           MS. YERGER:  It will depend on how the

13  Plaintiff's case presents.

14           THE COURT:  Okay.  You've agreed that it's

15  going to be five to seven days?

16           MS. YERGER:  Yeah.  I think that if they're

17  around two, two and a half, that we'll probably be about

18  the same amount of time.

19           THE COURT:  Okay.  So it's possible it will

20  go into the next week?

21           MS. YERGER:  I think so.

22           THE COURT:  I just wanted to be sure of

23  that.

24           MR. STRETTON:  Your Honor, may I ask some

25  questions?  On the witness list, you have a number of

1  state police officers. I was going through those with

2  Mr. Bailey last night, but we weren't quite sure, many

3  of them, who they are and what they would say and how

4  they're involved. Obviously, the people --

5           THE COURT: Do you want to point them out,

6  which ones they are, so you get a proffer?

7           MR. STRETTON: Sure. For instance, Corporal

8  -- number 12, Corporal Heming, or 13, Captain Holmberg.

9           THE COURT: Let's take them one at a time.

10 Corporal Heming.

11          MS. YERGER: Corporal Heming was a corporal

12 at the -- actually, he was a trooper at the

13 McConnellsburg barracks. And depending on how Ms.

14 Suders testifies, he may have rebuttal to her testimony

15 regarding anything that was seen or done.

16          MR. BAILEY: Can you speak up a little,

17 Sarah?

18          MS. YERGER: Sure. He might have rebuttal

19 testimony, depending on how Ms. Suders testifies,

20 regarding anything that he saw or the way he interacted

21 with Suders.

22          MR. STRETTON: Would that be the same then

23 with most of these troopers?

24          MS. YERGER: Pretty much, except for

25 Holmberg. Holmberg is a captain of the troop. He's

1   information, background information for the jury about

2   how the state police is made up, and what his role was

3   as captain regarding PCO's.

4             THE COURT:  What are PCO's?

5             MS. YERGER:  Sorry.  A police communication

6   operator, which is what Ms. Suders was.

7             MR. STRETTON:  Then 14, Steven Kagarise.

8             MS. YERGER:  Same as Heming.  He was a

9   trooper at McConnellsburg.

10           MR. STRETTON:  How about number 16?

11           MS. YERGER:  She was the troop

12  administrator.

13           MR. STRETTON:  At the barracks in question?

14           MS. YERGER:  No, at the troop in question.

15  So she was the person -- the first person that Nancy

16  Suders dealt with at the troop.

17           MR. STRETTON:  She was not present during

18  any of the alleged harassment?

19           MS. YERGER:  No.

20           MR. STRETTON:  Of all the officers you're

21  listing, other than the ones who were originally named

22  Defendants, other than Corporal Heming, is there anyone

23  else who would have been present and seen or say, we

24  never saw the others, Baker, Easton, others, do the

25  allegations that Ms. Suders is contending they did?

1    MS. YERGER: Every person on this list,

2    except for the people we've already discussed, and

3    additionally, Jina Wingard and Vicki Marrone, that would

4    be 17 and 28, those two individuals were not at the

5    barracks. But everyone else, except for Holmberg, was

6    at the barracks.

7        MR. BAILEY: The question was, are they

8    going to testify that they never saw Baker do this?

9        MS. YERGER: Do I have to reveal my trial

10   strategy?

11       THE COURT: No, you don't need to, but we

12   need to know just generally what their testimony --

13       MS. YERGER: They're going to testify

14   whether they did or did not see Baker do the wrestling

15   move, yes.

16       MR. BAILEY: Does that include Mr. Easton?

17       MS. YERGER: Yes.

18       MR. STRETTON: That's all right. I didn't

19   mean to tickle your trial strategy. I just wanted to

20   get a sense.

21       THE COURT: Okay. Who else?

22       MR. STRETTON: Well, I think she pretty well

23   covered it. I think that covers the questions I had

24   because they had a number of state officers.

25       THE COURT: Well, go ahead and make sure you

1  get them.

2          MR. STRETTON:  Prendergast is down there,

3  and Prendergast is going to say or can you give me the

4  same category as Prendergast?

5          MS. YERGER:  He's a prior Defendant.

6          MR. STRETTON:  That's right, he is.  I'm

7  sorry.

8          THE COURT:  That issue doesn't need to come

9  out.

10          MR. STRETTON:  No, I don't intend to point

11  out that they were prior Defendants unless, for some

12  reason, there's some issue of bias, but would I go to

13  sidebar before I would reveal that.  I don't like

14  mistrials.

15          THE COURT:  Okay.

16          MR. STRETTON:  Now just out of curiosity, in

17  terms of your affirmative defenses -- and excuse me for

18  talking across the table, Your Honor, and not through

19  you -- I take it, these witnesses will be your

20  affirmative defense also?

21          MS. YERGER:  Yes.

22          MR. STRETTON:  Is there anyone else that you

23  intend to put on who hasn't been listed?

24          MS. YERGER:  I do not have my expert listed

25  because of the nature of the judge's order.

1          MR. STRETTON: I understand that.

2          MS. YERGER: I will have that soon to you,

3  his name and curriculum vitae. His report will be in a

4  couple weeks.

5          MR. STRETTON: Your affirmative defense is

6  what, just so I understand in terms of how --

7          MS. YERGER: The affirmative defense is just

8  as the judge listed in her order listing it for trial.

9  The affirmative defense is the Ellerth/Faragher test.

10         THE COURT: Assuming they get that far.

11         MS. YERGER: Yeah.

12         MR. STRETTON: Sure. I understand. Thank

13 you. I'm sorry. I didn't mean to put you on the hot

14 seat. I apologize. Forgive me, Your Honor.

15         MS. YERGER: Forgive us. This is actually

16 the first time Sam and I met face-to-face, and it was a

17 little difficult on our telephone conference.

18         MR. STRETTON: Thanks for your courtesy. I

19 always appreciate it. I think she's answered my

20 questions. I didn't mean to grill the opposing counsel.

21 It's not my style. I apologize.

22         THE COURT: It's an unnumbered page, but

23 it's item 3 -- it's three pages from the end, item 3.

24 Plaintiff's counsel has suggested that Plaintiff would

25 be raising Fourth and First Amendment issues at trial.

1  I don't think so.  Those issues -- the only issue

2  remaining is what I've listed.  It has not been an

3  admitted complaint setting those forth, so there's no

4  First and Fourth Amendment issue in this case.

5         MR. BAILEY:  If I may speak to those

6  briefly, Your Honor, the reason that's put in there?

7         THE COURT:  Yes, sir.

8         MR. BAILEY:  The motion in limine was filed,

9  and due to my errors -- and incidentally, the Court was

10  in error when it thought I was criticizing its order.  I

11  was not.  I was criticizing my interpretation of your

12  order.  But with that being said, we had raised the

13  issue of the First and Fourth Amendments for the

14  following reasons:  The motion in limine, you had

15  responded that we were precluded from making any

16  retaliation claim based on the motion in limine.  We had

17  come back and asked for an opportunity to respond nunc

18  pro tunc, which was concurred in by opposing counsel,

19  and, of course, you denied that.  Now the issue that we

20  had wanted to raise are these First Amendment issues

21  where Nancy Suders had gone and complained about the --

22  to various officials, Virginia Smith Elliott, Mr.

23  Jubelirer, the governor's office, and they apparently

24  resulted in the BPR, which I guess we're not allowed

25  to -- which I suppose you'll ultimately rule that's

1    attorney work product.

2              But in any event, the Fourth Amendment is

3    another issue, Your Honor.  We had raised the Fourth

4    Amendment issue, and I was involved in a number of

5    different cases with you where you were doing a Gallo

6    interpretation, <u>Gallo v. Philadelphia</u>.  That eventually

7    was overturned, and we had a very cordial conference

8    call with another attorney on that issue, and I think

9    you came around to the Third Circuit's way of analyzing

10   it there.  But the point is that, I did not, for fear of

11   offending you at the time with the Fourth Amendment

12   issue, you had made clear that, unless there had been

13   some degree of an issue of seizure, incarceration, that

14   there was a Fourth Amendment claim there.  It is true

15   that the Fourth Amendment claim was not raised in the

16   appeal to the Supreme Court.  In fact, in the footnote

17   to the Supreme Court opinion, Justice Ginsburg notes

18   that the First and Fourth Amendment claims are not

19   before them.  Of course, in the Supreme Court, I was a

20   respondent.  Now, all I raise as an issue is, you know,

21   the -- whether you would consider -- we had raised the

22   Fourth Amendment claim based on that theft powder

23   incident which occurred, if you remember. Nancy was

24   forced to go back, take pictures.  She was interrogated.

25   I believe she was fingerprinted.  Incidentally --

```
1              THE COURT:  Is that on the retrieving her
2    test papers issue?
3              MR. BAILEY:  Yes, ma'am.
4              THE COURT:  Okay.
5              MR. BAILEY:  But it raises two very
6    important points there.  Incidentally, the Supreme Court
7    was in error where they noted -- I don't know whose
8    fault this was, or how it came about, or what they got
9    out of the record.  I'm not sure.  They had indicated
10   she had been handcuffed.  I want you to know, she was
11   not handcuffed.  She was not handcuffed.  But I don't
12   think that goes to the Gallo analysis anyway.  But I
13   wanted to ask, I mean, if you would consider, and I'm
14   sure Sarah, you know, that there should be a Fourth
15   Amendment claim there.  We only found out -- we only
16   learned at the LR 16.3 conference that the Defendants,
17   the previous Defendants, I'm sorry, had gone to the
18   District Attorney to try to get criminal charges against
19   Nancy because she found her test scores in a drawer.
20   And, you know, that's, you know, we think that's a
21   cogent retaliation and a cogent Fourth Amendment issue.
22   The District Attorney said, no.  He said he wasn't going
23   to do it.  But we found this letter.  We've never had a
24   chance to talk to the District Attorney.  It goes back
25   to this BPR stuff, which is claimed to be attorney work
```

1  product.  But it also goes to that Fourth Amendment

2  issue.  If the state police were filing Nancy's test

3  results in an unmarked drawer, I don't think anybody

4  disagrees with that, in the lady's bathroom with

5  lingerie, and then go to the -- then to use theft powder

6  and go to the District Attorney to try to get her

7  prosecuted, we think it raises, you know, cogent issues

8  that ought to be brought out.

9          And you may feel that we've waived those

10  issues in effect or they may not be properly before you,

11  but, you know, I think they were raised, and I think

12  they should be considered by the Court.  And I think

13  whether or not the government chose to appeal those

14  issues to the Supreme Court or whatnot, given your

15  rulings in Gallo at that time.  I had six or seven

16  Defendants in cases that did not go forward based on

17  people that I advised not to go forward based on that

18  ruling.

19          I think, in light of that, I would just ask

20  you to consider, out of a sense of loyalty to my

21  client -- it's not that I'm hopeful, I realize that.  I

22  have a duty, I think, to ask you to consider a

23  retaliation claim, which you already -- to let us, you

24  know, respond to that motion in limine, which you

25  denied.  With that being -- I understand you ruled

1    there, and I'm not trying to be argumentative or to

2    annoy you.  But on the Fourth Amendment, if you would

3    consider that.

4              THE COURT:  First of all, Mr. Bailey, you

5    don't need to ever worry about annoying me or getting me

6    upset, okay.

7              MR. BAILEY:  That's great to hear.

8              THE COURT:  I know how you feel.  And yet,

9    for the record, how many times do I grant you motions

10   for extension?  You know, my concern in any case is that

11   we try to conform to the rules so that the system can

12   operate proficiently.

13             MR. BAILEY:  Judge, as I said in my request

14   for you to recuse, you are a great judge, and I'll say

15   that on any public record --

16             THE COURT:  But you feel --

17             MR. BAILEY:  -- but you don't like me.

18             THE COURT:  Now that, sir -- Mr. Bailey, I

19   am not the type of person that goes around disliking

20   people.  If that were the case, I wouldn't be here.  A

21   person like that can't sit in this position.  I

22   sometimes get upset when you don't follow the rules, I

23   have to admit that.  But I do that with every attorney

24   who doesn't follow the rules.

25             MR. BAILEY:  Well, we have respectful

1    differences of opinion.    Thank you.

2              THE COURT:    May I have your response, Ms.

3    Yerger?

4              MS. YERGER:    Sure, Your Honor.    I have the

5    complaint before me, and I see nowhere in this complaint

6    where there's a Fourth Amendment claim whatsoever.

7    There's a partial First Amendment claim, which we then

8    -- so the Fourth Amendment claim, I never addressed in

9    summary judgment because I didn't see a claim.    He

10   didn't amend the complaint.    As far as I'm concerned,

11   there is no Fourth Amendment complaint in this case, and

12   I don't know how he could even suggest one given his

13   complaint and the fact that there is no amended

14   complaint.

15             MR. BAILEY:    In the addendum clause, I had

16   indicated, and such other relief as the Court deems

17   appropriate, based on research I had done and based on

18   what I had believed were affirmative duties by federal

19   district judges to look at claims or help to find

20   claims.    What I was expressing earlier was that, at the

21   time -- this is during a period of time we're working on

22   the Clevenger cases, and, you know, quite frankly, I

23   walk in daily fear of being sanctioned.    And I also

24   wondered if, you know, if I put that claim in there

25   without an incarceration or handcuffing, if I'm not

1    going to get sanctioned for it.  Lavery and whatnot,

2    those guys, always take that approach.  And that's the

3    reason why.  I'm just saying that the claim is there.

4    It was there.  The facts are very clear.  No one even

5    disagrees on the facts.  There is a Fourth Amendment

6    claim.  And I feel duty bound to my client to raise the

7    issue and respectfully ask if you might consider it.

8    That's all.

9            THE COURT:  What about the First Amendment?

10           MS. YERGER:  The First Amendment claim,

11   although that issue came up via the retaliation, you

12   ruled against that in summary judgment and found in the

13   Defendants' favor.  And that issue was never appealed.

14   Therefore, he waived any opportunity to raise the First

15   Amendment claim.  I did the motion in limine out of

16   concern that the First Amendment retaliation would come

17   up again.  Again, First Amendment shouldn't be an issue

18   either because he waived it.  He waived both of them.

19           THE COURT:  Now there are apparently some

20   objections to the Defendant's exhibits.  I haven't had a

21   chance to look at the motion.

22           MR. BAILEY:  These, Judge, I can summarize

23   these if you want.

24           THE COURT:  Well, 20, 21, and 22 are

25   interview notes of Nancy Suders.

1     MS. YERGER:  Those interview notes, I was

2 only going to use if -- mostly for the purposes of

3 impeachment.

4     THE COURT:  Impeachment of Ms. Suders

5 herself, right?

6     MS. YERGER:  Yes.

7     THE COURT:  Is that a problem?

8     MR. BAILEY:  I don't know when the notes --

9 where did they come from?  You pick things that you call

10 attorney work product from the BPR --

11     THE COURT:  Are these Ms. Suders' notes

12 themselves?

13     MS. YERGER:  No, they're the interview notes

14 from the, I believe, view panel members.  There were

15 three panel members that interviewed her.  The relevance

16 is limited.  It's only depending on what she says during

17 her --

18     THE COURT:  You're going to use somebody

19 else's notes to impeach her or were they interviews of

20 Ms. Suders herself?

21     MS. YERGER:  They were interviews of Ms.

22 Suders herself.

23     MR. STRETTON:  But not adopted by Ms. Suders

24 and not seen by her until recently.

25     MR. BAILEY:  There's a second -- that's

1   exactly right.  All of these things here violate Rule

2   26.  They were never disclosed.  We had no idea they

3   ever had them.  They showed up at the 16.3.  A lot of

4   them are phone interviews, which incidentally violate

5   the state police's own IAD requirements.  And we just

6   felt that we never had a chance to look at them,

7   cross-examine them, or anything else.  Apparently, these

8   were the -- if I may be mistaken, Sarah can help me --

9   these were notes, I think, that were put together during

10  the pre-hiring process, pre-hiring process.  We were

11  never made aware of this, didn't know they had them, or

12  anything.

13          MS. YERGER:  Just to respond to him.  He is

14  correct, I did not do a written disclosure about the BPR

15  and the documents attached to the BPR.  And the BPR

16  again is the attorney work product investigation that

17  was done.  I didn't do it because I didn't believe that

18  I needed to disclose attorney work product information.

19  And at the same time, Mr. Bailey never made any kind of

20  production request or interrogatory request to me about

21  any -- about the BPR, which he did know existed.

22          MR. BAILEY:  Well, that, I respectfully

23  disagree with.  We were told by counsel initially that

24  there was no BPR.  Then we were told that, if there was

25  a BPR, we didn't get it because it's attorney work

1    product.  But I would also like to be on the record to

2    objecting because the BPR is not attorney work product.

3    And I think Judge Dalzell, in a case, Weller v. Evanko,

4    in the Eastern District -- and I really want to be

5    careful.  I don't want to misrepresent the case to you,

6    Judge.  But I believe he spoke directly to that issue.

7    To my knowledge, the Pennsylvania State Police never

8    appealed his decision.  I realize it's not a Middle

9    District decision, however.

10          MS. YERGER:  We do, however, have a Middle

11   District decision deciding this by Judge Jones, and I

12   refer to it in my pretrial memo, in which he says,

13   attorney work product is not -- attorney work product

14   investigations do not have to be turned over, produced.

15          MR. BAILEY:  We don't disagree that attorney

16   work products don't have to be turned over.  That's not

17   the issue.  The state police go in, they take an officer

18   from the Pennsylvania State Police, use them to go out

19   and do Garrity warnings on people.  I just got a case

20   recently on admissions where a client of mine was

21   brought in, given Garrity warnings, and they questioned

22   him on the admissions that are in a district court case.

23   And as long as our judges keep letting this go on,

24   Plaintiffs are going to have a problem.  And we would

25   respectfully object that you can't use that state power

1    and badge of authority to do the attorney work product

2    when they have that employer control and badge of

3    authority over a Plaintiff or over a witness and what

4    they did in this case.  And I don't think Judge Jones is

5    saying that.  What he is saying is, if you have a bona

6    fide attorney work product, who can disagree that that

7    should not be discoverable?  I don't.  That's not the

8    issue.  That's not the way this is done.  They take this

9    thing and they do -- they do a -- they BPR.  They send

10   officers out.  They're in uniform.  If they're not in

11   uniform, they display a badge of authority.  They

12   investigate and talk to people.  They use all that state

13   power, they gather this information, they go back to the

14   state attorney in the civil case, in this case, the AG's

15   office operating under the Commonwealth Attorney's Act,

16   and they say, that's attorney work product.

17          Now my understanding is, and again, I don't

18   want to mislead this Court, because it's an important

19   issue, and I realize that.  I believe -- the only case I

20   know of that has ever spoken to the issue, Judge -- I

21   don't know of Judge Jones' decision.  I have to look

22   that up if it speaks to the IAD or BPR issue -- was

23   Judge Dalzell's rather extensive opinion, which I'm

24   almost certain was not appealed.  And that was a case of

25   Weller v. Evanko.

1          MS. YERGER:  If I may reply, Your Honor?

2   This whole discussion should have been done with you

3   during discovery.  He knew that a BPR existed.  And I

4   can point to deposition testimony where I said that the

5   BPR existed and I wasn't going to turn it over because

6   it's attorney work product.  At that point, he had an

7   obligation to file production requests, and he had an

8   obligation to set up a telephone conference with you or

9   do a motion to compel.  He did none of those things.

10  And now he's making an argument that he should have made

11  during that discovery period.

12          MR. BAILEY:  We argue as a Rule 26

13  obligation.

14          THE COURT:  All right.  Twenty-four, the

15  telephone reference check, what is that?

16          MS. YERGER:  Again, it was a pre-employment

17  background information check done for the purposes of

18  finding out Ms. Suders' listed references, and then

19  those references were called.  The reason --

20          THE COURT:  What's the relevance of that?

21          MS. YERGER:  Because many of the people that

22  she has listed as references, she also has listed --

23  many of the people that are in these documents, she also

24  has those people listed as witnesses.  And I wanted to

25  be able to question them about that, if it's different.

1    The reference check list basically doesn't give very

2    good references for Ms. Suders.  If those people come

3    into trial and say something different, I wanted to be

4    able to use it for the purpose of --

5              THE COURT:  Impeachment?

6              MS. YERGER:  -- impeachment.

7              MR. BAILEY:  Your Honor, we weren't -- I'm

8    sorry.  We weren't using those witnesses -- I mean,

9    they're being used in a different way.  The issue that

10   we had a concern about with some of those witnesses were

11   things that they had done either in the IAD

12   investigation or what they had witnessed at the station;

13   quite frankly, for that purpose, their personal opinion

14   of Nancy Suders.  We have a relevancy problem with it,

15   too, because the issue is the conduct, just as we do

16   with the issue of how competent or incompetent her

17   employment may have been.  I mean, we can produce people

18   to say that, too.  Our objection was on those grounds.

19   We hadn't seen them before.  If I understand this, these

20   things, they were phone interviews where the officer, an

21   officer would call up and question these people about

22   her.  So, I mean, it's hearsay -- if the person is a

23   witness, I understand that issue, but these telephone

24   reference check forms --

25              THE COURT:  I think she said she was going

1    to use them only if a person testified.

2              MR. BAILEY:  Oh, okay.  I didn't know that.

3              THE COURT:  But I'm still concerned about

4    the relevance.  So somebody interviewed her and maybe

5    there was a bad interview or what?

6              MS. YERGER:  Well, here's an example.  On

7    their witness list, they have listed Sheriff Pittman.

8              THE COURT:  Okay.

9              MS. YERGER:  Sheriff Pittman is one of the

10   people that was called for a reference.  And Sheriff

11   Pittman -- if Sheriff Pittman gets up and says that she

12   was a great employee for him, because she worked for him

13   before going to the state police, and that she would

14   have made a great PCO, then I would have a problem with

15   that, because he told, in this report, he told -- he

16   said something different to PSP officials.

17             MR. STRETTON:  Sheriff Pittman, as I

18   understand it, wouldn't be called -- certainly, we're

19   not going to call people as character witnesses,

20   obviously, on Nancy Suders.  But it's my understanding,

21   Sheriff Pittman actually observed some of the alleged

22   misconduct.

23             THE COURT:  That's what you're going to use

24   him for?

25             MR. STRETTON:  That would be the only

1    purpose.  I'm not going to put people on and say, I

2    highly recommend her, she was the best thing since

3    sliced bread or something of that nature.  There's

4    probably no issue here, because if I call any of those

5    -- some of these other witnesses like Pittman, I will be

6    very specific about if he saw something that's relevant

7    to the sexual harassment, period.  And it's not going to

8    be that she was a wonderful employee for me for 10 years

9    or for anything of that nature.

10                THE COURT:  Twenty-five, background

11   verification report.

12                MS. YERGER:  It's the same as the telephone

13   verification.  It just compiles information that was

14   received on the telephone report.

15                THE COURT:  Before you use any of those, if

16   I don't preclude them ahead of time, I want a sidebar

17   before you produce them.

18                MS. YERGER:  Okay.

19                THE COURT:  Thirty-one.

20                MR. BAILEY:  You mean 31, Judge?  Did you

21   say 31?

22                THE COURT:  Thirty-one.

23                MS. YERGER:  Thirty-one is a letter to the

24   sergeant of the station from the district attorney

25   stating that charges were -- are not going to be filed

1   against Ms. Suders for any kind of theft.  Again, the

2   district attorney is on their witness list, and it would

3   be dependent on what he said, if it was anything

4   different than that letter that he sent to Sergeant

5   Easton.

6           THE COURT:  I think everybody apparently

7   agrees that he refused to bring -- to pursue any

8   charges.

9           MS. YERGER:  Except that letter suggests

10  that he thinks charges could have been brought.

11          MR. STRETTON:  Well, at this point,

12  obviously, if I call the district attorney, and he

13  says -- and I elicit X, then I think it's fair game for

14  her to bring 31 in, but I don't think I'm going to be

15  that stupid to do that.  But at this point, I don't

16  think you have to make a ruling on it.  If I'm going to

17  do something or if she's going to do something, we'll

18  see you at sidebar at the appropriate time, but I don't

19  intend to open any door on that issue.

20          THE COURT:  All right.  I'll make my ruling

21  then.  33 and 34.  33 are photographs as well as 34.

22  Photographs from Degeneration X?  That almost sounds

23  like a movie.  What is Degeneration X?

24          MS. YERGER:  Those are photographs that Mr.

25  Bailey provided to me on my production request.

1          THE COURT:  What's Degeneration X?

2          MS. YERGER:  I think it's a wrestling --

3    it's something to do with wrestling.

4          MR. BAILEY:  Your Honor, Nancy had testified

5    -- and again --

6          THE COURT:  I know where you're coming from.

7    I got it.  Okay.

8          MR. BAILEY:  Judge, in fairness to Sarah,

9    because I think I may have misled you, and I didn't mean

10   to.  I don't believe they are the actual photographs

11   that were appended to the wall.  I think I --

12          THE COURT:  Is that --

13          MR. BAILEY:  I think I misled them.  I am

14   sorry.

15          THE COURT:  Well, what is your objection to

16   33 and 34?

17          MR. BAILEY:  Yes, ma'am.  These were

18   photographs that were offered to us for the first time

19   that Sarah provided to us.  Am I mistaken, Sarah?  You

20   provided photographs or maybe I made --

21          MS. YERGER:  Photographs of the barracks,

22   the bathroom.  I just took the photographs because I

23   wanted to use them for trial.

24          THE COURT:  So these are photographs of the

25   barracks?

1          MS. YERGER:  Yes.

2          THE COURT:  Not photographs that allegedly

3    were pinned up somewhere?

4          MS. YERGER:  No.

5          MR. BAILEY:  Well, the trouble with that is,

6    we don't know when they were taken.  We never had any

7    opportunity to participate in either the taking of them

8    or when they were taken for what purpose and we should

9    have been notified and should have been told about that.

10          THE COURT:  What's the purpose of it?

11          MS. YERGER:  The purpose of the photographs

12    of the women's locker room, this whole issue of her

13    going into the locker room and whose locker -- whose

14    locker was responsible for what, that issue will be at

15    the trial because she's claiming she went into an

16    unmarked drawer to get stuff out, and that's not what --

17    we're saying that the drawer was marked and she took out

18    stuff that wasn't hers.  And that's the whole reason why

19    the theft detection powder was sprinkled in the first

20    place.  These photographs just give a snapshot.  And

21    then I would have my witnesses basically show that the

22    photographs are accurate representations of what that

23    bathroom looked like, so the jury can get a picture in

24    their mind of what we're referring to.

25          THE COURT:  Who took the pictures?

1          MS. YERGER:  Someone at the McConnellsburg

2    barracks.

3          MR. STRETTON:  When were they taken though,

4    because the incident happened in '98, I believe?  Were

5    they taken in '98 or were they taken --

6          MS. YERGER:  No, they were just taken, and

7    my witness would basically say that that bathroom -- the

8    bathroom has not changed since 1998.

9          THE COURT:  Have they seen the photographs?

10         MS. YERGER:  Yes.  The witnesses?  Yes.

11         THE COURT:  No, have you folks seen them?

12         MS. YERGER:  Yes, I turned them over.

13         MR. BAILEY:  They were produced at the 16.3.

14   I would like to, in fairness to Sarah, I think she had

15   indicated to you that -- I don't think they will offer

16   testimony that the drawers were marked.

17         MS. YERGER:  Yes, I will.

18         MR. BAILEY:  Well, it's my understanding the

19   testimony was that they had allegedly been designated

20   for people.  But be that as it may, these photographs,

21   you know, we could have been consulted.  We could have

22   had an opportunity to go out and participate in that or

23   take different pictures in different ways maybe, but,

24   you know, they're so far years later.  And then to come

25   in to use the photograph of somebody that's going to

1    say, well, it's the same, we object to that.  I mean,

2    that's something they could have done also during the

3    period of time that we were in discovery or working on

4    that issue at a more contemporary time.  And there's

5    another thing.  It's just a little -- there were

6    designated drawers in filing cabinets that weren't in

7    this bathroom which also had a bed in it.  But the --

8    and those photographs, and I don't know how those

9    photographs were that clear to that.  Is there a bed in

10   those photographs?

11            MS. YERGER:  Yes.

12            MR. BAILEY:  There is.  I don't remember

13   seeing it.  In fairness to her, I don't remember seeing

14   that.  But anyway, there were other drawers that were in

15   filing cabinets that were -- that people had their

16   filing cabinet drawers, which is where Nancy's papers

17   were supposed to be.

18            THE COURT:  Not in the bathroom though?

19            MR. BAILEY:  Yes, ma'am, in the bathroom.

20            THE COURT:  The file cabinets were in the

21   bathroom?

22            MR. BAILEY:  No, ma'am, they were not in the

23   bathroom.  And people did have marked and designated

24   drawers for their own personal stuff in portions of

25   these filing cabinet drawers.  You know, I don't know

1 how relevant those issues are anyway to the allegations

2 of the sexual misconduct. They may be, I understand,

3 probative of a constructive discharge issue. I would

4 assume that's why Sarah is bringing it up.

5         THE COURT: Why do you want the pictures?

6         MS. YERGER: I think the pictures will help

7 the jury understand what the bathroom looked like. Ms.

8 Suders is probably going to testify that she went into

9 the bathroom, the whole incident with her hands becoming

10 blue in the bathroom and the blue all over the bathroom,

11 not to mention the fact that there's a suggestion that

12 there's something sexual about a bed being in the

13 bathroom, there's a suggestion that there's something

14 sexual about things that were in the drawers, and I

15 think the jury is entitled to see what that bathroom

16 looked like and the fact that they were dresser drawers

17 that were used for also filing. And my witness will

18 testify to that, that they put certain personal items in

19 there, but they also store some work papers in there,

20 that they didn't have any other location throughout the

21 barracks to do that. And it's just an opportunity for

22 the jury to see this room that we're going to be talking

23 about over and over in the trial.

24         THE COURT: What's the time span between the

25 time of this incident and the time of the pictures?

1        MR. STRETTON:  Seven years.

2        MS. YERGER:  It is seven years.  And that

3   would have to go to, you know, me laying a foundation

4   with my witnesses about whether that bathroom looks the

5   same or not.  There's also, I might add, there's also

6   pictures of the communications area where Ms. Suders

7   worked, the communications desk, the computer, and the

8   surrounding area, because some of the allegations have

9   to do with where the sexual harassment took place, the

10  incidents of alleged harassment took place.  And again,

11  those pictures are for the same purpose, for the jury to

12  have a picture in their mind of where she sat and what

13  it looked like from her perspective.

14        THE COURT:  You mean to tell me, in seven

15  years, nothing about that has changed?

16        MS. YERGER:  About those two rooms.  Those

17  are the only two rooms I offered pictures of.  There has

18  been a change to the barracks.  They added another part.

19  I didn't take pictures of that section.  I just took

20  pictures of the two rooms that have not changed.  And in

21  laying the foundation, I will have my witnesses testify

22  about, if anything has changed.  And one witness will

23  say that there is a computer -- there's not a computer

24  where there used to be one.  They used to have two

25  computers.  And that's the only change to that desk

1    area.

2            MR. BAILEY:  That's not the bathroom, that's

3    out in the --

4            MS. YERGER:  Right, that's the

5    communications area.

6            THE COURT:  Any other objections?

7            MR. STRETTON:  No, Your Honor.

8            MS. YERGER:  Your Honor, I forgot to object

9    to one of their exhibits, and I apologize.  I hadn't

10   marked it.  They have magazines, wrestling magazines

11   listed.  I'm trying to find where it is.  Exhibit 27,

12   wrestling magazines.  They've never turned those over.

13   They showed them to me briefly at the attorneys

14   conference, but I haven't really had the opportunity --

15   they never gave me even black and white copies when they

16   did give me the rest of the documents, so I haven't

17   really had an opportunity, and plus I'm not sure of the

18   relevance.

19           MR. BAILEY:  The reason for the pictures is

20   that, and the pictures and the magazines, was that Mr.

21   Baker copied this move from these magazines and these

22   pictures.  And I think we can demonstrate that.  To the

23   extent that showing somebody how he would do this, this

24   thing, and then make this, it came off of TV and it was

25   sort of a cult, and he was a super big fan, which I

1    think he admits, of the TV wrestling kind of thing.  And

2    that's the reason for the photographs, to show the jury

3    physically -- I mean, I don't see how he can, you know,

4    have Nancy get out there and demonstrate the move or

5    have him get out to demonstrate what it is and how it

6    looks, but those pictures show that.  That was our

7    reason for that.  I realize -- I mean, I understand --

8                    MS. YERGER:  I'm going to withdraw the

9    objection.  1 just want a copy of that.

10                   THE COURT:  Okay.

11                   MR. STRETTON:  Sure.  May I just ask, you

12   don't have a copy of our exhibits?

13                   MS. YERGER:  Of that particular exhibit.  It

14   was just magazines.

15                   MR. STRETTON:  Do you want me to get you a

16   complete copy of every exhibit?

17                   MS. YERGER:  No, just that one.

18                   THE COURT:  My concern is, making another

19   copy on that copy is not going to be good production.

20                   MR. BAILEY:  I understand.  Yes, ma'am.

21                   THE COURT:  See if you can get the magazine.

22   Do you have the magazine?

23                   MR. BAILEY:  We have the magazines and the

24   pictures, and they're color, and I can -- yeah, let me

25   get those.

1          MS. YERGER:  But I guess only the pictures

2    that are listed are the pictures that -- they're not

3    going to have somebody flipping through a magazine?

4    That was my question.

5          MR. STRETTON:  No.

6          THE COURT:  Whatever he has there is what

7    you'll get.  Plaintiff's voir dire.  On number 9, I

8    think it needs to be rephrased.

9          MR. STRETTON:  I agree, looking at it.

10         THE COURT:  I think what you need to do is,

11   if you find from the evidence that she is entitled to

12   recover, is there anyone who could not fairly and

13   adequately render a decision or grant damages or

14   something to that effect?  So rephrase that.

15         MR. STRETTON:  I'll have that rephrased for

16   the Court.

17         THE COURT:  Okay.  Number 10, my only

18   concern about that is that, unless they know what

19   punitive damages are, they might have difficulty

20   answering the question.

21         MS. YERGER:  Actually, my problem with that

22   is, it's a Title 7 case, and there is no punitive in

23   Title 7 cases.

24         MR. STRETTON:  So that's the end of that

25   one.

1    THE COURT:  Numbers 11 and 12, I will, when

2  I introduce the parties, will introduce the attorneys

3  and follow through with the question about prior contact

4  with either the firm or the Attorney General's Office.

5  So I'll cover that.

6    MR. STRETTON:  Your Honor does the voir dire

7  questioning.  We don't do any, is that right?

8    THE COURT:  What?

9    MR. STRETTON:  You do all the voir dire.

10    THE COURT:  No, only in criminal cases I do

11  all the voir dire.  The only reason I request these

12  ahead of time is so you don't get up there and ask a

13  question that might present a problem.  But you will do

14  the voir dire.  I will introduce the case, introduce the

15  parties, introduce the attorneys, and ask whether

16  there's any relationship and so forth, and then I'll

17  turn it over.  You'll be the first one.

18    MS. YERGER:  You'll remain in the courtroom?

19    THE COURT:  Absolutely.

20    MR. STRETTON:  I guess I forgot.  The last

21  case I tried was that old criminal case in front of you.

22  I had forgotten.

23    THE COURT:  Yeah.  I didn't have anything

24  further.  In Defendant's voir dire, number 7 needs to be

25  rephrased.

1    MS. YERGER:  What do you have a problem

2  with?

3              THE COURT:  Let me see.

4              MR. STRETTON:  I object to numbers 7 and 8

5  in my notes here.

6              THE COURT:  They could be rephrased.  I

7  think it said that, does the mere fact that a person has

8  filed a lawsuit -- do you believe, by the mere fact that

9  a lawsuit has been filed, means that the person is

10  entitled to relief?  I have a problem with that.

11              MS. YERGER:  Okay.

12              THE COURT:  Number 18.

13              MR. STRETTON:  We were objecting to it.

14              THE COURT:  Yeah.  That's too broad for them

15  to answer.  I'm declining that.  Number 20.

16              MR. STRETTON:  I would object to that.  I

17  think it's getting too deep.

18              THE COURT:  I know, I know.

19              MS. YERGER:  Okay.  I'm fine.

20              MR. STRETTON:  So 20 is out and 18 is out?

21              THE COURT:  Yes.

22              MR. STRETTON:  Thank you.  And 21 --

23              THE COURT:  Hold on.  I have that one, too,

24  but let me read it.  Yeah, I'm refusing 21.  Number 22

25  will be answered by the jurors themselves.  There is a

1   questionnaire before you begin your voir dire -- by the

2   way, I should indicate this, there's a questionnaire.

3   It's about six questions on it, the last question being,

4   have you ever served on a jury before?  And depending on

5   the answer, I will follow through.  The basic

6   questionnaire asks number of people in the household,

7   spouse's employment, if retired, how they were employed

8   before retirement, extent of their education, and then

9   service on a jury.  And I will follow through on

10  responses to those questions, and then I'll turn it over

11  to voir dire.  So, in essence, 22 is covered.  I'm

12  declining 24.  They will get instructions in the case of

13  the procedure that is followed and that they have to

14  keep an open mind until they've heard all of the

15  evidence.  On 25, I will try to remember to advise them

16  that this trial is likely to start the afternoon of

17  March 14, and possibly go into the following week.  And

18  the only -- the only question I will ask them is whether

19  they have any prepaid vacation, any medical appointments

20  which cannot be altered.  That would be the only thing

21  that I would permit them to be excused for, because by

22  that time, they should already have had their excuses

23  presented to me for employment purposes or otherwise.

24  Number 26 is, no.  It may be a follow question if

25  somebody maybe gives a response that may perhaps

1   indicate a personal attitude, I will follow through with

2   it.

3             MS. YERGER:  Okay.

4             THE COURT:  The issue here is whether you

5   can hear the evidence putting aside any personal

6   feelings and render a fair and impartial verdict.  But

7   this question is going to depend on an answer, number

8   26.  Twenty-seven again involves the charge.  It's a

9   difficult question to ask in the void.  First of all, an

10  individual won't know whether they disagree with the

11  charge.

12            MS. YERGER:  Until he hears the charge.

13            THE COURT:  Secondly, they're told, whether

14  they disagree with it or not, they have to follow it.

15  But I see some relevance, you know, even if you're told

16  that you cannot -- that you must apply the law even

17  though you personally disagreed with it.  You can ask

18  it.  The question is, it's in a void.  I don't know how

19  they can say, well, gee, I don't know what I would

20  disagree with, so I don't know whether or not I would

21  follow the instruction.

22            MS. YERGER:  That was a question that I

23  asked at another trial, in another sex trial, and it was

24  asked sort of at the end as a follow-up to other

25  questions that had been asked.  And an individual

1   basically said that he would have a problem because he

2   doesn't like the sexual harassment laws.  And they will

3   know at that point what those laws are.  And it became

4   clear that, that should be someone who should be

5   striked.

6              THE COURT:  You can give it a go.  See what

7   happens.

8              MS. YERGER:  Thank you.

9              THE COURT:  All right.  Mr. Stretton, do you

10  have any other objections?

11             MR. STRETTON:  No, Your Honor.  We're

12  picking an 8 person or a 12 person jury?

13             THE COURT:  Eight, with the understanding,

14  we can lose two and go with six.  We have a built-in two

15  alternates, but they will be full jurors if they're

16  still there at the end of the case.

17             MR. STRETTON:  It's a unanimous verdict

18  or --

19             THE COURT:  Unanimous with that short number

20  of people.

21             MR. STRETTON:  If I recall, it's three

22  strikes?

23             THE COURT:  Correct.

24             MR. STRETTON:  I always get confused with

25  the state system.

1          MS. YERGER:  After we pick the jury, will we

2     do our openings that afternoon?

3          THE COURT:  We're going to try.  A lot is

4     going to depend -- now, I will have to give a

5     preliminary instruction before you give your opening.

6     Anything else?

7          MS. YERGER:  I don't know if you usually

8     will do an order after this, but 1 was just wondering

9     about when special verdict questions and jury

10    instructions --

11         THE COURT:  Actually, the sooner the better.

12    I know sometimes it's difficult to do that, but it gives

13    us a chance to get a charge, draft it, and present it to

14    you, so that you can review it.  And it makes our charge

15    conference go a lot faster if you know what's being

16    done.  So as soon as you can get those to us, it would

17    be helpful.  I know my case management order, I think,

18    indicates at the pretrial conference, but the local

19    rules say, after the Plaintiff presents its case, but

20    that's too short for us.  Some cases can go too rapidly.

21    Anything else?

22         MR. BAILEY:  Your Honor, I have one other

23    thing.  Because of my concerns about this issue

24    pertaining to the OIG report, Kroll report, Mr. Stretton

25    is very kind in putting up with me in these situations,

1    but I will probably beseech him to put into the opening

2    a reference to -- and I don't want to spring this as a

3    surprise, if he decides to agree with me -- but a

4    reference to this state police policy and their

5    noncompliance with it and the admissions against

6    interest which the state government has exhibited.  I

7    will -- again, because I don't want to sound like I'm,

8    you know, being annoying and whatnot, if we have --

9              THE COURT:  Wait a minute, wait a minute,

10   wait a minute.  You used the term IG report.

11             MR. BAILEY:  Yes.

12             THE COURT:  I need to know which report is

13   which.  We have the BPR report.  We have a Kroll report.

14   We have an IG report.  Are they all three different

15   reports?

16             MS. YERGER:  Yes.

17             MR. BAILEY:  Ma'am, yes.  The IG report, we

18   discovered, I believe, after -- no, the IG report was a

19   report that we discovered just before the Supreme Court

20   argument which I lodged with the Supreme Court.  I

21   believe it's fair to say that, in my mind, when I looked

22   at these two reports, the Kroll report was then

23   commissioned by the governor, came along, worked off of

24   that IG report, I believe, did some of their own things.

25   And I may be mistaken about this.  All I want to raise

1  is this:  I'd like -- and understanding, I mean, I'll

2  talk to Mr. Stretton about that.  If he agrees that

3  issue can be raised, you know, I'll endeavor.  I know

4  I'm going to respond to the pretrial order to note out

5  the sections that we were referring to and inform her

6  and inform you whatnot of the portions in that report

7  and whatnot.  But I'm saying, are we precluded -- if

8  we're going to use something like that in the opening or

9  want to, I don't want to run afoul of you or, you

10  know -- I want to try to convince Mr. Stretton to do

11  that.  He's shaking his head here.

12              MS. YERGER:  I would ask the Court to make a

13  ruling.

14              MR. BAILEY:  We'll bring it to your

15  attention first.  That's what I'm saying.

16              MR. STRETTON:  I guess it's my understanding

17  that, in my opening, I'm not to mention it.  I'm going

18  to submit to you sometime today and to her --

19              THE COURT:  Both.

20              MR. STRETTON:  -- the areas that I would

21  like to use in terms of rebuttal, but I would not

22  reference those in my opening unless and until -- well,

23  if at all --

24              MS. YERGER:  I'm going to object, you can

25  believe that, no matter what you do.

1         MR. STRETTON:  I would not reference it in

2  my opening, and then if and when it becomes relevant on

3  rebuttal, and assuming you have indicated that you'll

4  consider it, depending on the evidence as it develops,

5  we'll go to sidebar, and then you will call the balls

6  and strikes and resolve it.  And the jury won't know

7  unless you say we can present it.  But it would seem to

8  me, based on your ruling this morning, that it would be

9  premature to go in the opening.  If, for some reason I

10 can come up with a brain storm, I think it would be

11 relevant in my opening, I would file a brief motion in

12 advance and ask you to consider that.  But I wouldn't

13 say it without you giving me permission to.  I don't

14 like mistrials in Plaintiff's cases.

15        THE COURT:  Anything else?  Yes, Mr. Bailey.

16        MR. BAILEY:  Lastly, I would like permission

17 to acquire copies of those reports.  I believe they

18 should be brought to the Court's attention, and I'm sure

19 you would have an interest in them because they affect

20 what we have already been told is going to be presented

21 to a jury, an affirmative defense where this is

22 particularly probative, and I know you would never want

23 your courtroom to be used to present information to a

24 jury that does not comply with state law.  So I just ask

25 for permission on the record here to provide the Court

1    with copies of those reports just because of the value

2    that's in them.

3                MS. YERGER:  My response is that, they are

4    attorney work product, and he's not entitled to the

5    investigation report.

6                MR. BAILEY:  Well, you had asked originally,

7    Judge, in fairness to you, I realize, and I apologize

8    about the different reports.  There's the IG report.  I

9    don't think she's objecting to that, if I heard her

10   correctly.

11               MS. YERGER:  That isn't on your exhibit

12   list.

13               MR. BAILEY:  No, I want to give it to the

14   Court.  I think the judge should be able to be informed

15   on the law and the facts if she's going to make rulings.

16   And this is not to give to the jury.  I'd like to

17   provide it to the Court.  You don't object to that, I

18   don't think?

19               MS. YERGER:  I'm not going to object if you

20   want to review them.

21               MR. BAILEY:  And the Kroll report.  The

22   issue to the BPR, Your Honor, is separate, and that was

23   the issue of whether or not it's an attorney work

24   product, and I don't think you did rule on that.  That's

25   what we objected to because we never had a chance to see

1    that.

2                   THE COURT:  Anything else?

3                   MR. STRETTON:  Just one -- I just want to

4    make sure.  You're withdrawing your letter then asking

5    the judge to recuse herself?

6                   MR. BAILEY:  I didn't withdraw the letter.

7                   MR. STRETTON:  I thought you did.

8                   THE COURT:  There's no motion.  It's a

9    letter.

10                   MR. BAILEY:  It's a letter, and I did it out

11   of courtesy to Judge Rambo.  I made that very clear in

12   the letter.  She can consider it, for what it is worth.

13   And I discussed that with Sarah.  And I discussed it

14   with you.  And, you know, I don't know whether, if you

15   would want me to do a formal motion, I'll certainly do

16   one.  I'm going to consider that, obviously, because

17   you're not responding to that.

18                   THE COURT:  You have to do what you think

19   you need to do.

20                   MR. BAILEY:  Yes, ma'am.

21                   MR. STRETTON:  Why don't we resolve this

22   issue right now.  Based on the judge's rulings, why

23   don't we just leave that aside and just try this case?

24                   MR. BAILEY:  I will make my decision based

25   upon what I think best, Your Honor, for my client.  I

1   highly respect Mr. Stretton.  I certainly take his

2   advice.  But this has got to be -- I've got to talk with

3   Nancy about it.  I talked with Nancy before I submitted

4   the letter.

5          MR. STRETTON:  I think we covered everything

6   I can think of.  And thank you, Your Honor.  Have a good

7   day.

8          (Whereupon, the proceeding adjourned at

9           10:20 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the within proceedings, and that this copy is a correct transcript of the same.


_____
Wendy C. Yinger, RPR
U.S. Official Court Reporter
(717) 440-1535


The foregoing certification of this transcript does not apply to any reproduction by any means unless under the direct control and/or supervision of the certifying reporter.